# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| PLUMBERS, PIPEFITTERS AND APPRENTICES LOCAL NO. 112, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> VESTIS CORPORATION, ARAMARK, KIMBERLY SCOTT, RICK DILLON, and JOHN J. ZILLMER, <br><br> Defendants. | No. 1:24-cv-02175-SDG <br><br> **LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT** |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ....................................................................1

II.   STATEMENT OF FACTS ...........................................................................10

    A.    Defendants Lay The Groundwork That Vestis Is A Strong, Standalone Business That Will Thrive Post-Spinoff...........................10

    B.    Just Prior To The Spinoff, Defendants Repeatedly And Falsely Tout Vestis' Customer Retention Rate, Its "Excellent" Service, And Its Optimal Logistics Systems.....................................................12

    C.    Post-Spinoff, Aramark Pocketed $1.5 Billion And Defendants Continued To Falsely Tout Vestis' Over 90% Customer Retention Rate And "Service Excellence Culture Across The Company"..................................................................................................14

    D.    Vestis Reports Disappointing Results In Its First Quarter As A Standalone Entity—Which It Falsely Attributes To Economic Factors Outside Of Its Control ...........................................................16

    E.    Defendants Admit That, Even Before The Spinoff, Vestis Suffered Significant Customer Losses And Severe "Service Gaps" That Rendered It Unable To Perform Even The Most Basic Tasks Of A Uniforms Company ...............................................18

    F.    Former Vestis Employees And Internal Company Reports Confirm Vestis Was Plagued By Service Failures And "Bleeding Customers" Prior To And During The Class Period .........22

III.   ARGUMENT ...............................................................................................25

    A.    Legal Standards .................................................................................25

    B.    The Amended Complaint Adequately Pleads Material Misstatements And Omissions ........................................................25

        1.    This Is Not A "Pure Omissions" Case .....................................26

        2.    Defendants' Statements Touting Vestis' "Service Excellence" And "Ability To Deliver On Time" Were False .........................................................................................27

        3.    Defendants Falsely Claimed Vestis Had "Fully" And "Successfully" Deployed Critical Inventory Management Systems, Including Industry-Standard Telematics....................31

        4.    During The Class Period, Defendants Materially Misrepresented, And Deliberately Concealed, The Fact

That Vestis' Dismal Service Failures Had Resulted In The Loss Of Numerous "Long-Term" Customers ...........................34

5.　Defendants' Statements That Vestis "Maintained" "Long-Term" Customer Relationships, With A Customer Retention Rate "In Excess Of 90%," Were Materially False ...............................................................................................35

6.　Rather Than "Tak[ing] Price," In Reality, Defendants Were Dramatically Discounting................................................44

7.　Defendants' Statements Are Not Shielded By The PSLRA Safe Harbor .........................................................45

8.　Defendants' Statements Are Not Inactionable Opinion...........48

C.　The Amended Complaint Raises A Strong And Compelling Inference Of Scienter.....................................................................49

1.　Defendants' Own Admissions Support Scienter.......................50

2.　The Individual Defendants' Specific, Regular Public Remarks To Investors Support Scienter.................................53

3.　The FEs And Internal Vestis Reports Support Scienter............55

4.　Analysts' Reaction To Defendants' Misrepresentations Supports Scienter ....................................................................61

5.　Top Executive Departures Support Scienter.............................63

6.　The Vestis Defendants' Lack of Insider Stock Sales Does Not Negate Scienter .................................................................65

D.　The Complaint Alleges The Aramark Defendants' Scienter ...............66

E.　The Aramark Defendants Are Responsible for the Information Statement ...................................................................................70

F.　Plaintiffs Have Standing To Sue The Aramark Defendants................71

G.　All Defendants Are Liable For Scheme Liability .............................73

IV.　THE AC ADEQUATELY PLEADS CONTROL PERSON LIABILITY.....75

V.　CONCLUSION.................................................................................75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Alaska v. Ryder Sys., Inc.*,
603 F. Supp. 3d 1229 (S.D Fla. 2022) ....................................................... 48, 75

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ..............................................................60

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) ..........................................................................73

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*,
2025 WL 897540 (N.D. Ga. Mar. 24, 2025)................................................. *passim*

*Burbidge v. Adtran, Inc.*,
2021 WL 2555690 (N.D. Ala. Mar. 31, 2021)......................................................59

*Bush v. Blink Charging Co.*,
2023 WL 8263037 (S.D. Fla. Nov. 27, 2023)......................................................28

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
56 F. Supp. 3d 549 (S.D.N.Y. 2014) ...................................................................70

*City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*,
649 F. Supp. 3d 1256 (S.D. Fla. 2023) ...............................................................53

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)......................................................61

*City of Sunrise Gen. Employees' Ret. Plan v. Fleetcor Techs., Inc.*,
2018 WL 4293143 (N.D. Ga. May 15, 2018)................................... 54, 55, 57, 59

*City of Warren General Emps. Ret. Sys. v. Teleperformance, SE*,
2024 WL 2320209 (S.D. Fla. May 22, 2024) ............................................... 54, 67

*City Pension Fund for Firefighters and Police Officers in City of
Miami Beach v. Aracruz Cellulose*,
41 F. Supp. 3d 1369 (S.D. Fla. 2011)..................................................................63

*Damian v. Montgomery Cnty. Bankshares, Inc.*,
   255 F. Supp. 3d 1265 (N.D. Ga. 2015) ....................................................61

*Edge v. Tupperware Brands Corp.*,
   2023 WL 6310236 (M.D. Fla. Sept. 28, 2023) ............................................ *passim*

*FindWhat Investor Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ..................................................... 27, 44

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ...................................................................57

*Gnanaraj v. Lilium N.V.*,
   2024 WL 3916758 (S.D. Fla. Aug. 23, 2024) ...............................................75

*Henningsen v. ADT Corp.*,
   161 F. Supp. 3d 1161, (S.D. Fla. 2015) ....................................................42

*Higginbottom v. Baxter Int'l.*,
   495 F.3d 753 (7th Cir. 2007) .................................................................41

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   2009 WL 3261941 (S.D. Fla. May 12, 2009) ............................................ 57, 59

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   625 F. Supp. 2d 1267 (S.D. Fla. 2008) .....................................................57

*IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
   660 F. App'x 850 (11th Cir. 2016) ..........................................................74

*In re BellSouth Corp. Sec. Litig.*,
   355 F. Supp. 2d 1350 (N.D. Ga. 2005) .....................................................25

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017) ...............................................58

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010) ....................................................60

*In re Carter's, Inc. Sec. Litig.*,
   2012 WL 3715241 (N.D. Ga. Aug. 28, 2012) ..............................................50

*In re Catalina Mktg. Corp. Sec. Litig.*,
390 F. Supp. 2d 1110 (M.D. Fla. 2005) ...............................................................51

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) .................................................................41

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020) ...........................................................74

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)...............................................................57

*In re Equifax Inc. Sec. Litig.*,
*357* F. Supp. 3d 1189 (N.D. Ga. 2019) ........................................... 28, 31, 59, 61

*In re FibroGen, Inc. Sec. Litig.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022).....................................................62

*In re FirstEnergy Corp.*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022) .......................................................65

*In re Floor & Decor Holdings, Inc. Sec. Litig.*,
2020 WL 13543880 (N.D. Ga. Sept. 21, 2020) ..................................................61

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ................................. 46, 55, 58, 69

*In re Friedman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005) ...............................................................25

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
2023 WL 2072227 (D. Del. Feb. 17, 2023) ........................................................60

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ......................................................... 46, 58

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010) ...............................................................65

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
2016 WL 10592320 (S.D. Fla. June 6, 2016) ............................................... 65, 71

v

*In re Immucor, Inc. Sec. Litig.*,
2011 WL 2619092 (N.D. Ga. June 30, 2011) .......................................................30

*In re Jiangbo Pharms. Inc., Sec. Litig.*,
884 F. Supp. 2d 1243 (S.D. Fla. 2012) ...............................................................64

*In re Paincare Holdings Sec. Litig.*,
541 F. Supp. 2d 1283 (M.D. Fla. 2008) ....................................................... 49, 57

*In re Physician Corp. of America Sec. Litig.*,
50 F. Supp. 2d 1304 (S.D. Fla. 1999) .................................................................47

*In re Ply Gem Holdings, Inc.*,
2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016) ....................................................39

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)......................................................64

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) .................................................................................62

*In re TECO Energy, Inc. Sec. Litig.*,
2006 WL 845161 (M.D. Fla. 2006) .....................................................................25

*In re Towne Servs., Inc. Sec. Litig.*,
184 F. Supp. 2d 1308 (N.D. Ga. 2001) ........................................... 38, 39, 46, 55

*In re Tupperware Brands Corp. Sec. Litig.*,
2023 WL 5091802 (11th Cir. Aug. 8, 2023) .......................................................58

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.*
*Liab. Litig.*,
2017 WL 3058563 (N.D. Cal. July 19, 2017).............................................. 70, 71

*In re Williams Sec. Litig.*,
339 F. Supp. 2d 1206 (N.D. Okla. 2003) ............................................................73

*In re: CCIV / Lucid Motors Sec. Litig.*,
110 F.4th 1181 (9th Cir. 2024) ................................................................... 71, 72

*In re: Ebix, Inc. Sec. Litig.*,
898 F. Supp. 2d 1325 (N.D. Ga. 2012) ...............................................................50

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ........................................................................................70

*Keippel v. Health Ins. Innovations, Inc.*,
    2019 WL 5698329 (M.D. Fla. Nov 4, 2019) ......................................................30

*LBS Petroleum, LLC v. Demir*,
    2016 WL 4625619 (S.D. Fla. Mar. 7, 2016) .......................................................69

*Levy v. Luo*,
    2025 WL 437022 (D. Del. Feb. 7, 2025) ...........................................................73

*Lorenzo v. Sec. & Exch. Comm'n*,
    587 U.S. 71 (2019) ...........................................................................................73

*Luczak v. Nat'l Beverage Corp.*,
    812 F. App'x (11th Cir. 2020) .........................................................................57

*Macquarie Infrastructure Corp. v. Moab Partners*,
    601 U.S. 257 (2024) .................................................................................. 7, 26

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
    2019 WL 5394011 (M.D. Fla. Oct. 16, 2019).....................................................67

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
    54 F.4th 82 (2d Cir. 2022) ........................................................................ 71, 72

*Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*,
    2019 WL 1429667 (M.D. Fla. Mar. 29, 2019).....................................................43

*Miller v. Dyadic Int'l Inc.*,
    2008 WL 5070279 (S.D. Fla. Nov. 25, 2008).....................................................66

*Mizzaro v. Home Depot*,
    544 F.3d 1230 (11th Cir. 2008) .......................................................................66

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
    2018 WL 1558577 (N.D. Ga. Mar. 29, 2018).................................. 46, 56, 66, 68

*Nebraska Inv. Council v. Fid. Nat'l Info. Servs., Inc.*,
    2024 WL 4349125 (M.D. Fla. Sept. 30, 2024)...................................................58

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ..................................................................61

*Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*,
2024 WL 5182634 (9th Cir. Dec. 20, 2024) .........................................33

*Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pen. Fund*,
575 U.S 175 (2015) ...............................................................................48

*Owl Creek I, L.P. v. Ocwen Fin. Corp.*,
2018 WL 4844019 (S.D. Fla. Oct. 4, 2018) ..........................................60

*Plymouth Cty. Ret. Sys. v. Carter's Inc.*,
2011 WL 13124501 (N.D. Ga. Mar. 17, 2011) ......................................53

*Primavera Investors v. Liquidmetal Tech. Inc.*,
403 F. Supp. 2d 1151 (M.D. Fla. 2008) .................................................53

*Public Emps. Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. Sept. 29, 2021) ....................... 31, 35, 49, 55

*S.E.C. v. Complete Business Solutions Grp., Inc.*,
538 F. Supp. 3d 1309 (S.D. Fla. 2021) ..................................................74

*S.E.C. v. Monterosso*,
756 F.3d 1326 (11th Cir. 2014) .............................................................71

*S.E.C. v. Westhead*,
733 F. Supp. 3d 1284 (S.D. Fla. 2024) ..................................................74

*San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*,
2024 WL 1898512 (S.D.N.Y. 2024) ......................................................63

*SEC* v. *Alar,*
2020 WL 10486745 (N.D. Ga. Sept. 21, 2020) .....................................48

*Smallwood v. Pearl Brewing Co.*,
489 F.2d 579 (5th Cir. 1974) .................................................................72

*Spiegel v. Siegel*,
2008 WL 151951 (S.D. Fla. Jan. 15, 2008) ...........................................73

*Tellabs, Inc. v Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................... 10, 49, 66

*Theodore v. Purecycle Techs. Inc.*,
  2023 WL 4035880 (M.D. Fla. June 15, 2023)......................................................73

*Theodore v. Purecycle Techs., Inc.*,
  2022 WL 20157415 (M.D. Fla. Aug. 4, 2022) ............................................. 37, 39

*Thorpe v. Walter Inv. Mgmt. Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015)................................................................50

*Tracy v. Elektra, Inc.*,
  667 F. Supp. 3d 1276 (N.D. Ga. 2023) ...............................................................25

*Tung v. Dycom Inds. Inc.*,
  454 F. Supp. 3d 1244 (S.D. Fla. 2020) ....................................................... 49, 55

*Wang v. Cloopen Group Holding Ltd.*,
  661 F. Supp. 3d 208 (S.D.N.Y. 2023) .......................................................... 37, 38

*Waterford Twp. Gen. Emps. Ret. Sys., v. Suntrust Banks, Inc.*,
  2010 WL 3368922 (N.D. Ga. Aug. 19, 2010).......................................................61

*West Palm Beach Police Pension Fund v. DFC Global Corp.*,
  2015 WL 3755218 (E.D. Pa. 2015) .....................................................................65

*Williams v. Hill*,
  2022 WL 1715212 (N.D. Ga. Mar. 31, 2022)......................................................74

*ZPR Inv. Mgmt. Inc. v. SEC*,
  861 F.3d 1239 (11th Cir. 2017) .................................................................... 9, 67

*Zuckerman v. Smart Choice Automotive Group, Inc.*,
  2000 WL 33996254 (M.D. Fla. Aug. 29, 2000) ..................................................53

*Zwick Partners, LP v. Quorum Health Corp.*,
  2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)...................................... 68, 70, 73

ix

Lead Plaintiffs the City of Atlanta General Employees' Pension Fund, the City of Atlanta Police Officers' Pension Fund, the City of Atlanta Firefighters' Pension Fund, the Employees' Retirement System of the City of Baltimore, and Norfolk County Retirement System ("Plaintiffs" or "Lead Plaintiffs"), respectfully submit this omnibus memorandum of law in combined opposition to Defendants' Motions to Dismiss the Amended Complaint (ECF Nos. 65, 66).[1]

## I.    PRELIMINARY STATEMENT

In September 2023, Aramark, a food services company desperate to alleviate over $7 billion in debt, spun off AUS, its uniforms business segment (the "Spinoff"). As part of the Spinoff, AUS—now called "Vestis"—was required to pay $1.5 billion in cash back to Aramark.  Because AUS had long trailed its top competitors in the uniforms business by a significant margin, to justify this massive payout, Defendants needed to convince the market that Vestis would succeed as a standalone entity.  As a uniforms company responsible for laundering and delivering uniforms and other workplace supplies to businesses on a weekly basis, Vestis' success hinged on its customer retention—and its customer retention depended on its ability to

---

[1] Defendants are Vestis Corporation ("Vestis" or the "Company"), Kimberly Scott ("Scott"), and Rick Dillon ("Dillon") (collectively, "Vestis Defendants"), and Aramark and John J. Zillmer ("Zillmer") (collectively, "Aramark Defendants"). References to "VSTS Br." refer to the Vestis Defendants' Motion to Dismiss (ECF No. 65-1), and references to "ARMK Br." refer to the Aramark Defendants' Motion to Dismiss (ECF No. 66). All citations to "¶_" are to the Amended Class Action Complaint ("AC" or "Complaint") (ECF No. 55). Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.

