**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| PLUMBERS, PIPEFITTERS AND APPRENTICES LOCAL NO. 112, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | <u>CLASS ACTION</u><br>NO. 1:24-CV-02175-SDG |
| vs. | ) ) | |
| VESTIS CORPORATION, ET AL., | ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

**DEFENDANTS VESTIS CORPORATION, KIMBERLY SCOTT, AND
RICK DILLON'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE
<u>AMENDED COMPLAINT</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ........................................................................................................5

I    THE AC FAILS TO PLEAD A MATERIAL
MISREPRESENTATION OR OMISSION. ...................................................5

    A.    Numerous Statements Were Pure Omissions......................................6

    B.    The Statements Were Not False, Misleading, or Material..................8

        1.    Statements Regarding Service Excellence and
Ability to Deliver on Time Were Not False and
Are Classic Puffery.............................................................8

        2.    The Telematics Statements Were Not False or
Misleading. ......................................................................11

        3.    Statements Regarding Long-Term Customers
Were Not False. ...............................................................13

        4.    Statements Regarding Long-Tenured Customers
and 90% Retention Rate Were Not False or
Misleading. ......................................................................14

        5.    The Statements Regarding "Taking Price" Were
Not False .........................................................................19

    C.    Defendants' Forward-Looking Guidance Is Non-Actionable............20

    D.    Defendants' Opinion Statements Are Not Actionable.......................22

II    THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED
FACTS GIVING RISE TO A STRONG INFERENCE OF
SCIENTER. ...............................................................................................22

    A.    Defendants Made No "Admissions" or Public Remarks
Supporting a Strong Inference of Scienter........................................22

    B.    The FE Allegations Do Not Support a Strong Inference of
Scienter.............................................................................................28

    C.    Synek's Departure and Events Post-dating the AC Cannot
Support an Inference of Scienter.......................................................32

    D.    Third-party Analysts Cannot Establish Defendants' Scienter. ..........34

    E.    The Absence of Motive Weighs Against Inferring Scienter.............34

i

CONCLUSION..............................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Bofi Holding Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)......................................................32

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*,
2025 WL 897540 (N.D. Ga. Mar. 24, 2025) ..........................................10, 28, 29

*Burbidge v. Adtran, Inc.*,
2021 WL 2555690 (N.D. Ala. Mar. 31, 2021) ....................................................31

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ........................................................5, 7, 21, 22

*In re Catalina Mktg. Corp. Sec. Litig.*,
390 F. Supp. 2d 1110 (M.D. Fla. 2005)........................................................25, 26

*City of Hollywood Police Officers' Ret. v. Citrix Sys.*,
649 F. Supp. 3d 1256 (S.D. Fla. 2023) ...............................................................33

*City of Los Angeles v. Bankrate, Inc.*,
2015 WL 11438106 (S.D. Fla. Nov. 23, 2015) ...................................................33

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)......................................................30

*In re Equifax Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)................................................................30

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022) .....................................................34

*In re Flowers Foods Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018).....................................................32

*In re Galectin Therapeutics Sec. Litig.*,
843 F.3d 1257 (11th Cir. 2016) ............................................................................5

*Gamboa v. Citizens, Inc.*,
2018 WL 2107205 (W.D. Tex. 2018)...................................................................35

*Hattaway v. Apyx Med. Corp.*,
 2023 WL 4030465 (M.D. Fla. June 15, 2023) ....................................................31

*In re HD Supply Sec. Litig.*,
 341 F. Supp. 3d 1342 (N.D. Ga. 2018)..........................................................20, 21

*Hershfang v. Citicorp*,
 767 F. Supp. 1251 (S.D.N.Y. 1991) ....................................................................34

*In re HomeBanc Corp. Sec. Litig.*,
 706 F. Supp. 2d 1336 (N.D. Ga. 2010)............................................................5, 35

*In re Immucor, Inc. Sec. Litig.*,
 2011 WL 2619092 (N.D. Ga. June 30, 2011)......................................................10

*Keippel v. Health Ins. Innovations, Inc.*,
 2019 WL 5698329 (M.D. Fla. Nov 4, 2019)...............................................*passim*

*Key v. JPMorgan Chase Bank, N.A.*,
 2019 WL 12521482 (N.D. Ga. Oct. 11, 2019) .......................................................5

*Luczak v. Nat'l Beverage Corp.*,
 812 F. App'x (11th Cir. 2020) .............................................................................29

*In re Mako Surgical Sec. Litig.*,
 2013 WL 2145661 (S.D. Fla. May 15, 2013)......................................................31

*Mizzaro v. Home Depot*,
 544 F.3d 1230 (11th Cir. 2008)........................................................................1, 35

*Mogensen v. Body Cent.*,
 15 F. Supp. 3d 1191 (M.D. Fla. 2014)..................................................................28

*N. Collier Fire Control Pension Plan v. MDC Partners*,
 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ....................................................33

*In re Paincare Holdings Sec. Litig.*,
 541 F. Supp. 2d 1283 (M.D. Fla. 2008)..........................................................29, 30

*Plymouth Cnty. Ret. v. Carter's Inc.*,
 2011 WL 13124501 (N.D. Ga. Mar. 17, 2011) ...............................................24, 27

iv

*Primavera Investors v. Liquidmetal Tech. Inc.,*
  403 F. Supp. 2d 1151 (M.D. Fla. 2008)...............................................................27

*In re Sunterra Corp. Sec. Litig.,*
  199 F. Supp. 2d 1308 (M.D. Fla. 2002)...............................................................30

*In re Tupperware Brands,*
  2023 WL 5091802 (11th Cir. Aug. 8, 2023) .......................................................28

*In re Wet Seal Sec. Litig.,*
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...............................................................34

*Wilbush v. Ambac Fin.,*
  271 F. Supp. 3d 473 (S.D.N.Y. 2017) .................................................................33

*Zuckerman v. Smart Choice Automotive Group, Inc*
2000 WL 33996254 (M.D. Fla. Aug. 29, 2000) ...................................................27

**Statutes**

PSLRA ...........................................................................................................1, 2, 3

**Other Authorities**

FRCP 9(b) .............................................................................................................1, 2

Local Rule 7.1 ...........................................................................................................5

Rule 10b-5................................................................................................................5, 7

Rule 10b-5(b) ............................................................................................................6

v

## PRELIMINARY STATEMENT

Nothing in Plaintiffs' Opposition Brief ("Opposition" or "Opp.") saves its deficient AC from dismissal. Plaintiffs do not, and cannot, persuasively address the compelling grounds for dismissal in Defendants' brief in support of their motion to dismiss ("Moving Brief" or "Br.") because, at its core, their securities fraud claim is based on a pleading tactic universally condemned by the courts: fraud by hindsight.[1] Without the required particularized and specific factual allegations, Plaintiffs ask the Court to assume that, because the Vestis Defendants made certain disclosures on May 2, 2024, they must have known months earlier that the 41 Statements alleged in the AC were false and misleading. In the Opposition, Plaintiffs merely repeat the AC's deficient fraud allegations, which rely purely on hindsight, conclusory speculation, and unsubstantiated allegations from low-level former employees.

The AC should be dismissed for the following additional reasons. ***First***, Plaintiffs' description of the legal standards applicable to this Motion is incomplete and misleading. Nowhere in the Opposition do they acknowledge that they must allege each element of their securities fraud claim in accordance with the heightened pleading requirements of FRCP 9(b) and the ***even higher*** pleading standard mandated by the PSLRA. *Mizzaro v. Home Depot*, 544 F.3d 1230, 1238 (11th Cir.

