The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

**Stenographic Reporter note:**

**No AI technology was used in the preparation of the**

**Official Certified U.S. District Court Transcript**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


PLUMBER, PIPEFITTERS AND          )
APPRENTICES LOCAL NO. 112, et al.  )          Docket Number
                                  )          1:24-CV-02175-SDG
                                  )
                Plaintiffs,       )
                                  )
          v.                      )
                                  )          Atlanta, Georgia
                                  )          August 28, 2025
VESTIS CORPORATION, et l.         )
                                  )
                                  )
                Defendants.       )

                    TRANSCRIPT OF MOTIONS
          BEFORE THE HONORABLE STEVEN D. GRIMBERG
                UNITED STATES DISTRICT JUDGE

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFFS:          MR. LESTER HOOKER
                             MR. JONATHAN LAMET
                             MR. WILLIAM LACY


FOR THE DEFENDANTS:          MR. JOSEPH DE SIMONE
                             MS. MICHELLE ANNUNZIATA
                             MR. SAM KREVLIN
                             MS. HILLARY LUKACS

                             MR. CHRISTOPHER TURNER
                             MS. ROSE JUNG


OFFICIAL COURT REPORTER:     ALICIA B. BAGLEY, RMR, CRR


 Proceedings recorded by mechanical stenography, transcript produced
                       by computer

P R O C E E D I N G S

(in Atlanta, Fulton County, Georgia; August 28, 2025;

all parties present)

THE COURT:  All right.  Let me call the case.  This is Plumbers, Pipefitters and Apprentices Local Number 112 Pension Fund vs. Vestis Corporation.  Case Number 24-CV-2175.  Let's begin with appearances of counsel for the plaintiffs.

MR. HOOKER:  Good afternoon, Your Honor.

Lester Hooker from Saxena White on behalf of the lead plaintiffs, the City of Atlanta, Firefighters Pension Fund, City of Atlanta Police Officers Pension Fund, the General Employees Pension Fund, and the Retirement Citizens for the City of Baltimore, and Norfolk County.  With me is my colleague Jonathan Lamet.

THE COURT:  Great.  Great to see you both.  And who's the last gentleman?

MR. LACY:  Tom Lacy, Your Honor, local counsel.

THE COURT:  Good to see you, Mr. Lacy.

MR. LACY:  Nice to see you.

THE COURT:  All right.

MR. DE SIMONE:  Good afternoon, Your Honor.

Joe De Simone of Mayer Brown for the Vestis defendant, that's Vestis Corporation, Kim Scott, and Rick Dillon.

THE COURT:  Good to see you.

MS. ANNUNZIATA:  Michelle Annunziata also from Mayer Brown for the Vestis defendants.

THE COURT:  Nice to see you.

MR. KREVLIN:  Sam Krevlin also from Mayer Brown for the Vestis defendants.

MS. LUKACS:  (Inaudible).

THE REPORTER:  I'm sorry?

MS. LUKACS:  Hillary Lukacs.

THE COURT:  Nice to see you, ma'am.

MR. TURNER:  Good afternoon, Your Honor.  Christopher Turner of Latham & Watkins for Aramark and John Jay Zillmer.  With me are Rose Jung also of Latham & Watkins and Christopher Havener of our firm.

THE COURT:  Okay.  Great.  Well, we have enough lawyers.

(Laughter)

THE COURT:  Good to see you all.

Thank you, first, for agreeing to the scheduling change from -- it was originally scheduled for argument tomorrow.  We moved it to today.  Hopefully that saved some of your Labor Day weekend and didn't disrupt your travel schedule too much so I appreciate your accommodating that.

This was originally scheduled for argument on 30 minutes per side, and I said that because I saw that it was a motion to dismiss, but it was before I had read the briefs.  After reading the briefs, which I have and they were excellent, so thank you for that, I think Ms. Brye told you we've increased that to 45 minutes per side.  Bonus points if you only use 30, but I wanted to at least give you a little

more wiggle room there especially because I know we have two sets of defendants and you're sharing those minutes.

But like I said, the briefing was excellent.  I look forward to hearing argument.  I do have some questions that I'm going to interpose throughout the way, but I look forward to your presentation.

Given that it's the defendants' motions, of course you can reserve some of that time for rebuttal.  Hopefully you've all coordinated that and game planned it all out.  So with that, the floor is yours.

MR. DE SIMONE:  Thank you, Your Honor.

THE COURT:  Sure.

MR. DE SIMONE:  I'm going to start.  We're going to take 30 minutes for our side and I'm going to reserve probably around 5.

THE COURT:  Okay.  The math doesn't quite shake out for all of that.

MR. DE SIMONE:  I was told by the court reporter to use the lectern.

MR. TURNER:  Your Honor, I think it's 5 of the 30.  I think Latham will also reserve 5 of the 30 for -- 15 for --

THE COURT:  Got it.  That makes more sense.  Good.  That's why we all went to law school, right, so we don't have to do math.

MR. DE SIMONE:  I was told there would be no math.

Your Honor, I do have a handout.  May I approach?

THE COURT:  Sure.  If you have an extra, Mr. Nagasaka there on the corner would like one as well.  There you go.  Thank you.

We have clocks up there, if you'd like, as well.  Above the jury box.

MR. DE SIMONE:  Thanks, Your Honor.

Okay.  Can you hear me?

All right.  This case is a straightforward attempt to transform a simple earnings miss and guidance revision into securities fraud.  Vestis is a company headquartered in Roswell, Georgia with 20,000 employees.  Vestis provides uniforms and workplace supplies to over 300,000 customers -- customer locations across the U.S. and Canada typically on a weekly recurring basis.

Now, in September 2023, Vestis spun off from its parent, Aramark, and became a standalone public company.

When Vestis experienced some growing pains in 2024 it disclosed to the market in realtime on May 2, 2024, some challenges regarding service gaps, its strategic decision to moderate some pricing, lower-than-expected growth rates, and its plans to aggressively address these issues.

From these rather innocuous statements, plaintiffs allege securities fraud using a pleading tactic universally condemned by the courts, fraud by hindsight.  Plaintiffs ask this court to assume that because the Vestis defendants made these disclosures on the May analysts call they must have known that 41 supposed misstatements made months earlier were false and misleading.

But plaintiffs need more.  Under Rule 9(d) and the PSLRA, plaintiffs have a high burden here.  They must plead detailed and

particularized allegations to show that the alleged misstatements were false. They fail to do so.

As to *scienter*, plaintiffs must satisfy the PSLRA's heightened requirement here as well, a strong inference that each defendant acted with *scienter*. As the Eleventh Circuit explained in the *Mizzaro vs. Home Depot* case, quote, "The PSLRA substantially raised the pleading standard," end quote, in securities class actions. Again, it requires cogent and compelling particularized facts from which the court may infer that defendants actually knew the statements were materially false when made or were severely reckless.

Importantly, when Congress enacted the PSLRA it gave the court the tools to dismiss meritless securities class actions. Here, the amended complaint does not plead a single fact demonstrating that any defendant actually possessed information that contradicted their statements at the time they were made.

Instead, plaintiffs attempt to plead *scienter* largely based on statements from anonymous, low-level former employees who had no contact with defendants' information that defendants are not alleged to have reviewed and water cooler gossip associated with a personnel disclosure.

There are four buckets of alleged misstatements, Your Honor. Customer service and satisfaction statements, customer tenure and retention statements, a technology called Telematics, and future predictions regarding the company's ability to, quote, "take price," that is, to raise prices and its ability to meet projected revenue

growth.

As we explain in our briefs, each of the 41 statements are not actionable under multiple theories, Your Honor. I will not go through each of the 41 statements, even though I have extra time, nor all of the legal theories from my briefs. But I would like to highlight a few examples for the Court.

First, plaintiffs allege that Vestis was forced to admit at the end of the class period that its customer retention rate had dropped below the 90-percent figure that defendants publicly tabbed all the way at 85 percent.

But the bar chart from the investor presentation that underlies this allegation, as Your Honor has before you, which plaintiffs paste into their amended complaint, that's Paragraph 99, directly contradicts these arguments.

Plaintiffs' version of the bar chart is on the left. Please note that two of the six bars in the chart are deleted. On the right is the full version of the bar chart from the May 2024 analyst call.

In the version on the right, not altered by plaintiffs, the presentation shows that the retention rate for Fiscal Year 2023 was 90.4 percent and the year-to-date retention rate for 2024 was 92.9 percent. There simply is no false statement because the customer retention rate for each year is over 90 percent consistent with Vestis's disclosures.

THE COURT: Let me ask you a question about that.

MR. DE SIMONE: Sure, Your Honor.

THE COURT:  So the representations were made in November of 2023, the first alleged representations; correct?

MR. DE SIMONE:  Correct.  And before that.

THE COURT:  And before that.  Let's focus first on November 2023.  At that point you already had the fourth quarter financials --

MR. DE SIMONE:  Correct, Your Honor.

