**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

PLUMBERS, PIPEFITTERS AND
APPRENTICES LOCAL NO. 112
PENSION FUND, *individually and on behalf
of all others similarly situated*,

    Plaintiffs,

               v.

VESTIS CORPORATION, KIMBERLY
SCOTT, RICK DILLION, ARAMARK, and
JOHN J. ZILLMER,

    Defendants.

Civil Action No.
1:24-cv-02175-SDG

## OPINION AND ORDER

This matter is before the Court on Defendants' motions to dismiss [ECFs 65, 66]. With the benefit of oral argument, the motions are **DENIED** in all respects except that dismissal is **GRANTED** as to Count I against Defendant John Zillmer.

## I.    BACKGROUND

This securities fraud case arises out of the steep fall in value of Defendant Vestis Corporation less than a year after it spun off as an independent entity. The complaint alleges that Vestis, a uniform-rental and workplace-supply services company, was troubled from before its inception by systemic customer service and retention problems—problems that were hidden from investors during the

1

spinoff, and, when those problems were eventually revealed, caused Vestis's stock price to fall nearly 50%.

### A.    The parties and claims

Plaintiffs—a consortium of public pension funds[1]—assert two counts under the Securities Exchange Act of 1934 against five Defendants: Vestis; Kimberly Scott (Vestis's CEO[2]); Rick Dillon (Vestis's CFO[3]); Aramark (the company from which Vestis spun off[4]); and John Zillmer (Aramark's CEO[5]). The first Count is asserted against all five defendants under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.[6] The Rule 10b-5 claim alleges that Plaintiffs were tricked by Defendants' misstatements into buying Vestis's stock at an artificially inflated price. The second Count is asserted against all Defendants except Vestis under § 20(a) of the Exchange Act, 15 U.S.C.

---

[1]    This case was originally filed by the named Plaintiff: Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund. ECF 1, at 1. In accordance with the statutory procedures governing private securities fraud cases like this one, *see* 15 U.S.C. § 78u-4(3), the Court appointed the following public pension funds to collectively serve as Lead Plaintiffs: City of Atlanta General Employees Pension Fund; City of Atlanta Police Officers Pension Fund; City of Atlanta Firefighters Pension Fund; Employees Retirement System of the City of Baltimore; and Norfolk County Retirement System. ECF 22, at 1.

[2]    ECF 55, ¶ 28.

[3]    *Id.* ¶ 29.

[4]    *Id.* ¶ 27.

[5]    *Id.* ¶ 30.

[6]    *Id.* at 123.

§ 78t(a).[7] The § 20(a) or "control person" claim would allow Aramark's and Vestis's 10b-5 liability to be imputed to those companies' executives.

### B.    The allegations[8]

At the heart of this case is Aramark's 2023 spinoff of its uniform services and workplace supplies division—Aramark Uniform Services, or AUS—into an independent, publicly-traded company called Vestis.[9] AUS's business consisted primarily of renting out uniforms and workplace supplies—towels, linens, floor mats, and the like—that it would pick up, launder, and return to its customers on a recurring basis, typically weekly.[10] AUS was a large company, with 20,000 employees, over 350 facilities, and over 3,400 delivery routes.[11] Nevertheless, it was the smallest of Aramark's three divisions and, allegedly, the odd one out.[12] According to Plaintiffs, Aramark was hesitant to invest in AUS, which did not mesh well with the rest of Aramark's food-services business.[13] As a result, by 2022, AUS had been receiving less capital investment and growing at a lower

---

[7]    *Id.* at 128.

[8]    Plaintiffs' allegations are assumed to be true for purposes of the instant motion. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

[9]    ECF 55, ¶ 1.

[10]    *Id.* ¶¶ 39–40.

[11]    *Id.* ¶ 39.

[12]    *Id.* ¶ 42.

[13]    *Id.*

annual rate than both of its principal competitors in the uniform-services industry for the greater part of a decade.[14] The one-sided relationship between Aramark and AUS was typified by the former's alleged tendency, during periods when it was struggling with high levels of debt, to treat AUS as little more than "a source of cash flow" for Aramark's food-service operations.[15]

Plaintiffs allege that this relationship culminated—fittingly—in the spinoff, wherein a debt-ridden Aramark unloaded a dysfunctional AUS onto unwitting investors in exchange for huge amounts of cash.[16] Aramark had been hard-hit by the COVID-19 pandemic's impact on the food-services industry: it had fallen close to $10 billion into debt, and its debt-to-earnings ratio had skyrocketed.[17] Facing "growing market concern over its balance sheet," Aramark, in December 2021, resolved to halve its debt-to-earnings ratio within four years.[18] It was in that context that Aramark hatched its plan to spin off

---

[14]    *Id.*

[15]    *Id.*

[16]    *Id.* ¶ 211.

[17]    *Id.* ¶ 43. More precisely, Plaintiffs allege that Aramark's EBITDA leverage was more than 7x. *Id.* EBITDA stands for "earnings before interest, taxes, depreciation and amortization."

[18]    *Id.*

4

AUS.[19] Pertinently, the terms of the contemplated spinoff provided for a payment, from Vestis to Aramark, of $1.5 billion.[20]

To justify the spinoff, Aramark presented AUS to investors as a once-troubled company now "poised to succeed" after an influx of fresh capital and under the guidance of new leadership.[21] In its press release announcing the spinoff, for example, Aramark promoted its "[r]ecent investments" in AUS that were "enhancing customer experience," improving its customer retention rate, and delivering hundreds of millions of dollars in "new client wins."[22] In the same press release, Aramark introduced what it described as an experienced new leadership team that had "developed a plan" to increase AUS's revenue growth by "capitalizing on [its] recent investments[ ] and modernizing [its] approach to

---

[19]   *Id.* ¶ 43

[20]   *Id.* ¶¶ 47, 72.

[21]   *Id.* ¶ 48.