1

consistently make complete, accurate and timely deliveries.

Accordingly, both prior to and throughout the Class Period (October 2, 2023, through May 1, 2024, inclusive), Defendants repeatedly boasted that Vestis did exactly that. Defendants averred that Vestis had a "significant competitive advantage" due to "the quality of our services and products" and "ability to deliver on time"—and that this "service excellence" had resulted in the Company maintaining a remarkably high customer retention rate that was consistently "in excess of 90%." As Defendant Scott, Vestis' CEO, stressed to investors, Vestis and its most senior officers were at all times "very focused on doing exactly what we say we're going to do . . . show up on time every week, deliver the products and services that you promise to your customers and do that with consistency and excellence."

Defendants also strongly assured investors that Vestis had the necessary operating systems in place to succeed—including Telematics, a critically important industry-standard fleet management system that ensured accurate, on time deliveries. Indeed, Defendants repeatedly touted Vestis' "new Telematics technology" as the key to "increas[ing] route efficiency," and as late as February 2024—only three months before the end of the Class Period—proclaimed that "we've successfully deployed new Telematics technology across 89% of our fleet."

Fueled by these wholly positive statements, Defendants successfully completed the Spinoff on September 30, 2023; Aramark pocketed its $1.5 billion in

2

cash; and Vestis' stock price thereafter surged 16%, from $19.20 per share upon the Spinoff to a Class Period high of more than $22 per share on February 6, 2024.

However, Defendants' statements were false. Just one day after the stock reached its Class Period high, on February 7, 2024, Vestis reported disappointing earnings for its first full quarter as a standalone entity, which fell far short of analyst estimates, and caused the stock price to fall approximately 13%. Significantly, however, Defendants prevented an even greater stock price decline by assuring the market that the revenue miss had nothing to do with Vestis' operations or customer retention, and that any customer losses were "intentional" and part of the Company's business strategy to exit underperforming businesses.

Accordingly, the market was shocked when, just three months later, on May 2, 2024, Defendants disclosed terrible 2Q24 results and dramatically slashed full-year guidance. Rather than annual revenue growth of 4-4.5%, Defendants now disclosed that Vestis' business would shrink in 2024, with "growth" in the range of negative 1 to 0%. In response, Vestis' stock price collapsed, falling nearly 50%, from a price of $18.47 per share to $9.41 per share. Faced with an onslaught of angry investors and analysts, Defendants were forced to make a series of stunning admissions that sharply contradicted their prior representations.

*First*, Defendants revealed that, even before the Spinoff occurred, Vestis had already lost an extraordinary number of customers—including some of its largest

3

clients—and those losses had materially and adversely impacted Vestis' business. In Defendants' own words, Vestis had suffered a "<u>large amount of rollover losses from FY'23</u>"—*i.e.*, <u>prior to the Spinoff</u>—including "<u>two large national account customers</u>." Significantly, Defendants made clear that they had known about these "large customer losses" prior to the Spinoff. Indeed, Defendants expressly confirmed that a significant portion of Vestis' lost revenue was attributable to "<u>known customer losses as we exited fiscal 2023</u>"—*i.e.*, pre-Spinoff.

Moreover, these customer losses were so significant that they not only hurt Vestis' revenue and profits, but they also caused Vestis' vaunted customer retention rate to <u>fall significantly below 90% in the quarter immediately preceding the Spinoff</u> (Q423). This was highly material, as maintaining a customer retention rate above 90% was crucial in the uniforms business—such that any rate that fell below that threshold signaled significant customer attrition. Tellingly, Defendants again made clear that they were fully aware of the significance of this development on Vestis' business, as they "<u>knew the impact coming in of the lower retention rate</u>."

*Second*, Defendants admitted that such losses were not "intentional" or a "strategic" part of their business plan. To the contrary, the losses were "regrettable," and were directly attributable to the fact that Vestis was unable to perform the most basic tasks required of a uniforms company—delivering proper, complete sets of uniforms to customers on time. As Defendant Scott admitted, Vestis suffered

significant customer losses due to severe "service gaps" that were "related to <u>how we are delivering the load on time and incomplete loads</u>"—such that "<u>more than 70% of the [customer] cancellations are due to causes that are within our control</u>."

Indeed, in stark contrast to Defendants' statements assuring investors that Vestis had the proper operational systems in place to service its customers, Vestis' service was so deficient during the Class Period that the Company <u>did not even "have a process to verify that the truck has been loaded and that all of the product that needs to go to our customer is, in fact, being delivered to our customer</u>." In fact, Defendants' systems were so inadequate that, while they had previously boasted that they had "successfully deploy[ed]" the critically important Telematics system across 89% of Vestis' fleet, Defendants now were forced to admit that, in reality, Telematics was still not operational at Vestis, and the Company only "expect[ed" to "begin" using Telematics at some undetermined point in the future.

Significantly, when analysts questioned how Defendants could not have known about these major issues during the Class Period—particularly given that Defendants Scott and Dillon, Vestis' CEO and CFO, respectively, had joined AUS a full two years before the Spinoff—Defendants were forced to admit they had in fact known about them before the Spinoff even occurred. As Scott explicitly confirmed, Vestis' severe issues were "not related to the spin" or any recent developments, but "<u>ha[d] been in our business for quite some time</u>."

Following these revelations, which came just seven months after the Spinoff, sophisticated market participants excoriated management for their lack of credibility in misrepresenting the true state of Vestis' business during the Class Period.  For example, Jefferies concluded there was now "a significant mgmt. credibility issue," as it was "troubling" that "this [was] the first time customer retention and service issues were made apparent publicly."  Barclays was incredulous there was "this big of a revision" "in the last 90 days or 60 days," particularly given that Scott and Dillon "were at the company for almost 2 years, while under Aramark."  And Wolfe Research bluntly asked: "why [didn't] [management] [catch] this before the [Spin]?"

Significantly, Defendants' fraud has been independently corroborated by numerous former high-ranking Aramark and Vestis employees, who worked at Vestis locations across North America.  These FEs uniformly confirmed that, throughout the Class Period, Vestis' services were so lacking that the Company was "selling a nonexistent service," akin to "sell[ing] air"—resulting in the Company "bleeding" customers before the Spinoff.  In a rarity for a securities class action pleading, these FE accounts have been confirmed by internal contemporaneous Vestis documents that were provided to high-level Vestis executives—including direct reports of Defendant Scott—showing that Vestis lost a massive $147 million in recurring weekly revenue due to customer losses between August 21, 2023 and April 19, 2024, with $55 million of that amount lost in the five weeks prior to the Spinoff alone.

6

In the face of such detailed and compelling allegations, Defendants' arguments should be swiftly rejected. *First*, Defendants claim that Plaintiffs failed to plead falsity because this is supposedly a "pure omissions" case under the Supreme Court's decision in *Macquarie Infrastructure Corp. v. Moab Partners*, 601 U.S. 257 (2024), but they are wrong. Far from "pure omissions," Defendants made a series of affirmative misstatements, chief among them that Vestis maintained remarkably high customer retention due to its "excellent" service and "ability to deliver on time" when the exact opposite was true: Vestis suffered a "large amount" of customer losses before the Spinoff, precisely because its service was so abysmal that it could not perform even the most basic tasks required of a uniforms business.

Nor can Defendants' statements about Vestis' "service excellence" or customer retention be regarded as immaterial "puffery." The law in this Circuit is clear that "courts should not rule statements immaterial as a matter of law—*even if they are puffery*—unless reasonable minds could not differ on the question of their importance." *Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 2025 WL 897540, at *7 (N.D. Ga. Mar. 24, 2025) (Grimberg, J.) (emphasis in original). Here, Defendants themselves repeatedly emphasized the critical importance of Vestis' high customer retention rate to its profitability, which they claimed Vestis maintained through its "ability to deliver on time" with "consistency and excellence." And the materiality of these statements was confirmed by Defendants themselves, as they admitted that

7

it was Vestis' service failures that had resulted in the "large amount" of "known" pre-Spinoff customer losses that had caused the Company's abysmal 2Q24 results.

Defendants also argue that their statements touting Vestis' purportedly consistent "above 90%" retention rate were not false because that rate dropped below 90% for only one quarter. However, Defendants ignore that this significant drop-off occurred during the final quarter right before the Spinoff—unquestionably the most critical period for investors. It was therefore patently false for Defendants to tout that Vestis "continu[ed] to deliver" the "above 90%" retention rate when it not only had fallen materially below this threshold, but also when these pre-Spinoff customer losses had caused such a severe and ongoing impact that they were the undisputed principal cause of Vestis' disastrous financial results just two quarters later.

Defendants' scienter arguments fare no better. Defendants assert that the AC "does not plead a single fact demonstrating that any Defendant actually possessed information that contradicted their statements at the time they were made" (VSTS Br. 5). However, Defendants ignore that it was Defendants themselves who admitted that they knew about these issues before the Spinoff. Again, Vestis' dismal 2Q24 results were directly attributable to what Defendants themselves called "known customer losses" that occurred pre-Spinoff, and these admissions fundamentally undercut any notion that this case constitutes "fraud by hindsight."

Moreover, Defendants' scienter arguments lack credibility given that

8

Defendants Scott and Dillon joined Aramark two full years before the Spinoff, and the issues that led to Vestis' disastrous 2Q24 results not only pertained to the core service Vestis offered—*i.e.*, accurate, on time deliveries—but indisputably materially impacted customer retention, which Defendants themselves presented to investors as the "single highest value growth lever" in the business. Defendants' own admissions are also corroborated by numerous detailed FE accounts, in addition to internal Company documents that were directly provided to Scott's direct reports. Collectively, these facts easily give rise to a strong inference of scienter.

These compelling scienter facts equally apply to the Aramark Defendants. The FEs and internal Vestis documents confirm the Company was "bleeding" customers, including two large national accounts, while Vestis was still part of Aramark. Moreover, the admissions of Scott and Dillon—former Aramark executives—about their direct knowledge of Vestis' severe service and customer retention issues before the Spinoff are imputed to Aramark. *ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017). The Aramark Defendants also had a compelling motive to misrepresent the true state of Vestis' business before the Spinoff—Aramark deliberately designed the Spinoff to ensure it would receive a massive $1.5 billion cash payment to relieve its over $7 billion in debt.

In sum, while Defendants claim that this case is an opportunistic "nuisance filing," in reality, this action presents the precise situation the securities laws were

meant to address: in order to line their own pockets, Defendants spun off a struggling part of their business to unsuspecting investors, falsely claiming that the new company was financially and operationally sound when Defendants knew the exact opposite was true. *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("[n]othing in the PSLRA . . . casts doubt on the conclusion 'that private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses—a matter crucial to the integrity of domestic capital markets").

Defendants' motions should be denied in their entirety.

## II.   STATEMENT OF FACTS

### A.   Defendants Lay The Groundwork That Vestis Is A Strong, Standalone Business That Will Thrive Post-Spinoff

Aramark is a food services company that, prior to the Spinoff, included a uniforms business segment known as "AUS." ¶38. Aramark's food services business was greatly impacted by COVID-19, which caused it to amass a whopping $7.4 billion in debt. ¶43. To alleviate this crushing debt, on May 10, 2022, Aramark announced that it would spin off AUS by the end of fiscal year 2023 (*i.e.*, September 29, 2023) as a separate entity known as Vestis (the "Spinoff"), and that as part of the Spinoff, Vestis would pay nearly <u>$1.5 billion in cash</u> back to Aramark. ¶47.

AUS was known as a B2B "route-based business" because its products and services were delivered to customers via delivery routes. ¶40. AUS served customers on a weekly basis, delivering clean uniforms, towels, linens and floormats

10

while, during the same visit, picking up worn items for inspection, cleaning, repair or replacement. *Id.* As a result, AUS's ability to make on-time, correct deliveries— and having the proper systems in place to do so—was crucial. ¶41. As a former Regional VP of AUS explained, such "inventory management" was the "biggest" issue for AUS because failure to make timely, complete deliveries would utterly defeat the value of the program for participating businesses. *Id.*

Historically, AUS had lagged behind top competitor Cintas by a significant margin, largely because AUS lacked sophisticated inventory management systems that Cintas had long had in place. ¶46. However, leading up to the Spinoff, Aramark's CEO, Defendant Zillmer, repeatedly insisted that all necessary "investments" were now "<u>largely behind us</u>"—such that Vestis was now "<u>well positioned to accelerate [its] growth and improve the margins in the business</u>." ¶50. For example, Aramark retained Defendant Scott in October 2021, <u>a full two years before the Spinoff</u>, "with the intent of preparing this business" to succeed. ¶¶44, 64. Aramark further touted that it had invested in a brand-new route accounting system for Vestis, "ABS," specifically to "enable efficiencies across all customer touchpoints," including "inventory management." ¶48. By June 2022, Zillmer highlighted that ABS' "implementation" was complete—such that AUS was "<u>beginning to drive the benefits of that system throughout the enterprise</u>." ¶52.

As the Spinoff got closer, Scott and Zillmer continued to emphasize that the

11

ABS "implementation" was complete, the Company was already "beginning to drive the benefits of [ABS] throughout the enterprise," and that AUS had now "install[ed] a proper logistics function" that used more "sophisticated" systems around "routing and scheduling."  Zillmer also confirmed that these efforts were working, as Vestis had purportedly already obtained "new business wins" and "improved" customer retention rates that were "right there with [Vestis'] competitors."  ¶¶48, 52, 54-55.

**B.    Just Prior To The Spinoff, Defendants Repeatedly And Falsely Tout Vestis' Customer Retention Rate, Its "Excellent" Service, And Its Optimal Logistics Systems**

On August 15, 2023, Vestis filed its registration statement for the Spinoff with the SEC, along with an information statement dated September 11, 2023 (the "Information Statement").  ¶¶58-59.  The Information Statement was expressly endorsed by Defendants Zillmer and Scott.  ¶59.

In the Information Statement, Defendants repeatedly emphasized that Vestis had consistently maintained a "customer retention rate[] in excess of 90%," which Defendants highlighted as a "key competitive strength[]." *See* ¶¶60-61, 65. Indeed, maintaining a 90% customer retention rate was critical in the uniform services industry, as if that rate fell below 90%, it would signal significant customer attrition. ¶60. For example, Vestis' top competitor Cintas typically maintained a retention rate of 95% or above—and according to Vestis' own former employees, if the Company's retention rate fell below 90%, it was internally considered to be a dire "DEFCON

One" situation. *Id.* Significantly, the Information Statement directly attributed Vestis' high customer retention to the "quality" of its services, and specifically its "ability to deliver on time." ¶¶59-61.