---

[1] All abbreviations and citations have the same meaning as in the Moving Brief. All references to "Ex. __" refer to exhibits attached to the Declaration of Max W. Hirsch filed in Support of the Moving Brief, ECF No. 65-3.

2008) ("the PSLRA **substantially raised** the pleading standard" from Rule 9(b)) (emphasis added). Br. 18-19 (collecting cases). Nor do they explain that the Court need not accept conclusory allegations as true, where, as here, they are **contradicted** by the Company documents they purport to cite and quote.

*Second*, Plaintiffs attempt to defend the AC allegations regarding Defendants' purportedly false Statements about the customer retention rate, including that they were "forced to admit" at the end of the Class Period that the rate had dropped below the 90% figure that Defendants publicly touted, "all the way to 85%." But the bar chart from the investor presentation that underlies this allegation—**which plaintiffs cite in the AC**—directly contradicts these arguments. The presentation shows that the average retention rate for FY23 was 90.4% and the YTD retention rate through 2Q24 was 92.9%, with the rate dropping below 90% in only **one** of the six quarters (4Q23), returning to 92.6% in 1Q24 and 93.2% in 2Q24. *Id.* Indeed, far from being an "admission" that the retention rate had plummeted, the momentary dip to 85% was depicted on a slide called "Retention Is Trending In the *Right* Direction." In the Opposition, Plaintiffs argue that the momentary drop was significant because it was "the final quarter right before the Spinoff" and "unquestionably the most critical period for Vestis investors." But Plaintiffs' myopic view of the customer retention rate ignores that: (i) the retention rate was over 90% at all times both before and after that quarter and (ii) Vestis never represented its 4Q23 to be any specific number.

2

***Third***, Plaintiffs argue that all of Vestis's Statements regarding their "excellent customer service" and "long-standing customer relationships" were false and misleading because "Vestis' services were so lacking that the Company was 'selling a nonexistent service,' akin to 'sell[ing] air'—resulting in the Company 'bleeding' customers before the Spinoff." But these wildly hyperbolic allegations lack the specificity required by the PSLRA and are contradicted by unassailable facts: Vestis's revenue ***grew*** by 4.8% in the quarter (4Q23) that Plaintiffs falsely allege that the Company was "selling air" and "bleeding customers." And its revenue ***increased*** by 5.1% in FY 2023 and 2.5% in 1Q24 (or 4.5% growth with one-time charges excluded). Even in 2Q24, when Vestis reported "disappointing" results, its revenue was $705 million, which represented a 0.9% year-over-year ***increase*** in revenue, notwithstanding Plaintiffs' rhetoric.

***Fourth***, Statements about Vestis's customer relationships were not rendered false by the allegation—made repeatedly in the AC and argued in the Opposition—that Vestis failed to disclose that it had lost "two national customers" leading up to the Spin. To the contrary, documents cited in the AC state that the two "national customers" combined represented an immaterial "60 basis points [0.6%] of revenue growth headwind in the full year of FY24": less than 1% of Vestis's annual revenue.

***Fifth***, Plaintiffs argue that Scott "admitted" in the May 2024 earnings call that Telematics had never been installed by Vestis in its fleet of trucks and was not

operational. Not so. Scott stated in no uncertain terms in February 2024 that Vestis had "successfully deployed new [T]elematics technology across 89% of our fleet." Here, Plaintiffs plainly misquote Scott in her response to a question by an analyst in the May earnings call to attempt to manufacture a misstatement. However, Scott did *not* say Telematics had never been used prior to May 2024; she did *not* say that Telematics was "not operational" in May 2024; and she did *not* say that Vestis would "begin to use" Telematics in May 2024. Notably, not one of the 17 FEs in the AC allege that Telematics was not installed in Vestis's fleet of trucks as of May 2024, nor did any of the analyst reports cited in the AC report this "significant" admission.

In sum, Plaintiffs fail to demonstrate that they have met their heightened burden of pleading a material misrepresentation or omission. A large number of the Statements are inactionable pure omissions or accurate statements of historical fact. *See infra* I.A-B. Further, the Statements are not false, constitute immaterial puffery, or are forward-looking projections. This includes Statements regarding: (i) customer service and retention; (ii) Telematics and other technology; and (iii) the Company's guidance forecasts and ability to "take price." *See infra* I.B.1-5. As for scienter, Plaintiffs failed to allege cogent and compelling particularized facts sufficient to create a "strong" inference that Scott or Dillon made the Statements with the intent to deceive. *See infra* II.A-E. Notably, while Plaintiffs suggest that Aramark had a financial incentive to inflate Vestis's stock price (a point debunked in Aramark's

4

briefing),[2] the Opposition makes no arguments (nor could it) as to the Vestis Defendants' motive to commit fraud. In fact, Scott and Dillon had the ***opposite*** incentive, as Plaintiffs do not allege that they sold stock during the Class Period, their Vestis holdings increased during the Class Period, and they lost money when the stock dropped. Accordingly, the AC should be dismissed in its entirety.

## ARGUMENT

**I      THE AC FAILS TO PLEAD A MATERIAL MISREPRESENTATION OR OMISSION.[3]**

At the outset, Plaintiffs argue that "[g]enerally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury." Opp. at 25. However, in a securities action under Rule 10b-5, courts routinely decide this issue and dismiss similar complaints at the motion to dismiss phase under the applicable heightened pleading standards. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1329 (11th Cir. 2019); *In re Galectin Therapeutics Sec. Litig.*, 843 F.3d 1257, 1274 (11th Cir. 2016); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1353-54

---

[2] The Vestis Defendants join the arguments in Aramark Defs.' Reply brief.

[3] Defendants filed an Appendix with the Moving Brief to provide the Court with the complete text of the Statements at issue in the AC. Plaintiffs edited the Appendix to include legal arguments related to the Statements, which violates Local Rule 7.1 and circumvents their 75-page limit. *See Key v. JPMorgan Chase Bank, N.A.*, 2019 WL 12521482, at *5 (N.D. Ga. Oct. 11, 2019) ("It is totally unfair and inappropriate for Plaintiffs to exceed this Court's page limitations by filing twenty-five pages of legal argument as an 'exhibit.'"). If the Court chooses to consider the improper argument in Plaintiffs' Appendix, Defendants respectfully request the chance to respond.

(N.D. Ga. 2010). The Court should not hesitate to do so here.

### A.   Numerous Statements Were Pure Omissions

Plaintiffs do not dispute (nor could they) that the Supreme Court recently and unanimously held that "pure omissions are not actionable under Rule 10b-5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 260 (2024). In Opposition (at 26-27), Plaintiffs make two arguments. Both of them are meritless.

They initially argue that this is "not a pure omissions case." Opp. at 26. But in making their argument, Plaintiffs challenge only two of the 21 pure omissions Statements identified in the Moving Brief (at 20). Plaintiffs implicitly concede 19 of the 21 Statements are pure omissions and thus not actionable. As to the two remaining Statements, Plaintiffs argue that they were not omissions but "affirmatively false." Opp. at 26. These arguments lack merit.