THE COURT:  -- in hand; right?

MR. DE SIMONE:  Yes, Your Honor.

THE COURT:  You did not have the first quarter 2024 financials?

MR. DE SIMONE:  Did not, correct.

THE COURT:  And yet you represented in November 2023 that the retention rate was above 90 percent?

MR. DE SIMONE:  Correct.  But the actual representation was for the prior five years ending in 2022 the retention rates averaged either 90 percent or higher.  So it was a yearly rate for each of the years ending in 2022.  They reiterated that in November.  They said go look at the Form 10, we're over 90 percent again.  Again, it was the yearend disclosure.  So the yearly rate was 90.4.  There's no requirement, we believe, Your Honor, under the law, because historically they had always disclosed annual rates and this was an annual rate there to disclose the quarterly rate.

THE COURT:  As they were standing there in November 2023 making that representation the retention rate was 85 percent?

MR. DE SIMONE:  For the quarter.  But for the year it was 90.4.  I think that's the key point, Your Honor.  For the year, if you look at the chart, retention rate was 90.4 percent and that's the yearly amount.  For the quarter it was 85 percent.

THE COURT:  All right.  Let's take that as fact.  Let's assume that that is correct and as a technical matter it was not a misstatement.  Does the fact that -- doesn't the fact that you're making that statement in November 2023, at a point at which the retention rate is 85 percent, isn't that evidence of *scienter?*

MR. DE SIMONE:  I don't think so, Your Honor.  Because, again, the statement relates to the yearend results.  They had always disclosed historically yearend retention rates, year-long retention rates, and in the actual disclosure in the Form 10, again, it was 5 years -- yearly retention rates for each 5 years.  The actual rate for 2023 was 90.4, as you see there.  Just like in 2024 it was 92.

So I don't think it was a false statement, Your Honor, because only the fourth quarter had dipped below.  Then again, it went right back up.  But the other three quarters for the year were all well above, as you look at the chart, 94.3 in one quarter, 90.3 and then up to 91.3 down to 85.  But for the year, as you see in the chart here, 90.4 percent.  Again, they were making yearly disclosures so I think it was fair to say that's not a false statement.

THE COURT:  Again, let's assume that it was not a false statement, okay.  My concern is --

MR. DeSIMONE:  An omission.

THE COURT:  In the context in which that statement is being made during a point of time in which that retention rate has fallen significantly below that 90-percent threshold, that omission, saying, by the way, you know, as of today, we've dipped -- that omission, isn't that evidence of *scienter?*

MR. DE SIMONE:  Can I supply more context?

THE COURT:  Sure.

MR. DE SIMONE:  So in the year they were up 5 percent, revenue was up.  In the quarter revenue was up 4.8 percent.  So even if retention had dipped - and it did - in the quarter the year rate for retention was over 90 and the total year of revenue was up significantly, 5 percent, and the fourth quarter was up 4.8 percent in revenue.

So, again, I think when you look at the context of all of that the retention rate is only one of the factors that are important for analysts and others who are following the stock.  But when you look at it in the full context it was a banner year for Vestis growing 5 percent for the full year and also growing 4.8 percent for the quarter.  I think when you put it in context, we don't think it was a false statement.  We don't think it was an omission, as well.

THE COURT:  Okay.

MR. DE SIMONE:  Does that answer Your Honor's question?

THE COURT:  Yes.  Thank you.

MR. DE SIMONE:  Okay.  Second, plaintiffs argue that all of Vestis's statements regarding their good customer service and

longstanding customer relationships were false and misleading because Vestis's services were so lacking that the company was selling a nonexistent service, selling air, resulting in the company's bleeding customers before the spinoff.  But, again, these wildly exaggerated allegations and others like them in the amended complaint are contradicted by the earnings reports and transcripts that plaintiffs refer to and cite in the complaint.

    This is an area that we were just talking about, Your Honor.  The revenue grew by 4.8 percent in the fourth quarter, the very quarter that plaintiffs falsely allege that the company was selling air and bleeding customers.  How could they be selling air and bleeding customers if the revenues were growing significantly in the quarter?  And this revenue increased, Your Honor, 5.1 percent, as we talked about before, in Fiscal Year '23.  This is the year that plaintiffs say defendants were selling a nonexistent service and the revenue grew 2.5 percent in the first quarter of 2024 and it was 4.5 percent growth with one-time charges excluded.

    Even in May 2024, when Vestis reported what the plaintiffs are saying are disappointing results, its revenue for the quarter was $705 million which represented a .9 percent year-over-year increase in revenue and a 2.8 percent increase in revenue when normalized for last year's temporary energy fee.  So the documents, Your Honor, that plaintiffs put at issue in the complaint plainly contradict this argument.

    Next, statements about Vestis's customer relationships were not

rendered false by the allegation made repeatedly in the complaint that Vestis failed to disclose that it had lost two national customers leading up to the spin.  To the contrary.  The May earnings' transcript - again, cited multiple times in the amended complaint - states that the two national customers combined represented an immaterial 60 basis points, that's .6 of 1 percent, Your Honor, of revenue growth for 2024.  So less than 1 percent of Vestis's annual revenue.

We cite several cases in our brief, Your Honor, for the proposition that a loss of less than 1 percent of a company's revenue is immaterial as a matter of law.  We cite cases from the Seventh Circuit, Eighth Circuit, Second Circuit, and the Southern District of Florida for that point and plaintiffs don't really dispute this in opposition, this authority, nor could they.

Fourth, plaintiffs argue that Scott admitted in the May 2024 earnings call that a technology called Telematics --

THE COURT:  I'm sorry.  Before we get to the technology point, let's talk about those losses of customers.

MR. DE SIMONE:  Sure.

THE COURT:  They had been characterized as non-regrettable at the time of the spinoff; right?

MR. DE SIMONE:  So that's actually not true, Your Honor.

The non-regrettable losses were in the -- so Vestis has two things they do.  They do recurring revenue and they do direct sales. Direct sales is like I sell you a uniform, that's different from

renting a uniform, picking up.  The direct sales business less margin, much smaller, and they were ramping that down, and that's explained in many of the earnings calls.  Again, that was not regrettable.  They were ramping that part down.  The regrettable loss was the loss of the national customers in the recurring revenue side of the business so there were two different things.

THE COURT:  If it was regrettable, then why wasn't it disclosed?

MR. DE SIMONE:  Again, it wasn't disclosed because -- first of all, they don't disclose customer losses by name, that's just their practice.  Secondly, it was immaterial because it was less than -- combined less than 1 percent of the yearly revenue.

THE COURT:  Okay.  Even if they did not identify the loss by name, which I understand they could have disclosed at the time, because they knew that they had lost two national customers and perhaps reported what percentage of loss of revenue that that yielded, but they didn't; correct?

MR. DE SIMONE:  So, again, it's not alleged in the complaint exactly when they knew that in the timeframe.  But even if they did know it before they were making the statements, again, it's our position that because it's less than 1 percent it's immaterial and they didn't have to disclose it because it -- remember, the way the business works, 90-percent customer retention rate, that means 10 percent of the customers are lost each year.  So it's a high-volume business, very, very diversified where they lose 10 percent of

2.8 billion in revenue, that's $280 million a year lost.

THE COURT:  How can I rely on the materiality of it or not at the pleading stage?

MR. DE SIMONE:  Well, we cited a bunch of cases in the brief, Your Honor.  The *Higginbotham* from the Seventh Circuit.  Tayback (phonetic) from the Second Circuit.

THE COURT:  But the information you're supplying me now about what those two national customers represented in terms of revenue, is that in the pleadings?

MR. DE SIMONE:  It's in the documents cited in the pleadings. The pleadings -- it's in the May earnings' transcript.  So when they were telling investors all the things that the plaintiffs are complaining about, they also told them in that same transcript that it was less than 1 percent of the revenue for the two national customers.

So, again, under established case law you are allowed to look at the full context of the document and under the cases that we cited in our brief you are allowed to find at the motion to dismiss stage when it's less than 1 percent of total revenue that it's immaterial as a matter of law and need not have been disclosed.

THE COURT:  Okay.

MR. DE SIMONE:  Again, we were segueing to Telematics.

So, again, plaintiffs argue that Scott admitted in the May 2024 earnings call that a technology called Telematics had never been installed by Vestis in its fleet of trucks and was not operational. Not so.  A simple look at the chronology debunks this argument, Your

Honor.  CEO Scott stated when she came into the business at Aramark in 2021, two years before the spin, she, quote, "Found it odd that we did not have Telematics in our fleet," end quote, that's at the complaint Paragraph 96.

In the February 2024 earnings call Scott plainly stated that Vestis had, quote, "Successfully deployed the new Telematics technology across 89 percent of our fleet," end quote.  Again, the complaint at Paragraph 26.