[22]   *Id.*; ECF 65-4, at 3. Here and throughout this Order, the Court takes judicial notice of (or, in the alternative, incorporates into the complaint by reference) certain exhibits attached to the parties' briefs—mainly SEC filings, earnings call transcripts, and press releases. The unopposed motion for judicial notice [ECF 67] is thus **GRANTED**. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999) (authorizing judicial notice in securities fraud cases of "relevant documents legally required by and publicly filed with the SEC at the motion to dismiss stage"); *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024) (authorizing the incorporation by reference of any document "(1) central to the plaintiff's claims" and "(2) undisputed").

customer relationship management."[23] At a conference a few weeks after the spinoff was announced, Aramark's CEO John Zillmer reported that AUS was "beginning to drive the benefits" of improvements to its "sales infrastructure and leadership development."[24] Similarly, AUS's CEO and president Kim Scott—whom Aramark had brought in for the purpose of preparing AUS for the spinoff[25]—spoke to investors of her "tremendous amount of experience" with AUS's customer-retention-driven revenue model, and of her installation of a "proper logistics function" that would allow AUS to do "more sophisticated things around routing and scheduling and logistics."[26]

In the weeks preceding the spinoff, Aramark continued to paint a rosy picture of soon-to-be Vestis's ability to succeed on its own. In an Information Statement filed on Vestis's behalf with the SEC on September 11, 2023, and on Vestis's inaugural Analyst Day conference call two days later, investors were beguiled with talk of Vestis's "sticky" and "loyal" customer base;[27] its ability to

---

[23]   ECF 55, ¶ 49; ECF 65-4, at 4.

[24]   ECF 55, ¶ 52.

[25]   *Id.* ¶¶ 47, 64, 107.

[26]   *Id.* ¶¶ 53–54.

[27]   *Id.* ¶ 169.

provide "service excellence"[28] through "on-time" deliveries;[29] and its new "ABS" operating system[30] and "telematics" technology.[31] Scott, speaking at the Analyst Day, predicted that Vestis would reach annual revenue growth rates of 5% to 7% by 2028.[32] Vestis's pitch was well-received by financial analysts, who highlighted how the company's "logistics muscle" would help it achieve "paramount" improvements to its customer service experience.[33] On September 30, 2023—the last day of the fiscal year[34]—Vestis was spun off from Aramark,[35] and, on October 2, began trading at $19.20 per share.[36]

Vestis's first months as an independent company went smoothly enough. In November, on an earnings call following disclosure of the financial report from the fourth quarter of fiscal year 2023,[37] Vestis hewed to its pre-spinoff messaging: that its customer retention rates remained above the industry-

---

[28]   *Id.* ¶ 65.

[29]   *Id.* ¶ 59.

[30]   *Id.* ¶ 67.

[31]   *Id.* ¶ 63.

[32]   *Id.* ¶ 69.

[33]   *Id.* ¶ 71.

[34]   *Id.* ¶ 47.

[35]   *Id.* ¶ 72.

[36]   *Id.*

[37]   *Id.* ¶ 74; ECF 65-9, at 2.

benchmark figure of 90%;[38] that the company was receiving "really, really great feedback" from its customers about service-improvement programs;[39] and that investors should not worry about the "muted" growth in its uniforms sector, which was attributable to "purposeful" and "strategic[ ]" exits from "underperforming businesses."[40] Scott reported that the company was "already within the long-term target range" of 5% to 7%,[41] and Dillon predicted that the company's revenues would grow between 4% to 4.5% in fiscal year 2024.[42] These assurances again impressed financial analysts—who highlighted the reported absence of "elevated customer churn"[43]—and buoyed Vestis's stock to a high of $22.30 per share on February 6, 2024.[44]

The first real sign of trouble appeared that same evening, when Vestis announced the abrupt resignation of its COO after only five months with the company.[45] The following morning, Vestis disclosed a disappointing financial

---

[38]  ECF 55, ¶ 74 (characterizing a 90% retention rate as a "critical threshold"); *id.* ¶ 60 ("[A]ny retention rate that fell below 90% would signal to the market that [Vestis] had serious issues with customer retention.").

[39]  *Id.* ¶ 74; ECF 65-9, at 15.

[40]  ECF 55, ¶ 76.

[41]  *Id.* ¶¶ 69, 74; ECF 65-8, at 25.

[42]  ECF 55, ¶ 75; ECF 65-9, at 9.

[43]  ECF 55, ¶ 77.

[44]  *Id.* ¶ 78.

[45]  *Id.* ¶ 79.

report from the first quarter of fiscal year 2024—Vestis's first as an independent entity—showing revenue growth of 2.5%.[46] In the subsequent earnings call, Scott for the first time referenced "a national account loss" from the *previous* fiscal year—a loss she described as "unfortunate," "regrettable," and "[not] part of our strategy"—that was continuing to depress uniforms-sector revenue into 2024.[47]

Vestis nevertheless assured investors that it remained in good "underlying health."[48] Scott explained to investors that a "pretty deep and granular" analysis of Vestis's customer losses had revealed that those losses were being driven by the closure of small-to-medium-sized businesses, particularly restaurants.[49] She reiterated that slow growth in Vestis's uniforms sector was the result of "a purposeful decision to throttle down."[50] She emphasized that Vestis was continuing to improve its logistics, as demonstrated by how it had "successfully deployed new telematics technology across 89% of [its] fleet" and "fully deployed new routing and scheduling technology and processes across North America."[51] And she and Dillon doubled down on their "ability to deliver [their]

---

[46]    *Id.* ¶ 80.

[47]    *Id.* ¶ 83.

[48]    *Id.* ¶ 84.

[49]    *Id.* ¶¶ 81–82.

[50]    ECF 65-12, at 24.

[51]    ECF 55, ¶ 89 (citation modified).

full year guidance of 4% to 4.5% revenue growth" in the quarters to come.[52]

Vestis's stock closed that evening at $19.42—a drop, but a limited one.[53] Financial

analysts attributed the drop to the revenue growth shortfall and to the COO's

departure,[54] but remained optimistic given Vestis's "healthy" client base, its

"stable" retention rate, and its widespread deployment of telematics.[55] Vestis's

stock dropped another dollar or so over the following three months and closed

at $18.47 on May 1, 2024.[56]

The next day, the bottom fell out. On the morning of May 2, 2024, Vestis

disclosed calamitous financial results from the second quarter of 2024: revenue

growth of only 0.9%, and a revised annual revenue growth outlook of -1% to

0%.[57] On the ensuing earnings call, Plaintiffs allege, Vestis was forced to reveal

the truth: fundamental "service gaps"[58] attributable "to causes . . . within [its]

control";[59] a customer retention rate that had fallen to 85.8% during the fourth

---

[52]   ECF 65-12, at 5, 8; ECF 55, ¶ 87.