Two days later on September 13, 2023, Defendants held Vestis' first ever "Analyst Day" to discuss the Spinoff. ¶64. During the Analyst Day, Defendants again emphasized that because the Company "service[d] [its customers] with excellence every single day," customers were "very loyal" and stayed with Vestis long-term, including its highly valuable "national account customers," which "are with us for 26 years." ¶¶65, 167. Scott underscored the point by strongly averring that Vestis was "very focused on doing exactly what we say we're going to do, deliver on the promise, show up on time every week, deliver the products and services that you promise to your customers and do that with consistency and excellence." ¶¶66, 167.

Defendants also again emphasized that Vestis' "service excellence" was due to "the investments that Aramark already quite wisely made in [Vestis]" pre-Spinoff, which Scott represented were already "in place," "in our run rate," and had resulted in Vestis being "primed and ready to go." ¶64. These investments included (i) ABS, which Scott claimed had been "launched across our entire network" and gave Vestis' employees the "digital tools in their hands" to ensure "seamless[]" and "efficient[]" dealings with customers (¶67); and (ii) Telematics, a fleet management system that

13

was an essential, industry-standard tool to allow Vestis to receive, view and track real-time delivery data—and thus ensure correct, on-time deliveries. ¶62. Indeed, the Information Statement specifically touted Vestis' use of "our new telematics technology," which purportedly "increase[d] route efficiency with technology and processes that reduce travel time, distance and fuel consumption." ¶63.

Defendants' representations bolstered their "commitment" to grow Vestis' compound annual growth rate ("CAGR")—a critical metric in the uniforms industry upon which the market heavily focused—5% to 7% by fiscal year 2028, significantly above AUS' historical CAGR of only 1-2%, and effectively matching Cintas. ¶69.

C.    **Post-Spinoff, Aramark Pocketed $1.5 Billion And Defendants Continued To Falsely Tout Vestis' Over 90% Customer Retention Rate And "Service Excellence Culture Across The Company"**

On September 30, 2023, the last day of fiscal year 2023, Defendants completed the Spinoff, upon which Aramark pocketed $1.5 billion in cash and Vestis began trading at $19.20 per share. ¶72. After Vestis became an independent entity, the Vestis Defendants continued to falsely portray Vestis' business. ¶73. For example, during Vestis' November 29, 2023 year-end earnings call, Scott proclaimed that Vestis "continue[d] to deliver retention rates that are above 90%," and claimed that Vestis was "seeing really, really great feedback from our customers" due to "the establishment of a service excellence culture across the company." ¶74. Scott also continued to tout Vestis' strong relationships with its "national account customers"

14

in particular, emphasizing again that those customers "stay more than 20 years with us" and so were "very valuable customers and the lifetime value is great." *Id.*

Significantly, when analysts raised questions about disappointing revenue growth, Defendants staunchly denied this was due to any issues with Vestis' operations or service. For example, when Scott was asked during the September 2023 Analyst Day why Vestis' uniforms revenue growth was flat, she claimed Vestis had deliberately jettisoned customers that it did not want or need, stating that this was of no moment and in fact "very intentional," as it was purportedly due to "nonregrettable losses around some accounts that just didn't make sense for our portfolio." ¶68. When Scott was asked this same question during the November 2023 earnings call, she again asserted the flatness was due to "a very purposeful decision" to "exit[] some businesses" that were "underperforming." ¶76.

Analysts were strongly reassured by Defendants' statements. In October 2023, J.P. Morgan stated that it was "encouraged by the company's recent business improvements under a new Vestis management team"; a November 2023 Jefferies report celebrated that "management has spent the last two years building its logistics muscle (CEO Kim Scott's specialty)"; and a November 2023 Baird report expressed relief that "VSTS isn't seeing elevated customer churn." ¶¶71, 77. Fueled by these representations, Vestis' stock price surged 16%, from $19.20 per share to a Class Period high of $22.30 per share on February 6, 2024. ¶78.

15

**D.**    **Vestis Reports Disappointing Results In Its First Quarter As A Standalone Entity—Which It Falsely Attributes To Economic Factors Outside Of Its Control**

Defendants' scheme began to unravel in February 2024. On the evening of February 6, 2024, Vestis announced that its COO, Chris Synek, had abruptly resigned. ¶79. Synek was appointed COO on September 11, 2023—mere days before Vestis' first Analyst Day—and had been with Vestis for only five months. *Id.*

Then on February 7, 2024, Vestis disclosed disappointing results for Q1 2024, including revenue growth of only 2.5%, a far cry from the projected 2024 revenue growth of 4 to 4.5%. ¶80. On the ensuing earnings call, Scott assured investors that this miss had nothing to do with any issues or problems with Vestis' operations, but was instead due to macroeconomic conditions, namely, a "trend" of "small to medium enterprise customers with an uptick in business closures." ¶81. To confirm this was the case, Scott told investors that she had personally "monitor[ed] [customer departures] very closely" and "[went] pretty deep and granular to understand what are those patterns and trends around why customers leave." ¶82.

Scott also revealed for the first time that, contrary to her prior statements about certain customer losses being "purposeful" and "very intentional," Vestis had in fact suffered what she now called an "unfortunate loss" of a "national account" prior to the Spinoff. ¶83. Remarkably, Scott admitted that Defendants had deliberately concealed this loss despite its obvious materiality to investors, stating: "[W]e

16

haven't talked about it a lot because it's a regrettable loss, it wasn't part of our strategy." *Id.* Significantly, however, Scott still did not reveal that this was only the tip of the iceberg—Vestis had in fact lost <u>two</u> major national accounts pre-Spinoff— and further falsely assured investors that even the one loss had nothing to do with any service issues, but was just "the nature of doing business." ¶84.

On this news, Vestis' stock price fell 13% to close at $19.42 per share on February 7, 2024. ¶91.

To stem any further stock price decline, Defendants continued to materially mislead investors. For example, during the February 2024 call, Defendants (i) asserted that Vestis "<u>will be taking price</u>" in the second half of 2024 to give investors "<u>additional comfort</u>" that Vestis would "deliver" on its annual growth guidance of "4% to 4.5%" (¶¶86-87); (ii) strongly emphasized Vestis' use of Telematics to ensure excellent service, proclaiming that, "[y]ear-to-date," Vestis had "<u>successfully deployed new [T]elematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling technology and processes across North America</u>" (¶89); and (iii) again asserted that Vestis' customer retention rate continued to be "<u>greater than 90%</u>," with Scott unequivocally assuring the market in response to an analyst question about customer attrition that there were "<u>no real surprises as it relates to retention and where we expected to be</u>." ¶90.

**E.    Defendants Admit That, Even Before The Spinoff, Vestis Suffered Significant Customer Losses And Severe "Service Gaps" That Rendered It Unable To Perform Even The Most Basic Tasks Of A Uniforms Company**

On May 2, 2024, just seven months after the Spinoff, the truth fully emerged. On that day, Vestis shocked the market by disclosing dismal financial results for 2Q24 far below analysts' consensus, including a mere 0.9% year-over-year increase in revenue to $705 million.  ¶93.  Defendants further announced that instead of 4-4.5% revenue growth for the year, Vestis now expected its business to shrink, with "growth" of -1 to 0%.  *Id.*  On the ensuing earnings call, Defendants made a series of extraordinary admissions directly contradicting their prior statements.

*First*, contrary to Defendants' statements touting Vestis' "very loyal" stable of customers, which was purportedly a "competitive advantage" for the Company, Defendants stunned investors by disclosing that, before the Spinoff, Vestis had been hemorrhaging a huge number of customers, including two large national clients. ¶¶61, 65, 94. Moreover, Defendants not only admitted that this "large amount of rollover losses from FY 2023" was extraordinarily material, accounting for the vast majority—two-thirds—of the revenue shortfall in the quarter, but they also explicitly admitted that they had known about these losses even before the Spinoff took place. ¶8, 98. Dillon directly attributed the revenue shortfall to "known customer losses as we exited fiscal year 2023," and noted that these losses were so severe that even in May 2024, Vestis was still "currently absorbing [the] losses incurred in FY 23." ¶98.

18

*Second*, while Scott had claimed the prior quarter that she had gone "deep and granular" to confirm that Vestis' customer losses were due to an "uptick" in business closures and not due to any service issues, she now admitted the opposite: it was Vestis' severe "<u>service gaps</u>" that had caused customers to leave in droves.  ¶97. Specifically, Scott confirmed that the "<u>root causes</u>" of why "<u>customers [are] choosing to leave Vestis</u>" were due to the "<u>service experiences</u>" that Vestis was providing its customers. *Id.* Indeed, Scott conceded that "<u>we know that more than 70% of cancellations [were] due to causes that are within our control.</u>"  *Id.*

*Third*, while Defendants had repeatedly represented that Vestis had implemented systems and processes to ensure on-time and accurate deliveries, Scott now explicitly admitted that Vestis did not even "<u>have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer.</u>" ¶95.  As a result, Vestis was "<u>not tight on [the] processes as it relates to disciplined loading of trucks, delivering on time, delivering full loads,</u>" and therefore needed to "<u>do a better job on being on time, being complete, being fully loaded and putting metrics around that.</u>"  *Id.*

*Fourth*, and directly contradicting Defendants' claim from just three months prior that Vestis had "successfully deployed new [T]elematics] technology across 89% of our fleet," Scott now admitted that no such thing had occurred. ¶96. Specifically, she conceded that despite Telematics being the most basic, "<u>very</u>

19

normal thing that you would have in a B2B [] business," and even though two full years had passed since Scott joined Vestis, Scott admitted that the Company was still not using Telematics, as Vestis was only "expect[ing]" to "begin to use those insights and that data from [T]elematics" at some undetermined point in the future. *Id.*

*Fifth*, Defendants expressly admitted that, as opposed to sustaining its vaunted retention rate "above 90%," the "known customer losses" that Vestis experienced in Q4 2023—the final quarter before the Spinoff—had caused the Company's retention rate to plummet to 85%, materially below the critical 90% threshold, and well below top competitor Cintas' retention rate of above 95%. ¶¶98-99. In fact, Defendants admitted that they knew about this material adverse information, and knew that it would materially impact their business in 2024, stating that they "knew the impact coming in of the lower retention rate." ¶101.

*Sixth*, while Defendants previously assured the market that Vestis would "take price" in the second quarter, in truth, Vestis' service was so deficient Defendants could not increase pricing at all, and instead were forced to dramatically discount to stem further customer losses. ¶100. As Defendants admitted, Vestis' severe "service gaps ha[d] driven price sensitivity, as fully satisfied customers typically don't leave because they've received a price increase." *Id.*

And finally, in response to heated questions from analysts, Defendants admitted that they had long been aware of these longstanding issues in Vestis'

business.  Specifically, during the call, analysts were incredulous that Defendants had not disclosed these severe service and customer retention issues earlier given that Defendants Scott and Dillon had overseen the legacy AUS for years prior to the Spinoff.  In response, Scott conceded that Defendants had known about these issues all along, as "these challenges have been in our business for quite some time" and were "not related to the spin [] I'll be clear about that." ¶101. Scott further made clear these deficiencies were very well known and "ha[d] persisted in this business for some time," as Vestis had been losing customers due to "very specific delivery matters related to on time delivery" and "shortages on loads." *Id.*

In response to these stunning disclosures, Vestis' share price was nearly halved, falling 49% from $18.47 per share on May 1, 2024, to $9.41 per share on May 3, 2024—a $1 billion decline in the Company's market capitalization.  ¶102.

Analysts were stunned and excoriated management for not revealing these issues earlier.  For example, Jefferies remarked that despite Defendants' admissions that the customer and service issues were longstanding, "this [was] the first time customer retention and service issues were made apparent publicly," creating "a significant [management] credibility issue."  ¶104.  Notably, Jefferies underscored the magnitude of Defendants' admission that these issues existed before the Spinoff, stating that it was even "more troubling" that "[management] never fully disclosed the fall off in retention on recurring revenue it started experiencing 2H23 or the true

21

magnitude of customer losses to be expected and overcome in FY 24." *Id.*

Analysts were also incredulous as to how Defendants could possibly not have been aware of these longstanding issues given that Scott and Dillon had joined Aramark a full two years before the Spinoff. For example, Barclays noted: "[Y]ou were at the company for almost 2 years, while under Aramark. You guys presumably did all this work going through IR Day and your confidence the last 2 quarters was pretty solid as well." ¶¶12, 107. Barclays wondered in disbelief how there could be "this big of a revision" "in the last 90 days or 60 days or whatever." *Id.* Wolfe Research similarly bluntly asked: "why haven't you guys caught this before the separation?" ¶107.

Other analysts similarly noted that Defendants had failed to disclose these issues that had long plagued the Company. For example, Wolfe Research emphasized that it was "surprised by the sudden [guidance] cut," while highlighting that Vestis' "service shortfalls were not discussed during the Company's previous analyst day." ¶106. Baird labeled management's "credibility [as] low," lamenting that the "depths of the challenges inside VSTS" were never previously revealed, such that management now had to "clear the decks and earn back credibility." *Id.*

**F.    Former Vestis Employees And Internal Company Reports Confirm Vestis Was Plagued By Service Failures And "Bleeding Customers" Prior To And During The Class Period**

Defendants' fraud was independently corroborated by numerous high-ranking

22

Vestis and Aramark employees ("FEs") who worked at Vestis facilities across North America, including Dallas, Baton Rouge, Nashville, Toledo and San Diego, and ranged from Account Executives to General Managers, Compliance Managers, and Vice Presidents. *See* ¶¶13, 109-155. These FEs uniformly confirmed that, contrary to Defendants' repeated assertions of "service excellence," in reality, "service is what kil[led]" Vestis, as Vestis' significant service problems had resulted in the "bleeding of [] customers" prior to and after the Spinoff. ¶¶2, 112, 137.

For example, FE1, a former Vice President of AUS who then served as a consultant for the President of AUS until May 2023, described internal reports before the Spinoff that showed customer losses that "certainly outweighed the gains"—resulting in retention rates falling below 90%, which FE1 described as a dire "DEFCON One" situation for the Company. ¶¶112-13. FE1 stated that Scott was "absolutely" aware of these customer departures and that they had resulted from Vestis' abysmal service, as "the reports were very clear" and there were "not a lot of ways to hide quality and service problems in the Company." ¶122. FE3, a former National Sales Trainer and Compliance Manager for Aramark and then Vestis, also described losing significant customers during his tenure with Vestis due to service issues, including large national accounts like Whole Foods and Tyson's Chicken. ¶118. FE3 stated AUS "had a lot of knowledge that there were a lot of service issues that were not being corrected [for Tyson's Chicken]" since at least 2022—such that

Defendant Scott met directly with Tyson's Chicken before the Spinoff to attempt to dissuade it from leaving. *Id.* FE4 similarly described how Vestis' "[s]ervice was so bad that [] clients left within the first 30 to 90 days," such that "the more [customers] we signed up the more we were leaving on the backend." ¶119.