Plaintiffs first argue that Scott stated, in February 2024, that Vestis's "disappointing 1Q24 results" were the result of an uptick in business closures "and not any issues with Vestis's service" but admitted three months later that these customers actually left due to "service gaps," rendering her statement about business closures "affirmatively false." Opp. at 26. However, the plain language of the 1Q24 earnings call transcript selectively quoted by Plaintiffs demonstrates that Scott did *not* state that *all* customer departures were due to an "uptick in business closures." The business closures she discussed specifically pertained to "small to medium

6

enterprise customers" like restaurants. And an "uptick in business closures" was only one of several factors discussed in that analyst call that contributed to the mixed 1Q24 results. *See* Ex. 9 at 20-21. Contrary to Plaintiffs' contention, Scott did not admit in May 2024 that "service gaps" ***as opposed to*** certain "business closures" impacted the financial results. Thus, Plaintiffs are wrong when they characterize Scott's statement as an affirmative misrepresentation.[4]

Recognizing that 19 of the 21 Statements are indeed pure omissions, Plaintiffs next pivot and argue that even if the Statements are omissions, they are still actionable. Here, in a single paragraph, Plaintiffs half-heartedly make a vague argument without any specific citations to the AC that every time Defendants made Statements about Vestis's "excellent service," "ability to deliver on time," or "90% retention rate," Defendants were obligated to disclose additional (but unspecified) information about customer complaints, alleged service issues, and periodic customer departures. Opp. at 26-27. However, in the context of omissions, "silence, absent a duty to disclose, is not misleading under Rule 10b-5." Br. at 20 (citing *Carvelli*, 934 F.3d at 1317). Defendants only have a duty to speak if the failure to do so would render the statement misleading. *Id*. Plaintiffs fail here to make the required

---

[4] Similarly, Defendants did not misrepresent certain customer losses to be "non-regrettable," only to later reveal that they were, in fact, "regrettable." Opp. at 34. Rather, as discussed below, Defendants were describing two distinct categories of customer loss. *See infra* Section I.B.3.

showing.

**B.**     **The Statements Were Not False, Misleading, or Material**

1.     Statements Regarding Service Excellence and Ability to Deliver on Time Were Not False and Are Classic Puffery.

Plaintiffs argue that Defendants' general statements regarding the "quality" of Vestis's services and its "ability to deliver on-time" were false or misleading because, in reality, Vestis "was plagued by severe service gaps" that caused customer losses. Opp. at 27-28. Plaintiffs' argument is meritless.

That Defendants disclosed in real time certain service issues that they learned about in 2Q24 toward the end of the Class Period did *not* render false when made any prior general statements about the quality of Vestis's customer service or its ability to deliver on time issued at the beginning of the Class Period. Br. at 27. This tactic is classic fraud by hindsight and should be rejected. *Id*. at 40. Indeed, it is Plaintiffs' burden to come forward with **particularized** facts to demonstrate that the Statements were false when made. *Id.* at 36-37. Pointing to the disclosure of certain service gaps during 2Q24 at Vestis (which exist at any client-facing business) does not satisfy Plaintiffs' heightened pleading standard. *Id.* at 27.

While Plaintiffs argue that "severe" service gaps "plagued" Vestis nationwide, the earnings release in which "service gaps" were discussed shows that the gaps were not a "plague" or "severe," but rather "very specific areas [that Vestis could] action around" based on feedback from customers who left. Ex. 11 at 13. The

8

Opposition falsely states that "Defendants 'admitted' these 'service gaps' were so profound and intractable that they directly resulted in a 'large amount' of customer losses." Opp. at 28. This alleged "admission" is fabricated and grossly misstates the transcript, with all words except for "service gaps" and "large amount" supplied by Plaintiffs. *Id.* Scott did not describe the service gaps as "profound and intractable." *See* Ex. 11. She simply said there were certain service gaps that Vestis identified through customer feedback in 2Q24.[5] *Id.* at 5.

Next, Plaintiffs argue that these Statements cannot be dismissed as puffery. Opp. at 29-31. However, courts routinely dismiss ***virtually identical*** statements as classic puffery. *See* Br. at 31-34 (collecting cases). The AC challenges numerous generic statements in which Vestis said that it: (i) had "significant competitive advantages including…long-tenured customer relationships"; (ii) "maintain[ed] long-term relationships with our customers due to the quality of our services and products" and "ability to deliver on-time"; (iii) "serv[ed] an attractive, large and long-tenured customer base"; (iv) remained "focused on retaining these customers…by ensuring we are delivering…new or updated services and products"; and (v) felt "very, very good about the establishment of a service excellence culture across the company." *See* Br. at 33. Defendants cite numerous cases in which courts

---

[5] Similarly, although Scott identified "on-time delivery" as focus area, she ***never*** said that Vestis "did not have" a process to verify that trucks were loaded accurately (Opp. at 27-28). Plaintiffs simply misquote her. *See infra* Section I.B.2.

in this circuit and around the country held nearly identical statements to be immaterial puffery. Br. at 31-34 (collecting cases). Tellingly, Plaintiffs do ***not*** distinguish ***a single one*** of Defendants' cases.

Instead, and in an effort to analogize this case to *Bucks Cnty. Emps. Ret. v. Norfolk S. Corp.,* 2025 WL 897540, at *7 (N.D. Ga. Mar. 24, 2025) ("*Norfolk*"),[6] Plaintiffs argue that customer service statements are material because they go to "the very core of what Vestis offered—correct, on-time deliveries." Opp. at 29. Plaintiffs' analogy is misplaced. In *Norfolk*, which related to the train derailment in East Palestine, Ohio and ensuing release of toxic chemicals, the Court ruled that defendant's safety-related statements were not puffery, finding "[t]he heightened importance of safety in inherently dangerous industries" could "support an inference of materiality." *Id.* at *7. Customer service in the uniforms business cannot be said to have the same "heightened importance" as safety in an inherently dangerous industry. *See id.*  The other cases that Plaintiffs cite are equally inapposite. *Keippel v. Health Ins. Innovations* (Opp. at 30) turned on the importance of statements about corporate compliance in a "highly regulated industry." 2019 WL 5698329, at *7. Similarly, the *Immucor Sec. Litig.* court found statements about commitment to quality were actionable given the "highly-regulated nature of the blood reagent

---

[6] To avoid duplication, the Vestis Defendants join in the detailed discussion of *Norfolk* in the Aramark Defendants' Brief at Section I.

10

industry" and the potential for revocation of the company's licenses by the FDA. 2011 WL 2619092, at *3. Here, there is no equivalent "highly-regulated" industry involved. Accordingly, the Court should dismiss these Statements.

 2. <u>The Telematics Statements Were Not False or Misleading.</u>

Defendants explained in detail that Plaintiffs' allegation—repeated multiple times in the AC—that Scott "admitted" in May 2024 that Telematics had never been used by Vestis in its fleet of trucks was contradicted by the plain language of cited earnings transcripts. Br. at 28-29. The Opposition does nothing to rehabilitate this meritless argument. Opp. at 31-33. Nor could it, as Scott plainly explained in the 1Q24 earnings call that Vestis had "successfully deployed new [T]elematics technology across 89% of our fleet" and she did not "admit" that this was a false statement three months later in May. To the contrary, Scott stated that when she "c[a]me into the business" at Aramark in 2021—*i.e.*, ***two years before the Spin***—to "evaluate" how the business was "measuring service efficacy, [she] found it very odd that we did not have [T]elematics in our fleet." Br. at 28. Scott did ***not*** say Telematics had never been used prior to May 2024; she did ***not*** say that Telematics was "not operational" in May 2024; and she did ***not*** say that Vestis would "begin to use" Telematics in May 2024. Opp. at 32. What Scott actually said in May 2024 was "[s]o we've put that telematics in our trucks, and we expect very quickly that we'll begin to use those insights and that data from telematics to shore this up." Ex. 11 at

25. Informing investors that Vestis would "begin to use" "insights" and "data from [T]elematics" in May 2024 is entirely consistent with Telematics being installed across 89% of Vestis's fleet as of February 2024. Br. at 29. Further, it is self-evident Vestis would not have gained "insights" or "data" from Telematics in May 2024 if it wasn't being "used" in its fleet prior to that time. Plaintiffs gloss over this distinction, because it contradicts their meritless argument.