Three months later in May 2024 Scott explains in another earnings call that Telematics had been fully installed in the trucks.  Again, if you go to the complaint, 96.  She says, quote, "So we've put Telematics in our trucks," end quote.  Here, the plaintiffs simply misquote Scott in a response to a question by an analyst to attempt to manufacture a misstatement.

However, Scott did not say that Telematics had never been used prior to May 2024.  She did not say that Telematics was not operational in May 2024.  She did not say that Vestis would begin to use Telematics in May 2024.  Rather, she said they would begin to use the insights and the data from Telematics over the rest of the year and into Fiscal Year 2025.

Remember, 3,400 routes per week, 52 weeks in a year, there's a lot of data to review and a lot of analysis to do.  So I feel like plaintiffs are stretching here, Your Honor, in a couple of these to find a misstatement and there is none here.

Let's move to puffery.  Many of the alleged misstatements in the

complaint are mere indefinite expressions of corporate optimism and should be dismissed as puffery.  Now, these include general indefinite statements that pertain to Vestis's long-term customers, good customer service, customer retention, and the growth strategy.

Some of the examples, Your Honor, that they had significant competitive advantages, including long-tenured customer relationships, that they maintain long-term customer relationships due to the quality of service and products that we felt very, very good about the establishment of a service culture, an excellent service culture, across the company and that our high-end quality growth is effective.

Now, multiple courts, Your Honor, in our districts and across the country have found nearly identical statements regarding these areas to be mere puffery and have dismissed these claims.

Now, we've cited several examples in our moving brief at Page 31 of 34, over ten, including *Carvelli* from the Eleventh Circuit, that's the *Ocwen* case; the *ADT Corp.* from the Eleventh Circuit; the *Coca-Cola* case from the Northern District of Georgia.  There the court said the statement by defendant that they were confident that the company would meet its annual growth target was immaterial puffery.

Then the *Henningsen* case from the Southern District of Florida, there they said the statement that the company's approach provided significant competitive advantage, same language that we used, was the type of corporate puffery that is not actionable.

Tellingly, the plaintiffs don't even try to distinguish any of these cases in their opposition.  Instead, they pivot to Your Honor's

decision in *Buck County Norfolk Southern*.  I'd like to take just a little bit of time to talk about that.

There Your Honor held that the heightened importance of safety in inherently dangerous industries can support an inference of materiality.  In that case the plaintiffs really did identify false statements.  They looked at the PSRA, that was the plan in the case, and the company said we weren't going to sacrifice safety and they set forth detailed allegations of how the company sacrificed safety.  Prioritizing profits over safety, including that they cut their staff, they cut training, they ran skeleton crews, inexperienced staff, too many cars violating federal safety regulations and Your Honor found in that case as well overwhelming evidence of *scienter*.

A CEO defendant in the case who testified before Congress and said to Congress, yes, we were prioritizing profits over safety, Your Honor called that a smoking gun.  There were also -- there was information and letters from the regulators talking about before the crash that you have these safety concerns addressed to the CEO and other senior management.

Again, when Your Honor looks at the totality -- and I think you should do this and I think under your decision in *Norfolk Southern* and the *Carvelli* decision, which you cite there, when you look at all the context here and the totality, that case is just very different from ours where the complaints are, you know, delivering wrinkled and dirty uniforms, stained towels, worn-out place mats and, you know, missing items from things that are delivered, it's just a very different case

to support that higher presumption of materiality.

Your Honor, I just want to talk a little bit about *scienter*.  I see my time is drawing low.

THE COURT:  Glad I gave you those extra minutes; aren't you?

MR. DE SIMONE:  Thank you so much, Your Honor.

First, none of the former employees are alleged to have interacted directly with the individual defendants in the amended complaint.  Not a single FE, former employee, even claims to have met Scott or Dillon, my clients, or discussed any Vestis' business with them.  And, again, the *Mizzaro* case from the Eleventh Circuit finds no *scienter* under very similar circumstances.

In addition, the Eleventh Circuit has refused to credit similar testimony of employees whose knowledge was limited to geographic sales districts with multiple levels between their supervisors and the individual defendants.  That's the *En re: Tupperware* case, Your Honor.

Further, 5 of the 17 FEs were not even Vestis' employees during the class period.  Five are alleged to have left their positions months before the class period started and two of them left their positions more than a year before the class period started and we've cited several cases in our brief, Your Honor, saying that in that circumstance that type of testimony way before the class period is irrelevant to *scienter*.

Finally, FE 15 was not even a Vestis' employee at all.  He was an employee of Cintas, one of our competitors, so I don't see how that could really help the Court.

Finally, Your Honor, let me say something about motive before I sit down.  The amended complaint fails to make any allegations that Scott or Dillon engaged in insider stock sales intended to take advantage of the company's purportedly inflated stock.

Now, plaintiffs concede that there's no motive for the Vestis' defendants, but they argue that no such allegations are required.  However, in the Eleventh Circuit without such allegations any inference of *scienter* is particularly weak, that's the Home Bank case.  Also the *Mizzaro* case says that kind of situation weighs against the inference of *scienter,* that's the Eleventh Circuit.

So in sum, you know --

THE COURT:  Was that a motion to dismiss case?

MR. DeSIMONE:  Yes, motion to dismiss case, both of them, and they did dismiss the case.

In sum, Your Honor, let's conclude where we started.  Plaintiffs are trying to turn an earnings miss and a guidance revision into a fraud case.  But no matter how hard they try to stretch the allegations to try to find a false statement or demonstrate material falsity, they cannot do so, and they cannot meet the PSLRA's stringent pleading requirements to establish *scienter*.

Now, Your Honor, congress enacted the PSLRA to allow judges to separate the wheat from the chaff in securities complaints.  We ask the Court to do so here and to dismiss the amended complaint.

THE COURT:  Thank you very much.

MR. TURNER:  Good afternoon, Your Honor.  I'm Topher Turner

from Latham & Watkins and I represent Aramark and its CEO John Zillmer.

Aramark and Mr. Zillmer were added to the complaint, in the amended complaint, only recently.  They weren't part of the original complaint.  And the claims that have been tacked on against them are particularly deficient.  And while all the claims in this case, we submit, warrant dismissal, those against Aramark and John Zillmer are particularly insufficiently pled and warrant dismissal for additional reasons.

Aramark is one of the nation's largest hospitality companies.  You may know them for stadium fare.  Aramark also serves universities, hospitals, national parks, among other venues.  Prior to the Vestis spin, a division of Aramark also provided uniform services.

We agree with counsel for Vestis that the plaintiffs have failed to plead a claim against any defendant based on any of the statements that are challenged in the complaint.  But the newly tacked on claims against Aramark and Mr. Zillmer are particularly deficient for two primary reasons.

One is that the arguments against having pled sufficiently material falsity of the statements are particularly acute and particularly strong with respect to the pre-spin statements which are the only statements for which claims against Aramark and Mr. Zillmer are asserted.  There are no claims against Aramark or Mr. Zillmer for any statement made after September of 2023.

THE COURT:  Well, they would have no reason to make a

statement after that; correct?

MR. TURNER:  Correct.

Second, the allegations supporting *scienter* are virtually nonexistent with respect to Aramark and Mr. Zillmer.  Plaintiffs instead rely on generic assertions about the defendants generally.  With respect, in many cases, to statements that are made or events that occur well after the spin and that cannot, by definition, apply to Aramark or Mr. Zillmer.  This is an insufficient way to plead *scienter* as to Aramark and Mr. Zillmer.

Plaintiffs are required to plead *scienter* -- to plead particularized facts establishing strong inference of *scienter* as to each defendant with respect to the statements that are made showing that they knew or were reckless in not knowing that they were false when they were made.  As to the pre-spin statements, plaintiffs have failed spectacularly in that regard.

I'll start with falsity.  Your Honor, I want to pick up on a question that you asked to Mr. De Simone about the 90-percent historical retention rate.  I think Your Honor is apt to focus on that statement.  It is really the only statement of historical fact that is challenged with respect to the pre-spin statements.  The remainder are ethereal statements about customer service or about customer retention, all of which lose even more salience in context because the 90-percent historical rate has been articulated.

Mr. De Simone is exactly right that that 90-percent historical rate was accurate at the time.  Nobody has suggested otherwise.  It is

a 5-year historical rate and Aramark well exceeded it during the period 2017 to 2022.  In fact, it's also evidence of a practice that plaintiffs put into place in their complaint drafting which is to cherry pick phrases from statements and make assumptions about the remainder of the statement when challenging it.

The actual full statement that is challenged in the 2023 information statement is we believe our customer retention rate was in excess of 90 percent in the 5 years ended September 30, 2022, according to internal estimates and no fact and no allegation in the complaint suggests, much less shows, that that statement was false or misleading when made.