[53]   *Id.* ¶ 91.

[54]   *Id.*

[55]   *Id.* ¶ 92.

[56]   *Id.* ¶ 102.

[57]   *Id.* ¶ 93; ECF 65-15, at 4.

[58]   ECF 55, ¶ 94.

[59]   *Id.* ¶ 97.

quarter of fiscal year 2023;[60] and customer losses, many of them from "fiscal 2023,"[61] causing $63 million in lost year-over-year revenue for the quarter and $128 million for the year.[62] Financial analysts were stunned[63] by the steep drop in Vestis's revenue guidance,[64] and by its sudden "change in tone"[65] after "just a couple of months."[66] They questioned the "credibility" of Vestis's executives,[67] who had failed to publicly disclose "customer retention and service issues" when they arose in fiscal year 2023.[68] And they wondered why Vestis's executives—especially Scott, who had been at AUS for almost two years—had failed to catch those issues before the spinoff.[69] Vestis's stock closed on May 3, 2024, at $9.41, good for a loss of $9.06 over the course of 48 hours.[70]

---

[60]   *Id.* ¶ 99.

[61]   *Id.* ¶ 98.

[62]   *Id.*; ECF 65-16, at 10, 18.

[63]   ECF 55, ¶ 103.

[64]   *Id.* ¶ 106.

[65]   *Id.* ¶ 105.

[66]   *Id.* ¶ 108.

[67]   *Id.* ¶¶ 104, 106.

[68]   *Id.* ¶ 104.

[69]   *Id.* ¶ 107.

[70]   *Id.* ¶ 102.

## II.   LEGAL STANDARDS

To state a claim under Rule 10b-5, a plaintiff must sufficiently allege six elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'"[71] *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008). To state a claim under § 20(a), a plaintiff must show, with respect to an entity primarily liable under Rule 10b-5, that a defendant (1) "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws " and (2) "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996).

---

[71]   Technically, these are the six elements of a claim under subsection *(b)* of Rule 10b-5. Plaintiffs also assert that Defendants are liable under subsections *(a)* and *(c)*, *id.* ¶¶ 235–36, which forbid fraudulent practices in securities trading more generally, 17 C.F.R. § 240.10b-5(a) (unlawful to "employ any device, scheme, or artifice to defraud"); *id.* § 240.10b-5(c) (unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person"), under the Supreme Court decision *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019). But because Plaintiffs' subsection (a) and (c) claims do not impact the resolution of the instant motion, the Court does not reach them in this Order. *See infra* p. 38–39 and note 170.

To survive a motion to dismiss a 10b-5 claim, a plaintiff must overcome a "triple-layered pleadings standard." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). First he must satisfy the "run-of-the-mill federal notice-pleading requirements" under Federal Rule of Civil Procedure 8(a)(2), *id.*: The factual allegations, assumed to be true and viewed "in the light most favorable to the plaintiff," *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019), must plausibly give rise to an inference of the defendant's liability, *McCullough v. Finley*, 907 F.3d 1324, 1335 (11th Cir. 2018).

Second, under Federal Rule of Civil Procedure 9(b), a 10b-5 plaintiff must allege material misstatements or omissions "with particularity." That is, he must identify "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

Third, and most formidably, a 10b-5 plaintiff must comply with "the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995," or PSLRA. *Carvelli*, 934 F.3d at 1318. The PSLRA, much like Rule 9(b), requires the plaintiff to specifically allege each misleading statement

13

or omission and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA also requires the plaintiff to plead, "with particularity[,] facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). A strong inference is one that is "cogent and at least as compelling as any opposing inference," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007); and the required state of mind is "'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Mizzaro*, 544 F.3d at 1238 (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11th Cir. 1999)). Put together, the PSLRA requires the plaintiff to "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Id.*

"Failure to meet any of the three standards"—Rule 8(a)(2) plausibility, Rule 9(b) particularity, or the PSLRA—"will result in a complaint's dismissal." *Carvelli*, 934 F.3d at 1318 (citation modified).

14

### III.   DISCUSSION

Before the Court are two motions to dismiss: one filed by Vestis, Scott, and Dillon;[72] and the other filed by Aramark and Zillmer.[73] The two motions raise four main issues:

A. Whether Plaintiffs have standing to sue for statements made before the spinoff;

B. Whether the complaint sufficiently alleges material misstatements;

C. Whether the complaint sufficiently alleges scienter; and

D. Whether the § 20(a) claims survive.

These issues are addressed in turn.

### A.   Plaintiffs have standing to sue for statements made before the spinoff.

The first issue is whether Plaintiffs can sue for statements made before the spinoff — specifically, for statements contained in the Information Statement filed with the SEC on September 11, 2023, or made during the Analyst Day conference call on September 13, 2023. Plaintiffs are suing "on behalf of themselves and all other persons and entities who purchased *Vestis* common stock between October 2, 2023, and May 1, 2024."[74] Aramark and Zillmer argue that any statements

---

[72]   ECF 65.

[73]   ECF 66.

[74]   ECF 55, at 4 (emphasis added).

made before the September 30, 2023 spinoff were made by *Aramark*, and are thus barred by the so-called purchaser-seller rule.[75] The Court disagrees.

The purchaser-seller rule, as its name suggests, requires 10b-5 *plaintiffs* to be "actual *purchasers and sellers*" of the stock in question. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975) (citing *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952) (emphasis added)). It does not, as Aramark and Zillmer seem to argue, require 10b-5 *defendants* to be actual *issuers* of the stock in question. The Supreme Court has repeatedly recognized that Rule 10b-5 reaches "secondary actors who commit primary violations,"[76] *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 166 (2008)—that is, it reaches "any person or entity, including a lawyer, accountant, or bank," who commits a "manipulative or deceptive act" prohibited by Rule 10b-5. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (emphasis added). It is plain from these cases that 10b-5 liability is not cabined, as a matter of law, to entities that themselves issue stock.

What is prohibited by the text of both the Exchange Act and Rule 10b-5 is the making of false statements, not by the issuer of any security, but "*in*

---

[75]    ECF 66, at 31–32.