Indeed, scores of FEs described how (i) Vestis routinely delivered the wrong number of uniforms, as items were frequently lost due to Vestis lack of "inventory management" (¶¶137, 139-41, 148); (ii) the items that were delivered "look[ed] like crap," as they were "wrinkled," "still dirty," and littered with holes, causing customers to conclude they could clean uniforms "better just doing it myself" (¶¶119, 126-31, 137, 143, 145); and (iii) Vestis had not "invested in [its] facilities in 10+ years," resulting in them being "old," "outdated," and "a detriment to providing quality service." ¶¶124-31, 135, 137. As FE17 put it, Vestis' service was so bad it was "nonexistent" and akin to "sell[ing] air," because "we knew for a fact it was not going to happen, and it was a complete misrepresentation of the facts." ¶150.

These FE accounts were confirmed by internal corporate reports, or "Weekly Install and Loss Reports," that detailed the amount of lost weekly revenue due to customer losses. ¶¶114-16. These reports showed that Vestis lost a staggering $147 million in weekly recurring revenue between August 21, 2023 and April 19, 2024— with losses averaging $4.2 million per week—including $55 million in the five weeks leading up to the Spinoff alone. *Id.* Significantly, these reports were directly

circulated to numerous high-level Vestis executives—including Andy Panos, SVP of Sales, and Matt Cornelius, VP of Sales, both direct reports of Defendant Scott. ¶116.

## III.   ARGUMENT[2]

### A.   Legal Standards

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Tracy v. Elektra, Inc.*, 667 F. Supp. 3d 1276, 1281 (N.D. Ga. 2023). Courts within the Eleventh Circuit have emphasized that "the PSLRA did not alter the required presumption that the court give Plaintiffs, not Defendants, the benefit of every favorable inference that can be drawn from their allegations." *In re TECO Energy, Inc. Sec. Litig.*, 2006 WL 845161, at *2 (M.D. Fla. 2006).

### B.   The Amended Complaint Adequately Pleads Material Misstatements And Omissions

"Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury." *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1367 (N.D. Ga. 2005).  Dismissal at the pleading stage is warranted only "if no reasonable investor could conclude public statements, taken together and in context, were misleading." *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1358 (N.D. Ga. 2005).  The AC adequately alleges falsity here.

---

[2] Filed herewith as Exhibit 1 to the Declaration of Lester Hooker ("Hooker Decl.") is Lead Plaintiffs' Response to Defendants' Chart of Alleged Misstatements (ECF No. 65-2), reflecting Plaintiffs' arguments contained in Section III herein.

### 1.     This Is Not A "Pure Omissions" Case

Defendants argue their statements are inactionable because they are "pure omissions" under the Supreme Court's decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024), but this is plainly incorrect.  VSTS Br. 20; ARMK Br. 7 n.3.  *First*, the statements Defendants proffer as "pure omissions" were in fact <u>affirmatively false</u>.  For example, while Scott claimed in February 2024 that Vestis' disappointing 1Q24 results were due to a "slight uptick" in business closures and not any issues with Vestis' service, just three months later, Scott admitted that these customers left because of Vestis' severe "service gaps."  ¶¶82, 97-98, 192.  Similarly, while Defendants claimed that certain FY23 customer losses were "purposeful," "very intentional," and "non-regrettable," they later admitted the opposite: that even before the Spinoff, Vestis had suffered a "<u>large amount of rollover losses</u>," including two major national accounts that were in truth very "regrettable" and not intentional at all, severely impacting Vestis' business in 2024.  ¶¶68, 83, 97-98, 173.

*Second*, even if Defendants' statements could qualify as omissions, *Macquarie* held "[a] pure omission occurs *when a speaker says nothing*, in circumstances that do not give any particular meaning to that silence."  601 U.S. at 263 (emphasis in original).  That is not the case here.  Indeed, it is axiomatic under the securities laws that by repeatedly touting, for example, Vestis' "excellent service"

26

and "ability to deliver on time," the long tenure of its national accounts, its over 90% retention rate, and the supposedly non-Company specific reasons for customer departures, Defendants were obligated to tell the whole truth. *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) ("By voluntarily revealing one fact about its operations, a duty arises for the corporations to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead."); *Norfolk*, 2025 WL 897540, at \*8 (same).

### 2. Defendants' Statements Touting Vestis' "Service Excellence" And "Ability To Deliver On Time" Were False

During the Class Period, Defendants repeatedly asserted that Vestis "maintain[ed] long-term" customer relationships and an over 90% retention rate due to the "quality" of the Company's services and its "ability to deliver on-time"; Vestis' "focus[] on doing exactly what we say we're going to do . . . show up on time every week, deliver the products and services that you promise to your customers and do that with consistency and excellence"; and the Company's "establishment of a service excellence culture across the company." *See, e.g.,* ¶¶159, 161, 167, 171, 176.

These statements were false. *See* Ex. 1 at Statement Nos. 1-6, 9-12, 19-20. In reality, as Defendants would admit and as FEs across the country confirmed, Vestis was plagued by severe "service gaps," which caused a "large amount" of customer losses before the Spinoff and severely impacted Vestis' business and growth in 2024. ¶¶94-98; ¶¶112-22. As Defendant Scott admitted, Vestis did not even "have a

27

process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." ¶95; *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1219 (N.D. Ga. 2019) (falsity where Equifax touted quality of cybersecurity systems that were in reality "grossly deficient and outdated" and "failed to meet the most basic industry standards").

Defendants argue that these statements were not false because "even if there were some service gaps," as a "general matter, Vestis' service was consistent and excellent." VSTS Br. 27. Not so. As Scott admitted at the end of the Class Period, Vestis' "service gaps" were severe, longstanding, and went to the core of the service Vestis was expected to provide: delivering the right items to the right customers on time.[3] ¶¶94-95. Indeed, Defendants admitted these "service gaps" were so profound and intractable that they directly resulted in a "large amount" of customer losses. ¶¶94, 97; *Equifax*, 357 F. Supp. 3d at 1219-20 (statements "touting the strength or quality of an important business operation are false, and thus actionable, when those operations are, in reality, deficient"); *Bush v. Blink Charging Co.*, 2023 WL 8263037, at *8 (S.D. Fla. Nov. 27, 2023) (statements touting Blink's EV charging network, while omitting "that a significant percentage of the network was not functional,"

---

[3] The Aramark Defendants argue that Vestis' "service gaps" do not render these statements false because they were "identif[ied] post-Spin" (ARMK Br. 8)—ignoring that Scott admitted exactly the opposite, stating that "these challenges have been in our business for quite some time" and "were not related to the spin [] I'll be clear about that." ¶101.

were false because defendants had "an obligation to neutralize the natural and normal implication of [their] statements"). Thus, as a "general matter," Vestis' service was the exact opposite of "consistent and excellent."

Nor are these statements immaterial "puffery." VSTS Br. 27, 31-33; ARMK Br. 7, 10, 13-15. As an initial matter, "judgments [about materiality] are, by their nature, peculiarly ones for the trier of fact." *Norfolk*, 2025 WL 897540, at *7. "Thus, courts should not rule statements immaterial as a matter of law—*even if they are puffery*—unless reasonable minds could not differ on the question of their importance." *Id.*

Here, Defendants' statements cannot be regarded as mere puffery because they concerned the very core of what Vestis offered—correct, on-time deliveries. Indeed, Defendants themselves repeatedly emphasized that customer retention was critical to their business—stating, for example, that the "single highest value growth lever is retention" (¶167)—and that Vestis was able to maintain this rate precisely because of its "service excellence" and "ability to deliver on time." ¶¶159, 167. *Norfolk* is instructive. In *Norfolk*, this Court determined that certain statements about a company's safety were materially false and misleading, holding that a statement such as "'[s]afety [is] a core value' may be vague, but it is not meaningless." 2025 WL 897540, at **6-8. This was particularly true given the "heightened importance" of the safety statements in the company's industry, "the sheer number of public

statements about safety" made by the defendants, and the fact that the statements came at a time when the company was "implementing a new operating plan." *Id.*

The same reasoning applies here. Defendants' statements touting Vestis' service capabilities had "heightened importance" because Vestis' customer retention—which was critical to its business—hinged on "the quality of our services" and "our ability to deliver on time." ¶159. As in *Norfolk*, this is underscored by the "sheer number" of Defendants' statements and the fact that the statements came at a critical time, when Defendants were attempting to convince the market that Vestis could succeed as a newly independent company. *Norfolk*, 2025 WL 897540, at *7 ("repeated emphasis of an operational priority, even at a high level, can give rise to an inference of materiality"); *Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at *7 (M.D. Fla. Nov 4, 2019) (not puffery where defendants repeatedly "emphasized and highlighted every quarter" the importance of customer satisfaction as a "competitive strength" and "a key to company success"); *In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *3 (N.D. Ga. June 30, 2011) ("assurances about the company's commitment to quality were more than puffery" because "the statements were designed to reassure investors").

Moreover, Defendants themselves confirmed the importance of these topics when, at the end of the Class Period, they admitted that it was the <u>lack</u> of correct, on-time deliveries that had caused the mass customer exodus leading to the

30

disastrous 2Q24 results.  ¶¶97-101.  *Equifax*, 357 F. Supp. 3d at 1224 ("the fact that these statements relate to a core aspect of Equifax's business makes it even more likely that a reasonable investor would assign weight to them"); *Public Emps. Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1300 (N.D. Ga. Sept. 29, 2021) (statements touting product acceptance not puffery where sales had fallen by 60-70% "due to alleged defects and widespread customer complaints").

### 3. Defendants Falsely Claimed Vestis Had "Fully" And "Successfully" Deployed Critical Inventory Management Systems, Including Industry-Standard Telematics

Defendants repeatedly boasted that they had implemented new technological systems—including ABS and Telematics—that improved Vestis' logistics and ensured it would timely and accurately deliver its products and services to clients. ¶¶163, 171, 181, 188.  For example, Defendants claimed that ABS had been "launched across [Vestis'] entire network," which gave Vestis employees "digital tools in their hands" to "interact more seamlessly and more efficiently with the customer." ¶171.  Defendants also repeatedly touted "new [T]elematics technology" as "increase[ing] route efficiency" (¶¶163, 181), while claiming in February 2024— only three months before the truth was revealed—that they had "successfully deployed new [T]elematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling technology and processes across North America." ¶188.

These statements were patently false.  *See* Ex. 1 at Statement Nos. 7, 13-15,

31

23, 34-35. As Scott starkly admitted at the end of the Class Period, in reality, Vestis did not even "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." ¶94. Scott further admitted that, contrary to her statements touting the "successful deployment" of Telematics across 89% of Vestis' fleet only three months earlier—which was a "very normal thing that you would have in a B2B route-based business" to "make sure that we are delivering to customers on time"—Vestis was still not using Telematics to ensure accurate, on-time deliveries, which had caused severe "service gaps." ¶¶94-96.[4]

Defendants argue their statements touting Telematics were not false because Scott was purportedly referring to when she first joined Aramark two years earlier. VSTS Br. 28; ARMK Br. 11. This is not true. The AC acknowledges that Scott stated in May 2024 that "we did not have [T]elematics in our fleet" when she joined Aramark in October 2021. ¶96. However, Scott further admitted that even over two full years later in May 2024, Telematics was still not operational at Vestis, and Defendants were only then "expect[ing]" to "begin to use" Telematics at some

---

[4] The Aramark Defendants assert that the statements touting Telematics in the Information Statement were not false because the use of Telematics related only to "fuel efficiency goals." (ARMK Br. 11). This is not true. The Information Statement stated that the "new telematics technology" would "increase route efficiency," and Scott made clear exactly what that meant—as she admitted at the end of the Class Period, it was because of the Company's lack of a functioning Telematics system that Vestis was unable to ensure correct, on time deliveries.

undetermined point in the future.  *Id*.  Scott's admission that Vestis was still not using Telematics rendered her prior past-tense statements that Telematics had already been "successfully deployed" materially false and misleading.  ¶¶94-96; *see also* ¶164, ECF No. 67-4 at 11 (Vestis had only "rolled out [T]elematics across our fleet <u>now</u>, so that <u>we can put</u> processes in place to . . . ensure that [] delivery happens," and that Telematics had only "<u>now</u> been installed in the trucks," such that the "benefits from [Telematics]" could not be realized until 2025).

Tellingly, realizing their argument holds no water, Defendants resort to completely rewriting history, altering what Scott said to assert that her statement was not false because "Vestis had <u>installed</u> Telematics in its fleet in May 2024" and this was "entirely consistent with Telematics being <u>installed</u> across 89% of Vestis's fleet."  VSTS Br. 28-29.  That is not what Scott said.  To the contrary, she explicitly represented to investors that Telematics had been "<u>successfully deployed</u>" across the fleet to "<u>ensure that we're running routes in compliance with how we'd like to do that</u>."  ¶188.  The "plain" meaning of "deployed," according to Oxford Languages, is "bring into effective action; utilize," not merely "install."[5]

---

[5] Moreover, even if Scott's remark could somehow be interpreted to mean "install," Defendants "alternative reading of [Scott's] statement . . . cannot appropriately be resolved at the motion to dismiss stage."  *Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at *3 (9th Cir. Dec. 20, 2024).

**4.    During The Class Period, Defendants Materially Misrepresented, And Deliberately Concealed, The Fact That Vestis' Dismal Service Failures Had Resulted In The Loss Of Numerous "Long-Term" Customers**

Throughout the Class Period, Defendants made a series of false and misleading statements and omissions concerning certain highly material customer losses that had occurred well before the Spinoff.  For example, during both the pre-Spinoff Analyst Day and Vestis' first earnings call following the Spinoff, Defendants minimized the significance of certain customer losses that took place during fiscal year 2023. Specifically, Scott claimed, in direct response to analyst inquiries, that such losses were entirely "intentional," "non-regrettable" and the product of "a very purposeful decision" to "exit[] some underperforming businesses." ¶¶76, 173, 175. Similarly, in February 2024, Defendants claimed that they had "gone pretty deep and granular" to confirm Vestis' disappointing 1Q24 results were not due to any operational problems, but rather a "slight uptick" in business closures. ¶¶82, 83, 192.

These statements were indisputably false. *See* Ex. 1 at Statement Nos. 16-18, 21-22, 38-41. Contrary to Defendants' statements that the pre-Spinoff losses were "very intentional" and "very purposeful," Defendants admitted in February 2024 that Vestis had in fact suffered an "unfortunate loss" of a "national account" prior to the Spinoff that was not "part of our strategy" and was "regrettable." ¶¶76, 83. Moreover, even then, Scott deliberately concealed the fact that Vestis had in fact lost not one, but two major national accounts prior to the Spinoff, while falsely stating

34

that this loss had nothing to do with Vestis' service, but was just "the nature of doing business."  ¶84.

In fact, Defendants admitted that Vestis' customer losses both prior to and after the Spinoff, far from being "very intentional" or attributable to a "slight uptick" in business closures, were in truth "due to causes that are within our control"—*i.e.*, Vestis' severe and intractable "service gaps."  ¶¶97, 173, 192; *Mohawk*, 564 F. Supp. 3d at 1292 (falsity where defendants "misrepresented the true reasons underlying" inventory and turnover issues by "misattributing these developments" to outside economic factors).  Tellingly, the Vestis Defendants do not separately address these statements anywhere in their motion, effectively conceding their falsity.