Plaintiffs next argue that the Statements about Telematics were rendered false by another supposed "admission" at the end of the Class Period: that Vestis did not "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Opp. at 32. But Plaintiffs again simply misquote Scott. She did not state that Vestis "did not have" a process to verify the accurate loading of trucks. Indeed, when describing opportunities around an aspirational "perfect" truck loading process, Scott said, "[w]e also see opportunities around things like shortages, that are making sure that we have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Ex. 11 at 14. Contrary to Plaintiffs' mischaracterization, Scott merely identified the truck loading process as an opportunity for improvement.

In any event, Telematics has nothing to do with the accurate loading of trucks, so the Statements related to the use of Telematics could not have been rendered false

by the statements about the "perfect truck" loading process. Telematics refers to technology aimed at "reduc[ing] emissions" from fossil fuels that "allows us to proactively reduce fuel usage by limiting idling" in delivery trucks. Ex. 2 at 72; Ex. 3 at 72; Ex. 8 at 14. This technology addressed environmental concerns, fuel usage and route efficiency—not the accurate loading of trucks or delivery of products.[7]

### 3.      Statements Regarding Long-Term Customers Were Not False.

Plaintiffs contend that Defendants made misstatements at the beginning of the Class Period designed to "minimize the significance" of pre-Spin customer losses regarding certain losses that were "intentional," "non-regrettable," and "purposeful." Opp. at 34-35. They argue these Statements are false because, at the end of the Class Period, Vestis admitted that it suffered an "unfortunate loss" of a "national account" prior to the Spin that was not "part of our strategy" and was "regrettable." *Id*.

In comparing these two statements, Plaintiffs are mixing apples and oranges. Scott's comment regarding "non-regrettable losses" was made during the September 2023 Analyst Day presentation in response to a question about why "Uniforms" growth was flat. Ex. 5 at 32-33. Scott stated that the Uniforms numbers were affected by *"ADS" or "direct sale[s]"* customers, and the numbers were "very purposefully

---

[7] Plaintiffs also argue that the "truck loading" statement renders false Vestis's statements about its use of ABS technology. Opp. at 31. To the contrary, there are no allegations in the AC, nor could there be, that link ABS to loading trucks accurately. Moreover, the AC acknowledges that Vestis completed its installation of ABS in 2022. (AC ¶¶ at 48, 52)

tied to throttling down ADS so that we can expand it more profitably." Ex. 5 at 32-33; *id.* at 13 (describing strategy around the direct sale business). In this context, she said Vestis had "a couple of, quite frankly, non-regrettable losses around some accounts that just didn't make sense for our portfolio." *Id*. 32-33. Scott described the loss of these "direct sale[s]" customers as "non-regrettable" because of a purposeful decision to "throttle down" unprofitable pieces of the ADS business. *Id.*

None of these Statements regarding "direct sales" customers were "proven" false by Scott's statement, in February 2024, that Vestis suffered an "unfortunate loss" of a "national account" that was "not part of our strategy" and "regrettable." Opp. at 34. The "national account" was different from the "direct sales" account, as Scott made clear by discussing the two losses separately in the 1Q24 earnings call. Discussing the "direct sale" customer, Scott said: "you'll recall in our full year earnings for FY 2023, I shared with you a large direct sale customer that will be rolling off" as part of a "strategic decision to kind of throttle down." Ex. 9. at 20. Later in the call, she discussed a "national account" loss, that "wasn't a strategic loss. It was an unfortunate loss from our Clean Room business last year." *Id.* at 24. Thus, Scott was not "correcting" a "misstatement" by describing the national account loss as "regrettable"; she was describing two distinct customer losses.

4.    Statements Regarding Long-Tenured Customers and 90% Retention Rate Were Not False or Misleading.

Plaintiffs next take issue with accurate historical Statements regarding "long-

14

term relationships" with customers, including the "customer retention rate in excess of 90%." Opp. at 35-44. Plaintiffs argue that Defendants' Statements regarding their "long tenured customer relationships" were false because "Vestis was 'bleeding' a massive number of customers." *Id*. at 35-38. Plaintiffs further fault Vestis for touting its 90% customer retention rate because it "fell to 85%" in 4Q23. *Id*.

First, the Opposition does not address, much less dispute, the accurate historical fact that Vestis had long tenured customers, or that the average customer stayed with Vestis for 26 years. Br. at 26. And, as *Michigan Carpenters* holds under very similar facts, Vestis was under no obligation to disclose the loss of specific individual customers, notwithstanding Plaintiffs' allegations that the Company was losing customers in the lead up to the Spin. Br. 23-24.

Nor did any alleged customer losses render false the Statements regarding Vestis' 90% customer retention. In the AC, Plaintiffs allege that Defendants were "forced to admit" at the end of the Class Period that Vestis's customer retention rate had dropped below the 90% rate that Defendants publicly touted, to 85%. AC ¶¶ 99, 162. But the only "statement" that Vestis made regarding an 85% customer retention rate was in an investor presentation from 2Q24 that depicted Vestis's customer retention rate over six quarters. Br. at 22-23. Far from making an "admission" about an 85% retention rate, the bar chart reflected that the average retention rate for FY23 was 90.4% and the YTD retention rate through 2Q24 was 92.9%, with the rate

15

dropping below 90% in only *one* of the six quarters (4Q23). *Id.* And although the retention rate dropped to 85% in 4Q23, it immediately returned to 92.6% in 1Q24 and further increased to 93.2% in 2Q24. Ex. 13 at 5. But because the ***actual*** retention rate data set forth in the bar chart does not support an allegation of fraud, Plaintiffs ***altered*** the bar chart in the AC to create the false impression that the rate was at "DEFCON One." In particular, the AC ***deliberately excised*** the 1Q24 and 2Q24 customer retention from the bar chart, which showed that the 85% retention rate from 4Q23 was an outlier and that the rate normalized in the very next two quarters.[8]

Plaintiffs next proffer a newly minted "omission" theory. They argue that the momentary drop in the 4Q23 was significant because it "had fallen so sharply in the critical quarter before the Spinoff" that Defendants should have disclosed the dip in November 2023, when Vestis had its year-end 2023 earnings call and referred to its yearly retention rate for the past five years as "stated in the Form 10." Opp. at 37-38.[9] But on this call Vestis was reporting its *annual* results for FY23 and was referring to its prior *annual* retention rate disclosures in the Form 10. Critically, the *annual* retention rate for FY23 was 90.4%, *i.e.,* ***over 90%***. This was true notwithstanding the dip to 85% in 4Q23. Ex. 13 at 5. Plaintiffs have alleged no

---

[8] Tellingly, Plaintiffs do not deny that they deliberately removed the 1Q24 and 2Q24 entries in the bar chart to (wrongly) imply that the retention rate had "plummeted."