A couple of other, I think, important things to bear in mind when assessing that statement -- because I think Your Honor focused on a November 2023 statement, that's not a challenged statement with respect to Aramark and Mr. Zillmer.  Rather, the statements that are challenged with respect to Aramark and Mr. Zillmer took place in September of 2023.  At that point Q4 2023 had not concluded, it had not yet ended, and no one was in position to relay information about Q4 2023.

As Mr. De Simone indicated, Aramark had traditionally represented annual rates of customer retention and the annual rate for 2023 ultimately exceeded 90 percent.  I think importantly, because Aramark had been reporting these figures on an annual basis, it was appropriate for the company and for Vestis to articulate a historical annual rate for 2017 through 2022.  Indicating that that statement is

made misleading by a temporary dip in Q4 of 2023 would be a little bit like saying Chipper Jones wasn't a 300 hitter because he hit 281 August.  It just doesn't --

THE COURT:  That's an Atlanta reference.  Hold on.

(Laughter)

MR. TURNER:  We withdraw it immediately.

All of the statements were made, the statements that are challenged with respect to Vestis -- I'm sorry, Aramark and Mr. Zillmer were all made in September 2023 and, as Mr. De Simone and the documents that he's cited make clear, that's a time when Vestis was still succeeding, was still growing and developing revenue according to plan.

Accordingly, as our briefs outline in much greater detail, the arguments for dismissal based on a failure to plead material falsity as to the pre-spin statements made in September 2023 are particularly strong and warrant dismissal of the claims against Aramark and Mr. Zillmer in full.

THE COURT:  Thank you.

MR. TURNER:  The second reason that it's particularly appropriate to dismiss the claims against Aramark and Mr. Zillmer is plaintiffs failure to plead *scienter* as to either.

As I noted earlier it's -- I'm sorry.  As Mr. De Simone noted earlier, pleading *scienter* is a very high pleading bar in securities cases by design pursuant to the PSLRA.  The need to plead with particularity specific facts showing that Aramark and Mr. Zillmer knew

or were reckless in not knowing that the pre-spin statements were false when they were made.

First they need to allege facts showing *scienter* specifically as to Aramark and Mr. Zillmer.  They don't do that.  Instead, there are allegations left and right about the defendants, most of which reference activity after the spin.  An example is Paragraphs 198 to 201 of the amended complaint where they allege generally that defendants made a series of striking admissions at the end of the class period.  Obviously, that doesn't apply to Aramark or Mr. Zillmer, they were no longer part of Vestis following the spin.  Vestis was an entirely separate company at the time.

This court has repeatedly held that broad statements about defendants simply are enough.  We cite a parade of cases in our briefing.  I would refer you principally to the *Internet Network* case and the *Carters, Inc.* case cited therein.

THE COURT:  What about the loss of those two national account customers and the fact that Aramark disclosed that the losses during that sector had been non-regrettable?

MR. TURNER:  Sure.

As Mr. De Simone noted, it's a little bit apples and tacos.  We're talking about different losses when talking about those that were identified as regrettable at the time and those that were identified as -- sorry.  Regrettable later and those identified as non regrettable at the time.  But as to your specific question, sir, the two customer losses, as Mr. De Simone noted, weren't ultimately

material to Vestis's revenue and that's important.

Plaintiffs here don't allege, as I understand it, a theory of omission, that that's an independent disclosure that Vestis was required to make or that Aramark was required to make about those two customers, nor could they.  There's simply no duty to disclose that information.

They're compelled to show that a statement that Aramark or Vestis did make was materially false because it didn't include information about those two discrete customers and that's why it's important that the information about those two customers is quantitatively and qualitatively immaterial.  It certainly doesn't render false a statement about a 5-year historical retroactive -- or retrospective retention rate in any way, shape or form, much less a statement that begins I believe or we believe when asserting that rate.

THE COURT:  So are you saying that the disclosure in May of 2024 acknowledging there had been regrettable national customer losses were not the same -- was not referring to the two that had been lost pre-spinoff?

MR. TURNER:  No, I'm sorry.  I'm saying that the losses identified as regrettable in May of 2024 are not the same as losses that were identified as non-regrettable early in the period.

THE COURT:  That's what I meant.

MR. TURNER:  Yeah.  Those are different.  One is direct sales and the other is two national customer accounts, as Mr. De Simone

articulated, and I think as is outlined principally in the Vestis briefing.

I have just a couple of minutes left. I want to make sure that we also focus on the other prong of *scienter* here which is that it's not enough that the statements be known to be false. They have to be known to be false when they were made. Here, Vestis was succeeding in September 2023. There were no, you know, statements regarding its financial condition that, you know, were materially false. But certainly not any that Aramark or that John Zillmer would have understood to be false when made.

The allegations animating the assertions of falsity are like you note, Your Honor, statements from May of 2024 regarding a retrospective analysis of losses, none of which, you know, is alleged to have been known by Aramark or John Zillmer in September of 2023.

I'll take just one minute to flag the sort of alternative and really Hail Mary theory of *scienter* against Aramark and Mr. Zillmer in this case which is the theory of motive. As I'm sure you know, Your Honor, motive in this circuit is insufficient to establish *scienter,* that's *Bryant vs. Avado Brands*, that was the standard in place when I was clerking here 20 years ago.

But in any event, plaintiffs fail to establish or fail to allege facts showing that there was any motive by Aramark or by Mr. Zillmer to make false statements in connection with the information statement or analyst day and here's why. Plaintiffs allege that Aramark and Mr. Zillmer had a motive to consummate the spin. That is not an

improper motive and I think they attempt to cast a standard *pro rata*, you know, allocation of debt as some sort of an offload of debt. But this Court doesn't need to address that issue because there's a critical gap in plaintiffs' analysis.

None of the statements that were made were necessary to affect the spin. The spin was a *fait accompli*. It didn't require a shareholder vote. It didn't require a given stock price. There was no need for Aramark or Mr. Zillmer to make any statements, you know, false or otherwise, to effectuate the spin. So it can't have been that making the statements was motivated by an interest in consummating the spin transaction, that's a critical step and there's no allegation in the complaint or otherwise that fills it.

THE COURT: Are you saying the infusion of cash into Aramark was not dependent on the stock price of Vestis?

MR. TURNER: That's exactly right. It was simply dependent on affecting the spin causing the spin to occur and none of the statements that were made were necessary to that, nor does increasing Vestis's stock price post-spin have any effect on the amount of the debt that Vestis assumed and that Aramark no longer had to assume.

I believe I'm at my time. I'll save the remainder for rebuttal, if that's alright.

THE COURT: All right. Thank you.

MR. TURNER: Thank you.

MR. HOOKER: Good afternoon, Your Honor. Again, Lester Hooker from Saxena White on behalf of the lead plaintiffs.

We have prepared a presentation addressing the responses to defendants' arguments.  May I approach?

THE COURT:  Sure.

MR. HOOKER:  May it please the Court.

I just wanted to start by addressing this notion that the Vestis' defendants set forth at the beginning of their brief, that this is a nuisance filing that the PSLRA was designed to weed out at the pleading stage.  Really, in our view the exact opposite is true. This is the exact situation that the federal securities laws were designed to address where a company spun off or was an underperforming segment of its business, investors were reliant on that company and its executives for material information about how the business is performing.

And before and throughout the class period here defendants provided that exact assurance to investors.  They said that Aramark had made all the necessary investments for Vestis to succeed as a standalone business.  They said that Vestis's infrastructure was operationally sound, the service was excellent and consistent, its customer base was consistent and loyal, the company had a competitive advantage.  On the strength of those representations the spinoff was a success.  Vestis's stock starts trading above $19 per share.  It reaches a class period high of over $22 per share and just a few months later investors learned the exact opposite was true.

In fact, Vestis's operations were materially deficient in a number of key ways.  What defendants and what my friends across the

aisle glossed over today and didn't mention was several key admissions that the executives make when they reveal this information at the end of the class period, they admit that this was not a new development. They admit that several of these issues were, in fact, prevalent at Vestis's business before the spinoff, including known customer losses in the leadup to the spinoff and severe service issues in the quality of the service.  In the wake of these disclosures, Vestis's stock price collapsed.  It lost 50 percent of its value.  It went all the way down to $9.41 per share on May 3rd, a billion dollars in market capitalization was wiped out.

The other thing that my friends didn't mention was the reaction of the market.  In particular, the analysts here.  That's one of the things that makes this case pretty extraordinary for a pleading stage is that you rarely see prominent analysts like Jeffries and Barclays giving this type of commentary, being highly critical of Vestis' management.  You have Jeffries explicitly stating there's a significant management credibility issue here.  This was the first time customer retention and service issues were made apparent publicly.

More troubling, management never fully disclosed the falloff in retention on recurring revenue it started experiencing in the second half of '23 or the true magnitude of customer losses to be expected and overcome in Fiscal Year 2024.  As I'll talk about in a little bit as we discuss falsity and *scienter*, the analysts here are saying the company's starting off basically in the red and that wasn't disclosed.