[76]    The term "secondary actor" in this context refers "to all entities or individuals who are not direct issuers of securities." *Scope of Secondary Actor Liability*, 122 HARV. L. REV. 485, 494 (2008).

*connection with* the purchase or sale of any security." 15 U.S.C. § 78j(b) (emphasis added); 17 C.F.R. § 240.10b-5 (emphasis added); *accord Central Bank*, 511 U.S. at 199 n.10; *Stoneridge*, 552 U.S. at 160; *see also Blue Chip*, 421 U.S. at 729 (holding that the purchaser-seller rule "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission *relates*") (emphasis added). Thus, the proper test for whether Plaintiffs can sue for Aramark's pre-spinoff statements is whether those statements were made "in connection with" Plaintiffs' purchase or sale of Vestis's stock. 17 C.F.R. § 240.10b-5. There is no doubt that the complaint plainly alleges that they were: that the Information Statement was filed on Vestis's behalf[77] to "promot[e] [its] operational excellence";[78] that the Analyst Day, billed as Vestis's "very first," was "specifically designed to inform investors about the soon-to-be public independent company";[79] and that statements made in the Information Statement and at the Analyst Day "artificially inflated" the price of Vestis's stock when Plaintiffs purchased it beginning on October 2, 2023.[80] These allegations

---

[77]   ECF 55, ¶ 58.

[78]   *Id.* ¶ 59. Plaintiffs have also alleged that Zillmer and Scott wrote Information Statement cover letters touting the spinoff and encouraging future Vestis stockholders to "learn more about" the company by reading the "business and financial information" contained therein. ECF 65-5, at 9–10.

[79]   ECF 55, ¶ 64.

[80]   *Id.* ¶ 213.

establish the requisite connection between the pre-spinoff statements and the purchase of Vestis stock to establish Plaintiffs' "standing"[81] to sue.

The recent out-of-circuit cases cited by Aramark and Zillmer do not require a different result. In 2022, the Second Circuit held in *Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.*, in the context of a merger, that stockholders of an *acquiring* company lacked standing to sue for misstatements made by an acquisition *target* about the target's own operations. 54 F.4th 82, 88 (2d Cir. 2022). In 2024, the Ninth Circuit adopted this holding in *In re: CCIV / Lucid Motors Securities Litigation*, 110 F.4th 1181, 1185 (9th Cir. 2024). But the Court does not read *Menora* or *Lucid* as conflicting with Supreme Court case law on the scope of Rule 10b-5 liability. In *Menora*, the dispositive question was "whether the plaintiff bought or sold the securities *about which* the misstatements were made." 54 F.4th at 88 (emphasis added). *Lucid* likewise limited the class of

---

[81]   The parties characterize Plaintiffs' ability to sue for pre-spinoff statements as a "standing" issue. ECF 66, at 31; ECF 73, at 81. However, the purchaser-seller rule is a limit on the "class of plaintiffs" that can sue under § 10(b) and Rule 10b-5. *Blue Chip*, 421 U.S. at 747. And whether a given plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" is not a question of standing but of whether the plaintiff "has a cause of action." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014); *cf. Blue Chip*, 421 U.S. at 742 (referring to the purchaser-seller rule as one of "substantive law"); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) ("[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question.").

18

10b-5 plaintiffs "to purchasers and sellers of the security *about which* the alleged misrepresentations were made." 110 F.4th at 1185 (emphasis added). The Court sees little practical difference between this "about which" standard and the "in connection with" standard the Court believes is mandated by the text of Rule 10b-5 and longstanding precedent. Plaintiffs can sue for Aramark's pre-spinoff statements under either standard.

Moreover, both *Menora* and *Lucid* are distinguishable based solely on the fact that the alleged misstatements in this case arise, not out of a merger, but out of a spinoff. Before a merger, the acquirer and the target are "two entirely separate companies." *Lucid*, 110 F.4th at 1187. Thus, *Menora* and *Lucid* rightly balked at imputing statements made by the latter onto the former. *Id.*; *Menora*, 54 F.4th at 86. But by that same logic, before the spinoff, Aramark and Vestis were the same company. Thus, *Menora* and *Lucid* do not preclude Aramark's pre-spinoff statements from forming a basis for 10b-5 liability.

B.    **The complaint sufficiently alleges that Scott, Dillon, Vestis, and Aramark made material misstatements.**

The second issue is whether the complaint sufficiently alleges a material misstatement that is actionable under Rule 10b-5. To streamline that analysis, the Court will not determine whether the complaint alleges an actionable statement as to *Zillmer*—as discussed in the following section, the 10b-5 claim against him fails on scienter grounds. The Court will thus limit its analysis in this section to

19

whether the complaint sufficiently alleges that Scott, Dillon, Vestis, and Aramark[82] (whom the Court will collectively call "Defendants" only within this section) made "false representation[s] that a reasonable investor would have relied on in light of the total mix of information available." *Carvelli*, 934 F.3d at 1329. Defendants assert that no actionable statement has been alleged in a series of formally distinct yet "overlap[ping]" arguments, *see id.*: that the statements were not literally false;[83] that they were not so misleading as to give rise to a duty to disclose;[84] that they were immaterial puffery;[85] that they were non-actionable opinions;[86] and that they were protected forward-looking statements.[87]

Defendants' arguments invite the Court to miss the forest for the trees. Under "well established" precedent, an actionable misstatement occurs when a person "makes optimistic statements about the prospects of [his] business but fails to include past performance information that would be useful to a

---

[82]   Pre- and post-spinoff statements made by Scott and Dillon are attributable to Aramark and Vestis, respectively. *See Sec. & Exch. Comm'n v. Morgan Keegan & Co.*, 678 F.3d 1233, 1249 (11th Cir. 2012) (applying *respondeat superior* principles to claims under the Exchange Act).

[83]   ECF 65-1, at 29–31, 34–39; ECF 66, at 15–23.

[84]   ECF 65-1, at 28, 31–32, 34–35; ECF 66, at 14 n.3, 16.

[85]   ECF 65-1, at 39–42; ECF 66, at 13–14, 17, 20–22.

[86]   ECF 65-1, at 45–46; ECF 66, at 13, 15, 16, 23.