### 5.    Defendants' Statements That Vestis "Maintained" "Long-Term" Customer Relationships, With A Customer Retention Rate "In Excess Of 90%," Were Materially False

Throughout the Class Period, Defendants repeatedly emphasized to the market that Vestis' "long-term relationships with our customers"—including its "national account customers" in particular, who were "very loyal" and "stay[ed] more than 20 years with us"—purportedly yielded a remarkably high "customer retention rate [] in excess of 90%."  ¶¶61, 65, 74, 167, 176.  In fact, Defendants underscored that Vestis enjoyed a "significant competitive advantage" precisely because of its "long-tenured customer relationships."  ¶159.  Even as late as February 2024, one quarter before the truth would be revealed, Defendants reiterated that

Vestis' retention rate "continue[d]" to be "greater than 90%," and further asserted that there were "no real surprises as it relates to retention." ¶¶90, 190.

These statements were false. *See* Ex. 1 at Statement Nos. 1-6, 9-12, 16-20, 36-37. As Defendants admitted at the end of the Class Period, and as FEs and internal Company documents confirmed, in the weeks and months prior to the Spinoff, Vestis was "bleeding" a massive number of customers—including "two large national accounts"—which was having a material impact on the Company's business. *See, e.g.,* ¶¶202-203. In fact, Defendants confirmed that the Company experienced a "large amount of rollover losses from FY 2023"—*i.e.*, before the Spinoff, and well before Defendants' statements above—which were directly responsible for no less than two-thirds of the revenue shortfall that Vestis reported at the end of the Class Period. ¶98. Defendants further made clear that these pre-Spinoff losses were so significant that they "more than offset[] [Vestis'] new business growth," and several quarters into 2024, the Company was still "currently absorbing [the] losses incurred in FY 23," which necessitated a drastic downward revision in guidance. ¶¶93, 98.

*Norfolk* is again instructive. As this Court held, "once Defendants made public statements about Norfolk's valuation of and commitment to safety, they came under a duty to ensure that those statements were 'not so incomplete as to mislead.'" *Norfolk*, 2025 WL 897540, at *8. So too here. By repeatedly touting Vestis' customer retention rate during the Class Period, Defendants were obligated to

36

disclose the whole truth: that in the final quarter immediately preceding the Spinoff, Vestis had suffered a "large amount" of "known customer losses," and such losses had caused Vestis' customer retention rate to plummet materially below the critical 90% rate that Defendants publicly touted. ¶¶98-99. Thus here, as in *Norfolk*, 2025 WL 897540, at *8, Defendants breached their duty of disclosure by "failing to inform investors of the myriad ways in which [Vestis' customer retention]" was not at all what Defendants represented it to be—rather than customer retention being a "significant competitive advantage," customer *attrition* had caused Vestis' material revenue losses. ¶¶61, 159.

Indeed, the fact that Vestis' retention rate had fallen so sharply in the critical quarter before the Spinoff is obviously an extraordinarily important fact that renders Defendants' statements materially false and misleading. "Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Norfolk*, 2025 WL 897540, at *8; *Theodore v. Purecycle Techs., Inc.*, 2022 WL 20157415, at *13 (M.D. Fla. Aug. 4, 2022) ("question courts must ask themselves is: would a reasonable investor have been interested in the omitted information, thus making the statement misleading without it?").

The decision in *Wang v. Cloopen Group Holding Ltd.*, 661 F. Supp. 3d 208, 227 (S.D.N.Y. 2023) is, like *Norfolk*, directly on point. There, like here, the

company suffered an undisclosed precipitous decline in retention rates in the final quarter before its February 2021 initial public offering ("IPO"). *Id.* The defendants argued that the retention statements in their pre-IPO filings were historically accurate, and therefore not actionable, because they only addressed the "customer retention rate between 2018 and the first nine months of 2020." *Id.* The court rejected this argument because, even if literally true, the other representations "regarding [the company's] comprehensive customer retention strategy, its loyal customer base, its steady revenues from existing customers, and its expected opportunities to increase sales among those customers," triggered an obligation to address "the dramatic 4Q 2020 decline in that [retention] rate," which occurred "the quarter before the IPO." *Id.* at 227-28; *see also In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1321-22 (N.D. Ga. 2001) (obligation to disclose the loss of customers prior to public offering in light of positive statements about customer attrition).

The facts here are even more egregious. Indeed, Defendants do not deny (nor can they) that Vestis' retention rate fell to 85% in 4Q23 (ending September 29, 2023)—the final quarter before the Spinoff, unquestionably the most critical for Vestis investors. Thus, their statement during the November 29, 2023 year-end 2023 earnings call—the first earnings call after the Spinoff—that Vestis "continue[d] to deliver" the same "in excess of 90%" retention rate as "stated in the Form 10" (¶74) was not "historically accurate," but patently false.

In response, Defendants make a series of arguments which are meritless. For example, Defendants assert that the retention rate was not false because Vestis' retention rate for the full year 2023 was 90.4%, and Vestis "never represented its Q423 rate to be any specific number." VSTS Br. 21-22; ARMK Br. 9. However, as noted above, Defendants' repeated statements touting Vestis' "greater than 90%" retention rate imposed a duty to disclose the substantial customer losses suffered in the final quarter before the Spinoff that caused that rate to drop to 85%.[6] ¶¶53, 59-60, 74, 90. Without this disclosure, Defendants robbed investors of vital information and left the market with an entirely inaccurate picture of Vestis' prospects. *Purecycle*, 2022 WL 20157415, at *13. Tellingly, upon learning the truth, analysts excoriated Defendants for their "troubling" statements that "never fully disclosed the fall off in retention" in FY23 or the "true magnitude of customer losses to be expected and overcome in FY24." ¶104; *In re Ply Gem Holdings, Inc.*, 2016 WL 5339541, at *4 (S.D.N.Y. Sept. 23, 2016) ("analyst disappointment resulting directly

---

[6] The Aramark Defendants argue that there was no obligation to disclose on September 11, 2023 "a projected retention rate for a quarter (or fiscal year) that had yet to end"—however, again, Defendants' decision to tout the over 90% retention rate in the Information Statement gave rise to a duty to tell the whole truth regarding the substantial customer losses that had occurred, regardless of whether the quarter was yet finished. *Towne Services*, 184 F. Supp. 2d at 1323 (refusing to endorse "a *per se* rejection of a duty to disclose events that occurred in a particular quarter" even if the quarter was not yet complete because the complaint alleged "a discrete damaging event—the disruption of Towne's data lines—coupled with higher-than-ordinary customer cancellations" that warranted disclosure in prospectus).

from the alleged omissions supports an inference that … the omissions were qualitatively material").

Defendants also assert that Vestis' retention rate falling to 85% in 4Q23 is of "no moment" because it "rebounded" above 90% after the Spinoff, but this is belied by Defendants' own admissions. VSTS Br. 22-23, ARMK Br. 9, 12.  As an initial matter, Defendants' assertion is a factual issue that cannot be resolved on this motion. Moreover, Defendants themselves later starkly admitted that, far from being of "no moment," the "large amount of rollover losses from FY '23" devastated Vestis' business and directly caused Vestis' disastrous 2Q24 results:  indeed, these "known customer losses" were responsible for no less than two-thirds (6% of 9%) of the 2Q24 revenue shortfall, which "more than offset[] [Vestis'] new business growth" and were still being "absorbed" several quarters into 2024.  ¶¶93, 98.[7]

This also dispels Defendants' misguided assertion that the pre-Spin losses

---

[7] For the same reasons, Defendants' statements about the above 90% retention rate in the Form 10, and during the February 7, 2024 first quarter earnings call, were similarly materially false and misleading.  With respect to the Form 10, while the "in excess of 90%" retention rate referred to the five years prior to the Spinoff (ARMK Br. 9), it was misleading to tout that rate in the Information Statement for the Spinoff when—at the exact same time the Form 10 was filed in September 2023—the retention rate had dropped materially to 85%, profoundly impacting Vestis' business in 2024.  With respect to the February 7, 2024 statements, Defendants argue the retention rate had "rebounded" by that time (VSTS Br. 22)—but as Defendants would later admit, the pre-Spinoff losses in Q423 were so significant that they were still being "absorb[ed]" through the 2Q24 and beyond.

were "immaterial as a matter of law" because they accounted for "less than 1% of Vestis' yearly revenue." VSTS Br. 25; ARMK Br. 12.  It is undisputed that these losses caused a 5.5% decline in Vestis' 4Q23 retention rate (from 91.3% to 85.8%) and a 6% revenue loss in 2Q24. ¶¶98-99.  Thus, even under Defendants' own "rule of thumb" measurement, these losses were material. VSTS Br. 25 (quoting *Higginbottom v. Baxter Int'l.*, 495 F.3d 753, 759 (7th Cir. 2007)); *see also Norfolk*, 2025 WL 897540, at *7 (materiality "is a low standard, especially in the context of a motion to dismiss").  Indeed, if the losses were so insignificant, one wonders why Defendants felt the need to specifically address them, and to even misrepresent the reasons why Vestis lost these customers—falsely claiming they were "purposeful" and "very intentional"—only to later admit they were "unfortunate," not "part of our strategy," and "regrettable."  ¶¶76, 83.  "Regrettable" and "unfortunate" are the polar opposite of immateriality.  Moreover, Vestis' stock price was cut in half when these "known customer losses" were disclosed—another strong indication of materiality. ¶222; *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236 (S.D.N.Y. 2010) ("market's reaction in the wake of [the] disclosure suggests" information was "highly material").

Defendants also argue that they were under no obligation to disclose these losses because Vestis never "denied" losing national account customers and "never touted or hyped their relationship." VSTS Br. 23-24; ARMK Br. 16.  Defendants are

41

wrong. In truth, Defendants repeatedly touted their national account customers as "very loyal customers" who "stay more than 20 years," constituting "very valuable customers" with "great" "lifetime value." ¶¶167, 176. The loss of two of these major customers rendered these statements materially false and misleading, as "once Defendants made public statements [touting Vestis' national account customers], they came under a duty to ensure those statements were not so incomplete as to mislead." *Norfolk*, 2025 WL 897540, at *8.[8] Moreover, Defendants strongly denied, in direct response to analyst inquiries, that these customer losses were at all significant (¶¶173, 175)—only to later admit the opposite: the losses were "unfortunate," not "strategic" and in fact very "regrettable." ¶¶83, 97.[9]

---

[8] Defendants argue that any allegation that Vestis was "bleeding customers" or had suffered significant customer losses "flies in the face" of Vestis' "***revenue growth***," but this argument is contradicted by the facts. VSTS Br.27. Defendants themselves admitted that the "large amount of rollover losses from FY23," coupled with continuing customer losses during 2024, resulted in a 9% revenue shortfall in 2Q24 that forced the Company to cut its growth guidance from 4.5% to <u>negative 1%</u>.

[9] Defendants' argument that "losing two customers is entirely consistent with a retention rate in excess of 90%" makes no sense—Defendants themselves attributed the fall-off in retention to well below 90% before the Spinoff to the loss of the two national accounts. VSTS Br. 24. Defendants' citation to *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1188, (S.D. Fla. 2015) (VSTS Br. at 26) is misplaced as, unlike here, the company made numerous "public disclosures acknowledging…*increased* attrition." Moreover, the alleged service problems in *Henningsen* had "no alleged effect on the company's key drivers" and were not alleged to be "more than isolated problems." *Id.* at 1188, 1205. Here, Defendants admitted that it was in fact the "service gaps" that had caused "more than 70%" of customer departures leading to the terrible 2Q24 results. ¶¶97-98, 101.

42

Defendants' heavy reliance on *Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667, at *18 (M.D. Fla. Mar. 29, 2019) is misplaced. VSTS Br. 21, 23-24; ARMK Br. 7, 10.  Unlike here, the *Rayonier* defendants disclosed key customer losses, thereby giving "the market [] the information necessary to assess Defendants' projections for growth." 2019 WL 1429667, at *26.  Additionally, the *Rayonier* complaint lacked allegations of "of any internal reports" showing "awareness that [the company's] edge in the market was eroding." *Id.* at *18.  By contrast, the AC identifies internal reports that align with Defendants' own admissions confirming Vestis suffered undisclosed material pre-Spin losses that profoundly impacted the Company's growth and business.  ¶¶101, 114-116, 203.[10]

Finally, Defendants' assertion that the retention statements were not misleading because "Vestis made fulsome cautionary disclosures" that warned of Vestis' "failure to retain its current customers" (VSTS Br. 21, ARMK Br. 12) is a non-starter.  Those warnings themselves were misleading because those losses had already occurred.  ¶182.  "As this Circuit has held, to warn that the untoward may

---

[10] Defendants misread the AC when arguing that the loss of $55 million in recurring revenue is "non-sensical" because it amounts to $2.8 billion. VSTS Br. 26-27.  The allegation clearly refers to the type of revenue lost, specifically "recurring weekly revenue," which, as Defendants well know, was annualized and reported on a yearly basis in the internal "Weekly Install and Loss" reports.  ¶¶115, 203. Other allegations confirm this common-sense interpretation—for example, the AC alleges this $55 million represented 8% of the Q1 24 revenue of $718 million.  ¶114.

occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *FindWhat*, 658 F.3d at 1299.  Issuing warnings that customer attrition "could" harm the Company at the exact same time Vestis was enduring its worst retention quarter in history—and reiterating that same hypothetical warning as the Company continued to "absorb" those "known customer losses" through 2024—was materially false and misleading. *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *4 (M.D. Fla. Sept. 28, 2023) ("But when a risk has already occurred and corporate officers have become aware of it, the inclusion of cautionary language that omits mention of the realized risk will not cure the non-disclosure.").

> **6.    Rather Than "Tak[ing] Price," In Reality, Defendants Were Dramatically Discounting**

During Vestis' February 7, 2024 earnings call—to assuage investors' concerns regarding Defendants' announcement of disappointing 2Q24 results—Defendants represented that they saw "opportunity for additional pricing actions in the back half of the year" and "we will be taking price," which Defendants said should give investors "<u>additional comfort</u>" that Vestis would "deliver" 4% to 4.5% growth for the year.  ¶¶185-86.  However, as Defendants would admit only three months later, these statements were false—in reality, Vestis' services were so deficient that Defendants could not raise prices and had to resort to dramatic discounting instead in order to stem even greater customer losses.  ¶100; s*ee also* Ex. 1 at Statement Nos.

44

25-30. As Defendants admitted, Vestis was forced to "deliberately moderate[] planned price increases" to the tune of "250 basis points" in order "to reduce customer churn." ¶187.

Defendants argue these statements were not false when made because they said they planned to "take price" in the "back half" of 2024, and "the third and fourth quarters of 2024 *had not yet occurred*." VSTS Br. 30 (emphasis in original). However, Defendants completely ignore contemporaneous FE allegations describing that, <u>at this exact same time in February 2024</u>, Scott held an internal town hall meeting during which <u>she told employees that Vestis would have to significantly discount prices due to declining business</u>. ¶123. Specifically, FE 8 and FE 2, former Account Executives at Vestis who worked at two different Vestis locations (Arkansas and Tennessee), both independently recalled the February 2024 town hall meeting during which Scott acknowledged Vestis' poor results and stated that it would now have to cut prices dramatically—for example, towels that cost $0.07-$0.08 per towel now being sold for only $0.02 per towel, a 75% reduction—facts that were corroborated by Defendants' own admissions only one quarter later. ¶¶100, 123.