[9] In the Form 10 filed in August 2023, Vestis said that its "customer retention rate was in excess of 90% ***in the five years ended September 30, 2022***, according to internal estimates," a statement that Plaintiffs do not dispute.

adequate factual or legal basis for suggesting that Vestis was obligated to highlight the specific retention rate for 4Q23 during this call other than Plaintiffs' own view that the fourth quarter was somehow "more important than" the other three quarters in 2023 because it was the quarter before the Spin. Opp. at 35-55. But the November 2023 earnings call did not occur before the Spin, which had been completed two months earlier in September 2023. Ex. 6. And to the extent Plaintiffs imply that the dip in retention rate was meaningful to investors as a harbinger of things to come, Plaintiffs are incorrect, as the retention rate immediately returned to 90%, consistent with the historical average. Br. at 22-23.[10]

Next, the Opposition argues that Vestis experienced "staggering" annualized losses of $147 million between August 21, 2023, and April 19, 2024 (8 months), with $55 million of that amount lost in the five weeks prior to the Spin. Opp. at 43. But, in context, these alleged losses are not "staggering," given that a company (like Vestis) with $2.8 billion in annual revenue and a 90% customer retention rate *by definition* loses ~$280 million in revenue *every year*. Thus, the $147 million alleged by Plaintiffs is entirely consistent with the revenue loss expected based on a 90%

---

[10] To the extent Plaintiffs argue that the 4Q23 losses were "material" because they caused a 6% revenue loss in 2Q24 (Opp. at 41), Plaintiffs ignore: (i) the 6% revenue loss associated with these pre-Spin losses was netted out by gains, resulting in revenue *growth* (Br. at 27); and (ii) Defendants could not have known (or disclosed) the effect of pre-Spin losses on future revenue growth before 2Q24, as customer gains and other factors affecting 2Q24 revenue were unknowable before then.

annual retention rate. And, of course, Plaintiffs' argument focuses only on losses: it fails to account for the ***customer gains*** during these periods and ignores the key question of whether customer gains outpaced customer losses. That Vestis's efforts to ramp customer gains through cross-selling existing customers and adding new customers (Ex. 11 at 11, 18, 22) were more successful in 4Q23 (4.8% growth) and 1Q24 (2.5% growth) than in 2Q24 (0.9% growth) does not demonstrate fraud. At most, it shows mixed execution on projected customer growth targets or the difficulty in forecasting those targets. Plaintiffs' singular focus on "bleeding customers," "staggering" pre-Spin losses, and the "large amount of rollover losses from FY23" reflects a fundamental misunderstanding of Vestis's business.

Plaintiffs' comparison of the "retention rate" Statements here to those in *Wang v. Cloopen Group* is misplaced. The *Wang* court concluded that a company's failure to disclose its "dramatic 30-percent decline in its dollar-based net customer retention rate" was a material omission considering the "retention rate had plummeted from 94.4% to 63.1%." Opp. at 38. This Court should reject Plaintiffs' contention that the momentary five percent dip here is akin to the 31% drop in *Wang*.

Plaintiffs further urge the Court to ignore that the retention rate was over 93% by 2Q24, on the basis that it is somehow "belied by Defendants' own admissions" about the effects of "rollover losses from FY '23." Opp. at 40. Not so. The retention rates are depicted in black and white in the investor presentation that accompanied

its 2Q24 financial results. Ex. 13 at 5. The objective data in this chart—which show that the retention rate reverted to 92.6% and 93.2% in the first two quarters of 2024—cannot be "belied by admissions" about anything. Plaintiffs' effort to question the retention rate data is particularly disingenuous given that ***Plaintiffs themselves*** introduced the bar chart—in a misleadingly truncated form—in the AC. AC at ¶ 99. For this reason, it is also absurd that Plaintiffs argue the retention rate pattern is "a factual issue that cannot be resolved on this motion." Opp. at 40. Plaintiffs surely cannot rely on the data contained in the chart in the AC while simultaneously urging this Court to ignore the complete picture of the data. *See* AC ¶ 99.

Finally, Plaintiffs' argument that certain Statements were false because Vestis failed to disclose earlier the "material" loss of "two national customers" fails because combined these two customers accounted for less than 1% of Vestis's yearly revenue. Br. 24-25. Plaintiffs do not (and cannot) rebut the caselaw in the Moving Brief conclusively establishing this point. *Id.*[11]

### 5.    The Statements Regarding "Taking Price" Were Not False

Plaintiffs next argue that Statements from the February 1Q24 earnings call regarding Vestis's potential opportunity to "take price" "in the back half of 2024" are false or misleading. Opp. at 44-45. This argument fails.

---

[11] Vestis did not, as Plaintiffs suggest (Opp. at 40-1), argue that "all pre-Spin losses" accounted for less than 1% of its yearly revenue. The argument was limited to the "two national customers" repeatedly referenced in the AC. Br. at 24-25.

19

Plaintiffs argue that these Statements were false because Scott supposedly held a "contemporaneous" internal town hall meeting at which she "told employees that Vestis would have to significantly discount prices due to declining business." Opp. at 45 (citing AC ¶ 123). However, the actual allegations in Paragraph 123 of the AC do not support this argument. The only factual detail in Paragraph 123 regarding pricing is that—according to two FEs—towels that were previously "$0.07-$0.08 per towel were now being sold for $0.02 per towel." AC ¶ 123. In other words, Plaintiffs only allege that that the price of *one product* in *one geographic area* was being discounted; they did not allege that Vestis was broadly planning to discount prices at that time. Further, as explained in the Moving Brief and not rebutted in the Opposition, Defendants' Statement that Vestis would endeavor to take price "in the back half of" 2024 (i.e., 3Q24 and 4Q24), cannot be rendered false by actions in 2Q24 (which occur in the *front half* of FY24). Br. at 29-30, 34-37.

### C.    Defendants' Forward-Looking Guidance Is Non-Actionable

Plaintiffs argue that Statements regarding financial guidance and future ability to take price are not protected because: (1) the Statements were not accompanied by meaningful cautionary language; and (2) Defendants had actual knowledge that the Statements were false. Opp. at 46-48. Plaintiffs are mistaken on both counts.

*First*, the Opposition faults Vestis for not including in its public disclosures language that cautioned against more specific risks that Defendants supposedly

20

knew at the time. Opp. at 46 (citing *In re HD Supply Sec. Litig.*, 341 F. Supp. 3d at 1359).[12] However, Vestis's risk disclosures contained language addressing the ***specific risks*** at issue: that its projections could be impacted by "Vestis's failure to retain its current customers, renew its existing customer contracts on comparable terms and obtain new customer contracts." Br. at 35-36. "When an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Carvelli*, 934 F.3d at 1327.

***Second***, assuming the specific risk disclosures were insufficient (and they were not), these Statements still would not be actionable because the AC contains no allegations that the Statements were ***false when made***. Br. at 36-37. As for "taking price," as discussed above, those were not undermined by anything Scott said in the "town hall," as those statements applied narrowly to a single product (towels) and not Vestis's ability to take price in ***the last two quarters*** of 2024. *Supra* I.B.5. As to the guidance, the Opposition does not point to a ***single*** allegation that Defendants had actual knowledge that the re-affirmation of the guidance in February 2024 was false when made. The best Plaintiffs can do is go back to their familiar general

---

[12] *HD Supply* has no application here. There, the Court faulted defendant for relying on "boilerplate" cautionary statements and asking it to "use its scarce resources to scour 50 pages of filings in the hopes of finding which cautionary language Defendants intended." *Id*. In contrast, the cautionary statements here are not boilerplate and Defendants cited the applicable pages in the disclosure documents.

refrain of "service gaps," "known customer losses," and "discount[ed] prices," to argue that "[i]n light of these facts, Defendants ***had no basis***" to make the guidance statements in February 2024. Opp. at 47-48. This argument fares no better because the arguments about "severe" service gaps, discounting and known customer losses are without merit (*supra* at I.B.1, 3-4) and thus cannot serve as a basis for actual knowledge of falsity. Moreover, Vestis had a reasonable basis for guidance of 4-4.5% growth in FY24, considering their 5.1% revenue growth in FY23 and their business plan presented to investors and analysts. Accordingly, the Court should reject Plaintiffs' arguments and dismiss the forward-looking Statements.