For a newly public company there's now a significant management credibility issue in the tone yesterday lacked the *mea culpa*, that's from Jeffries.  Wolfe Research was also incredulous why management didn't catch this before the spinoff.  Baird also questioned credibility.  Barclay's asked incredulously how could this happen.

Defendants Scott and Dillon were executives at Aramark for years prior to the spinoff.  They were the executives in charge of this business.  So this type of commentary from prominent market analysts we typically don't see in these cases.

THE COURT:  That's interesting.  But how does that play into the analysis on a motion to dismiss?  I mean, does this impact the materiality analysis or am I supposed to look just objectively at materiality?

MR. HOOKER:  It absolutely impacts materiality.  It impacts *scienter* and falsity, really, here because these are prominent analysts that follow the company.  They are asking questions throughout the class period and there's great interchange here between the analysts and the executives and they're shocked.  They're saying why wasn't this disclosed and they're reacting to the executives' admissions at the end of the class period that, for instance, the customer losses that Vestis experienced leading up to the spinoff, that they were no customer losses.  Defendant Dillon said we knew the impact coming in of the lower retention rate.  These are all issues that were never disclosed and they questioned credibility.

We cite the *FibroGen* case in our brief from the Northern

District of California where you had similar visceral reaction from analysts in support of *scienter* on behalf of the executives.  So it definitely places an emphasis on the materiality of the information that was not disclosed, as well as the fact that the executives knew about the information that was not disclosed.

So I'll now turn to falsity and I just want to touch on briefly the standard here because one of the primary arguments that Vestis defendants made is that this is a pure omissions case, that 21 of the challenged statements should be dismissed because they're pure omissions.

They rely on the *Macquarie* decision from the Supreme Court.  But *Macquarie* was clear.  It states a pure omission occurs when a speaker says nothing, that's not what happened here.  Defendants at every step of the way made affirmative representations about the retention rate, about the service quality, about these aspects of the company's business.  The *Macquarie* decision says it does not apply to half truths and at 258 of the opinion the Supreme Court said half truths, on the other hand, are representations that state the truth only so far as it goes while omitting critical qualifying information.  That's exactly what happened here, Your Honor, and that is actually entirely consistent with Eleventh Circuit law.

We cite here on this slide the *FindWhat* case where it states by voluntarily revealing one fact about its operations a duty arises for the corporation to disclose other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead.

Again, that's exactly what happened here.

So turning next to the statements on customer losses and the retention rate. I'll start with the customer retention rate. The statements here were materially false and misleading on a number of levels. They obviously touted this 90-percent rate before the class period leading up to the spinoff and throughout the class period and these representations were highly material to investors.

On the left side of the slide, I can point to the November 2023 earnings call that we were discussing earlier and in particular what's notable here is that analysts are asking about recent trends regarding retention and that's when, in response, Defendant Scott touts momentum around protecting and growing our customer base and states that they continue to deliver retention rates that are above 90 percent. We talk about this at Paragraph 176 of our complaint.

In Paragraph 77 of our complaint, we also note that right after this call analysts, including Baird, specifically noted that Vestis isn't seeing elevated churn. So on the basis of defendants' statements saying that -- again touting the 90-percent rate, they said they're not seeing churn. The defendants never disclose that in the most critical quarter in the company's history, the quarter right before the spinoff, it experienced a material decline in that retention rate. That was absolutely critical information for investors to know. This is at a time that the company's new shares are being promoted to the market and you're withholding this material information.

THE COURT:  How do you respond to the statement that they were always consistently referring to a three-year lookback period?

MR. HOOKER:  Again, we cite both the *Wang vs. Cloopen* case and the *Towne Services* case in our brief that it's materially misleading. They made the same arguments in *Cloopen,* the defendants did.  It's materially misleading to tout, even if it's on its face true, a retention rate that's true while withholding by failing to disclose that in that quarter before the company starts trading publicly that rate declined materially and here it was absolutely material decline.

This retention rate was incredibly important for the company and in this industry.  The main competitor, Cintas, boasts 95-percent retention rate.  We have allegations in the complaint that anything below 90 percent represents a DEFCON 1 situation for this company and to not disclose that it declined all the way down to 85 percent.

And, again, the context matters.  At the end of the class period the defendants disclosed that there were known customer losses happening during this time period and that it's because of those known customer losses that the company was still absorbing, even quarters later, that they missed revenue marks.  So just all of this points to how material information this was for the market.

And the point about analysts being hyperfocused on this, it continues in February.  Again, analysts asked about trends on retention and again defendants tout the same thing.  We continue to maintain retention above that level.  They even go so far as to say there's no real surprises as it relates to retention, Paragraph 190.

No real surprises.

Three months later they, in fact, make a highly material surprise that even before the spinoff Vestis had suffered a large amount of customer losses, including two large national account customers. They admit at the end of the class period that those losses materially impacted Vestis's business, those losses were still being absorbed, and they admit that they knew about the losses even before the spinoff.

THE COURT: Are we talking apples to apples here? When they identified two large national accounts that had been lost, was it those same two that they contend represented less than 1 percent of their revenue?

MR. HOOKER: Those are the same two, yes, less than 1 percent of the revenue. Again, they highlighted to investors the importance of these national account customers and they highlighted that the customer base was absolutely the single largest growth level, the largest growth driver, and to not disclose this at the time while promoting how consistent the customer base was materially misleading. It's something that the analysts pick up on, too.

THE COURT: But if it's less than 1 percent of the revenue, then, and it wasn't -- if it's not material, then they didn't have to disclose it?

MR. HOOKER: In the context it was. In a vacuum, less than 1 percent of revenue could be deemed immaterial, I grant that. But in the context of this particular business, particularly where they say

that they're experiencing known customer losses as we exited Fiscal Year 2023 and analysts are specifically asking about the customer base, to not disclose something as significant as that, that you're experiencing all of these customer losses, including those two large national account losses, in the context it was materially misleading to investors.

THE COURT:  All right.

MR. HOOKER:  Now, again, at the end of the class period of May these admissions, they say that they're still being absorbed.  They say that they caused the company to have to change its business plan.  Instead of increasing prices, they have to materially decrease prices.

So getting back to the 90-percent rate defendants argue that they weren't obligated to disclose that.  They say it's a 5-year retention rate.  But, again, as we just discussed, analysts were asking about the trends.  What are the trends?  They want to know what's happening in the recent history, the recent quarters of the company.  They're not asking about three, four, five years in the past.

So from a reasonable investor's perspective, this large amount of known customer losses - again, that's defendants' terminology - known customer losses the material decrease in the rentention rate, all of this information was highly material a reasonable investor would want to know it.

So the last point here is something that I mentioned when we were discussing the analysts.  The Jeffries' analysts really

highlights that.  In Paragraph 104, we have it, that they say more troubling than management never fully disclosed the falloff in retention on recurring revenue it started experiencing the second half of '23, Jeffries goes on to say or the true magnitude of customer losses to be expected and overcome in Fiscal Year '24.  So that's how material these known customer losses were, you had to overcome them. The company had to overcome them in Fiscal Year '24.  Yet, that wasn't disclosed.

Turning to the next slide I just wanted to highlight the two cases that I mentioned before because they did involve the similar arguments that defendants make here.

In *Wang vs. Cloopen,* the court considered and rejected the same argument that there was no obligation to disclose because the statement was referring to a much longer period of time, that was on its face accurate.  The court rejected that particularly because the decline came in the quarter immediately before the company started trading publicly and that made the representations about the retention rate misleading.

The *Cloopen* case is also instructive with regard to defendants' argument that they adequately warned of the risks of not being able to retain customers.  We see this time and time again in these cases, that defendants point to a laundry list of boilerplate warnings about what might happen in the future, but what they're not telling the market is what's happening right now or what already happened in this case.  Vestis did not warn that the loss of customers had already

happened, did not warn that it already came to pass, and that's what defendants admitted to. These were, again, known customer losses as we were exiting Fiscal Year '23.

The *Cloopen* case at 228 of the opinion states warnings regarding the future risk of declining customer retention were misleading. In view of the then existing, but omitted fact, of the steep fourth quarter 2020 decline in the net customer retention rate, that's exactly what happened here.

So defendants, in their brief, say *Cloopen* is distinguishable because it was a bigger decline in the retention rate. It was something like 30 percent, Your Honor. But from our perspective -- first as an initial matter, materiality arguments are difficult to resolve at the motion to dismiss stage. But here, we would submit that the facts are just as, if not even more, egregious than in *Cloopen* given the timing and magnitude here.

Timing, again, as I mentioned, the most important quarter in the history of the company, you're about to be spun off and about to become a newly independent company -- magnitude, as I mentioned earlier, falling below 90 percent is a DEFCON 1 situation in this industry. The competitors had 95 percent. So analysts specifically highlighted this. This is the first -- at the end of the class period, this is the first time we're hearing about the lower retention rate, so under these circumstances the drop in the retention rate certainly affected the total mix of information that was available to investors.