[87]   ECF 65-1, at 42–45; ECF 66, at 17–18.

reasonable investor in assessing those statements." *Sec. & Exch. Comm'n v. Merch. Cap., LLC*, 483 F.3d 747, 768 (11th Cir. 2007). That is, essentially word-for-word, what Plaintiffs have alleged: that Defendants made optimistic statements about the prospects of Vestis's[88] business while failing to include past performance information that would have been useful to reasonable investors in assessing whether those statements truly reflected Vestis's customer-retention prowess, its service-delivery capabilities, and its underlying financial health.

Beginning with customer retention: Defendants allegedly made customer retention the centerpiece of Vestis's growth strategy, advising investors that it was the company's "single highest growth lever"[89] and the "single most profitable thing" about its business model.[90] Defendants allegedly reiterated that Vestis's customer retention rate remained above 90%, first at its Analyst Day, and twice more in quarterly earnings calls in November 2023 and February 2024. And Defendants allegedly touted Vestis's "sticky" customer base, whose loyalty was exemplified by the fact that Vestis's national accounts stayed with the company for an average of 26 years.[91]

---

[88]  For simplicity, "Vestis" will be used throughout this Order to refer both to the independent entity and to AUS when it was still a division of Aramark.

[89]  *Id.* ¶ 65.

[90]  *Id.*

[91]  *Id.*

21

What Defendants did *not* tell investors during the spinoff, Plaintiffs allege, is that Vestis was "bleeding" customers.[92] According to internal "Weekly Install and Loss" reports, Vestis lost an average of $9 million in recurring revenue *every week* in the five weeks before the spinoff,[93] and an average of $4.2 million in recurring revenue every week from August 2023 to April 2024.[94] According to a former employee who served as a consultant to AUS's president in 2022 and 2023 (FE1),[95] customer losses leading up to the spinoff "certainly outweighed the gains."[96] According to another former employee who served as Vestis's national compliance manager in its corporate office (FE3),[97] Vestis's pre-spinoff losses included large national accounts like Tyson Chicken and Whole Foods.[98] As a

---

[92]  *Id.* ¶ 112.

[93]  *Id.* ¶ 116.

[94]  *Id.* ¶ 115.

[95]  FE1 was AUS's President of Operations until 2022, and a consultant to AUS's president until May 2023. *Id.* ¶ 112. Here and elsewhere, the "weight to be afforded" alleged confidential witness testimony is a function of "the particularity of the allegations," as well as of "the foundation or basis of [the witness's] knowledge" in light of "the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Mizzaro*, 544 F.3d at 1240.

[96]  ECF 55, ¶ 112.

[97]  FE3 was Aramark's and Vestis's National Sales Trainer and Compliance Manager from October 2004 until April 2024. *Id.* ¶ 118.

[98]  *Id.* ¶¶ 14, 117–18. Plaintiffs also allege that Vestis's "giant" and "long-term" customer Pape Materials Handling defected to a competitor just before the spinoff. *Id.* ¶ 112.

result of such losses, Vestis's retention rate in the final quarter before the spinoff plummeted to a "DEFCON One"[99] low of 85.8%.[100]

It was a similar story, Plaintiffs allege, with statements about Vestis's operational excellence. Before and after the spinoff, Defendants touted Vestis's ability to deliver "quality" services and products "on-time"[101] due to investments in logistics technologies like ABS (an operating system that Vestis touted would enable it to interact more "seamlessly and efficiently" with customers[102]) and telematics[103] (an "industry-standard fleet management system"[104]). In truth, Vestis lacked the capacity, technological or otherwise, to arrange for the proper delivery of its services and products[105]—it had no "process to verify that the truck ha[d] been loaded accurately and that all of the product that need[ed] to go to [the] customer [was], in fact, being delivered to [the] customer."[106] Moreover, contrary to her own February 2024 representation that telematics had been

---

[99]    *Id.* ¶ 113.

[100]    *Id.* ¶ 99.

[101]    *Id.* ¶ 59.

[102]    *Id.* ¶ 171.

[103]    *Id.* ¶ 63.

[104]    *Id.* ¶ 171.

[105]    *Id.* ¶ 95.

[106]    *Id.*

"successfully deployed" across much of Vestis's truck fleet,[107] Scott seemed to admit that Vestis in May 2024 still lacked the "capability" to leverage "insights" and "data" from telematics in its day-to-day operations.[108]

Little surprise, then, that Vestis's operations were plagued by substantial "service gaps."[109] Vestis struggled, in Scott's words, with basic tasks like "being on time, being complete, being fully loaded."[110] Nor, according to Scott, were these struggles new: They were "not related" to the spinoff, and had "persisted" within Vestis "for quite some time."[111] Scott's assessment was echoed by Vestis's former employees: Even before the spinoff, they testified, Vestis was "delay[ing]" product deliveries,[112] "constantly shorting" customers,[113] and "routinely" mismatching or losing inventory.[114] In addition, its cleaning facilities were "outdated,"[115] its uniforms "ragged,"[116] its floor mats "ripped,"[117] its linens

---

[107]  *Id.* ¶ 89.

[108]  *Id.* ¶ 96; ECF 65-14, at 14, 26.

[109]  ECF 55, ¶ 97.

[110]  *Id.* ¶ 95.

[111]  *Id.* ¶ 101.

[112]  *Id.* ¶ 138.

[113]  *Id.* ¶ 139.

[114]  *Id.* ¶ 140.

[115]  *Id.* ¶ 126.

[116]  *Id.* ¶ 142.

[117]  *Id.* ¶ 119.

"disgusting,"[118] and its towels "smelled like fish."[119] Vestis's former employees reported that these service failures were directly connected to customer losses: that Vestis's "service is what kills them";[120] that Vestis's "tarnished" reputation was "spread[ing] like wildfire" among its customers;[121] and that Vestis's service was at times "so bad" that customers would sign three-to-five year contracts and then leave "within the first 30 to 90 days."[122]

Finally, Defendants allegedly misled investors about Vestis's financial health, and especially about the lack of revenue growth in the recurring-revenue side of Vestis's uniforms business. At the Analyst Day, Scott ascribed the lack of growth in uniforms to Vestis's "very intentional" strategy to "step back" from the less profitable, direct-sales side of the business.[123] At the same time, Scott downplayed the significance of "nonregrettable" recurring-revenue customer losses that "just didn't make sense for our portfolio,"[124] and reiterated her "confiden[ce]" in the profitability of Vestis's recurring-revenue uniforms

---

[118]  *Id.* ¶ 143.