### 7. Defendants' Statements Are Not Shielded By The PSLRA Safe Harbor

Defendants argue that their February 2024 statements that Vestis would "take price" in the back half of 2024, and that Vestis would "deliver our full year guidance of 4% to 4.5%," are inactionable forward-looking statements protected by the

PSLRA safe harbor. VSTS Br. 34-35. Defendants are wrong.

Forward-looking statements are actionable if (1) the statement is not accompanied by meaningful cautionary language; or (2) plaintiffs prove the defendants "had actual knowledge that the statement was false." *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *6 (N.D. Ga. Mar. 29, 2018). *First*, neither category of statements was accompanied by meaningful cautionary language. For cautionary language to be "meaningful," it must be "specifically tailored . . . to the risks Plaintiff argues existed." *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *11 (M.D. Ga. Mar. 23, 2018). Defendants' cautionary language did "not caution against the more specific risks" "that Plaintiffs allege were known to Defendants at the time," *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1359 (N.D. Ga. 2018)—namely, that Vestis had already suffered significant customer losses before the Spinoff due to severe "service gaps." *Tupperware*, 2023 WL 6310236, at *4 ("[N]one of Defendants' statements disclose to the public that Tupperware allegedly knew it was cutting prices to move inventory, reducing margins to zero, and abandoning the Turnaround Plan.").

Indeed, while Defendants claim their risk factors were specific because they mentioned Vestis' potential "failure to retain its current customers," as explained above, these risk warnings were themselves false because the risks they warned of had <u>already transpired</u>. *See* Section III.B.5, *supra*; *Towne Servs.*, 184 F. Supp. 2d at

46

1320-21 (safe harbor inapplicable where challenged statements were "false or misleading because of events that already occurred at the time"); *In re Physician Corp. of America Sec. Litig.*, 50 F. Supp. 2d 1304, 1318 (S.D. Fla. 1999) ("warnings were misleading in light of what defendants allegedly knew or should have known").

*Second*, Defendants are wrong that the AC "fails to allege a single fact" showing Defendants had "actual knowledge" of falsity.  VSTS Br. 37.  With regard to the pricing statements, as set forth above, Defendants ignore that multiple FEs— who had direct contact with Defendant Scott—stated that, at the exact same time these statements were made in February 2024, Scott told employees Vestis had to dramatically discount prices instead.  *See* Section III.B.6, *supra*.

With regard to Defendants' February 2024 reaffirmation of the 4%-4.5% revenue growth guidance, Defendants themselves admitted only one quarter later that, at this same time, they knew that (i) Vestis was plagued by severe "service gaps" that "have been in our business for quite some time" (¶101); (ii) Vestis' business and growth were dramatically impacted by material "known customer losses" that occurred pre-Spinoff, and that Defendants "knew the impact coming in of the lower retention rate" (¶¶98, 101); and (iii) Defendants had to significantly discount prices to stem even greater customer losses, necessitating a dramatic downward revision to guidance from 4.5% to negative 1%.  ¶¶100, 123.  In light of these facts, Defendants had no basis to state in February 2024 that they would "take price" in the back half

47

of the year, or be able to "deliver" on the Company's growth guidance of 4-4.5%.

### 8.    Defendants' Statements Are Not Inactionable Opinion

Defendants argue that their February 2024 statements issued only one quarter before the truth was revealed that the Company would "deliver" on its 4% to 4.5% growth guidance, and "expect[ed] acceleration in our growth rates," are inactionable opinions. ¶¶183-84; VSTS Br. 38.  This argument fails.

Under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, opinion statements are actionable—regardless of whether they are sincerely believed—if they do not "fairly align" with known facts.  575 U.S 175, 188-89 (2015).  Defendants' statements did not "fairly align" with the facts they admit they knew at this time, including that (i) Vestis was plagued by severe and pervasive "service gaps," including its inability to deliver its products and services correctly and on time, which "ha[d] been in our business for quite some time"; (ii) Vestis had suffered a "large amount" of customer losses before the Spinoff that had materially impacted the Company's business; and (iii) Vestis was forced to dramatically discount prices in order to stave off even greater customer losses.  ¶¶94-100.  Under these circumstances, Defendants' statements cannot be considered inactionable opinion. *SEC v. Alar*, 2020 WL 10486745, at *5 (N.D. Ga. Sept. 21, 2020) ("it can be reasonably inferred that Defendants' statements did not fairly align with the information they had in their possession at the time"); *Alaska v. Ryder Sys., Inc.*, 603

F. Supp. 3d 1229, 1238 (S.D Fla. 2022) (opinion actionable where complaint pleads "facts alleging that Defendants possessed information that did not support Defendants' opinions as articulated to investors").[11]

C.    **The Amended Complaint Raises A Strong And Compelling Inference Of Scienter**

In the Eleventh Circuit, scienter may be alleged "by a showing that the defendant had 'an intent to deceive, manipulate or defraud' <u>or</u> that the defendant 'acted with a severely reckless state of mind.'" *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1289 (M.D. Fla. 2008); *Tung v. Dycom Inds. Inc.*, 454 F. Supp. 3d 1244, 1258 (S.D. Fla. 2020) (scienter "runs the continuum from intentional to recklessness"). The inference need not be of the "'smoking-gun' genre" and can be established by circumstantial evidence alone. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007); *Mohawk Indus.*, 564 F. Supp. 3d at 1304 (same).

---

[11] The Aramark Defendants argue certain other statements are also inactionable "opinion," including that Vestis' "long-tenured customer relationships" were a "significant competitive advantage[]" (ARMK Br. 6, 8), and Scott's responses to analyst inquiries that customer losses before the Spinoff were "non-regrettable." *Id.* at 16. This argument fails. *First*, Scott's statements that the pre-Spinoff losses were "non-regrettable" were not only not opinion—Scott specifically stated these customers did not "make sense" for Vestis' portfolio, concrete facts that were clearly untrue—even if they were, Scott later admitted the exact opposite. And Defendants' hope that they could "offset [the] lost accounts" later in the year—despite Vestis' uncorrected abysmal service issues—cannot render these statements true. ARMK Br. 16. *Second*, even if these statements could be regarded as "opinion," they did not "fairly align" with what Defendants Scott and Dillon (former Aramark executives) admitted they knew at the time, namely that Vestis had lost two major national customers that had severely impacted its business and growth going into the Spinoff.

Further, there is no requirement that plaintiffs produce "direct evidence connecting the defendants to the alleged fraud." *In re Carter's, Inc. Sec. Litig.*, 2012 WL 3715241, at *1 n.5 (N.D. Ga. Aug. 28, 2012). Instead, scienter is established if "a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it)." *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1344 (N.D. Ga. 2012). Scienter allegations must not be scrutinized in "isolation" but rather "holistically." *Thorpe v. Walter Inv. Mgmt. Corp.*, 111 F. Supp. 3d 1336, 1359 (S.D. Fla. 2015). The AC sets forth numerous detailed factual allegations that collectively establish a strong inference of Defendants' scienter here. ¶¶197-212.

### 1. Defendants' Own Admissions Support Scienter

Defendants' own stark admissions at the end of the Class Period confirm their scienter. ¶¶93-101. Defendants admitted that Vestis was plagued by longstanding "service gaps" that had prompted a mass customer exodus and rendered Vestis unable to perform even the most basic tasks required of a uniform company: "delivering on time, delivering full loads." ¶¶94-95, 97. Significantly, Scott made crystal clear that "these challenges have been in our business for quite some time" and were "not related to the spin [] I'll be clear about that." ¶101. Defendants further admitted that Vestis had lost a substantial number of customers before the Spinoff, including "two large national accounts," and that these were "known customer losses

as we exited FY 2023"—such that Defendants "<u>knew the impact coming in of the lower retention rate</u>." *Id*; *Tupperware*, 2023 WL 6310236, at *6 ("[i]ncongruity between word and deed establishes a strong inference of scienter"); *Norfolk*, 2025 WL 897540, at *9 (admission that pre-derailment safety statements were knowingly false was "effectively, a concession of scienter").

Defendants argue "no identified admissions constitute an admission that any officer knew their statements were false or misleading ***at the time they were made***" (VSTS Br. 40, emphasis in original), but the exact opposite is true. As stated above, <u>Defendants themselves admitted their statements were false when made</u>, *i.e.*, that the "service gaps" were not new and had "been in in our business for quite some time," and that the loss of the two large national accounts occurred before the Spinoff and were "<u>known customer losses</u>" with a known impact "<u>coming in</u>." ¶101; *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1115 (M.D. Fla. 2005) (rejecting "fraud by hindsight" argument where defendants made "contemporaneous statements praising the success of Catalina U.K. while simultaneously failing to disclose the loss of its largest contract"); *Towne Servs.*, 184 F. Supp. 3d at 1322 ("the presence of a properly-pled allegation of an existing problem at the time the statements and omissions were made renders the no-hindsight cases inapplicable").[12]

---

[12] Furthermore, Defendants' admissions are corroborated by FE accounts describing major customer losses before the Class Period—including Tyson's Chicken who

Moreover, Defendant Scott's substantial involvement in Vestis' logistics—and Scott and Dillon's repeated, explicit representations that their entire focus for years was to improve Vestis' logistics to ensure its success post-Spin—support that Defendants had long known about Vestis' significant service issues. ¶¶28, 53, 54, 57, 64, 85, 205-06. For example, two years before the Spinoff, Scott emphasized that she "had the opportunity to go pretty deep" at AUS and had "immersed [herself] in this business over the last 60 days." ¶205. Scott further emphasized as the Spinoff approached that she was "very, very focused on logistics," and had personally "spent time in the field riding along with [employees] and meeting our customers" to ensure Vestis' systems were working. ¶206. When COO Synek departed in February 2024, Scott again assured investors that her plan for Vestis "ha[d] been in motion for a very long time, for the 2.5 or 2 plus years that I've been here." ¶206.

Defendants assert these facts are irrelevant because "it is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business." VSTS Br. 40-41. However, given Scott's detailed emphasis of her direct involvement in the specific aspects of Vestis' business that Defendants later admitted were significantly deficient (and, as set forth below, the fact that she made repeated public statements about these issues), it would be

---

Scott personally met with to stop from leaving—and by internal Vestis reports sent to Scott's direct reports showing massive losses before the Spinoff and continuing through the Class Period. ¶¶114-118.

implausible to believe Scott was unaware of these deficiencies. *Zuckerman v. Smart Choice Automotive Group, Inc.*, 2000 WL 33996254, at \*2 (M.D. Fla. Aug. 29, 2000) (scienter found where defendant "[is] integrally involved in running [the company]" and was a "hands on manager"); *Primavera Investors v. Liquidmetal Tech. Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2008) (scienter where defendant was a "hands-on CEO" involved in the "nuts and bolts" of company operations).[13]

### 2. The Individual Defendants' Specific, Regular Public Remarks To Investors Support Scienter

Moreover, Defendants made a multitude of public statements regarding Vestis' service operations, customer relationships and technology both prior to and throughout the Class Period. For example, Defendants Scott and Dillon repeatedly asserted both before and during the Class Period—including in response to numerous analyst questions—that Vestis had "establish[ed] [] a service excellence culture across the [C]ompany" and that it had all of the necessary operating systems and technology in place to ensure accurate, on-time deliveries, including Telematics, which enabled it to maintain a customer retention rate above 90%. *E.g.*, ¶¶44-45,

---

[13] Defendants' authority (VSTS Br. 41) supports scienter here. In *Plymouth Cty. Ret. Sys. v. Carter's Inc.*, 2011 WL 13124501, at \*17 (N.D. Ga. Mar. 17, 2011), the Court agreed with the "basic proposition that a person's status as a corporate officer, when considered alongside other allegations, can help support an inference that this person is familiar with the company's most important operations." In *City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*, 649 F. Supp. 3d 1256, 1272 (S.D. Fla. 2023), unlike here, there were no scienter "specific facts [] derived from confidential witnesses, internal company documents, defendant admissions, or other sources."

48-50, 54-57, 59-67, 74, 88-90. Defendants' repeated statements demonstrate their direct knowledge of the matters of which they spoke. *Tupperware*, 2023 WL 6310236, at *6 (defendants "made several public statements on these topics" and "were or should have been knowledgeable on the statements"); *City of Warren General Emps. Ret. Sys. v. Teleperformance SE*, 2024 WL 2320209, at *19 (S.D. Fla. May 22, 2024) (when a defendant "makes a statement or statements repeatedly, it can more strongly evince an inference that the defendant spoke with scienter").

Defendant Scott also regularly responded to specific analyst inquiries about customer losses by falsely claiming they were either "very intentional" and "very purposeful," and thus of no moment, or were due to "business closures" and did not have anything to do with Vestis' poor service. In reality, and as Scott herself would ultimately admit, the opposite was true: these customer departures were "regrettable," not "part of our strategy," and directly attributable to Vestis' abysmal service. Scott's statements "downplay[ing]" or "dod[ging] questions" about the real reasons for Vestis' customer attrition support scienter. *Teleperformance*, 2024 WL 2320209, at *19 ("Directly nonresponsive answers to questions have been held to support a strong inference of scienter. So, too, have evasive responses.").

The inference of scienter is bolstered where, as here, Vestis' deficiencies unquestionably involved its core operations. *City of Sunrise Gen. Employees' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *11 (N.D. Ga. May 15, 2018);

54

*Flower Foods*, 2018 WL 1558558, at *14; *Tupperware*, 2023 WL 6310236, at *6; *Mohawk*, 564 F. Supp. 3d at 1302. Indeed, given the admitted importance of Vestis' on-time, accurate service; its technology and tools enabling that service; and the retention of its long-tenured customers, Defendants knew or were severely reckless in not knowing about the fundamental issues they admitted had plagued Vestis "for quite some time." ¶¶41, 209; *Norfolk*, 2025 WL 897540, at *10 ("Plaintiffs have adequately alleged knowledge of Norfolk's safety failures should have percolated up to the company's executives because those failures were obvious. . ."); *Towne Servs.*, 184 F. Supp. 2d at 1325 (where claims involved "a shut down of Towne's data lines, and a greater-than-usual cancellation of its customer contracts," "[n]o further facts need be pleaded to support a strong inference that Towne was at least 'severely reckless' if it remained unaware of these facts").

### 3.    The FEs And Internal Vestis Reports Support Scienter

*First*, the AC's seventeen FEs provide first-hand and cross-corroborating accounts of the fundamental service failures plaguing nearly all aspects of Vestis' business, supporting an inference of Defendants' scienter. *Dycom Indus.*, 454 F. Supp. 3d at 1258 (crediting FE accounts because "information from multiple confidential sources can be meaningful when corroborated by one another").[14]

---

[14] "The Eleventh Circuit welcomes confidential informants." *Fleetcor*, 2018 WL 4293143, at *8. The AC sets forth the FEs responsibilities and employment tenures,

Indeed, the FEs described significant operational problems at Vestis locations across the Country, including Arkansas (¶172), Louisiana (¶¶118, 120, 155), Michigan (¶119), Maryland (¶150), Tennessee (¶120, 123), Mississippi (¶¶120, 148, 155), Ohio (¶¶119, 121, 130), California (¶122), New England (¶128), Oregon (¶129), Texas (¶129), and Illinois (¶139). The reports came from, and involved, employes ranging from Presidents (¶¶112, 126) and Vice Presidents (¶¶112, 116, 127) to Account Executives (¶117, 119, 122, 129, 138), Sales Executives (¶¶123, 128), Facility Sales Representatives (¶121, 139,) and Compliance Managers (¶118). Additionally, the events described all occurred in the context of a two-year Spinoff process and extended throughout the Class Period, during which Scott and Dillon were specifically tasked with fixing Vestis' operations. ¶¶47, 49-50, 56-57.