### D. Defendants' Opinion Statements Are Not Actionable

Plaintiffs' arguments about Opinion Statements are meritless. They attempt to lower the pleading bar by misstating the standard. The inquiry is not whether a statement "fairly align[s]" with known facts, (Opp. at 48), but rather whether the statement either (i) "falsely describe[s] the speaker's own state of mind," or (ii) "contain[s] [an] embedded statement of fact" which is "untrue." *Carvelli*, 934 F.3d at 1322 (citing *Omnicare*, 135 S. Ct. at 1326-27). Plaintiffs fail on both prongs.

## II    THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.

### A. Defendants Made No "Admissions" or Public Remarks Supporting a Strong Inference of Scienter.

As explained in the Moving Brief, Plaintiffs wildly misrepresent Defendants' Statements, framing them as "admissions" of wrongdoing when, in reality, the

Statements in question simply acknowledge that Vestis and its leadership became aware of, and worked to address, certain issues with customer service and retention in 2Q24. Br. at 39-45. In response, Plaintiffs simply repeat their distortions of Defendants' words, selectively quoting from Scott and Dillon's public Statements to fabricate supposed contradictions with their prior Statements where none, in fact, exist (Opp. at 49-53) or assert without support that these Statements "demonstrate [Defendants'] direct knowledge of the matters of which they spoke." Opp. at 53-55.

Critically, Plaintiffs fail to address *at all* how their allegations "create a *strong inference*—again, one that is cogent and compelling—that [Scott or Dillon] knew about the alleged fraud . . . *when they made the purportedly false or misleading statements*." Br. at 39. Indeed, the inference must be strong enough that a "reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 38. The few times Plaintiffs *do* address specific statements shows why they deal in vagaries.

*Service Gaps.* Plaintiffs assert "Defendants admitted that Vestis was plagued by longstanding 'service gaps' that had prompted a mass customer exodus and rendered Vestis unable to perform even the most basic tasks required of a uniform company: 'delivering on time, delivering full loads.'" Opp. at 50. What Scott *actually* said, in response to an analyst's question about the "genesis of some of the service issues" that she had described in her remarks, was that she had "explored this

23

[issue] and listen[ed] to customer feedback" in 2Q24, which made it "clear that we are not tight on our processes as it relates to disciplined loading of trucks, delivering on time, delivering full loads[,]" adding that certain issues had "persisted in this business for some time and ha[d] not been realized or addressed" previously. Ex. 11 at 17. Plaintiffs fail to explain, nor could they, how Scott's comments show that any specific prior Statements regarding Vestis' operations were false *at all*, let alone how the fact that she was "listen[ing] to customer feedback" to identify problems that "persisted" but had "***not been realized*** or addressed" is somehow an admission that she knew any prior Statements to have been false **when she made them**. *Id.* These arguments are meritless. *See, e.g.*, *Plymouth Cnty. Ret. v. Carter's Inc.*, 2011 WL 13124501, at *19-20 (N.D. Ga. Mar. 17, 2011) (failure to "allege[] with sufficient particularity any facts suggesting [defendants'] actual awareness" of falsity cannot overcome the "competing and stronger inferences are that Defendants were unaware" of specific underlying problems).

***Customer Retention.*** Plaintiffs similarly insist that Dillon's references in the May 2024 earnings call to "known customer losses as we exited FY 2023," including "two large national accounts," shows "that Defendants 'knew the impact coming in of the lower retention rate.'" Opp. at 50-51. As discussed above, Vestis did not "admit" anything false or fraudulent, but rather described in May 2024 various factors that contributed to the revenue mix in 2Q24, including certain carryover

customer losses from FY23 (6%), ***before factoring in offsetting new business and other gains*** in 2Q24 (8% customer gains) that could *not* have been "known" before 2Q24, much less before the Spin. *See supra* Section I.B.4. That Vestis's efforts to ramp customer gains through cross-selling existing customers and adding new customers in 2Q24 did not offset customer losses enough to meet forecasts cannot serve as a basis for Scienter. Plaintiffs again do not identify any prior statements that are contradicted (and certainly none shown to be ***knowingly false***) by Dillon's discussion of "known customer losses as we exited fiscal 2023." *Id*.

Moreover, the assertion that the loss of "two large national accounts" was somehow illustrative of a concealed "mass customer exodus" from the Company (Opp. at 50) is a particularly egregious example of Plaintiffs distortions. As Scott explained in the ***same earnings call transcript*** Plaintiffs cite, the loss of those two accounts reduced Vestis' revenues by "approximately 60 basis points"—*i.e.*, ***0.6%***—for FY24. Ex. 11 at 6. Defendants' awareness that Vestis had lost accounts making up less than 1% of its FY24 revenue cannot possibly support the required "strong inference" of scienter. Lacking any credible basis for scienter, Plaintiffs are forced to rely on wildly inapposite authorities. Opp. at 51-53. The *Catalina Mktg* court found that the failure to disclose the loss of the company's largest European contract was suggestive of scienter because that loss cut its "income from operations by *43%*"—more than 70 times greater than the revenue attributable to Vestis' two lost

25

national accounts (.6%). 390 F. Supp. 2d at 1114. Similarly, the allegations in *Towne Servs.* were far more serious than merely disclosing rolled-over customer losses, to wit: a total "shut-down of [the company's] data lines" resulting in "a 'serious' disruption" of service, "'massive' customer cancellations[,]" "and an 'extraordinary' asset sale [that] was omitted from earnings reports." 184 F. Supp. 2d at 1325.

Further, Plaintiffs' attempts to demonstrate scienter by arguing that Defendants disclaimed "service issues" as a cause of customer attrition, instead attributing the losses to certain "business closures" or an intentional strategy (regrettable v. non-regrettable losses) fail for the reasons stated *supra* at I.B.3.

***Logistics.*** Finally, Plaintiffs repeatedly emphasize "Scott's substantial involvement in Vestis' logistics" both before and after the spinoff (Opp. at 52), but still fail to explain how her ***general focus*** on logistics somehow shows that she was aware of ***specific facts*** contradicting her prior Statements (and, once again, they fail to identify which ***specific*** Statements were supposedly contradicted). Instead, Plaintiffs cherry-pick misleading quotes from their authorities (*id*. at 53) to distort the law of this Circuit: claiming, *e.g.*, that an executive being "integrally involved" in a company's operations was sufficient to establish a strong inference of scienter, while omitting that this involvement included, *inter alia*, receiving "personal notice" of "a systematic practice of falsifying customer information" in credit applications.