I'll next turn to --

THE COURT:  These arguments, I'm gathering, in your view apply equally to Aramark as it does to the Vestis' defendants?

MR. HOOKER:  Yes, Your Honor.

I will turn to the specific Aramark arguments that my friend made at the end of my presentation.

THE COURT:  Okay.

MR. HOOKER:  But definitely because we're talking about the time period where Vestis was still part of Aramark for certain of the statements.  The known customer losses admitted the words of the defendants happened before the spinoff.

THE COURT:  All right.

MR. HOOKER:  So the next set of statements I'll just briefly touch on is the service quality statements and here we juxtapose what defendants told the investors during the class period with what they ultimately admitted and it's really night and day.

You see them paint this picture of consistency and accuracy. They represent that they retain their customers long-term specifically because of their service, it's the single highest growth lever.

Analysts are asking at various points about muted growth in the uniforms business, does it have anything to do with service, and the lowest point on the left side, the analyst asks uniform growth was below competitors and asked whether it's service quality.  Again, that's never disclosed.  Defendants say, no, it was either intentional or purposeful decisions or an uptick in business closures.

Just a month after the spinoff is complete, as you see on the right side of the slide, defendants admit the opposite. Defendant Scott admits there wasn't a process to verify whether a truck has been loaded, we were not tight on our processes. She says the root causes of customers choosing to leave Vestis was related to service experiences.

THE COURT: But did they know that at the time?

MR. HOOKER: That's another good question, Your Honor, because in the May earnings call analysts asked that. Analysts asked you guys were leading up this company for years before the spinoff, how could you not catch this? In response, they said that these were not new issues. To the contrary, they said -- they made crystal clear these challenges have been in our business for quite some time, that's at Paragraph 101 of our complaint. They said these issues were not related to the spin, I'll be clear about that. So they made clear themselves -- the own plain language of their words said these issues were in the business for quite some time.

I'll next turn briefly to the statements concerning Telematics and taking price. So with regard to Telematics defendants touted this technology both before the spinoff and during the class period. They repeated it in their December 2023 10-K. They said that they had this Telematics technology. And even in February of 2024, just months before the end of the class period, Defendant Scott said we have successfully deployed new Telematics' technology across 89 percent of the fleet. Successfully deployed.

At the end of the class period investors find out all these service issues that directly led to the loss of customers.  This is where defendants, in their argument, are really ignoring the allegations of the complaint and really ignoring Defendant Scott's own words which we have in the complaint.  She says we expect very quickly that we'll begin to use Telematics to shore this up and to make sure that we're delivering on time and that we're where we should be when we should be.

We expect very quickly that we'll begin to use Telematics, that's the opposite of what defendants represented earlier during the class period.  They didn't say it at that point early in the class period that we've installed it, but we haven't started using it yet, to make sure that we're delivering on time.  They said successfully deployed.

In the *Snap* case, the Ninth Circuit found a similar statement by a defendant, "successfully implemented," to mean just the plain language of those words, that that tool was in place and was actually working.  Here, they're only beginning to use Telematics at some undetermined point in the future in May of 2024 to make sure we're delivering on time.  So it's our view that that statement was -- the Telematics' statements were materially misleading for that reason.

With regard to defendants' statements about taking price, again, that happened in February of 2024.  It's our view that there was no basis to make those representations to the market.  They said that to give investors additional comfort, again at a time when the COO,

Synek, had resigned the day before Vestis was reporting lower revenue, the market had concerns, Vestis wanted to reassure the market, said we're going to take price.

We have allegations in the complaint that around that same time in February of 2024 service issues were subpar. There was a town hall meeting where decrease in prices was actually discussed and at the end of the class period defendants admit they had to decrease prices because of these service issues. Happy customers don't leave. You have to decrease prices to keep them. So on that basis we believe the taking price statements were also materially misleading.

I next just want to address defendants' arguments on immateriality and puffery and they argue that certain of their statements are immaterial, a reasonable investor would not rely on them or assign any weight to them. But as courts in this district, around the country, they repeatedly emphasize that the motion to dismiss stage context matters.

This court made clear puffery is a low standard, especially in the context of a motion to dismiss. But here, the context, as I've been mentioning, is conclusive. Defendants themselves emphasized to investors time and time again that these exact operational areas gave Vestis a competitive advantage, that this is one of the most important levers in the investor presentation, we discuss at Paragraph 65, the single highest value growth lever is retention which we achieve through service excellence.

Defendants themselves are placing these areas of the company's

business at issue front and center.  Again, analysts repeatedly asked about customer retention, they asked about service throughout the class period, and at the end of the class period the analysts react viscerally when they find out what they've been told is, in fact, not true.

THE COURT:  Why are you not bringing any claims for statements made before September of '23?

MR. HOOKER:  Those were the statements that were made in connection with the spinoff.  So Vestis' investors can rely on the statements in the registration statement, in the information statement, that were made analyst day and those were statements by Aramark, Zillmer, Defendant Scott, and Defendant Dillon when Scott and Dillon were still executives of Aramark.  So those were the ones really intended or directed towards the spinoff at a time when Vestis' investors can still rely upon those.

I did want to address one of the arguments that defendants made -- both Aramark and the Vestis' defendants make about the *Norfolk* opinion.  They say that both *Norfolk* and others of the cases that they rely upon involve the safety operation really matters of higher importance, regulated materials, but we think this is a red herring. The point here is that the statements that are at issue, if false, have the ability to undercut the entirety of the company's business operations.

A uniform company that cannot deliver uniforms to its customers accurately or on time that leads to the loss of customers is obviously

of utmost importance to investors.  It's something that has profoundly affected the business of the company.  Again, at the end of the class period the stock price dropped 50 percent.  The company is still having to deal with these issues.  Today the stock price trades below $5 per share.  The areas of the company's industry or business is really irrelevant here.  It's how profound or how significant are these areas to this company's business and here it's the only thing that they do, it's the most important thing that they do.

I'll next turn to *scienter* and our next slide just discusses the standard.  I know that the Court is very familiar with this.  I'll just hit upon a couple of quick things.

The Supreme Court has made clear there's no smoking gun evidence that's necessary.  No motive is needed at the pleading stage. Knowledge or recklessness are sufficient and a tie on the *scienter* issue.  If there's a 50/50 inference, it goes to the plaintiff.

Here, I think on *scienter* we have again, as I mentioned at the beginning, just a plethora of facts that establish *scienter* at the pleading stage.  The first I'll discuss - and I know we've discussed this already - are defendants' admissions and again my friends across the aisle didn't discuss these at all during their presentation.  But they're really rare when defendants own words establish their knowledge at the time that the challenged statements were made.

On this slide we just collect the various statements that defendants made at the end of the class period and they confirm that they knew full well even before the class period started about the

lost customers, the known customer losses.  The pervasive service issues were in the business for some time.

Defendants Scott and Dillon made these statements.  They say known customer losses.  We knew the impact coming in of the lower retention rate.  In our view, these are remarkable admissions.  It led to the analysts reacting in the way that they did.  Now, defendants try to explain them away in their briefs.  They try to say that they meant something else or that they just recently found out about the service issues.  But that's, I think, a pretty convenient position to take and it doesn't comport with the complaint's allegations.

It's nonsensical to believe that these executives repeatedly told the market that they were focused on these issues, that they had gone deep and granular on these issues, and they didn't know about them even though they admit that they had been in the business for some time even before the class period started, even before the spinoff.  It's not credible.  It's certainly not sufficient to grant a motion to dismiss at the pleading stage.  The next couple of slides really underscore this fact.

THE COURT:  Before we go there.  One of the questions that I had was what specific allegations you had with regard to Rick Dillon.  Is it those two, Paragraphs 98 and 101?

MR. HOOKER:  Those are what his statements -- his admissions at the end of the class period regarding the known customer losses and knowing the impact coming into the retention rate, that's with respect to what he said about defendants' knowledge.  But certainly what both

Defendants Scott and Dillon admitted at the end of the class period go to both of their *scienter*s because they were both at the company, they were both executives at Aramark in the leadup to the spinoff.

THE COURT:  So you're saying that Scott's statements are attributable to Dillon?

MR. HOOKER:  Well, when Scott says that the fundamental service gaps have been in our business for some time when Dillon was an executive during that same time period, I think that can lead to a reasonable inference that he would know about the service gaps as well.  When Dillon says that we knew the impact coming in of the lower retention rate, I mean, it's the plain words that they're saying are that we collectively knew.

THE COURT:  All right.

MR. HOOKER:  Okay.  I'll next turn to something that, again, really takes this case and sets it apart from a typical securities case is that it's rare for a securities class action complaint to have internal documents.  You know, we don't have the benefit of discovery yet so typically there's no internal reports that are cited to in a complaint.  We have that here.