[119]  *Id.*

[120]  *Id.* ¶ 137.

[121]  *Id.* ¶ 139.

[122]  *Id.* ¶ 119.

[123]  *Id.* ¶ 173; ECF 65-8, at 33–34.

[124]  ECF 55, ¶ 68.

business.[125] Dillon told investors to expect 2% to 3% of annual growth over the coming fiscal year from customer retention alone,[126] and a further 1% from "tak[ing] price"—that is, from raising prices on existing customers.[127]

Six months later, with growth in its uniforms business continuing to flatline, Vestis stuck to the script. Scott told investors that Vestis had taken a "pretty deep and granular" look at the "patterns and trends" around recurring-revenue customer losses, and had determined those losses to be driven by "an uptick in business closures"—in other words, by macro-economic trends beyond Vestis's control.[128] Scott and Dillon both reaffirmed Vestis's ability to hold the line on its "full year guidance of 4% to 4.5% revenue growth"[129]—guidance that incorporated 2% to 3% in projected growth from customer retention.[130] Scott also advised investors to find "a level of comfort" in Vestis's ability to "take price" throughout the rest of the fiscal year to grow revenue.[131]

---

[125]   ECF 65-8, at 34.

[126]   *Id.* at 25.

[127]   *Id.*; ECF 55, ¶ 70.

[128]   ECF 55, ¶ 192.

[129]   ECF 65-12, at 5, 8.

[130]   *Supra* note 126.

[131]   ECF 55, ¶ 186.

Much of this, Plaintiffs allege, was—by Defendants' own admissions—not true. As Scott eventually conceded, growth in Vestis's uniforms sector *was* being affected by a non-strategic, "*regrettable*" loss of a national recurring-revenue account from before the spinoff.[132] In fact, Vestis had lost at least *two* national accounts before the spinoff, worth "60 basis points of revenue growth headwind" in fiscal year 2024.[133] In the same vein, Vestis eventually admitted that it was still struggling to "overcome and offset a large amount" of pre-spinoff customer losses"[134]—as Dillon explained, over $40 million in pre-spinoff losses would continue to drag down the entire company's growth through the end of the 2024 fiscal year.[135] Moreover, Scott eventually admitted that **70%** of Vestis's customer losses were attributable, not to business closures or other macro-economic trends, but "to causes that are within our control"—namely, to Vestis's own

---

[132]  *Id.* ¶ 195 (emphasis added). The details of this "regrettable" uniforms sector loss are hazy, but it seems clear from context that it did not come as part of Vestis's intentional throttling down of its direct-sales business. *See* ECF 65-12, at 24–25. The same earnings call separately refers to a loss of a national account from Vestis's direct-sales business in fiscal year 2024. *Id.* at 13, 21. The two losses are clearly distinct.

[133]  ECF 65-14, at 7. It is worth noting that Vestis may have lost more than two national accounts in fiscal year 2023, given that the complaint names three. *See supra* note 98 and accompanying text.

[134]  ECF 65-14, at 7; *see also* ECF 55, ¶ 166.

[135]  ECF 55, ¶ 98.

service failures.[136] Scott further admitted that service failures were causing "price sensitivity," which was in turn causing price and volume "erosion"—in other words, Vestis was being forced to choose between losing customers due to bad service and retaining them on less favorable financial terms.[137] Price sensitivity and recurring-revenue losses were in turn "key drivers" of Vestis's depressed revenue growth.[138]

These allegations, which are assumed to be true at this stage, establish that Defendants made actionable misstatements. Defendants' representations at the Analyst Day and subsequent earnings calls "could mislead a reasonable investor into believing" that Vestis was profiting from its recurring-revenue business model by delivering excellent service to loyal customers, "when in truth and in fact" Vestis was doing the opposite. *FindWhat*, 658 F.3d at 1298. Defendants' representations thus "triggered a duty to disclose the grave defects that existed within" the parts of Vestis's business that Defendants "voluntary touted." *Id.* at 1298–99. "Defendants' failure to disclose these defects rendered their statements materially misleading." *Id.* at 1299.

---

[136]  *Id.* ¶ 9.

[137]  *Id.* ¶ 100.

[138]  ECF 65-14, at 12, 22.

Nor was this failure cured by "general cautionary or risk-disclosing language" attached to Defendants' statements. *Id.* at 1299. The PSLRA includes "a 'safe harbor' provision that immunizes certain 'forward-looking' statements from liability." *Carvelli*, 934 F.3d at 1324. But many of Vestis's representations "purport[ed] to represent present facts," and are thus ineligible for safe harbor protection. *FindWhat*, 658 F.3d at 1299. Furthermore, cautionary language is of no import "if it is nothing more than a front for present problems." *Carvelli*, 934 F.3d at 1327. As the Eleventh Circuit has held, "to caution that it is only possible for [ ] unfavorable events to happen when they have already occurred is deceit." *Merch. Cap.*, 483 F.3d at 769. And that is exactly what the complaint has alleged: that Scott and Dillon were "aware of [Vestis's] poor performance" in critical areas like customer retention and customer service even before the spinoff,[139] but "continue[d] to paint a rosy picture of [Vestis's] prospects" anyway. *Id.* at 768–69. The PSLRA's safe harbor does not protect such alleged deceit.

Defendants' more specific arguments are for the same reason rejected. Defendants argue that some statements are not *literally* untrue: for example, that Vestis's *yearly* retention rate never fell below 90%;[140] that Vestis's national

---

[139] Scott's and Dillon's awareness of Vestis's poor performance is discussed in more detail in the following section.

[140] ECF 65-1, at 29–31; ECF 66, at 15–16.

account customers did stay for an *average* tenure of 26 years;[141] and that Vestis

had at least *installed* telematics in 89% of its trucks by February 2024. Even

allowing that these are technical truths, they are still actionable because Plaintiffs

have alleged that they are no more than half-truths: "representations that state

the truth only so far as it goes, while omitting critical qualifying information."