These allegations more than support "senior management participation" or knowledge of the issues plaguing Vestis. *Norfolk*, 2025 WL 897540, at \*\*9-10 ("pervasiveness" of safety violations supported scienter where "[i]t pervaded every aspect of the company's operations," "impacted every area of the company's footprint," and was "felt by every level of employee").[15]

---

which demonstrate that they were "in a position to know" the information presented. ¶¶109-155; *Monroe*, 2018 WL 1558577, at \*32.

[15] Defendants' assertion that the FEs are inconsequential because the "customer losses were offset by gains elsewhere" (VSTS Br. 47; ARMK Br. 12), wholly ignores their admission that those "losses reduced second quarter revenues by 9% year-over-

Defendants are wrong that the FEs cannot support scienter where there is a lack of direct "contact with Defendants." VSTS Br. 42-43; ARMK Br. 20. Multiple courts, including this one, have rejected the need for "allegations directly linking" the former employees to Defendants when their widespread and corroborating accounts show "company-wide" conduct. *Fleetcor*, 2018 WL 4293143, at *11; *Norfolk*, 2025 WL 897540, at *10 (crediting FEs without direct contact with defendants because "the sheer scale of Plaintiffs' allegations give rise to an inference of senior management participation"); *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) (crediting FEs who had no direct contact with defendants); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008) (same). In fact, in *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x at 915, 925 (11th Cir. 2020), the Eleventh Circuit found it "at least as likely as not that the defendants acted with scienter" based on reports from confidential sources who were not alleged to have directly spoken with the defendants.[16] *See also Paincare Holdings,* 541 F. Supp. 2d at 1293 ("The Company's

---

year, <u>more than offsetting new business growth</u>," and two-thirds of this amount were from "<u>known</u> customer losses as we exited fiscal 2023." ¶¶98, 101.

[16] Defendants' citation to *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1290 (S.D. Fla. 2008) (VSTS Br. 42), undermines their argument, as that very court later credited FE allegations who "were in close proximity to the offending conduct," rather than those with direct access to the C-Suite. *See Hubbard v. BankAtlantic Bancorp, Inc.,* 2009 WL 3261941, at *1 (S.D. Fla. May 12, 2009); *see*

implicit assertion that a Company can ignore the elephant in the room, as long as no one *told* them it was there, does not negate recklessness.") (emphasis in original).

Furthermore, Defendants ignore that the FEs <u>do</u> establish Defendants' personal involvement.  For example, FE3 recounted how Scott personally met with Tyson's Chicken in an attempt retain the national account's business despite "a lot of service issues that were not being corrected." ¶118.  FE1 and FE7 described internal cancellation and quality reports delivered to the C-Suite, which highlighted the operational problems and customer losses.  ¶122.  And FE2 and FE8 both recalled the February 2024 town hall meeting where Scott explained that, due to Vestis' poor services, Vestis was slashing prices to keep customers from jumping ship. ¶123.

Defendants' gripe that five of the FEs left before the Class Period (VSTS Br. 45) misses the mark because witness "statements are not rendered irrelevant merely because [the witness] was not employed during the Class Period." *Flowers Foods*, 2018 WL 1558558, at *15; *Nebraska Inv. Council v. Fid. Nat'l Info. Servs., Inc.,* 2024 WL 4349125, at *4 (M.D. Fla. Sept. 30, 2024) (same); *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *8 n.6 (S.D. Cal. May 23, 2017) (FE's pre-class period

---

*also HD Supply*, 341 F. Supp. 3d at 1360 (finding scienter based on FEs with "proximity to the supply chain issues").  Defendants' reliance on *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *6 (11th Cir. Aug. 8, 2023) (VSTS Br. 43) is also misplaced, as the court there was concerned with determining whether a low-level employee could be considered the "maker" of certain statements through the use of FEs, an issue not present here.

tenure did not "diminish the probative value of his allegations," where they "corroborate the allegations of other [FEs]" and "indicate" a "pattern of misconduct that began before the class period").[17]

*Second*, in a rarity for a securities fraud action, the AC details numerous internal "Weekly Install and Loss" reports that were sent directly to Scott's direct reports, which confirm the heavy customer losses just prior to and after the Spinoff. ¶¶112-115, 122.  These reports—showing $147 million in customer losses between August 21, 2023 and April 19, 2024, with $55 million of that amount lost during the five weeks prior to the Spinoff—strongly reinforce the FE accounts, especially when combined with Defendants' own admissions of "known customer losses as we exited fiscal 2023." ¶¶98; 122; *Hubbard*, 2009 WL 3261941, at *1 (inferring scienter based on FE accounts and internal "Exception Reports" provided to defendants); *Equifax*, 357 F. Supp. 3d at 1235 ("the PSLRA can easily be satisfied with references to internal memoranda").

Recognizing the damning nature of these reports, Defendants proffer that

---

[17] In *Burbidge v. Adtran, Inc.*, 2021 WL 2555690, at *8 (N.D. Ala. Mar. 31, 2021) (VSTS Br. 45) the court discredited the FE report because the pre-class period information was "not in close proximity to the alleged offending conduct"; here, the pre-Spinoff information was integral to the false statements in the Information Statement. The attacks on FE15 (VSTS Br. 45) are unwarranted because, as a former Cintas Service Account Manager, he was in position to hear customers' complaints regarding a competitor.  *Fleetcor*, 2018 WL 4293143, at *8 (FEs are credited where "Court is able to determine the basis of each witnesses' knowledge").

there are no allegations that "Scott or Dillon ever received or reviewed those documents." VSTS Br. 46. But, again, these reports were sent to Scott's direct reports—including Senior VP of Sales Panos, and VP of Sales Cornelius—and internal reports that are known to a defendant's direct reports support scienter. *Tupperware*, 2023 WL 6310236, at *6 (scienter where FE "attended meetings with [individual defendant's] direct report where pricing and margins were discussed"); *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, 2018 WL 4844019 (S.D. Fla. Oct. 4, 2018) (despite no specific allegations that executive "conveyed the backdating discovery to [defendant], given [defendant's] status as a high level executive, there is a plausible inference that he was aware of the backdating scheme"); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192–93 (N.D. Cal. 2010) ("having penetrated the Defendants' executive circle, so to speak, Plaintiffs may support an inference that the other executive officers were aware of certain key facts"). Given that retention was "the single most profitable thing" for Vestis, it is inconceivable that these direct reports would not share news of massive pre-Spin losses with the CEO and CFO. ¶65; *In re Grand Canyon Educ., Inc. Sec. Litig.*, 2023 WL 2072227, at *24 (D. Del. Feb. 17, 2023) ( "fair inference" that important information was "shared" with those "heavily involved" in the relevant issues). Again, Defendants themselves admitted to these "known" losses as Vestis "exited" 2023 described in these documents. ¶98; *Bond v. Clover Health Invs., Corp.*, 587 F.

60

Supp. 3d 641, 677 (M.D. Tenn. 2022) ("defendants' own position is that they were aware…and affirmatively chose not to disclose" the underlying information).[18]

Moreover, smoking gun allegations are not necessary. A "classic fact pattern giving rise to a strong inference of scienter" is "access to facts suggesting that the statement is inaccurate." *Tupperware*, 2023 WL 6310236, at *5; *see also Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 (5th Cir. 2023) ("A confidential witness does not need to be a fly on every relevant wall—or directly deliver every relevant presentation"). Dillon and Scott had access to these reports, supporting scienter. ¶¶116, 122; *Equifax*, 357 F. Supp. 3d at 1239 (defendant "at least, *had access to facts* showing that the cybersecurity was seriously deficient, which would contribute to a conclusion that he was at least severely reckless").

### 4. Analysts' Reaction To Defendants' Misrepresentations Supports Scienter

Analysts' excoriation of Vestis' management at the end of the Class Period for

---

[18] That Defendants admitted they knew the substance of the reports renders Defendants' cited cases *Waterford Twp. Gen. Emps. Ret. Sys., v. Suntrust Banks, Inc.*, 2010 WL 3368922, at *4 (N.D. Ga. Aug. 19, 2010), *Damian v. Montgomery Cnty. Bankshares, Inc.*, 255 F. Supp. 3d 1265, 1281 (N.D. Ga. 2015), and *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *19 (N.D. Cal. Dec. 17, 2019), irrelevant as none involved similar admissions. VSTS Br. 46. The *Damian* decision is further distinguishable because the reports in question did not contradict the public statements. *Damian*, 255 F. Supp. 3d at 1279. So too in *In re Floor & Decor Holdings, Inc. Sec. Litig.*, 2020 WL 13543880, at *7 (N.D. Ga. Sept. 21, 2020), which lacked allegations that review of the reports would have alerted defendants to the falsity of their statements.

their prior misrepresentations and lack of credibility supports scienter.  ¶¶102-08, 204; *In re FibroGen, Inc. Sec. Litig.*, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022) (scienter "supported by the reaction of the . . . financial community); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (same).   While Defendants argue ipse dixit that such analyst reactions cannot support scienter (VSTS Br. 47), in reality, it is clearly significant that these sophisticated market participants highlighted the stark contrast from Defendants' earlier representations, including as recently as the prior quarter, and seriously questioned management's credibility as a result.

For example, Jefferies expressed incredulity that this was the "first time" Defendants were disclosing the customer retention and service issues publicly, emphasizing that Vestis suffered from a "significant mgmt. credibility issue." Jefferies further noted that it was "troubling" that "mgmt. never fully disclosed the fall off in retention on recurring revenue it started experiencing 2H23 or the true magnitude of customer losses to be expected" in FY24. ¶104.   Other analysts followed suit, expressing incredulity that Defendants were unaware of these longstanding issues given that Scott and Dillon were Aramark executives for a full two years before the Spinoff.  For example, Barclays wondered how there could be "this big of a revision" "in the last 90 days or whatever," pointing out to Defendants that "you were at the company for almost 2 years, while under Aramark."  Wolfe

62

Research similarly bluntly asked: "<u>why haven't you guys caught this before the separation</u>?"  Wolfe Research later expressed incredulity that Vestis had just reaffirmed its FY24 guidance the prior quarter—and lamented that, despite these "service shortfalls" clearly already being known pre-Spinoff, they "were not discussed during the Company's [September 2023] analyst day."  ¶¶107-08. Similarly, Goldman Sachs emphasized "<u>the revenue guide that you issued just a quarter ago was brought down quite a significant amount,</u>" and J.P. Morgan noted that "<u>[a]s you articulated, your plan had just been a couple of months ago for a targeted in-year price increase and then you pivoted to a price decrease.</u>" ¶108.

### 5.    Top Executive Departures Support Scienter

Courts have regularly found that suspiciously-timed or "rapid succession" key executive departures "can strengthen an inference of scienter."  *E.g.*, *San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *11 (S.D.N.Y. 2024) ("there were too many departures to say that they were coincidental with a straight face" as "[s]uch house-cleaning" does "not follow innocent mistakes"); *City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. Aracruz Cellulose*, 41 F. Supp. 3d 1369, 1408 (S.D. Fla. 2011) (resignation of CEO responsible for misstatements supported scienter).

Despite the fact that Vestis has been an independent company for only 18 months, it had a remarkably high level of turnover at the top—with at least five

confirmed C-suite departures in a year. *First*, as the AC alleges, on February 6, 2024, the day before announcing disappointing 1Q24 results, COO Synek abruptly resigned. ¶¶79-80; *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (resignation on day company announced "true wholesale inventory numbers" supported scienter). While Defendants argue Synek's departure is not indicative of scienter because there are no allegations that link it to the fraud (VSTS Br. 48), this is incorrect—the timing of it makes clear that it was directly linked to the disclosures, and multiple FEs described Synek's departure as being a direct result of disputes with Scott over Vestis' lack of service quality. ¶¶133-34. Analysts also reacted to Synek's "abrupt" departure, which occurred only five months after he joined the Company and in the midst of what Defendants would later admit were serious customer service and retention issues. ¶91.[19]

*Second*, on January 31, 2025, Vestis announced that Defendant Dillon and General Counsel Timothy Donovan would depart Vestis. Significantly, Dillon did not leave on his own terms; rather, "it was determined" that he "will leave the

---

[19] Thus, in contrast to *In re Jiangbo Pharms. Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1268 (S.D. Fla. 2012) (VSTS Br. 48), Plaintiffs have specifically alleged "facts linking the departure(s)" with the alleged fraud. The departure there is also distinguishable given the officer in *Jiangbo* "stayed on with the Company as a consultant after her resignation." *Id.* at 1263. The resignations here were abrupt, and in both Scott and Dillon's case, not voluntary.

Company." Hooker Decl. Ex. 2 (January 31, 2025 Vestis Form 8-K).[20] Shortly thereafter on March 18, 2025, Vestis' Board of Directors determined that Scott would also leave her position as CEO and President of Vestis, effective immediately. *Id.* Ex. 3 (March 19, 2025 Vestis Form 8-K). Scott resigned from the Company's Board of Directors the same day. *Id.*; *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at \*7 (S.D. Fla. June 6, 2016) (resignation suggested scienter where former officer "was at the epicenter of" company's business and was "forced to resign"); *In re FirstEnergy Corp.*, 2022 WL 681320, at \*21 (S.D. Ohio Mar. 7, 2022) ("tall[ying] the executive terminations on the side of scienter"); *West Palm Beach Police Pension Fund v. DFC Global Corp.*, 2015 WL 3755218, at \*17 (E.D. Pa. 2015) ("resignation of key executives . . . bolsters the evidence of conscious or reckless behavior").[21]

### 6. The Vestis Defendants' Lack of Insider Stock Sales Does Not Negate Scienter

The Vestis Defendants attempt to make much of the fact that the Individual Defendants did not engage in insider stock sales (VSTS Br. 49-50), but the Supreme

---

[20] Judicial notice of the SEC filings submitted as exhibits herewith (Exs. 1-4) is proper as courts routinely take judicial notice of various public documents filed with the SEC. *See, e.g., In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1341 n.1 (N.D. Ga. 2010) (taking judicial notice of SEC filings).

[21] According to analysts, Andy Panos, SVP of Sales & Marketing, Scott's former direct report, has also left the Company, in addition to Chief Accounting Officer Bryan Johnson. Hooker Decl. Ex. 4 (March 4, 2025 Form 8-K).

Court has held that a complaint need not include allegations of "motive." *Tellabs*, 551 U.S at 325. "That Plaintiffs do not allege that [a defendant] gained, or attempted to gain, any personal enrichment from the improprieties does not defeat the complaint." *Miller v. Dyadic Int'l Inc.*, 2008 WL 5070279, at *14 (S.D. Fla. Nov. 25, 2008); *Monroe*, 2018 WL 1558577, at *26 (allegation of personal financial gain not required for scienter); *Tupperware*, 2023 WL 6310236, at *5 (same).