*Zuckerman*, 2000 WL 33996254, at *2.[13] Plaintiffs' citation to *Primavera Invs. v. Liquidmetal Techs.* also highlights the AC's deficiency: there, the complaint alleged far more than the CEO of a materials company merely being "hands-on" and "involved in the nuts and bolts" of operations—the FEs in that case "provide[d] specific and detailed information that [the CEO] knew the falsity of his public representations about alloy strength . . . including weekly meetings with [company] executives to discuss the company's inability to develop testable alloy samples[.]" 403 F. Supp. 2d at 1158. Plaintiffs come nowhere close in the AC to such specific, individualized allegations based on firsthand knowledge.

Moreover, Plaintiffs' assertion that the "inference of scienter is bolstered" here because "Vestis' deficiencies unquestionably involved its core operations" such as delivery logistics (Opp. at 54) simply ignores their obligation to plead "other, individualized allegations" showing Defendants "had knowledge of *the fact in question*[,]" *Plymouth Cnty.*, 2011 WL 13124501, *17. As courts have explained— and as Plaintiffs ignore—if allegations that an executive was a "hands-on, active manager[] who regularly received and reviewed information about the company"

---

[13] Plaintiffs' attempt to distinguish *Plymouth Cty.,* 2011 WL 13124501, at *17 misses the point. Opp. at 53, n.13. That decision ***directly contrasts*** the language quoted by Plaintiffs with a warning not to assume that an officer is familiar "with certain facts just because these facts are important to the company's business" generally, and emphasizes the need for "other, individualized allegations that further suggest that the officer had knowledge of the fact in question" specifically. *Id.* at *17. Plaintiffs do not have similar allegations here.

were suggestive of scienter, any such executives "would work at their peril" and "almost any securities fraud case [would] proceed into discovery." *Mogensen v. Body Cent.,* 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014).

**B.      The FE Allegations Do Not Support a Strong Inference of Scienter.**

The FE allegations cannot establish a strong inference of scienter because no FE has a credible basis for establishing any Defendant's state of mind, and Plaintiffs cannot compensate for this defect with scattershot allegations from low-level FE's of "widespread" problems to establish scienter. Br. at 41-45.[14] In response, Plaintiffs point to a number of inapposite authorities to argue that the FEs need not allege Defendants had direct knowledge of the information. Opp. at 57-61. They are wrong.

***First***, Plaintiffs cite to *Norfolk*, where this Court noted that "there is a critical difference between inferring the existence of company-wide misconduct and inferring company executives' knowledge of it." 2025 WL 897540, at *9. Thus, when considering whether Norfolk executives were behind a "comprehensive" "deprioritization of safety" that resulted in a train derailment and carcinogenic

---

[14] To distract from the deficiency of their low-level FE allegations, Plaintiffs argue that the holding in *In re Tupperware Brands*, 2023 WL 5091802 (11th Cir. Aug. 8, 2023) was limited to "whether a low-level employee could be considered the 'maker' of certain statements[.]" Opp. at 57-58 n.16. Not so. The court considered whether a "low-level employee" who "was 'in charge of' multiple geographic sales districts" but separated from management could credibly testify to whether a managing director approved sales figures for inclusion in SEC filings. *Id*. at *6. Because of his junior position and lack of direct contact with the managing director, the court concluded that the FE lacked "proximity to the offending conduct[.]" *Id.*

"inferno" that "burned for days[,]"—an event that unquestionably illustrated the grave deficiencies in Norfolk's safety procedures—this Court reasoned that Norfolk's pattern of behavior was "so systematic, coordinated, and all-encompassing that it gives rise to a strong inference that it must have originated with senior officials." *Id.* at *2, *10.

Here, however, the question is whether Defendants *knew* specific information that rendered certain statements false when made. Tellingly, Plaintiffs ignore the more relevant portion of *Norfolk's* scienter analysis: whether the complaint alleged "mechanisms through which knowledge . . . could and should have percolated up to its executives." *Id.* The *Norfolk* plaintiffs alleged numerous such mechanisms: *e.g.*, regulators' letters "addressed to Norfolk's CEO by name[,]" an audit reporting "violations of federal safety regulations" to the company, and a "smoking gun" "admission" by the CEO defendant before Congress "that Norfolk's pre-derailment statements touting its focus on safety were knowingly false[.]" *Id.* Each of these directly and verifiably confronted executives with specific information contradicting their prior public statements about safety. By contrast, the AC here lacks *any* FE allegations that speak directly to what Scott or Dillon knew.[15]

---

[15] *Luczak v. Nat'l Beverage Corp.* did not consider FE allegations when inquiring into the officer's knowledge of particular facts; rather, it used FE allegations to answer the narrow question of whether the company had ever used certain supposedly proprietary financial metrics in its own internal accounting. 812 F. App'x at 925. *Paincare Holdings Sec. Litig.* involved accounting errors so massive

***Second***, Plaintiffs resort to distorting ***their own*** confidential witnesses' words to claim their allegations "establish Defendants' personal involvement." Opp. at 58. They do not. For example, Plaintiffs argue "FE3 recounted how Scott personally met with Tyson's Chicken in an attempt retain the national account's business despite 'a lot of service issues that were not being corrected.'" *Id.* Yet FE3 actually alleges only that Scott met with Tyson's "to attempt to dissuade the large customer from leaving[;]" FE3 offers no insight into what specific "service issues" animated Tyson's decision, what issues were discussed, or whether any of them were resolved. AC ¶ 118. Similarly, FEs 1 and 7 "describ[ing] internal cancellation and quality reports delivered to the C-Suite" and allegations that "internal 'Weekly Install and Loss' reports [] were sent directly to Scott's direct Reports" (Opp. at 58) are irrelevant; that FEs were allegedly ***aware*** of reports—or sent them to the executives' "direct reports"—is no substitute for a witness with "personal knowledge" that Defendants actually "read or heard of the internal information" to support a strong inference of scienter. *City of Sunrise*, 2019 WL 6877195, at *19. *See In re Equifax Sec. Litig.*, 357 F. Supp. 3d 1189, 1236 (N.D. Ga. 2019) (no scienter where complaint failed to "adequately plead[] that [defendants] ever received any of these purported warnings"); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1331 (M.D. Fla.

---

that their discovery "led to the Company issuing a Restatement that covered virtually its entire public life[,]" 541 F. Supp. 2d at 1292.

2002) (no scienter where "Complaint does not identify [defendants] as recipients of the internal communications regarding the accounting problems").

**Third**, Plaintiffs attempt to salvage their reliance on FEs who were not Vestis employees during the Class Period, or who were **never even employed by Vestis** at all—massive defects in the AC which they attempt to dismiss as merely "gripe[s]." Opp. at 58-59. However, authorities here repeatedly hold that FE allegations "shed scant light on Defendants' state of mind" where the FEs "left [the company] … before the Class Period began" and Plaintiffs fail to "allege that the information purportedly gathered by [the FEs] was ever passed to" Defendants. *Hattaway v. Apyx Med. Corp.*, 2023 WL 4030465, at *13 (M.D. Fla. June 15, 2023); *see In re Mako Surgical Sec. Litig.*, 2013 WL 2145661, at *12 (S.D. Fla. May 15, 2013) (rejecting FE allegations from outside class period); *Burbidge v. Adtran, Inc.*, 2021 WL 2555690, at *8 (N.D. Ala. Mar. 31, 2021) ("statements from confidential witnesses which fall outside the class period should not be considered for scienter purposes").[16]

Plaintiffs' reliance (at 58-59) on other authorities downplaying this pleading defect is unavailing: they cite to inapposite cases involving FEs who had **personal knowledge** that the defendants first learned **specific, contrary facts** prior to making certain statements during the class period, or FEs who described **specific**

---

[16] The Opp. fails to differentiate *Burbidge*. Unlike here, the FEs in *Burbidge* had direct contact with the defendants in meetings to discuss issues underlying plaintiffs' claims—and that court *still* declined to credit their allegations. *See id.* at *3.