We have weekly installed and loss reports that showed that the company was experiencing significant client losses in the weeks and months leading up to the spinoff.  It showed tens of millions of dollars in lost revenue.  That's consistent with what defendants admitted to at the end of the class period.

Their main argument is that there's no evidence at this stage

that Defendants Dillon or Scott actually received and read.  But as we noted, we addressed this argument in Page 60 of our opposition, the reports were sent to direct reports of Defendant Scott including senior vice presidents and vice presidents of sales.  So it's a fair inference that it penetrated the executive realm here, this information.  Again, the information contained in those reports is consistent with what defendants admitted to.  They experienced large known customer losses in the weeks and months leading up to the spinoff.

The second point here is that we have the accounts of former employees, which I know defendants try to devalue, but this isn't a case where there's only two or three or even five former employees. We have 16 former employees from Vestis and Aramark that worked at disparate locations across the country, all of which confirmed the severe service quality issues, again, consistent with what defendants admitted to at the end of the class period about service quality not being good enough and leading to lost customers and they provide details.

They don't just say, okay, a uniform was dirty or a mat had holes in it.  They confirm pervasive service issues, including with respect to multiple large customers like Tyson's Chicken, Whole Foods, Cracker Barrel.  They provide details like Spat met personally with Tyson's Chicken to try to retain business despite significant service issues.  That's at Paragraph 118.

Multiple former employees described that the COO, Synek, leaving

after only five months on the job was directly due to concerns regarding service quality and lack of investment. We talk about that at Paragraphs 133 to 34. A couple independently corroborated the February 2024 town hall meeting where these issues were discussed. So these are overwhelming *indicia* of *scienter,* that these issues were so prevalent throughout the company, and there's 16 former employees that contribute to that inference.

And lastly on *scienter* we have just a few more additional points that even contribute more to an overwhelming inference of *scienter.* The first is what Defendant Scott said about her personal monitoring of these issues. The defendants portrayed themselves as hands-on executives. They're brought in specifically to facilitate the spinoff well in advance of it. They emphasize they were very focused on logistics.

The statement on February 6th, 2024, I discussed this briefly earlier, by Defendant Scott is extremely telling. It comes at a critical time for the company. Again, COO Synek had resigned the day before Vestis disclosed disappointing revenue growth, they reaffirm guidance, they say they're increasing prices and then when an analyst asks why the uniforms business in particular reported growth below Vestis' competitors, she said that she monitored customer departures very closely. She had gone pretty deep and granular to understand what are those patterns and trends around why customers are leaving. That's at Paragraph 82 of the complaint.

She's telling the market that she's personally going deep and

granular to understand why customers are leaving and she doesn't say anything about service issues.  She doesn't say anything that these were known customer losses from the year before.  She said it was a slight uptick in customers going out of business, something that has nothing to do with Vestis's service, nothing to do with the losses from the previous year.  Again, just three months later they admit the opposite.  So this is yet another reason why analysts are perplexed.  The executives were closely involved with those issues.  Again, the analyst specifically asked how could you not have caught this?  We don't understand why you didn't disclose this.  You're at Aramark years before the spinoff.

Lastly, the fact that virtually the entire C Suite left Vestis either during the class period or in the months following the end of the class period also contributes to a strong inference of *scienter*. We made the point in our brief.  Obviously Synek, but also both Dillon and Scott left in the months following the end of the class period.

THE COURT:  Tell me why that is evidence of *scienter*.

MR. HOOKER:  When you have rapid fire succession of executives leaving -- we cite this in our brief several cases on this point - that it adds to the inference that these weren't just preplanned or innocuous executive departures, that things went horribly wrong behind the scenes.  In conjunction with the rest of our allegations, it absolutely contributes to an inference of *scienter* that the blame lies with the C Suite.

I'll address defendants' argument on the lack of insider sales

here.  As we addressed in our brief, insider trading, personal motive, absolutely not needed to establish *scienter* at the pleading stage. *Tellabs* specifically says that a personal financial motive is not needed and here that argument is particularly not very persuasive.

What defendants are suggesting is that in the context of a spinoff a newly traded company, these executives are supposed to -- the first thing that they do is sell shares, that's the message they want to send to the market, that they're taking the helm of a newly independent company and the first thing you do is sell shares.  That's not persuasive, in our opinion.

Another point here that we make is that there was a requirement that they hold shares.  Defendants say that requirement didn't kick in until 2028.  But under this scenario they would have to sell shares immediately after the spinoff, again unrealistic, only to thereafter reacquire shares in order to meet this requirement and, again, they're not even at the company anymore.  So they never even met the timeframe for that requirement.

I'll turn to Aramark's arguments.  Initially I just -- I'll speak briefly about standing because they didn't really argue it today and in the reply brief they largely ignored it.  They relied on out-of-circuit precedent in *Lucid* and *Menora*.  Those are cases involving merger where a statement made by a merger partner for claims brought by shareholders by the other company were found to not have standing, that's not the case here.  Vestis was not another existing company.  It was part of Aramark at the time of the statements.

Regarding falsity, the statements that were made pre-spinoff, again, were false for many of the same reasons we've already discussed.  Aramark tries to distinguish *Norfolk* on some of the same bases as we've discussed already.  They make the safety argument as well.  They do make a different argument here that *Norfolk* involved a business pivot that wasn't alleged here.  We would submit that there was a major event here.  There was the spinoff.  And we do explain that Aramark's defendants were touting their major investments in the business as a reason to promote the spinoff.

For similar reasons, the Aramark defendants argue in their brief that there were only isolated service gaps that were not systemic.  I think that ignores our allegations about just how systemic these service gaps were and it ignores defendants' own admissions at the end that they were longstanding and existed before the spinoff.

Today my friend for the Aramark defendants argue that the retention rate statement in connection with the spinoff is not actionable because it included the words "we believe" before the statement and, therefore, it's an opinion.  But even defendants' own cases reject that notion.  The *Carvelli* case.

The *Ocwen* case states, of course, simply because a statement is couched as opinion, "I believe," "I think," or even "in my opinion" doesn't foreclose a finding that it constitutes an express or implied misrepresentation of fact.  That's at 1322 of the opinion.  Again, this is particularly true here where we have an overwhelming number of facts indicating that these issues were, in fact, prevalent and

ongoing at the time that those statements were made.

THE COURT:  So the only evidence you have against Mr. Zillmer is that he signed the cover letter?

MR. HOOKER:  He did sign the cover letter.  But he did make representations to the market about knowing -- he was very well versed with the business for AUS, what was then AUS, what became Vestis.  He told the market about the investments that were made in preparation for the spinoff.  He signed the cover letter.

We cite the *Zwick* case in our brief that found under similar circumstances -- and it's not in this circuit.  It's in the Middle District of Tennessee.  The CEO of the parent company that was spinning off a segment, by signing the cover letter making representations to the market that he made false, misleading statements regarding that business.

THE COURT:  Do you have any false statement coming out of his mouth?

MR. HOOKER:  No.  He didn't speak at the analyst day.  He just signed a cover letter that had the information statement that included those false statements.

Lastly, the last point that I'll make on Aramark *scienter* is -- the first point is that Aramark has conceded that Scott and Dillon's *scienter* can be imputed to Aramark.  Scott and Dillon were executives of Aramark at the time of the pre-spin statements.  Their misrepresentations are binding on Aramark.  We note this at Page 67 of our opposition.  The Aramark defendants do not really refute it.

Again, just to recap what we discussed already, the allegations of the former employees, the internal documents, and defendants' own admissions confirm that these issues were happening at the time of those statements.

The last point is the argument on the Aramark motive, the $1.5 billion cash payment that went back from Vestis.  Defendants argue that that's no basis for motive, that this was just a proportionate share of the debt.  But there's no indication in the four corners of the complaint that AUS actually incurred $1.5 billion of debt.  So, in effect, what defendants are asking the Court is to assume that Vestis or the legacy AUS business was the source of $1.5 billion in debt.  If anything, our allegations show the opposite.  We discuss in Paragraphs 42 and 43 of the complaint that it was Aramark that was hit hard by covid.  It was Aramark that was siphoning off whatever cash Vestis was earning to help with Aramark's debt.

We allege that Aramark had for years failed to properly invest in AUS's operations.  Actually, executives later on complained about this lack of investment and their complaints were either ignored or those executives were let go.  So we have allegations in the complaint that counter this argument.

So, again, Your Honor, at the pleading stage this is more than the federal security losses require.  We respectfully submit that defendants' motion should be denied and unless the Court has further questions I'm done with my presentation.

THE COURT:  I'm good.  Thank you very much.

MR. HOOKER:  Thank you.

MR. DE SIMONE:  Thank you, Your Honor.

THE COURT:  Under your initial allocation, you have 3 and a half minutes.