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024)

(quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016)). For

the same reason, the Court rejects Defendants' rather ironic argument that they

cannot be held liable for "pure omissions,"[142] which is a true statement of the law

so far as it goes, *id.* at 264, but omits the critical qualifying information that

Plaintiffs are not actually suing under a theory of pure omissions.[143]

Defendants also argue that some statements are non-actionable opinions,

citing examples like "We believe we have significant competitive advantages

including our . . . long-tenured customer relationships,"[144] and "[W]e feel very,

very good about the establishment of a service excellence culture across the

company."[145] But because the opinion statements in this case are limited in

---

[141]  ECF 65-1, at 34; ECF 66, at 21.

[142]  ECF 65-1, at 28; *see also* ECF 66, at 14 n.3.

[143]  ECF 73, at 17.

[144]  ECF 65-2, at 1.

[145]  *Id.* at 7.

number and largely duplicative of statements that are clearly *not* opinions, they have a negligible impact on the sufficiency of the complaint. In any case, opinion statements can often be reasonably understood as an implied representation "that the speaker knows facts sufficient to justify him in forming the opinion, or that he at least knows no facts incompatible with the opinion." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015). And that, of course, is what Plaintiffs have alleged: that even if Defendants couched their positive assessments of Vestis's business as opinions, they remain liable under 10b-5 because they knew facts inconsistent with those opinions.[146]

Finally, Defendants argue that some statements are immaterial "puffery": "generalized, vague, nonquantifiable statements of corporate optimism" that are "just too boosterish to justify reasonable reliance." *Carvelli*, 934 F.3d at 1318. On one hand, the Eleventh Circuit has recognized in the securities fraud context that some statements are "so exaggerated," "so vague," or "such obvious hyperbole" that they are not material to investors as a matter of law. *Id.* at 1320 (citation modified). On the other hand, the pleading standard for materiality is low: a 10b-5 claim should be dismissed on materiality grounds only if "reasonable minds could not differ" on the alleged misstatements' unimportance. *Id.* That low

---

[146]  *See supra* note 139.

standard is easily satisfied here: It is self-evident that the alleged statements were made at too pivotal of a moment (during the spinoff), about topics too essential to Vestis's business (customer service and retention), to be ruled immaterial to all reasonable investors as a matter of law.[147] Defendants' motion to dismiss for failure to allege an actionable statement is therefore denied.

### C.     The complaint sufficiently alleges scienter as to Scott, Dillon, Vestis, and Aramark — but not as to Zillmer.

The third issue is whether the complaint alleges particular facts supporting a *strong* inference that each Defendant acted with scienter — that each Defendant made a false statement either with actual knowledge of its falsity or with reckless disregard for its truth. *Bryant*, 187 F.3d at 1284. This inquiry is "comparative": the Court must determine whether a reasonable person would infer that it is at least as likely that a defendant acted with fraudulent intent as it is that he acted for some other, "nonculpable" reason. *Mizzaro*, 544 F.3d at 1239 (citing *Tellabs*, 551 U.S. at 323–24). Thus, to plead scienter, Plaintiffs must overcome a more "stringent" standard than they would face at summary judgment, without the benefit of any discovery. *Id.* at 1238. That is no easy task.

---

[147]   The inference of materiality is bolstered by allegations that Vestis's customer retention, quality of service, and logistical capabilities were significant to financial analysts. *See supra* notes 33, 43, 54–55, 63–69 and accompanying text.

Plaintiffs' task is made easier, however, by Vestis's own admissions. Two are particularly incriminating. First is Scott's and Dillon's admission that Vestis's uniforms business was still facing significant financial headwinds in 2024 from "known," pre-spinoff customer losses,[148] one of which was the "unfortunate" and "regrettable" loss of a large national account.[149] There is a strong inference from this admission that financial headwinds from customer losses were known to Vestis in September 2023, when it falsely assured investors that the "depressed" growth of Vestis's uniforms business was the "very intentional" byproduct of "nonregrettable losses" that "just didn't make sense for our portfolio."[150] Second is Vestis's admission that its customer retention rate had fallen to 85.8% during the fourth quarter of fiscal year 2023. Given the importance Vestis allegedly placed on maintaining a retention rate above 90%,[151] there is a strong inference that Scott was aware of that 85.8% figure in November 2023, when she falsely told investors (during an earnings call for the fourth quarter of

---

[148]  ECF 55, ¶ 98.

[149]  *Id.* ¶ 83.

[150]  *Id.* ¶ 68.

[151]  *Id.* ¶ 113.

2023, and in response to a question about "recent trends" in retention[152]) that Vestis was "continu[ing] to deliver retention rates that are above 90%."[153]

These are, of course, only two of a constellation of data points relevant to scienter. The totality of the allegations, "taken as a whole," more generally supports the strong inference that Scott and Dillon knew they were painting a rosy picture of Vestis's business inconsistent with its actual performance. *Id.* at 1240. The timing of Scott's and Dillon's statements—the fact that they were made during what can fairly be called the "most critical period" of Vestis's business life[154]—raises *an* inference of scienter. Scott's and Dillon's corporate roles—the fact that they were brought on to prepare Vestis for the spinoff[155] by streamlining its logistics[156] and bolstering its recurring-revenue business[157]—raises *an* inference of scienter. The statements' subject matter—the fact that they related to

---

[152]  ECF 65-9, at 14.

[153]  *Id.* at 15; ECF 55, ¶ 176. The Court reiterates that this statement, which Defendants argue was not false because Vestis's *yearly* customer retention rate never fell below 90%, is sufficiently alleged to have been materially misleading—both because it was made in response to an investor question about *recent* trends, and because voluntarily touting Vestis's yearly customer retention rates triggered a duty for Defendants to disclose corresponding deficiencies. *See supra* pp. 21–23, 28–30.

[154]  ECF 73, at 18.

[155]  ECF 55, ¶¶ 29, 44.

[156]  *Id.* ¶ 54.

[157]  *Id.* ¶ 53.

what Vestis itself identified as primary drivers of its profitability and growth[158]—raises *an* inference of scienter. The duration and magnitude of Vestis's service failures—the fact that they had been in the business "for quite some time"[159] and were responsible for 70% of its customer losses[160]—raises *an* inference of scienter. These facts—even if each one alone is insufficient to support a strong inference of scienter—collectively begin to add up.