In any event, Defendants' arguments regarding the lack of insider sales are not compelling here, as Defendants Scott and Dillon were required to retain their stock. Hooker Decl. Ex. 5 (December 16, 2024 Vestis Proxy Statement at 41-42) (detailing the requirement to hold shares respective to salary, with Defendant Scott required to hold 6x her annual base salary, or $5.5 million, and direct reports such as Defendant Dillon to hold 3x his annual base salary, or $1.8 million).[22]

### D.    The Complaint Alleges The Aramark Defendants' Scienter

The AC alleges numerous facts supporting an inference of the Aramark Defendants' scienter. For example, the internal "Weekly Install and Loss" reports and numerous FE statements—including from a former VP of AUS—confirm Vestis was "bleeding customers," including the two national accounts, while it was still

---

[22] In *Mizzaro v. Home Depot*, 544 F.3d 1230, 1253 n.3 (11th Cir. 2008) (VSTS Br. 49), the case Defendants cite, the Eleventh Circuit in fact took pains to "emphasize that suspicious stock sales are not *necessary* to create a strong inference of scienter" (emphasis in original). Rather, "the presence or absence of such allegations must be assessed in light of all of the allegations found in the complaint." *Id.*

66

with Aramark. *See* ¶¶112-115; 117-121, 139, 148, 151.  Numerous FEs, including AUS executives, confirmed Vestis' horrendous service pre-dated the Spinoff and was caused by Aramark's failure to "invest[] in facilities in 10+ years." *See* ¶¶117-122, 126-129, 134, 137-139, 141, 143-145, 147-148, 151. Scott and Dillon's admissions that Vestis' major customer losses were "known" before the Spinoff, and that the service issues "persisted in this business for some time" and were "not related to the spin," fundamentally refutes the Aramark Defendants' argument that the admissions do not "reflect" pre-Spin knowledge. ¶98, 101; ARMK Br. 20.

In addition, "scienter of a corporation is established by showing that the corporation's officers or directors acted with scienter." *ZPR*, 861 F.3d at 1252.  Scott and Dillon were both pre-Spin executives at Aramark, and therefore their pre-Spin knowledge—including the "known" customer losses and service issues—is imputed to Aramark.  ¶¶28-29; *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011, at *16 (M.D. Fla. Oct. 16, 2019) (imputing a former executive's scienter to corporation).

With regard to Zillmer, Defendants overlook his public statements professing his deep knowledge of AUS's business and operations, which further confirm scienter. *Teleperformance*, 2024 WL 2320209, at *19 ("[t]he most powerful evidence of scienter is the content and context of [the] statements themselves").  For example, Zillmer divulged in 2022 that he knew the "company had work to do with respect to

67

fixing the business" but assured investors that all necessary "investments" were made. ¶50. He further claimed the Company had implemented "route accounting systems" and saw "improved" retention, such that Vestis already had begun "to drive the benefits of that system throughout the enterprise." ¶¶48, 50, 52.  Just prior to the Spinoff, Zillmer confirmed that the Company's "retention" was "right there with our competitors," and "encourage[d]" investors to read the Information Statement highlighting the false 90% retention rate. ¶¶55, 59. These statements recklessly disregarded that the route system was not operational, Vestis lacked a basic Telematics system, and Vestis was hemorrhaging customers due to its abysmal service in the lead up to the Spinoff.  ¶¶95-96, 98-99.

Moreover, the Aramark Defendants had strong motive to lie:  they had to justify the massive $1.5 billion payout Aramark desperately needed to alleviate its over $7 billion in debt. ¶¶42-43, 211; *Monroe*, 2018 WL 1558577, at *24 (finding company's financial motive probative of scienter); *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018) ("Defendants had a significant *motive* … they could secure $1.2 billion of financing needed for the spin off") (emphasis in original).

The Aramark Defendants' counter-factual argument that the $1.5 billion payment reflected Vestis' "proportionate share" of the pre-Spin debt fails. ARMK Br. 21-22.  *First*, to make the argument, Defendants go well beyond the four corners

68

of the pleading, as not only is the purported pre-Spinoff debt nowhere in the AC, but it also requires the Court to accept the truth of the information in the document they provided. *LBS Petroleum, LLC v. Demir*, 2016 WL 4625619, at \*5 (S.D. Fla. Mar. 7, 2016) ("The only documents properly before the Court are the documents incorporated into Plaintiff's Complaint"); *Flowers Foods*, 2018 WL 1558558, at \*5 (judicially noticing SEC filings but "not for the truth of the matters they assert").

*Second*, even if the Court were to consider this document, the document utterly fails to support the Aramark Defendants' argument. ARMK Br. 21.  The document merely lists Aramark's total debt as of September 29, 2023, without specifying what portion, if any, was incurred by AUS. *See* ECF No. 67-3 at 17.  At base, the argument presents factual disputes inappropriate at this stage. *Norfolk*, 2025 WL 897540, at \*7 ("resolving competing factual inferences against Plaintiffs on a motion to dismiss...is something the Court cannot do").  Further, this fact, even if true, would not defeat Aramark's motive, as it still received a massive and desperately needed $1.5 billion cash payment, which it could not have obtained without falsely representing Vestis' business.[23]

---

[23] The fact that a shareholder vote was unnecessary to accomplish the Spinoff does not negate the Aramark Defendants' scienter—the Aramark Defendants were still clearly motivated to artificially prop up Vestis' stock price to convince investors that the Spinoff should occur and would be successful.  ARMK Br. 22.  Moreover, while Aramark argues Zillmer received some Vestis stock in the Spinoff (*id.*), Zillmer's automatic receipt of Vestis stock "like all Aramark shareholders" does not negate his scienter, and only highlights that Aramark itself did not retain any Vestis stock.

### E.    The Aramark Defendants Are Responsible for the Information Statement

Citing to *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), Zillmer argues that he did not "make" any statements in the Information Statement and thus cannot be held liable.  ARMK Br. 22-24. Notably, there is no dispute that Aramark is responsible for the Information Statement. *Id.* at 25 (arguing that "Plaintiffs fail to plead a Section 10(b) claim against Zillmer").  Nor could there be, as the Information Statement makes clear that it was "Aramark [that was] delivering this document" to shareholders.  ECF No. 67-2 at 12.

Zillmer, however, is also liable for the Information Statement.  In *Zwick*, 2018 WL 2933406, at *3, the court found that a parent company's CEO was a "maker" of a spinoff-related information statement because the statement was "accompanied by a letter on [the parent's] letterhead from [the parent's] President and CEO."  *Id.* Here, Zillmer's signed cover letter appeared on Aramark letterhead, endorsed the Information Statement's contents, and specifically "encourag[ed]" investors to rely on it.  ¶59; ECF 67-2 at 6.  Moreover, parent companies and their executives are regularly considered "makers" of a subsidiary's statements as they have ultimate control over such filings. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017) (finding parent-company CEO maker of subsidiary's offering memorandum); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558-

70

59 (S.D.N.Y. 2014) (holding parent company and its president were makers of subsidiary's statement).

Contrary to Zillmer's assertions (ARMK Br. 23), the AC alleges that Zillmer "possessed the authority to control the contents of Vestis' Information Statement" and was "provided with copies" of the filing "prior to or shortly after [its] issuance." ¶33. That is sufficient. *Volkswagen*, 2017 WL 3058563, at *8 (executives deemed makers where they allegedly "were able to and did control the content" of offerings and "were provided with copies…prior to or shortly after their issuance"); *Home Loan Servicing*, 2016 WL 10592320, at *8 (allegations of "control" are sufficient under *Janus*).

In any event, and as discussed below, Zillmer is liable for disseminating the Information Statement even if he was not the statement's "maker." *S.E.C. v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) (holding *Janus* does not apply to "subsections (a) and (c) of Rule 10b–5").

### F.    Plaintiffs Have Standing To Sue The Aramark Defendants

The Aramark Defendants also argue that Plaintiffs "lack standing" to sue them (ARMK Br. 24), relying on the Second Circuit decision of *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 88 (2d Cir. 2022), subsequently adopted by the Ninth Circuit in *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024). As an initial matter, these out-of-Circuit cases addressed the specific

71

issue of whether shareholders of a company had standing to sue that company's merger partner for pre-merger statements under Section 10(b)—a situation that is wholly inapposite from this case, which involves <u>Aramark spinning off part of itself</u>.

The Aramark Defendants also misrepresent the standard set forth by *Menora* and *Lucid*, falsely claiming that those courts limited standing based on whether the statements related to the "pre-transaction" or "post-transaction" entities. ARMK Br. 24. This is incorrect. Both the Second and Ninth Circuits only narrowed statutory standing "to purchasers or sellers of securities <u>about which</u> a misstatement was made," without distinguishing between pre and post transaction statements. *Menora*, 54 F4th at 84; *Lucid*, 110 F4th at 1186.[24] It cannot be disputed that Vestis' Information Statement was "about" Vestis, and if it were not already obvious, Zillmer's cover letter expressly concedes that "[I]nformation [S]tatement…contains important business and financial information <u>about Vestis</u>." ¶30; ECF No. 67-2 at 6.

Regardless, the court should reject the invitation to adopt this out-of-circuit standing standard, as aside from being inapplicable, it also contradicts long-standing <u>binding precedent</u> allowing plaintiffs to sue defendants who did not issue the exact stock purchased. *See Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 595 (5th Cir.

---

[24] Defendants' framing of *Lucid* as turning on whether the statements relate to a "pre" or "post-transaction" entity is disingenuous at best, as the Ninth Circuit went out of its way to note that the "[p]laintiffs purchased CCIV stock" when the statements were about Lucid—i.e. "two entirely separate companies." *Lucid*, 110 F. 4th at 1187.

1974)[25] (finding shareholder of "Pearl stock" had standing to assert Section 10(b) claims against merger partner "Southdown" based on pre-merger statements); *see also Spiegel v. Siegel*, 2008 WL 151951, at *5 (S.D. Fla. Jan. 15, 2008) (shareholder of "Accessity" had standing to assert claims against "Pacific Ethanol" for pre-merger statements); *Zwick*, 2018 WL 2933406, at *7 (pre-spinoff misstatements actionable against parent); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1236 (N.D. Okla. 2003) (former parent liable for "statements made prior to WCG's spin-off").

Even after *Menora*, courts in the Eleventh Circuit and elsewhere have not changed this standing analysis. *See Theodore v. Purecycle Techs. Inc.*, 2023 WL 4035880, at *1 (M.D. Fla. June 15, 2023) (post-*Menora* decision sustaining misleading statements about a private company prior to SPAC transaction); *Levy v. Luo*, 2025 WL 437022, at *5 (D. Del. Feb. 7, 2025) (rejecting the "arguments regarding standing" because "[t]he Third Circuit has not adopted the standard set forth in *Menora* or *Lucid*"). This Court should not deviate from binding precedent.

G.    **All Defendants Are Liable For Scheme Liability**

All Defendants are also liable under SEC Rules 10b-5(a) and (c) for disseminating the false and misleading statements which operated as a fraud on investors. ¶¶237, 244; *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 78 (2019)

---

[25] All decision from the former Fifth Circuit prior to October 1, 1981 are binding precedent within the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

(scheme liability is "sufficiently broad to include within [its] scope the dissemination of false or misleading information with the intent to defraud").  Notably, the Vestis Defendants do not contest their liability for partaking in the scheme and therefore waive any argument to the contrary.  *Williams v. Hill*, 2022 WL 1715212, at *4 (N.D. Ga. Mar. 31, 2022) (arguments not addressed in brief are waived).

The Aramark Defendants argue that the AC alleges "only misrepresentations" and "no other conduct by Aramark and Zillmer to further a scheme." ARMK Br. 25. But this fundamentally misunderstands the law.  No allegations of "other conduct" are needed because in the Eleventh Circuit, "dissemination of fraudulent statements is clearly sufficient under *Lorenzo* itself."  *S.E.C. v. Westhead*, 733 F. Supp. 3d 1284, 1303 (S.D. Fla. 2024); *S.E.C. v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309, 1340 (S.D. Fla. 2021) ("[U]nder *Lorenzo*, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself") (citing *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020)). Zillmer's cover letter makes clear he "attached" the Information Statement and "encouraged" investors to read it; the Information Statement itself professed that it was "Aramark" who was "delivering this document."  ¶59; ECF No. 67-2 at 6, 12.[26]  Nothing more is required.

---

[26] The Aramark Defendants' reliance on *IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 858 (11th Cir. 2016) (ARMK Br.

74

## IV.    THE AC ADEQUATELY PLEADS CONTROL PERSON LIABILITY

To state a claim under Section 20(a), Plaintiffs must allege (1) that Defendants committed a primary violation of the securities laws; (2) that the Individual Defendants had the power to control Vestis; and (3) that they had "the requisite power to directly or indirectly control or influence" the public statements at issue. *Alaska*, 603 F. Supp. 3d at 1240-41.  Plaintiffs have done so here.

*First*, as set forth above, Plaintiffs have established that all Defendants committed a primary violation of the securities laws.  *Second*, Plaintiffs have pleaded that Defendants Scott and Dillon, as CEO and CFO of Vestis, had the power to control Vestis and its public statements during the Class Period. ¶35-37. *Third*, Defendants Aramark and Zillmer similarly had control over Vestis when it was part of Aramark, as they had power and influence over Scott and Dillon, former officers of AUS, in addition to the content of the statements made in Vestis' Information Statement and September 13, 2023 Investor Day call.  *See* ¶31-34; 249-57.

## V.    CONCLUSION

For all of the foregoing reasons, Lead Plaintiffs respectfully submit that Defendants' motions should be denied in their entirety.

---

25) is misplaced as it predates *Lorenzo*. The opinion in *Gnanaraj v. Lilium N.V.*, 2024 WL 3916758, at *2 (S.D. Fla. Aug. 23, 2024) does not help because it lacked allegations that the defendant personally disseminated the false statements.

Dated:  May 2, 2025

Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/ Lester R. Hooker*

Lester R. Hooker (admitted *pro hac vice*)
Dianne M. Pitre (admitted *pro hac vice*)
Jonathan Lamet (admitted *pro hac vice*)
Scott Koren (admitted *pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com
dpitre@saxenawhite.com
jlamet@saxenawhite.com
skoren@saxenawhite.com

**SAXENA WHITE P.A.**
Steven B. Singer (admitted *pro hac vice*)
Kyla Grant (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com

*Lead Counsel for Lead Plaintiffs*

**LINDSEY & LACY, PC**
W. Thomas Lacy, Jr.
Georgia Bar No. 431032
200 Westpark Drive, Suite 280
Peachtree City, GA 30269
Tel.: (770) 486-8445
Fax: (770) 486-8889
tlacy@llptc.com

76

*Local Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ Lester R. Hooker*
Lester R. Hooker

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Civil Rule 7.1D, that the foregoing document complies with the font and point selections approved by the Court in Local Civil Rule 5.1C, as it was prepared on a computer using Times New Roman, font size 14.

*/s/ Lester R. Hooker*
Lester R. Hooker