31

***management decisions*** made by the defendants immediately prior to the period. *In re Flowers Foods Sec. Litig.*, 2018 WL 1558558, at \*15 (former CFO alleged "certain executives had knowledge that the DSD model did not comply with all laws and … that the DSD model was problematic"); *In re Bofi Holding Sec. Litig.*, 2016 WL 5390533, at \*10 (FE "described being pressured by senior management to underwrite loans that [FE] felt uncomfortable approving").[17]

### C.    Synek's Departure and Events Post-dating the AC Cannot Support an Inference of Scienter.

Plaintiffs insist it is "clear" that Synek's resignation "was directly linked to the disclosures" because two "FEs described Synek's departure as being a direct result of disputes with Scott over Vestis' lack of service quality." Opp. at 64. But Plaintiffs again misrepresent the very FE allegations that they cite: the FEs relayed secondhand information and subjective impressions—*e.g.*, FE1 "***believed*** . . . Synek ***felt*** like he was 'misled'" because FE1 "recalled ***hearing*** that [] Synek made comments about 'housekeeping' and 'facility maintenance'" following a site visit (AC ¶ 133)—or speculate about a supposed "fundamental disagreement" between Synek and Scott without offering any basis for that supposed knowledge (AC ¶ 134).

Moreover, executive departures months after the Class Period, including

---

[17] *Nebraska Inv. v. Fid. Nat'l* is off-base: that case credited allegations where the FEs did not provide the ***specific dates*** of their employment because they were adequately described "during the relevant period." 2024 WL 4349125 at \*4.

Scott's (10.5 months) and Dillon's (9 months), are irrelevant to scienter. A "court should not consider public records dated after a complaint is filed and submitted by a plaintiff in an attempt to bolster or amend a complaint[,]" as an "opposition to a motion a dismiss" is not the "proper vehicle" by which to introduce additional, unpled allegations. *City of Los Angeles v. Bankrate, Inc.*, 2015 WL 11438106, at *4 (S.D. Fla. Nov. 23, 2015). Plaintiffs' proffered authorities (Opp. at 65) do not address this obvious deficiency. Even if these allegations were properly pleaded, officer departures so far removed from the end of the Class Period do not support a finding of scienter. *See N. Collier Fire Control Pension Plan v. MDC Partners*, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) (allegation defendants "resigned abruptly several months after the Class Period ended . . . is insufficient to support a strong inference of scienter"); *Wilbush v. Ambac Fin.*, 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017) (resignations were not "highly unusual or suspicious" because they occurred eight and eleven months after the class period). Finally, where departures are more readily attributable to "alleged systemic operational shortcomings due to poor performance, internal company problems, and inaccurate forecasting," prompting "a major overhaul" of the company's leadership, "this does not amount to intentional or reckless misconduct" required to show scienter. *City of Hollywood Police Officers' Ret. v. Citrix Sys.*, 649 F. Supp. 3d 1256, 1275-76 (S.D. Fla. 2023).

33

### D.    Third-party Analysts Cannot Establish Defendants' Scienter.

Plaintiffs' reliance on third-party analysts who lack any basis to speak to Defendants' knowledge cannot support scienter. Br. at 37-38. In response, Plaintiffs merely rehash the AC's claims while attempting to bolster their argument with inapposite authorities. *See* Opp. at 61-63. For example, *In re Fibrogen, Inc.*, 2022 WL 2793032 (N.D. Cal. July 15, 2022), found industry reactions relevant to scienter because the applicable analyses included specific accounts from scientific experts directly involved in the manipulated drug trials at issue. *See id.* at \*22. Indeed, "analysts' opinions are neither relevant to this complaint nor admissible[;]" rather, "[t]he complaint must rise or fall on allegations about defendants' conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991). *See In re Wet Seal Sec. Litig.*, 518 F. Supp. 2d 1148, 1172–73 (C.D. Cal. 2007) (same).

### E.    The Absence of Motive Weighs Against Inferring Scienter.

Plaintiffs' fraud theory suffers from another massive flaw: the absence of any motive as to the Vestis Defendants. Br. at 49-50. In response, Plaintiffs ***concede*** this point but insist that no such allegations are necessary. Opp. at 65-66.

True, inside stock sales are not a required element to plead scienter, but in the absence of "inside stock sales intended to take advantage of the company's purportedly inflated stock prices[,]" "any inference of scienter is *particularly*

*weak*[.]" *In re HomeBanc*, 706 F. Supp. 2d at 1359; *Mizzaro,* 544 F.3d at 1253 (lack of "suspicious stock transactions by any of the individual defendants" "weighs against inferring scienter"). Moreover, where, as here, a plaintiff can offer no financial motive to explain Defendants' purpose in carrying out an alleged fraud, that "lack of allegations of insider sales requires that the strength of pro-scienter allegations be 'correspondingly greater.'" *Gamboa v. Citizens, Inc.*, 2018 WL 2107205, at *4 (W.D. Tex. 2018) (citations omitted).

Finally, Plaintiffs argue that Scott and Dillon were ***required*** to hold a certain threshold amount of Vestis stock pursuant to the Company's stock ownership guidelines for executives. Opp. at 66. But those guidelines only "require that the specified amount be attained by the fifth anniversary of the later of the Separation [from Aramark] and the date the named executive officer became subject to their current ownership guideline[,]" and thus could ***not*** have applied to either Scott or Dillon until ***2028 at the earliest***. *See* Ex. 8 at 98. Ultimately, the case against Scott and Dillon rests on an absurd theory: they supposedly fraudulently inflated Vestis's stock price, increased their holdings of Vestis shares during the Class Period, and continued to hold those shares at artificially inflated prices through the end of the Class Period, losing money when the stock fell just like the other Vestis investors.

## CONCLUSION

The Court should dismiss the AC in its entirety and with prejudice.

35

Respectfully submitted this 2nd day of June, 2025.

By: */s/ Hillary Lukacs*

Hillary Lukacs (Bar No. 141034)
MORRIS, MANNING & MARTIN
3343 Peachtree Road, NE
1600 Atlanta Financial Center
Atlanta, GA 30326
Telephone: (404) 504-5492
Facsimile: (404) 365-9532
hlukacs@mmmlaw.com

By: */s/ Joseph De Simone*

Joseph De Simone (*PHV admitted*)
Michelle Annunziata (*PHV admitted*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
jdesimone@mayerbrown.com
mannunziata@mayerbrown.com

Max Hirsch (*PHV admitted*)
MAYER BROWN LLP
333 S. Grand Avenue,
47th Floor
Los Angeles, CA 90071
Telephone: (213) 229-9500
mhirsch@mayerbrown.com

***Counsel for Defendants Vestis
Corporation, Kimberly Scott and Rick
Dillon***

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1D, this is to certify that the foregoing Memorandum of Law complies with the font and point selections approved by the Court in L.R. 5.1C. The foregoing document was prepared on a computer using the Times New Roman font (14 point).


DATED this 2nd day of June, 2025

/s/ Hillary Lukacs
Hillary Lukacs

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing was served via ECF System this June 2, 2025, on all counsel of record.

DATED this 2nd day of June, 2025

/s/ *Hillary Lukacs*
Hillary Lukacs