MR. DE SIMONE:  I better go fast.

Let's talk about the so-called admissions, known customer losses carrying over from the prior year.  It just shows a fundamental lack of understanding how the business works.  There's always known customer losses every quarter, every year, that's the way it works when you lose 10 percent customer retention is 90, you lose 10 percent.  Again, out of 2.8 billion, that's 280 million a year you're losing.

The question is you know there's losses.  The question is are you able to ramp up and bring on new customers, cross sell existing customers, so that the net amount is more than the losses?  Remember, there's customer gains coming over from new customers that are put in on the prior year also.  So, again, to say that known customer losses is an admission.  It's not an admission.  That's the way the business works and everyone knows that including the analysts.

The admission about severe service issue or horrible service, there's a lot of adjectives being used about what happened in the May disclosures.  Scott merely said that we have some service issues.  She also said there were four reasons why May, the second quarter, wasn't as good as we want it to be.  The first was the failure to ramp up.  We didn't ramp enough new sales to make up for the known customer

losses which we know about every year.

Now, in the fourth quarter of 2023 when we had 4.8 percent growth there the ramp was bigger than the known customer losses. In the full year, again, ramp of new customers bigger than the known customer losses.

In the first quarter, 2.5 percent growth. Again, same known customer losses from the prior year. We just had a bigger ramp. There wasn't a bigger ramp in the second quarter. Again, that's not something you could know back in 2023. You don't know what the ramp will be in the second quarter prospectively.

The second thing she talked about in the May conference call was sales productivity, sales per dollar. In the plan they had, they were supposed to increase the sales productivity more than half in that quarter. Again, not something that could have been known back in 2023.

Then there was a conscious, strategic decision to moderate some pricing, that is true. But, again, that's a decision by the executives seeing how the business is doing in the second quarter and making decisions. Again, that's not fraud. That's prudent management. Maybe they disagree with the decision to moderate pricing, but at most that's mismanagement, that's certainly not fraud.

They talk a lot about analysts and the role of analysts here. The reliance on third-party analysts who lack any basis to speak about plaintiffs' actual knowledge, either in May or six months beforehand or three months beforehand, I think is dispositive and I think Your

Honor asked a question about that.

We cite three cases in our brief, the *Sysco* case, the *Citicorp* case, and the *Wet Seal* case. I'm going to read to you what the *Citicorp* case said. Analysts' opinions aren't either relevant to this complaint nor admissible. Rather, the complaint must rise or fall on allegations about defendants' conduct and not the wide-eyed citation and gratuitous commentary of outsiders who don't know what the executives were thinking or whether there was -- you know, at the time the statement was made information that they knew to contradict their knowledge.

THE COURT: Does it help inform on the materiality question, though, if we know that it was material information to analysts?

MR. DeSIMONE: Look, I think the analysts were looking at these issues. Of course if there's a miss, an earnings miss and a downgrade, they're going to be looking at these issues and they're going to be questioning credibility and they should be doing that, that's their jobs as analysts. But just because an analyst says I think what you said now is different from what you said three months ago, that's fraud by hindsight, you need to know three months ago what the knowledge was and analysts can't know that.

They cite one case called *FibroGen*. That's a case where the analyst is quoting from a scientist who was involved in the trials earlier. So that's a case where I could see where the analyst would say, well, here's a guy who was involved knowing what was going on and that's a very different situation, Your Honor.

Just on the puffery point, I think we went through *Bucks County*, your opinion, and how it relates here.  I would just say if you take the plaintiffs' position and establish it as law in this circuit there will be no puffery doctrine.

Look, *Carvelli*, the Eleventh Circuit case that you cite, Your Honor, is still the law.  They found a case looking at the totality where they dismiss gains on puffery using the same standard you did.  So, again, it's for the judge to look at the totality of all the information, the allegedly false statements, the *scienter*, all of it together realizing whether it's an inherently dangerous industry or not and then making a decision.  We think if you do that here, our case is very different on *scienter,* very different on falsity than what was going on in *Bucks County*.

My time is up.  But I think Your Honor made a great point about Defendant Dillon, there's really no discussion of it.  Same with Zillmer from Aramark.  Just one thing about Synek leaving, Your Honor, that was watercooler gossip.  There was no discussion either of the FEs had with Synek who was the COO about why he left, that was just sort of their musings.

THE COURT:  Okay.

MR. DE SIMONE:  Thank you, Your Honor.

THE COURT:  Thank you very much.

MR. DE SIMONE:  I appreciate it.

THE COURT:  Sure.  Mr. Turner, bring it home.

MR. TURNER:  Yes, Your Honor.  2:32.  Rolling up sleeves.

Your Honor, I think today's oral argument reinforces that Aramark and Mr. Zillmer are afterthoughts in this case and that dismissal as to each is entirely appropriate.

I'll start with Mr. Zillmer.  As you noted, Your Honor, he's not alleged to have made directly any of the statements in the case. There aren't allegations that speak to his *scienter* in any meaningful way.  In fact, if you flip through the presentation that plaintiffs have provided today, you'll see, just as in the complaint and in their opposition, there's a parade of places where they say defendants ultimately admitted X, Page 4.  Defendants ultimately admitted X, Page 6.  Defendants' claims will be taking price, Page 7 and 10 and 12.  All these pages there are statements generally about defendants. They're not about Aramark, they're not about Zillmer.  I think plaintiffs are effectively conceding, at a minimum, that Mr. Zillmer should be dismissed from the case.

As to Aramark, plaintiffs have also acknowledged that this is really just -- they're not inserting omissions and so their case with respect to pre-incident statements ultimately boils down to the statement made in the information statement about Vestis -- I'm sorry, Aramark's customer retention rate historically for the years 2017 to 2022 and whether that's a materially false statement.

What their argument boils down to is the assertion that this statement we believe our customer retention rate was in excess of 90 percent in the 5 years ended September 30, 2022, according to internal estimates, is false because it doesn't then say but in the

not-yet-completed quarter we lost two customers representing 0.6 percent of our revenue.  Simply not a material addition.  Simply not anything that anybody could be required to disclose under the circumstances is absolutely not the predicate for securities fraud with respect to Aramark or Mr. Zillmer.

Mr. De Simone noted that we lost up to 10 percent of customers each year.  Under those circumstances, the notion that we lost 9.6 percent in Fiscal Year 2023 simply can't be a misrepresentation, it isn't, and that's all that plaintiffs are hanging their hat on with resect to pre-spin statements.

The other note I would make is that plaintiffs have in no way denied that they are missing a step between any motive to affect the spin and a motive to make challenge statements because the challenge statements weren't necessary to consummate the spin, that eliminates the notion of motive with respect to Aramark and Mr. Zillmer and by extension eliminates any arguments regarding *scienter* that are unique as to the two.  The rest are as to defendants, they're improper as pled.

If Your Honor has no questions.

THE COURT:  One question, actually, for both sets of defendants.  As noted by Mr. Hooker, you did not use any of your time on the standing issue.  Are you withdrawing that argument or resting on your briefs?

MR. TURNER:  Do you mind if I take that?

With apologies, we're not withdrawing the argument.  We rest on

the briefs with respect to the argument. I would note, though, that Your Honor's question of plaintiffs' counsel was particularly apt. Why aren't they challenging statements that were made by Aramark before September 2023? Part of the reason is they can't challenge statements as Vestis's investors that were made by Aramark about Aramark. We submit that the purchasers seller rule doesn't just extend to those statements that were made before September 2023, but also the statements were made in September 2023 before the spin.

With limited time today, Your Honor, we wanted to focus on the equally dispositive ideas of falsity and *scienter* and we think that those clearly mandate dismissal.

THE COURT: Okay. Thank you. I don't fault you for not raising it. Obviously, in limited argument you can't touch every issue. But Mr. Nagasaka, my law clerk, would have been very upset with me if I didn't confirm that you weren't abandoning the argument and save us some time.

MR. TURNER: Thank you, both.

THE COURT: Thank you.

Very well done, counsel, thank you all. That was excellent argument that matched the briefing. I appreciate you coming here -- traveling here close to a holiday weekend and being as prepared as you were.

I know that this case has been pending for quite some time, these motions have been pending. Our goal is to get this out in about the next 30 days. So we're already working on it and I'm hoping to do

that so that it gives you some clarity going forward.

Okay.  Thank you again.  Safe travels home.  All right.  Have a good holiday weekend.  We're in recess.

(Proceedings concluded at 3:39 p.m.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

CERTIFICATE OF REPORTER

      I do hereby certify that the foregoing pages are a true and correct transcript of the proceedings taken down by me in the case aforesaid.

                    This the 23rd day of September, 2025.

                          /S/ Alicia B. Bagley _____
                          ALICIA B. BAGLEY, RMR, CRR
                          OFFICIAL COURT REPORTER
                          (706) 378-4017