There's more. To raise an inference that a company's executives knew or should have known specific details about that company's business, it behooves a plaintiff to allege "*some* facts showing how knowledge . . . would or should have percolated up to senior management." *Id.* at 1251. Plaintiffs have done so here. They have alleged that FE1—a consultant to AUS's president[161]—was privy to "internal reports on a global scale" showing "serious retention issues within the uniform business."[162] Plaintiffs have alleged that these internal reports were circulated to Scott's direct subordinate—a senior executive in his own right[163]—

---

[158] *Id.* ¶¶ 56, 65.

[159] *Id.* ¶ 101.

[160] *Id.* ¶ 97.

[161] Elsewhere in the complaint, Plaintiffs have indicated that Scott was AUS's president at the same time these reports were being circulated. *Id.* ¶ 28.

[162] *Id.* ¶ 112.

[163] *Id.* ¶ 116.

every week from at least August 2023 to April 2024.[164] They have alleged that Vestis was, by its own admission, "very closely" "monitoring" the reasons for customer churn.[165] And they have alleged that the loss of a national recurring-revenue account like Tyson Chicken would not have escaped senior executive attention: According to FE3—a corporate manager—Scott intervened "directly" to "dissuade" Tyson Chicken from leaving, and a regional vice president was "let go" when Scott's efforts were unsuccessful.[166]

Finally, *an* inference of scienter arises from the $1.5 billion that Vestis paid Aramark under the terms of the spinoff. Plaintiffs allege that the payment raises an inference that Aramark and its executives had a motive to inflate Vestis's value.[167] Defendants argue that the payment was simply a mechanism for Vestis to take on its "pro rata" share of Aramark's pre-spinoff debt, and thus cannot be probative of scienter.[168] Though it may be impossible to fully assess the matter without knowing more about the spinoff's financial structure, the mere fact that Vestis took on its proportion of Aramark's debt does not, in the Court's view,

---

[164]   *Id.* ¶ 115.

[165]   *Id.* ¶ 192.

[166]   *Id.* ¶ 118.

[167]   *Id.* ¶¶ 43, 47–48, 211; *see also* ECF 73, at 19, 78–79.

[168]   ECF 65-1, at 58; ECF 66, at 28.

preclude an inference of untoward motive.[169] If Vestis took on Aramark's pre-spinoff debt *in proportion* to the companies' values, for example, there would seem to be a motive for Aramark and its executives to maximize Vestis's value throughout the spinoff process.

These allegations, assumed to be true at this stage, give rise to a strong inference of scienter as to Scott, Dillon, Vestis, and Aramark. That inference is not conclusive. It is certainly *possible* that Scott and Dillon acted in good faith—that their overly optimistic predictions of Vestis's profitability had been uninformed but honest. But it is not more likely than the alternative: that Scott and Dillon knew how fundamental service failures were costing Vestis millions of dollars in recurring revenue every week, but hid the truth from investors until plummeting revenues forced them to come clean. The motion to dismiss on scienter grounds is thus denied as to Scott and Dillon, and by extension Aramark and Vestis.

The result as to Zillmer is different. There is a layer of corporate separation between Zillmer and the other four Defendants that the complaint has failed to pierce. Plaintiffs' theory of Zillmer's scienter largely comes down to the idea that Aramark's CEO "must have known" what was happening at Vestis—an idea that

---

[169]   ECF 66, at 9.

courts have been instructed to view with "some skepticism." *Mizzaro*, 544 F.3d at 1250; *cf. Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("Fraud cannot be inferred simply because [a parent company] might have been more curious or concerned about the activity at [its subsidiary]."). Even strong indicia of Scott's and Dillon's scienter are thus much diluted in strength when applied to Zillmer. To take but one example: That weekly customer loss reports were being internally circulated at Vestis is not nearly as probative of Zillmer's knowledge as it is of Scott's and Dillon's. It is the same for the bulk of Plaintiffs' scienter allegations. The only exceptions are allegations relating to motive, under the theory that inflating Vestis's value would allow Zillmer to offload more of Aramark's debt. As already discussed, however, there are too few details in the record about the financial structure of the spinoff transaction for that theory to be dispositive at this stage. *Cf. Bryant*, 187 F.3d at 1287 ("[A] showing of mere motive and opportunity is insufficient to plead scienter."). The allegations, on balance, do not raise a compelling reason to impute Vestis's knowledge to Zillmer, and thus fail to raise the requisite strong inference of the latter's scienter.

Plaintiffs cannot save their 10b-5 claim against Zillmer under the recent Supreme Court case *Lorenzo v. Securities & Exchange Commission*, 587 U.S. 71 (2019). Plaintiffs argue that *Lorenzo* expanded the scope of 10b-5 liability to those who, though not a "maker" of a false or misleading statement within the

38

meaning of 10b-5(b), nevertheless participated in a scheme to defraud investors. *Id.* at 74. So-called "scheme liability" under *Lorenzo* is a developing area of law on which the Eleventh Circuit has not yet opined. Thus, for purposes of this motion, the Court assumes without deciding that the complaint sufficiently alleges that Zillmer was a participant in a fraudulent scheme.[170] Even under a theory of scheme liability, however, the collective allegations in the complaint must raise a strong inference of scienter as to each participant to survive a motion to dismiss. *Id.* at 72. Because they have not done so here as to Zillmer, the 10b-5 claim against him is dismissed.

### D.    The 20(a) claims survive.

The survival of the 20(a) claims is contingent on the survival of the 10b-5 claims against Vestis and Aramark.[171] *Mizzaro*, 544 F.3d at 1237. Because the 10b-5 claims against Vestis and Aramark survive, the 20(a) claims survive with them.

## IV.   CONCLUSION

Defendants' motions to dismiss [ECFs 65, 66] are **DENIED** in all respects except that dismissal is **GRANTED** as to Count I against Zillmer. Aramark and

---

[170]   For the same reason, the Court assumes without deciding that the complaint sufficiently alleges that Scott and Dillon were participants in a fraudulent scheme under *Lorenzo. See supra* note 71.

[171]   *See* ECF 65-1, at 58; ECF 66, at 32.

Ziller's motion for judicial notice [ECF 67] is **GRANTED**.[172] Defendants' answers are due within 30 days of this Order. The parties' Joint Preliminary Report and Discovery Plan is due within 30 days of Defendants' answers.

**SO ORDERED** this 30th day of September, 2025.

_____
Steven D. Grimberg
United States District Judge

---

[172]  *See supra* note 22.