# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

PLUMBERS, PIPEFITTERS AND
APPRENTICES LOCAL NO. 112,
individually and on behalf of all others
similarly situated,

        Plaintiff,

        vs.

VESTIS CORPORATION, ET AL.,

        Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

<u>CLASS ACTION</u>
NO. 1:24-CV-02175-SDG

DEMAND FOR JURY TRIAL

**DEFENDANTS VESTIS CORPORATION, KIMBERLY SCOTT AND RICK DILLON'S ANSWER AND AFFIRMATIVE DEFENSES TO <u>PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT</u>**

Defendants Vestis Corporation, Kimberly Scott, and Rick Dillon (collectively, "Defendants"), through their undersigned counsel, submit this Answer and Defenses to the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") filed on November 22, 2024 by Lead Plaintiffs the City of Atlanta General Employees' Pension Fund, the City of Atlanta Police Officers' Pension Fund, the City of Atlanta Firefighters' Pension Fund, the Employees' Retirement System of the City of Baltimore, and Norfolk County Retirement System (collectively, "Plaintiffs"), in the above-captioned action (the "Action"). This Answer is based on the current knowledge of the Defendants, who reserve their rights to revise and/or supplement this Answer.

In responding to the allegations below, Defendants: (i) incorporate into each response a denial of all allegations in the Complaint (including those outside of the knowledge and information of Defendants) to the extent they assert or suggest that Defendants made any material misrepresentations or omissions or did anything that would violate the federal securities laws; and (ii) deny any averments or characterizations in the Complaint's cover page, table of contents, headings and subheadings.

The three unnumbered introductory paragraphs on pages 1-2 of the Complaint ("Introductory Paragraphs") contain Plaintiffs' characterizations of the Complaint to which no response is required. To the extent a response is required, Defendants deny

1

the allegations in the Introductory Paragraphs, except those allegations that state legal conclusions to which no response is required. Defendants further state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in the Introductory Paragraphs that purport to describe Plaintiffs' acts, beliefs and investigation related to the allegations in the Complaint.

Defendants respond to the numbered paragraphs of the Complaint as follows:

## I.    PRELIMINARY STATEMENT

1.    In the years leading up to the Class Period, Aramark—a food service, uniform and facilities services provider—was saddled with massive debt of over $7.5 billion, which severely limited its ability to grow its business. To unload this significant debt and increase its free cash flow, on May 10, 2022, Aramark announced the spin off ("Spinoff") of its uniform and workplace supply business segment, Aramark Uniform Services ("AUS"). Notably, Aramark stood to profit handsomely from the Spinoff: upon the transaction's expected completion in September 2023, the new publicly traded company—to be called Vestis—would fund a nearly $1.5 billion cash payment back to Aramark. However, for the Spinoff to be a success, Defendants needed to convince the market that Vestis could succeed as a standalone entity, which was particularly important given investor concerns as to whether Vestis had the technology and operating systems in place to allow it to effectively compete in the industry.

**Answer:** Defendants deny the allegations in Paragraph 1 of the Complaint, except admit that: (i) Vestis became a publicly-traded Company as a result of the spin off ("Spinoff") of a segment of Aramark's business known as Aramark Uniform Services ("AUS"); (ii) Aramark announced plans to spin off AUS on May 10, 2022; and (iii) the Spinoff was expected to be completed in September 2023.

2.    Significantly, as a business-to-business ("B2B") provider of uniforms and other workplace supplies to corporations and national franchises in a variety of industries, it was absolutely critical for Vestis to be able to deliver its products and services to its customers on-time, consistently and accurately. To that end, both prior to the Spinoff and throughout the Class Period, Defendants repeatedly boasted that Vestis did just that. Indeed, according to Defendants, Vestis had a "significant competitive advantage" in the marketplace "due to the quality of our services and products" and "ability to deliver on-time"—qualities which allowed the Company to "maintain long-tenured customer relationships" with large national accounts that lasted for decades. Maintaining these customer relationships was so critical to the Company's business that Vestis repeatedly boasted that its "customer retention rate was in excess of 90%," and that the "Company's single highest value growth lever [was] retention, which we achieve through service excellence." As Defendant Scott, Vestis' CEO, stressed to investors, Vestis and its most senior officers were at all times "very focused on doing exactly what we say we're going to do, deliver on the

3

promise, <u>show up on time every week, deliver the products and services that you promise to your customers and do that with consistency and excellence</u>."

**Answer:** Defendants deny the allegations in Paragraph 2 of the Complaint, except admit Vestis provides uniforms and other workplace supplies to corporations. To the extent Paragraph 2 of the Complaint purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

3.     Defendants also made clear throughout the Class Period that Vestis had the operating systems and technology in place to ensure on-time, accurate deliveries to its customers, including "technology and processes that reduce travel time, distance and fuel consumption" and "increase route efficiency." Chief among these technologies was Telematics, a critically-important, industry-standard fleet management system that allowed B2B route-based providers like Vestis to efficiently monitor fleet data, track vehicles and deliveries, and provide timely delivery notifications. Indeed, Telematics was so material to investors that in Vestis' September 2023 registration materials and in the Company's 2023 Form 10-K, filed on December 31, 2023, the Company specifically touted its "<u>new Telematics technology</u>" as being key for "<u>increas[ing] route efficiency</u>," and as late as February 7, 2024—just three months before the end of the Class Period—Defendants assured

4

the market that "we've successfully deployed new Telematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling processes across North America."

**Answer:** Defendants deny the allegations in Paragraph 3 of the Complaint. To the extent Paragraph 3 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023, Vestis's 2023 Form 10-K filed on December 21, 2023, the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

4.    Fueled by these wholly positive statements, Defendants successfully completed the Spinoff on September 30, 2023; Aramark pocketed its $1.5 billion in cash; and Vestis stock soon reached a Class Period high of more than $22 per share by early February 2024.

**Answer:** Defendants deny the allegations in Paragraph 4 of the Complaint, except admit that: (i) the Spinoff was completed on or about September 30, 2023; and (ii) Vestis had a closing price of over $22 per share in early February 2024.

5.    However, as would soon be revealed, Defendants' statements about Vestis' technology and operating systems, its ability to provide accurate, on-time services to its customers, and its customer retention were all materially false and

5

misleading. The truth began to be revealed on February 6, 2024—just four months after the Spinoff—when Vestis announced that its Chief Operating Officer ("COO"), Chris Synek, had suddenly resigned after only five months on the job. The following morning, Vestis reported disappointing financial results for the first quarter of 2024 that fell far short of analyst estimates, causing Vestis' stock price to fall 13% on February 7, 2024.

**Answer:** Defendants deny the allegations in Paragraph 5 of the Complaint, except admit that: (i) Vestis's COO Chris Synek departed the Company on or about February 6, 2024; (ii) Vestis issued a press release on February 7, 2024; and (iii) Vestis's stock price declined on February 7, 2024. To the extent Paragraph 5 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 5 of the Complaint.

6.      Significantly, however, Defendants stemmed any further decline in Vestis' stock price by insisting to investors that the poor results had nothing to do with the Company's underlying business. Indeed, when analysts asked during Vestis' earnings call on February 7, 2024, if the Company's poor results were due to customer retention being impacted by "service quality," Defendant Scott emphatically denied that there were any service issues, stating that Vestis had "go[ne] pretty deep and granular to understand . . . why customers leave" and that the revenue miss was purportedly due to "an uptick in business closures." To further

6

assure investors that Vestis' business was strong and on track, Defendants reaffirmed their prior full-year revenue growth guidance of 4-4.5%—which they were "confident" they would "deliver"—and touted the fact that Vestis "continue[d] to maintain" customer retention rates "greater than 90%," while claiming that there were "no real surprises as it relates to retention." As Scott staunchly declared: "I can assure you that I have no concerns about our business, our business performance and how we're tracking against our strategy."

**Answer:** Defendants deny the allegations in Paragraph 6 of the Complaint. To the extent Paragraph 6 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

7. Accordingly, the market was shocked when, just three months later, on May 2, 2024, Defendants made a series of disclosures that the market immediately recognized contradicted their prior representations about Vestis' business. On that day, Vestis disclosed terrible results for the second quarter of 2024, and further revealed that its business, rather than growing, was in freefall. Indeed, rather than reporting yearly revenue growth of 4-4.5%, Defendants now disclosed that Vestis' business would actually shrink in 2024, with "growth" in the range of -1% to 0.

**Answer:** Defendants deny the allegations in Paragraph 7 of the Complaint. To the extent Paragraph 7 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

8.    Significantly, while Defendants had previously claimed that there were "no real surprises" regarding Vestis' customer base and that they had fully disclosed any customer retention issues, Defendants now admitted that, unbeknownst to investors, even before the Spinoff occurred, Vestis had been losing major clients who were dissatisfied with the Company's inadequate services. Defendants made clear that the principal reason for Vestis' poor financial results was a "large amount of rollover losses from FY '23"—*i.e.*, undisclosed customer losses that took place even before the Spinoff occurred. These large "rollover losses" included "two large national account customers" that accounted for a material portion of Vestis' revenue. Indeed, Defendants revealed that customer losses had reduced second quarter revenues by 9% year-over-year, and remarkably, two-thirds of this lost revenue, or over $40 million, was directly attributable to what Defendants themselves called "known customer losses as we exited fiscal 2023"—*i.e.*, customer losses that Defendants knew full well existed before the start of the Class Period, and which would continue to impact Vestis throughout all of 2024.

8

**Answer:** Defendants deny the allegations in Paragraph 8 of the Complaint. To the extent Paragraph 8 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

9.      Defendants also were forced to admit, under withering questions from financial analysts, that the customer exodus that led to Vestis' catastrophically poor results were not due to market factors or the economy, but to the fact that the Company could not adequately perform the most basic tasks required of a B2B route-based business—delivering proper, complete sets of uniforms to customers where they wanted, and when they wanted them. As Defendants conceded, the "root cause" for "customers [] choosing to leave Vestis" was "service experiences related to our procedures." Indeed, while Vestis had previously boasted about its ability to provide its customers with on-time, accurate delivery, in reality, Vestis' services were so inadequate that they had resulted in severe "service gaps" in which the Company was "not tight on our processes as it relates to disciplined loading of trucks, delivering on-time, delivering full loads." As Scott conceded, "more than 70% of the [client] cancellations are due to causes that are within our control"—they were directly "related to how we are delivering the load on time and incomplete loads."

**Answer:** Defendants deny the allegations in Paragraph 9 of the Complaint. To the extent Paragraph 9 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

10.     Furthermore, and in stark contrast to Defendants' statements touting that they had "fully deployed new routing and scheduling technology and scheduling processes across North America," including Vestis' "new Telematics technology," Defendants now acknowledged that, during the Class Period, Vestis was wholly unable to utilize those systems. Indeed, as Defendant Scott explicitly admitted, Vestis did not even "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Scott noted that, when she first joined Aramark, she was stunned to learn that "we were not using Telematics to make sure that we are delivering to customers on time and also that we are following routing efficiencies." Yet despite the critical importance of this technology and Scott's own prior statements averring the exact opposite, Scott now admitted that, over two years later, Defendants' Telematics system was still not operational and Vestis was still not utilizing Telematics to ensure accurate, on-time deliveries—such that the Company would only "begin" using Telematics at some undetermined point in the

10

future: "we expect very quickly that we'll <u>begin to use those insights and that data</u> <u>from Telematics to shore this up and to make sure that we're delivering on time and</u> <u>that we're where we should be, when we should be</u>."

**Answer:** Defendants deny the allegations in Paragraph 10 of the Complaint. To the extent Paragraph 10 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

11.     Tellingly, when analysts incredulously questioned how Defendants could not have disclosed these problems during the Class Period, Defendants were forced to admit that they knew about these issues all along. Indeed, Defendant Scott admitted that Vestis' massive service problems were "<u>not related to the spin</u>" or any recent developments. To the contrary, they were significant, longstanding issues that had been "<u>in our business for quite some time.</u>" Similarly, Defendant Dillon expressly confirmed that Defendants knew about these severe issues during the Class Period, stating that they "<u>knew the impact coming in of the lower retention rate.</u>"

**Answer:** Defendants deny the allegations in Paragraph 11 of the Complaint. To the extent Paragraph 11 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their

true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

12.    These revelations had a catastrophic impact on the Company and its investors. Vestis' stock price fell more than 49% on extraordinarily heavy volume following the disclosures, from a price of $18.47 on May 1, 2024 to a price of $9.41 per share on May 3, 2024. Analysts uniformly reacted with astonishment, pointedly noting that the news completely contradicted what Defendants had been saying for months, and excoriating management for their lack of credibility in misrepresenting the true state of Vestis' business during the Class Period. For example, Jefferies emphasized that Defendants had failed to disclose highly material information to investors, stating that "this [was] the first time customer retention and service issues were made apparent publicly," and that as a result, there was now "**a significant mgmt. credibility issue**." Baird noted that management's "credibility is low." Barclays expressed disbelief as to how there could be "this big of a revision" "in the last 90 days or 60 days," particularly given Defendants' long tenures at Aramark before the Spinoff: "[Y]ou were at the company for almost 2 years, while under Aramark. You guys presumably did all this work going through IR Day and your confidence the last 2 quarters was pretty solid as well." And Wolfe Research aptly wondered: "why [didn't] [management] [catch] this before the [Spinoff]?"

**Answer:** Defendants deny the allegations in Paragraph 12 of the Complaint, except admit that Vestis's stock price declined between May 1, 2024 and May 3, 2024. To the extent Paragraph 12 purports to quote from and/or characterize third party analysts' reports or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

13. Significantly, Defendants' fraud has been independently corroborated by numerous former high-ranking Vestis and Aramark employees ("FEs") who worked at Vestis facilities across North America, including locations as diverse as Dallas, Baton Rouge, Nashville, Toledo and San Diego. These FEs uniformly confirmed that Defendants were well aware throughout the Class Period that Vestis was plagued by long-standing operational failures that were prevalent well before the Spinoff, including consistently poor customer service, a severe lack of functioning technology, and unjustified pricing increases, all of which resulted in significant customer departures leading up to the Spinoff.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint, which purport to characterize the statements of anonymous former employees ("FEs"), except deny the allegations to the extent they suggest that they "corroborate[]" "Defendants' fraud."

13

14. For example, these FEs recalled that Vestis' customer service was so deficient that the Company was "<u>selling a nonexistent service</u>," akin to "<u>sell[ing] air</u>," and that poor quality service was the "<u>number one issue</u>" that caused it to lose customers—"<u>their services is what kills them</u>." The FEs also recounted that Vestis' "<u>service was so bad that these clients left within the first 30 to 90 days</u>," and that "it was tough to compete with other uniform companies that were doing a much better job." Indeed, the FEs described internal reports showing that because of Vestis' egregiously bad service, it was "bleeding" customers even before the Spinoff— including major national accounts such as Tyson Chicken and Whole Foods—and that there was no comparison between "<u>the type of customers and businesses that were being lost versus the businesses that the sales team were signing up</u>."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 of the Complaint.

15. Furthermore, and in a rarity for a securities class action pleading, Lead Plaintiffs obtained contemporaneous internal Vestis documents confirming that, as a result of Vestis' severe service issues, Defendants knew that the "in excess of 90%" customer retention rate that they repeatedly touted both prior to and after the Spinoff was materially false and misleading. These internal reports were provided to high level executives, including direct reports to Defendant Scott, and showed that Vestis lost a massive <u>$147 million</u> in recurring weekly revenue due to customer losses

14

between August 21, 2023 and April 19, 2024, <u>with a staggering $55 million of that amount lost in the five weeks prior to the Spinoff alone</u>. These reports were entirely consistent with Defendants' own admissions at the end of the Class Period that these customer losses had caused Vestis' customer retention rate to fall materially below 90% in the quarter before the Spinoff. Moreover, the FEs confirmed that Defendants were well aware of these developments, as a customer retention rate below 90% in the uniforms services business—which was heavily reliant on high customer retention, with top competitors consistently boasting a retention rate of over 95%— represented a "<u>DEFCON One</u>" situation for the Company.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in of Paragraph 15 of the Complaint, which purport to characterize or describe internal Vestis documents that Plaintiffs allegedly obtained. To the extent Paragraph 15 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 15 of the Complaint.

16.    Investors who purchased Vestis common stock at artificially inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

**Answer:** Defendants deny the allegations in Paragraph 16 of the Complaint.

15

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

**Answer:** Paragraph 17 of the Complaint characterizes the nature of the present action and no response is required. To the extent a response is required, Defendants admit that the Complaint purports to bring this action pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, but deny that the Complaint has merit.

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

**Answer:** Paragraph 18 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 18.

19.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this

Judicial District. In addition, the Company's headquarters is located within this Judicial District.

**Answer:** Defendants admit that Vestis is headquartered in Georgia. Paragraph 19 of the Complaint otherwise states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 19.

20.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

**Answer:** Paragraph 20 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 20.

## III.    PARTIES

### A.    Lead Plaintiffs

21.    Lead Plaintiff the City of Atlanta General Employees' Pension Fund is a public pension system organized for the benefit of approximately 11,000 current and retired employees of the City of Atlanta, Georgia and their beneficiaries. As reflected in its PSLRA certification (ECF No. 15-2), the City of Atlanta General Employees' Pension Fund purchased Vestis common stock during the Class Period

and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint.

22.    Lead Plaintiff the City of Atlanta Police Officers' Pension Fund is a public pension system organized for the benefit of approximately 3,600 current and retired police officers of the City of Atlanta, Georgia and their beneficiaries. As reflected in its PSLRA certification (ECF No. 15-2), the City of Atlanta Police Officers' Pension Fund purchased Vestis common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint.

23.    Lead Plaintiff the City of Atlanta Firefighters' Pension Fund is a public pension system organized for the benefit of approximately 2,000 current and retired firefighters of the City of Atlanta, Georgia and their beneficiaries. As reflected in its PSLRA certification (ECF No. 15-2), the City of Atlanta Firefighters' Pension Fund purchased Vestis common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

18

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint.

24. Lead Plaintiff the Employees' Retirement System of the City of Baltimore is a defined-benefit public pension fund organized for the benefit of more than 18,000 city employees of the City of Baltimore, Maryland and their beneficiaries. As reflected in its PSLRA certification (ECF No. 15-2), the Employees' Retirement System of the City of Baltimore purchased Vestis common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint.

25. Lead Plaintiff Norfolk County Retirement System is a defined-benefit public pension fund that provides pension and other benefits for approximately 9,500 employees working within Norfolk County, Massachusetts and their beneficiaries. As reflected in its PSLRA certification (ECF No. 15-2), Norfolk County Retirement System purchased Vestis common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint.

### B.    Corporate Defendants

26.    Defendant Vestis is incorporated under the laws of Delaware with its principal executive offices located in Roswell, Georgia. Following the Spinoff, on October 2, 2023, Vestis common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "VSTS."

**Answer:** Defendants admit the allegations in Paragraph 26 of the Complaint.

27.    Defendant Aramark is incorporated under the laws of Delaware with its principal executive offices located in Philadelphia, Pennsylvania. Aramark common stock trades on the NYSE under the ticker symbol "ARMK." As a result of the Spinoff, Aramark's uniform segment, AUS, became the independent publicly traded company, Vestis.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint, except admit that Vestis became an independent publicly traded company after the Spinoff from Aramark.

### C.    Individual Defendants

28.    Defendant Scott is the President and CEO of Vestis and a member of the Company's Board of Directors. According to the Company, Scott joined

20

Aramark in October 2021—two full years before the Spinoff was completed—to serve as AUS' President and CEO and "to develop and launch an accelerated growth and value creation strategy for the company, while also preparing Vestis to be a standalone, independent public company." Per the Company's Registration Statement filed in connection with the Spinoff, Scott "has deep and relevant expertise with recurring revenue models having led and operated multiple businesses of this nature over the past 16 years," "extensive experience in logistics, route-based distribution and complex rental or subscription-based programs," and "a broad operating background that includes plant management, logistics, procurement, engineering, acquisitions and large-scale integrations."

**Answer:** Defendants deny the allegations in Paragraph 28 of the Complaint, except admit that Defendant Scott: (i) joined Aramark in October 2021; and (ii) served as Vestis's President and CEO and a member of Vestis's Board of Directors during the putative Class Period alleged in the Complaint. To the extent Paragraph 28 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

21

29.    Defendant Dillon is the EVP and CFO of Vestis. According to the Company, Dillon joined Aramark in May 2022 to serve as CFO of AUS and "to prepare Vestis to be a standalone, independent public company."

**Answer:** Defendants deny the allegations in Paragraph 29 of the Complaint, except admit that Defendant Dillon: (i) joined Aramark in 2022; and (ii) served as the EVP and CFO of Vestis during the putative Class Period alleged in the Complaint. To the extent Paragraph 29 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

30.    Defendant Zillmer has served as the CEO of Aramark, and as a member of Aramark's Board of Directors, since October 2019. Vestis' Information Statement included a cover letter dated September 11, 2023 that was signed by Zillmer. Zillmer's cover letter "encourage[d]" investors to read the Information Statement as it "describe[d] the [Spinoff] in detail and contain[ed] important business and financial information about Vestis." As discussed herein, Zillmer made materially false and misleading statements and omissions in the Information Statement.

**Answer:** Defendants deny the allegations in Paragraph 30 of the Complaint, except admit that: (i) Defendant Zillmer was CEO of Aramark, and a member of

Aramark's Board of Directors during the putative Class Period alleged in the Complaint; and (ii) signed a letter dated September 11, 2023 that was attached to Vestis's final Information Statement. To the extent Paragraph 30 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them. To the extent Paragraph 30 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 30 of the Complaint.

31.    The Individual Defendants, as senior executive officers and/or directors of Vestis and/or Aramark, were privy to confidential, proprietary and material adverse non-public information concerning Vestis and/or Aramark, their operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

23

**Answer:** Defendants deny the allegations in Paragraph 31 of the Complaint.

32.    Defendants Aramark and Zillmer are liable as direct participants in the wrongs complained of herein for their conduct and misstatements made about Vestis in connection with the Spinoff. In addition, Defendants Aramark and Zillmer were "controlling persons" within the meaning of Section 20(a) of the Exchange Act over Vestis and its officers and directors, including Defendants Scott and Dillon, prior to the Spinoff. Defendants Aramark and Zillmer had the power and influence to cause Vestis and its officers and directors to engage in the unlawful conduct complained of herein prior to the Spinoff, including with regard to the statements made in the Information Statement filed in connection with the Spinoff. Because of their positions of control, Defendants Aramark and Zillmer were able to and did, directly or indirectly, control the conduct of Vestis' business prior to the Spinoff, including through the actions of its officers and directors, including Defendants Scott and Dillon.

**Answer:** Defendants deny the allegations in Paragraph 32 of the Complaint. To the extent Paragraph 32 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 32 of the Complaint.

33.    Defendants Aramark and Zillmer, because of their control over Vestis prior to the Spinoff, controlled and/or possessed the authority to control the contents

24

of Vestis' Information Statement, SEC filings, press releases, and presentations to securities analysts, and through them, to the investing public. Defendants Aramark and Zillmer were provided with copies of Vestis' reports and publicly disseminated documents filed prior to the Spinoff alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants Aramark and Zillmer had the opportunity to commit the fraudulent acts alleged herein.

**Answer:** Defendants deny the allegations in Paragraph 33 of the Complaint. To the extent Paragraph 33 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 33 of the Complaint.

34.    As controlling persons of Vestis prior to the Spinoff, whose securities were registered with the SEC pursuant to the Exchange Act and governed by the federal securities laws, Defendants Aramark and Zillmer had a duty to disseminate promptly accurate and truthful information with respect to Vestis' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Vestis' common stock would be based on truthful and accurate information once its trading began after the Spinoff.

25

Defendants Aramark and Zillmer's misrepresentations and omissions prior to the Spinoff violated these specific requirements and obligations.

**Answer:** Defendants deny the allegations in Paragraph 34 of the Complaint. To the extent Paragraph 34 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 34 of the Complaint.

35.    Defendants Scott and Dillon are liable as direct participants in the wrongs complained of herein. In addition, Defendants Scott and Dillon, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause Vestis to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants Scott and Dillon were able to and did, directly or indirectly, control the conduct of Vestis' business.

**Answer:** Defendants deny the allegations in Paragraph 35 of the Complaint. To the extent Paragraph 35 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 35 of the Complaint.

36.    Defendants Scott and Dillon, because of their positions within Vestis, controlled and/or possessed the authority to control the contents of Vestis' Information Statement, reports, SEC filings, press releases, and presentations to

securities analysts, and through them, to the investing public. Defendants Scott and Dillon were provided with copies of Vestis' reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants Scott and Dillon had the opportunity to commit the fraudulent acts alleged herein.

**Answer:** Defendants deny the allegations in Paragraph 36 of the Complaint.

37.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were registered with the SEC pursuant to the Exchange Act and governed by the federal securities laws, Defendants Scott and Dillon had a duty to disseminate promptly accurate and truthful information with respect to Vestis' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Vestis' common stock would be based on truthful and accurate information. Defendants Scott's and Dillon's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**Answer:** Defendants deny the allegations in Paragraph 37 of the Complaint. To the extent Paragraph 37 states legal conclusions, no response is required. To the

27

extent a response is required, Defendants deny the allegations in Paragraph 37 of the Complaint.

## IV.    OVERVIEW OF THE FRAUD

### A.    Background of the Spinoff

38.    Aramark, Vestis' former parent, provides food service, facilities and uniform services to hospitals, universities, school districts, stadiums and other businesses around the world. Aramark entered the uniform services industry in 1977. Prior to the Spinoff, Aramark consisted of three segments: Food and Support Services United States, Food and Support Services International, and the Uniform and Career Apparel segment ("AUS").

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint, except admit that: (i) Aramark was Vestis's parent company prior to the Spin; and (ii) Aramark had a business segment called AUS prior to the Spin.

39.    AUS's business—which ultimately became Vestis—entails providing uniforms, mats, towels, linens, restroom supplies, first-aid and safety products, and other workplace supplies to a diverse customer base. The Company serves large corporations and national franchises with multiple locations to small, family-owned customers with a single location. AUS had 20,000 employees who operated over 350 sites including laundry plants, satellite plants, distribution centers and

28

manufacturing plants, along with a fleet of service vehicles that supported over 3,400 pick-up and delivery routes.

**Answer:** Defendants admit that AUS's business was ultimately run by Vestis but deny that the allegations in Paragraph 39 of the Complaint provide a full and complete description of AUS's or Vestis's business.

40.    AUS was known as a B2B "route-based business," as its services and products were delivered to customers by delivery drivers ("route service representatives" or "RSRs") via delivery routes that originated from one of the Company's laundry plants or "market centers." AUS serviced customers on a recurring rental basis, typically weekly, delivering clean uniforms while, during the same visit, picking up worn uniforms for inspection, cleaning, replacement, or repair. Similarly, used towels, linens and floor mats were picked up regularly by AUS employees and replaced with fresh, clean products. AUS also offered regular restocking of safety products, first aid supplies, and restroom supplies as needed.

**Answer:** Defendants deny that the allegations in Paragraph 40 provide a full and complete description of AUS's or Vestis's business.

41.    Significantly, the ability to make on-time, correct deliveries to customers was critical to AUS. As one former Regional VP of AUS explained, "inventory management" was the "biggest" issue for a uniforms program, because if the right number of uniforms were not timely delivered, customers were left with

29

insufficient uniforms for their employees and were often significantly impacted—

completely defeating the value of the program:

> I'll give you an example of what can go bad. <u>You have a company's inventory management, one of the biggest things. That's a big issue in the industry.</u> If you're an employer and you have let's say 20 employees and you're paying for a program, then I come and deliver your garments, pick them up, deliver them every week, and <u>every week, you're missing two shirts, a pair of pants, that causes a strain on your business</u>. Now your employees don't have uniforms to work their complete workweek. They either have to wear a garment twice or they have to go ahead and wear their own garments. That puts a big strain. <u>When I say service, when I say the inventory management piece, that's critical when it comes to a uniform program</u>. A lot of companies buy into it, and then they see that it's not working because they're not getting the garments back.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 of the Complaint.

42.    Prior to the Spinoff, AUS was the smallest segment of Aramark, and was in substantial need of capital investment and focus. On an absolute dollar basis, the Company had generally trailed its principal competitors, Cintas and UniFirst, with respect to capital investment over the last decade. AUS also averaged a much lower compound annual revenue growth rate ("CAGR") than its competitors, 1-2% per year, as compared to Cintas, which averaged 6.3% per year. Indeed, from 2012 to 2022, AUS' growth lagged Cintas' by a significant margin for all eleven years and UniFirst's growth for nine of those eleven years. AUS struggled given its lack

of synergies with Aramark's main food service business, causing Aramark to not invest in the growth of the business. Moreover, historically, high levels of debt at Aramark led to periods where the AUS business was effectively run as a source of cash flow for Aramark's predominantly food services business.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Complaint.

43.    Additionally, as a food services company, Aramark was hard hit by COVID-19, as the pandemic had a material impact on the customer segments it serviced (*e.g.* sports & leisure, education, restaurant, onsite business & industry). As a result, Aramark became weighed down with astronomically high debt: $9.2 billion in 2020 and $7.4 billion in 2021, with its leverage above 7x EBITDA in late 2021. In light of growing market concern over its balance sheet, at Aramark's Analyst Day held on December 9, 2021, Aramark announced that it would decrease its leverage significantly, to 3x-3.5x by fiscal year 2025. While not yet known to the market, part of Aramark's deleveraging plan was to conduct a Spinoff of AUS, which would come with an associated hefty cash payment back to Aramark.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 of the Complaint. To the extent Paragraph 43 purports to characterize statements made during Aramark's Analyst Day on December 9, 2021 or any publicly available documents, Defendants

refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

44. In preparation for the Spinoff, on October 10, 2021, Aramark retained Defendant Scott as the new CEO of AUS, specifically to begin working towards a Spinoff, which would be publicly announced a few months later. To lay the groundwork that AUS was a strong, standalone operating business—a theme Defendants would repeatedly push in connection with the Spinoff—even before the Spinoff was announced, Scott began publicly touting the "great amazing investments" Aramark had recently made in AUS.

**Answer:** Defendants deny the allegations in Paragraph 44 of the Complaint, except admit that Defendant Scott was hired as the CEO of Aramark's AUS business segment on or around October 11, 2021.

45. Indeed, at Aramark's December 9, 2021 Investor Day, Defendant Scott praised how Aramark had increased the AUS sales force and had invested in "a new" customer relationship management system, "ABS," which, as she described, was "the enabler for many things that we want to do across this business. It is one place to house all of our data and information about our customers to see the movement of our routes so that we can understand how efficient we're being to allow us to have very ease of doing business activities with our customers." Scott proclaimed that, with the new ABS system in place—which was "already more than 70%

implemented"—AUS would be able to run efficiently and generate growth, putting it on track to catch up to top competitor Cintas. In Scott's words, "now that we have [ABS] in place" and "now that we have our sales team in place" the "building blocks [for growth] are now in place."

**Answer:** Defendants deny the allegations in Paragraph 45 of the Complaint. To the extent Paragraph 45 purports to quote from and/or characterize statements made during Aramark's December 9, 2021 Analyst/Investor Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

46.    Moreover, market commentators had long recognized that having technologically-advanced management systems was the key to AUS becoming more competitive with Cintas. Cintas had long ago implemented its own technological infrastructure investments that had significantly improved its customer retention rate to over 95%, and helped Cintas to realize several benefits, including "real-time inventory tracking of stockrooms (better use of garments), management of high input costs, and increased employee efficiency by getting more stops per mile." The new ABS system was thought to have similar benefits for AUS, helping it to improve customer service and thus overall customer retention.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 of the Complaint.

> **B.    In The Wake Of Announcing The Spinoff, Defendants Tout Their Investments In Vestis To Assure Investors That Vestis Had Improved Logistics And Operating Systems In Place To Thrive**

47.    On May 10, 2022, Aramark publicly announced that it would spin off AUS by the end of its fiscal year 2023—*i.e.*, by September 30, 2023. The Spinoff would therefore occur a full two years after Defendant Scott was first brought in as CEO of AUS—giving her ample time to prepare AUS to succeed as an independent entity. The new company would be called Vestis. The Spinoff would be tax-free and Aramark stockholders would receive one share of Vestis common stock for every two shares of Aramark common stock they held as of the record date of the distribution. Significantly, as part of the Spinoff—and to help relieve Aramark's over $7.5 billion in debt—Aramark would receive an enormous cash payout from the transaction: specifically, Vestis would be required to pay nearly $1.5 billion in cash back to Aramark.

**Answer:** Defendants deny the allegations in Paragraph 47 of the Complaint, except admit that: (i) Defendant Scott was hired as the CEO of Aramark's AUS business segment on or around October 11, 2021; and (ii) Vestis became a publicly-traded Company as a result of the Spinoff. To the extent Paragraph 47 purports to paraphrase, quote from, and/or characterize publicly-available documents,

34

Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

48.    To justify the Spinoff and its nearly $1.5 billion payout to Aramark, Defendants needed to convince the market that Vestis was a strong operating business that was poised to succeed as an independent entity after the Spinoff was completed. Thus, in Aramark's May 10, 2022 press release announcing the Spinoff, it strongly emphasized that its "recent investments" in Vestis—including investments in "an operating platform [ABS] that is anticipated to enable efficiencies across all customer touchpoints including supply chain logistics, inventory management, and back office support" and a "stronger salesforce"—had already resulted in "new client wins" and an "improved" customer retention rate of more than 150 basis points. As a result, Vestis was purportedly "well-positioned to succeed independently."

**Answer:** Defendants deny the allegations in Paragraph 48 of the Complaint. To the extent Paragraph 48 purports to quote from and/or characterize Aramark's May 10, 2022 press release or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

49.    Defendant Scott likewise emphasized Aramark's "recent investments," touting that Vestis' new team would "capitaliz[e] on [the] investments, and

moderniz[e] [the Company's] approach to customer relationship management" "to substantially increase the performance of our business." Scott also represented that "[s]ince October [2021]," when she first joined AUS, "a plan" had been "developed" "to deliver a step change increase in organic revenue growth and margin."

**Answer:** Defendants deny the allegations in Paragraph 49 of the Complaint. To the extent Paragraph 49 purports to quote from and/or characterize Aramark's May 10, 2022 press release or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

50.     During Aramark's conference call held that day, Zillmer specifically highlighted that Vestis was ready for the Spinoff because Aramark's investments in the Company were already accomplished, and Scott would have over a year to shore up operations before the Spinoff occurred. Indeed, Zillmer explained that Aramark specifically delayed pulling the trigger on the Spinoff until after these key investments had been fully implemented to ensure Vestis' success. According to Zillmer, in the past, "the company had work to do with respect to fixing the business, to getting the systems right [and] the infrastructure right" but now, "the investments we've made over the last couple of years, in both sales infrastructure, growth infrastructure, the route accounting systems, are largely behind us. And we are now well positioned to accelerate the growth and improve the margins in the business."

36

**Answer:** Defendants deny the allegations in Paragraph 50 of the Complaint, except admit that Aramark held an earnings call on May 10, 2022. To the extent Paragraph 50 purports to quote from and/or characterize the transcript of Aramark's May 10, 2022 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

51.    Analysts reacted favorably to the news of the Spinoff. For example, analysts at Oppenheimer called it "a long anticipated move, and one we view as highly positive . . . The move will create two industry-leading, independent public companies with strong growth and profitability strategies." Those analysts concluded their report, saying, "we believe the Uniforms spin-off is the right step that creates long-term shareholder value and an optimal capital structure." Analysts at Baird credited Defendants' statements, noting "ARMK sees AUS well positioned for growth after investments including a new CRM."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 of the Complaint to the extent they purport to characterize third party analysts' reactions. To the extent Paragraph 51 purports to quote from and/or characterize third party analysts' reports or any other publicly available documents, Defendants refer the Court to the source

documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

52.    Throughout the rest of 2022, Defendants kept stressing that the Company was thriving operationally and would only continue to succeed. For example, Zillmer again drove home that Vestis was ready to grow at a June 2, 2022 Bernstein Strategic Decisions Conference, where he explained that Aramark's investments in Vestis' "route accounting system," ABS, and its "implementation," were now complete—such that AUS was "beginning to drive the benefits of that system throughout the enterprise." Zillmer added that AUS was "well ahead" of the investment in "sales infrastructure and leadership development and training," and with "those 2 big strategic initiatives behind us," the Spinoff was happening at the exact right time, as the new Company would benefit immediately from its now strong operations.

**Answer:** Defendants deny the allegations in Paragraph 52 of the Complaint. To the extent Paragraph 52 purports to quote from and/or characterize Aramark's presentation at a June 2, 2022 Bernstein Strategic Decisions Conference or other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

53.    Significantly, Scott—who was slated to become CEO of Vestis—further reassured investors by repeatedly emphasizing her intimate role in ensuring the business was running efficiently and effectively long before the Spinoff. For example, at a June 8, 2022 Baird Consumer, Technology & Services Conference, Scott noted that she had "an affinity for the recurring revenue model" and an "understanding [of] how important protecting that base is and really building customer loyalty, so that you can then drive retention, which, as you all know, is a great way to grow your business in a recurring revenue model, but also this huge opportunity to cross-sell the base." Scott specifically noted that her "tremendous amount of experience really running these recurring revenue models and running them very well" would help the Company succeed.

**Answer:** Defendants deny the allegations in Paragraph 53 of the Complaint. To the extent Paragraph 53 purports to quote from and/or characterize Aramark's presentation at a June 8, 2022 Baird Consumer, Technology & Services Conference or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

54.    Defendant Scott also again made clear that the Company's operating systems and investments were already in place and providing strong customer services. Indeed, Scott highlighted the fact that, while the Company previously was

not "as focused as we should have been" on making sure it had a "proper logistics function," the "first thing" Scott did upon assuming her position as CEO was to "install a proper logistics function":

> So the first thing that we've done around operations, candidly, is to install a proper logistics function. And so there is a massive opportunity in this model, of course, to leverage logistics know-how to drive efficiencies. So efficient routes, really driving density across those routes so that you can leverage your footprint and lower your cost to serve. And so we're very, very focused on logistics. And I think that's been an area that we have not been as focused as we should have been in the past. And so that's really not related to what you do when you spin out, it's just really related to what do you do to really run this business really well. Whether we're inside Aramark or outside of Aramark, we should be really, really expert at logistics because we're running a route-based business. And going back to your question of kind of what surprised you, I mean, candidly, I love our team and I think we're doing amazing work, but I was surprised that we weren't doing more sophisticated things around routing and scheduling and logistics.

**Answer:** Defendants deny the allegations in Paragraph 54 of the Complaint. To the extent Paragraph 54 purports to quote from and/or characterize Aramark's presentation at a June 8, 2022 Baird Consumer, Technology & Services Conference or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

40

55.     In 2023, as the Spinoff grew closer, Defendants continued to strongly assure investors that they had "position[ed] the Uniform Services Spinoff for success." For example, at a May 31, 2023 Bernstein Conference, Aramark boasted that Vestis' customers were pleased with the Company's services, as they were renewing their contracts, and Vestis was ready for independent status. When an analyst pointed out that the Company had seemingly "exited the pandemic a little behind some of the larger listed peers" in terms of its organic growth, Zillmer dismissed any concerns, claiming that this was due to a one-off "fuel recovery fee" that purportedly did not affect Vestis' competitors. Indeed, Zillmer strongly asserted that the Company was now apace with its competitors, stating "if you look at our sales volumes, our net new business wins and our [customer] retention[,] we're right there with our competitors."

**Answer:** Defendants deny the allegations in Paragraph 55 of the Complaint. To the extent Paragraph 55 purports to quote from and/or characterize the transcript of Aramark's May 9, 2023 earnings call, Aramark's presentation at a May 31, 2023 Bernstein Strategic Decisions Conference or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

56.     Then, just before the Spinoff, at a June 8, 2023 Baird conference, Vestis' management, including Defendants Scott and Dillon, depicted Vestis as a

41

"wonderful hidden jewel" that served "customers with excellence" and had "outstanding customer relationships." Scott stressed that customer retention was especially critical to the Company's success, stating that retention was "one of the most important levers in this model," and that "the best thing you can do is protect it, so it keeps giving week-over-week and month-over-month and quarter-over-quarter . . . and so we hold on to every customer that we worked so hard to acquire." Scott explained that "high-quality revenue growth is the #1 component in our strategic plan" and that revenue growth "starts with retaining the amazing customers that you already have." Scott further averred that Vestis was able to retain and grow its customer base because "the investments [Aramark] already made in [the Company's] infrastructure" had paid off.

**Answer:** Defendants deny the allegations in Paragraph 56 of the Complaint. To the extent Paragraph 56 purports to quote from and/or characterize Aramark's presentation at a June 8, 2023 Baird Consumer, Technology & Services Conference or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

57.    Indeed, Scott again stressed that a "portfolio of logistics initiatives" was now in place, emphasizing that she "c[a]me from a route-based business previously so I'm familiar with these tools," and further stated that she personally had "spent

time in the field riding along with [employees] and meeting our customers" to ensure the systems were working—and it was "very clear over the last 18 months that with a new strategic plan, which we have now put in place and with the establishment of some new functional capabilities, we can take this business to a new level." Scott proclaimed that, as a result, Vestis was a "really, really wonderful business with this fantastic recurring revenue. And what's so amazing about this business is the opportunity to expand with our existing customers."

**Answer:** Defendants deny the allegations in Paragraph 57 of the Complaint. To the extent Paragraph 57 purports to quote from and/or Aramark's presentation at a June 8, 2023 Baird Consumer, Technology & Services Conference or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

 **C.** **In Preparation For The Spinoff, Defendants Tout The Company's "Long-Term Relationships With [] Customers Due To The Quality Of [Its] Services And Products [And] [] Ability To Deliver On Time" And Its High Retention Rate "In Excess Of 90%"**

58. On August 15, 2023, Vestis filed with the SEC a registration statement on Form 10 (as amended, the "Registration Statement"), which became effective on September 8, 2023, and included a preliminary information statement ("Information Statement") that was executed on September 11, 2023.

**Answer:** Defendants admit the allegations in Paragraph 58 of the Complaint.

43

59.     The Information Statement included cover letters from both Defendants Zillmer and Scott, which "encourag[ed] [investors] to read the attached [I]nformation [S]tatement." The Information Statement continued to convey that the successful investments in Vestis' business were a *fait accompli*, promoting Vestis' operational excellence as a key value driver that ensured the Company would retain customers and grow revenue. Indeed, the Information Statement repeatedly boasted of the Company's "[l]ong tenured [c]ustomer relationships" and "recurring revenue streams," which Defendants claimed were made possible precisely "due to the quality of [Vestis'] services and products" and its "ability to deliver on-time."

**Answer:** Defendants deny the allegations in Paragraph 59 of the Complaint. To the extent Paragraph 59 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

60.     Defendants also made sure to emphasize in the Information Statement and throughout the Class Period that Vestis consistently maintained a "customer retention rate [] in excess of 90%," which was absolutely critical in the uniforms services industry, as any retention rate that fell below 90% would signal to the market that the Company had serious issues with customer retention. Indeed, as set

forth above, Vestis' top competitor Cintas typically maintained a retention above 95%, and according to the Company's own former employees, any retention rate that fell below 90% was internally considered to be a dire "DEFCON One" situation.

**Answer:** Defendants deny the allegations in Paragraph 60 of the Complaint. To the extent Paragraph 60 purports to quote from and/or characterize - Vestis's final Information Statement filed on September 11, 2023 or any other publicly available document, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation regarding non-party Cintas's customer retention rate. Further, to the extent that Paragraph 60 purports quote an anonymous FE, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations.

61.     For example, the Information Statement boasted that Vestis' exemplary service kept customers happy and loyal such that, over the prior five years, Vestis had consistently maintained a "customer retention rate [] in excess of 90%," which provided Vestis with a "significant competitive advantage[]" and was a "key competitive strength[]." The Information Statement made clear that this strong "Customer Retention" would deliver "High Quality Revenue Growth" for the

45

Company and create "recurring revenue streams" that allowed for "predictability of revenue."

**Answer:** Defendants deny the allegations in Paragraph 61 of the Complaint. To the extent Paragraph 61 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

62. The Information Statement also highlighted the fact that the Company had successfully implemented, and was using, a critically important fleet management technology called "Telematics." Telematics combines telecommunications and GPS technology to help route-based companies receive, view and track real-time data about delivery vehicles, delivery schedules, and the status of deliveries. In the uniform service industry, Telematics is an essential management tool for commercial fleets that is standard for B2B route-based services businesses like Vestis, as it is absolutely critical for ensuring efficient routes and correct, on-time deliveries.

**Answer:** Defendants deny the allegations in Paragraph 62 of the Complaint. To the extent Paragraph 62 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available

documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

63. Indeed, in the Information Statement, Defendants specifically touted Vestis' use of "our new telematics technology," stating: "We seek to increase route efficiency with technology and processes that reduce travel time, distance and fuel consumption. For example, our new telematics technology allows us to proactively reduce fuel usage by limiting idling through real-time, in-cab driver alerts."

**Answer:** Defendants deny the allegations in Paragraph 63 of the Complaint. To the extent Paragraph 63 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

64. Two days later, on September 13, 2023, Aramark and Defendants Scott and Dillon hosted "the very first Vestis Analyst Day," which was specifically designed to inform investors about the soon-to-be public independent company. At that conference, Defendants left no doubt that Vestis already had in place all of the operating systems and processes it needed to succeed. Indeed, incoming Vestis CEO Defendant Scott explained at the outset that she had "joined [AUS] a couple of years

47

ago with the <u>intent of preparing this business for this exact moment</u>." Defendants crowed that as a result of these years of preparation and "<u>the investments that Aramark already quite wisely made in this business, the ramping of the sales force, the investment of our operating system platform</u>"—investments that were "<u>in place</u>," "<u>in our run rate</u>" and had "<u>been made</u>"—Vestis was "<u>primed and ready to go</u>."

**Answer:** Defendants deny the allegations in Paragraph 64 of the Complaint, except admit that Vestis held an Analyst Day on September 13, 2023. To the extent Paragraph 64 purports to quote from and/or characterize materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

65.    As in the Information Statement, Defendants further touted at Analyst Day that Vestis' services were already "<u>excellent</u>," which allowed the Company to "retain[] the base" and grow revenue. Indeed, Defendants repeatedly assured the market that Vestis' stellar service was what allowed the Company to retain customers. For example, the Company's accompanying investor presentation highlighted that "<u>the single highest value growth lever is retention, which we achieve through service excellence</u>." Defendants emphasized that not only did the Company have "very loyal customers," it was specifically the large "national account customers"— which had been "with us for 26 years"—that formed the "very strong

relationships" that would propel growth. According to Scott, these "amazing relationships" were borne out in the strong customer "retention metrics," and were a testament to Vestis' ability to "service [the customers] with excellence every single day." Defendant Dillon similarly confirmed that "retaining our existing customers [was] the single most profitable thing" underlying Vestis' business model.

**Answer:** Defendants deny the allegations in Paragraph 65 of the Complaint. To the extent Paragraph 65 purports to quote from and/or characterize Vestis's final Information Statement, filed on September 11, 2023, materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

66.    Defendant Scott also averred that Vestis employees were keenly "focused" on service and "taking care of [the] customers," which meant they were "doing exactly what we say we're going to do, deliver on the promise, show up on time every week, deliver the products and services that you . . . promise to your customers and do that with consistency and excellence."

**Answer:** Defendants deny the allegations in Paragraph 66 of the Complaint. To the extent Paragraph 66 purports to quote from and/or characterize materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents,

49

Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

67.    Indeed, Scott strongly highlighted the fact that Vestis had in place the systems it needed to effectively service its customers, and to ensure accurate, on-time delivery. For example, Scott attributed Vestis' retention success to the "implementation of [the] ABS" system, which had been "<u>launched across our entire network</u>," and gave team members the "digital tools in their hands so that they can interact more seamlessly and more efficiently with the customer." Scott directly credited Vestis' ability to "<u>protect the base</u>" and "<u>retain the customers</u>" to these "better tools" and "data analytics" that could "really trend customer behaviors" and cause Vestis to provide "excellent service."

**Answer:** Defendants deny the allegations in Paragraph 67 of the Complaint. To the extent Paragraph 67 purports to quote from and/or characterize materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

68.    Significantly, when analysts questioned Defendants about customer retention in light of the fact that the Company had reported flat revenue year-over-year growth in Vestis' core uniforms business, Scott claimed that the flatness was of no moment and in fact "very intentional," as it was purportedly due to

50

"nonregrettable losses around some accounts that just didn't make sense for our portfolio." Scott thus strongly assured investors that any customer losses that were weighing on the uniforms revenue were strategic and had nothing to do with any problems in Vestis' business: "So you've got a couple of accounts that have left the portfolio as well that are depressing that uniforms number . . . So while you may see that as a depressed number or a flat number, it's very intentional."

**Answer:** Defendants deny the allegations in Paragraph 68 of the Complaint. To the extent Paragraph 68 purports to quote from and/or characterize materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

69. Based on these proclamations, Defendants confirmed their "commitment" to growing the Company's CAGR—a critical metric in the uniform services business on which the market heavily focused—by stating that "we're going to grow our top line revenue CAGR on an organic basis, 5% to 7%," and "deliver 18% to 20% adjusted EBITDA margin," by fiscal year 2028. This was significantly above AUS' historical CAGR of only 1-2% annually, and effectively matched top competitor Cintas' CAGR and profit margins. Defendants claimed that the key tenets underpinning this guidance was the Company's strategy to "retain[] the customers

51

that you have, cross-sell the customers that you have"—with cross-selling similarly being dependent on customer retention— "and gain new customers."

**Answer:** Defendants deny the allegations in Paragraph 69 of the Complaint. To the extent Paragraph 69 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

70.    Additionally, Defendant Dillon announced that Vestis was able to increase prices as needed because of its strong customer retention, assuring investors that "we will take price" and "we will price different going forward." To provide extra assurance, Dillon emphasized how Vestis had already "demonstrated [its] ability to take price and pass through inflation."

**Answer:** Defendants deny the allegations in Paragraph 70 of the Complaint. To the extent Paragraph 70 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

71.    Analysts were highly encouraged by Vestis' Analyst Day, and in particular noted how the Company's "logistics muscle" and "data-driven" systems had set the Company up for success. For example, an October 16, 2023 J.P. Morgan

52

report stated that it was "<u>encouraged by the company's recent business improvements under a new Vestis management team</u>," and found management's plans "for driving growth-oriented operational improvements to be detailed, data-driven, and supported by recent concrete proof points and action items around each retention, cross-sell, and new account wins." A November 21, 2023 Jefferies report similarly lauded that "<u>management has spent the last two years building its logistics muscle (CEO Kim Scott's specialty) to drive more efficiency gains</u>." The report also celebrated Vestis' implementation of ABS as being key to improving customer retention, as "improving the overall customer experience is paramount" and ABS would "improve the customer experience by providing a higher quality of services through a better understanding of customer needs / behaviors."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71 of the Complaint, which purport to characterize the views and feelings of third party analysts. To the extent Paragraph 71 purports to quote from and/or characterize third party analysts' reports or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

**D.    Post-Spin, Defendants Repeatedly Tout Vestis' "Service Excellence" That Purportedly "Continue[d] To Deliver Retention Rates That Are Above 90%"**

72.    The Spinoff was accomplished on Saturday, September 30, 2023, and Vestis began regular trading on October 2, 2023 at a price of $19.20 per share. As prescribed by the Spinoff terms with Aramark, Vestis entered into financing with lenders to the tune of $1.8 billion in order to fund the nearly $1.5 billion in cash that was due to Aramark under the terms of the Spinoff.

**Answer:** Defendants deny the allegations in Paragraph 72 of the Complaint, except admit that: (i) the Spinoff was accomplished on or around September 30, 2023; and (ii) that Vestis began trading as a public Company on or around October 2, 2023.

73.    Significantly, even after Vestis became a separate, independent entity, Defendants Scott and Dillon continued to make the same false statements touting Vestis' customer retention, the investments that Aramark had made in the Company, and Vestis' supposed service excellence that Defendants had purportedly successfully accomplished in the years prior to the Spinoff.

**Answer:** Defendants deny the allegations in Paragraph 73 of the Complaint.

74.    For example, during the Company's November 29, 2023 earnings call, Defendants proclaimed that, given Vestis' "efficient operations," "we are well positioned to deliver healthy revenue growth and margin expansion" that was

54

"already within the long-term target range that we provided at Analyst Day." Defendants also again stressed that Vestis had successfully maintained a customer retention rate that exceeded the critical threshold of 90%, with Scott proudly reporting that Vestis "continue[d] to deliver retention rates that are above 90%," just as Defendants had "stated in our Form 10." Scott thus assured investors that there were no issues with customers leaving Vestis—in fact, rather than any dissatisfied clients, Defendants claimed Vestis was "seeing really, really great feedback from our customers," such that "we feel very, very good about the establishment of a service excellence culture across the company." Scott also reminded investors that Vestis' "national account customers" in particular remained highly loyal and were a vital part of Vestis' business, as they "stay more than 20 years with us. So they're very valuable customers and the lifetime value is great."

**Answer:** Defendants deny the allegations in Paragraph 74 of the Complaint. To the extent Paragraph 74 purports to quote from and/or characterize the transcript of Vestis's November 29, 2023 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

75.    In light of the Company's purported strong positioning for future growth, including its excellent operations and strong customer retention, Defendants

also announced during the call that they were "pleased to share our outlook for fiscal year 2024, a revenue growth rate of 4% to 4.5%" (when normalized for a temporary energy fee, a 5% to 5.5% rate), "which is well above our historical norms of approximately 2%." Scott confirmed that the projected 4% to 4.5% of revenue growth was based on Vestis' results to date, as the Company was "seeing great results well above our historical norms."

**Answer:** Defendants deny the allegations in Paragraph 75 of the Complaint. To the extent Paragraph 75 purports to quote from and/or characterize the transcript of Vestis's November 29, 2023 earnings call or any other publicly available documents publicly available, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

76. Moreover, when analysts raised questions about the performance of the Company's business, Defendants emphatically denied there were any issues. For example, when Defendants were again directly asked why the uniform business' revenue continued to be flat and not grow commensurate with Defendants' glowing statements about their successful growth initiatives, Defendant Scott again claimed this was because of Vestis' "purposeful" efforts to strategically and intentionally "exit[] some businesses" that did not fit with its business. Specifically, as she did at Analyst Day, Scott assured investors that "[w]e are just purposely at times exiting

56

some business . . . So I would expect you should see a muted uniforms growth rate again in FY '24, but that is a very purposeful decision to grow very strategically under high-quality verticals and exiting some underperforming businesses."

**Answer:** Defendants deny the allegations in Paragraph 76 of the Complaint. To the extent Paragraph 76 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

77.     Defendants' messaging worked. On November 29, 2023, Baird analysts reported that "[g]uidance matters most, and it looked good," and "VSTS isn't seeing elevated customer churn." Jefferies' November 30, 2023 report was pleased with the Company's "first quarter out as a public company" calling it a "strong" "good start," and reiterating their Buy rating. The Jefferies analysts added, "[o]ur sense is management set conservative guidance on revenue growth" and "we have confidence they are taking the right actions to achieve the organic growth and margin targets outlined at their analyst day." J.P. Morgan reported, "[o]ver the last two-plus years, Vestis' new leadership team has been building out credible proof points that the firm's growth transformation is progressing well." A January 11, 2024 Wolfe research report stated that it was "pleased to see that management completed its ABS

system integration," which "we view as an encouraging sign of management's ability to deliver on its promise."

**Answer:** Defendants deny the allegations in Paragraph 77 of the Complaint. To the extent Paragraph 77 purports to quote from and/or characterize third party analysts' reports or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

78. On the backs of these representations, Vestis' stock price surged by 16%, from $19.20 per share when the Company first began publicly trading to a Class Period high of $22.30 per share on February 6, 2024.

**Answer:** Defendants deny the allegations in Paragraph 78 of the Complaint.

E. **Defendants Report Disappointing Results But Maintain Full-year Guidance, "Comfort[ing]" Investors That Vestis Would Be "Taking Price," With Scott "Assur[ng]" There Were "No Concerns"**

79. Defendants' scheme began to unravel before markets opened on February 7, 2024. First, on the evening of February 6, 2024, the Company announced that its COO Chris Synek ("Synek") had suddenly resigned for "personal reasons," effective immediately. Synek had been appointed COO on September 11, 2023—mere days before Vestis held its Analyst Day prior to the Spinoff—and had been with the Company for only five months.

**Answer:** Defendants deny the allegations in Paragraph 79 of the Complaint, except admit that Vestis's COO Chris Synek departed the Company on or about February 5, 2024.

80.    Second, before trading commenced on February 7, 2024, Vestis issued a press release disclosing disappointing results for Q1 2024 (which ended December 31, 2023)—Vestis' first full quarter as a standalone entity—including revenue growth of just 2.5%, a far cry from the projected 2024 revenue growth of 4 to 4.5%. Despite this underperformance, the press release made clear that Vestis "reaffirm[ed] Fiscal 2024 guidance" and therefore purportedly still "expect[ed] to deliver revenue growth in the range of 4.0 to 4.5%" for the year.

**Answer:** Defendants deny the allegations in Paragraph 80 of the Complaint, except admit that Vestis issued a press release on February 7, 2024 reporting its first quarter results for the quarter ending on December 29, 2023. To the extent Paragraph 80 purports to quote from and/or characterize Vestis's press release on February 7, 2024 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

81.    On the earnings call held that day, Scott sought to quash investor concerns by explaining that the revenue miss had nothing to do with Vestis' operations or customer retention, but was instead purportedly a result of economic

factors completely outside of the Company's control. Indeed, Scott claimed that Vestis had seen a "trend" of "small to medium enterprise customers with an uptick in business closures," and that this was the reason for the revenue shortfall.

**Answer:** Defendants deny the allegations in Paragraph 81 of the Complaint. To the extent Paragraph 81 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

82.    To underscore this point, Defendant Scott strongly assured investors that she had personally "monitor[ed] [customer departures] very closely" and had undertaken extensive efforts to "go[] pretty deep and granular to understand what are those patterns and trends around why customers leave"—including the close evaluation of "reason codes," or internally-applied codes that denoted the reason for each customer departure. According to Scott, her detailed analysis had confirmed that the reason for customer departures was that there was "a slight uptick in customers going out of business in all those medium and enterprise verticals." When an analyst directly asked Scott why the uniforms business in particular had growth "com[ing] in a bit below" Vestis' competitors, Scott responded by stating that the Company had been "very transparent" that it was due to "an uptick in business closures as it relates to our SMEs" that "ha[d] an effect on the number as it relates

to the impact of retention on the Uniforms number." Thus, according to Scott, the shortfall was not attributable to any problems with the Company's operations, but to Vestis' clients' own bad business results.

**Answer:** Defendants deny the allegations in Paragraph 82 of the Complaint. To the extent Paragraph 82 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

83. Notably, Scott revealed for the first time that, contrary to her prior statements about Vestis' loss of certain customers being "purposeful" and "very intentional," Vestis had in fact suffered what she now called an "unfortunate loss" of a "national account" prior to the Spinoff. Specifically, Scott explained that an "unfortunate loss from [Vestis'] Clean Room business" had occurred "last year," and the loss was so significant that it had "continue[d] to flow through" the Company's revenue streams in 2024. Remarkably, in making this disclosure, Scott starkly admitted that the Company had deliberately concealed this loss despite its obvious materiality to investors. Specifically, Scott confessed that Defendants "ha[dn]'t talked about [this loss] a lot because it wasn't a strategic loss" and that it was "regrettable":

> And then we also have a national account loss, but <u>we</u>
> <u>haven't talked about it a lot because it wasn't a strategic</u>

61

loss. It was an unfortunate loss from our Clean Room business last year, and it was a loss that continues to flow through in the first 2 quarters of this year, which also affects that Uniforms number. And again, we haven't talked about it a lot because it's a regrettable loss, It wasn't part of our strategy . . .

**Answer:** Defendants deny the allegations in Paragraph 83 of the Complaint. To the extent Paragraph 83 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

84.    Significantly, however, Scott did not reveal that the Company had in fact lost not one, but two major national accounts prior to the Spinoff—and also falsely assured investors that this loss was not representative of any service issues at Vestis, but just "the nature of doing business." As Scott stated, "while we regret losses like that, the underlying health of the business is tracking exactly like we want it to track . . . So we feel very good about the underlying health of the business despite some of those factors that are muting [the] Uniforms growth rate."

**Answer:** Defendants deny the allegations in Paragraph 84 of the Complaint. To the extent Paragraph 84 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

62

85.    Scott also sought to quell analysts' uneasiness about COO Synek's sudden departure. Indeed, Scott "reassur[ed] everyone that [Synek's] departure does not impact our strategy or our ability to deliver against our strategy," and emphasized that Vestis' strategic plan "ha[d] been in motion for a very long time, for the 2.5 or 2-plus years that I've been here," so "we feel really confident that we will continue down the path that we are down." Scott also reminded investors that the team was "essentially reporting to [her] before [Vestis] created the COO role," that she "was an operator" who had previously "been a COO," and that the team is "back reporting to me" just as they had been for the "2-plus years that [she had] been [t]here."

**Answer:** Defendants deny the allegations in Paragraph 85 of the Complaint. To the extent Paragraph 85 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

86.    To reassure investors that Vestis would achieve its reaffirmed revenue guidance despite these setbacks, Defendants also announced that they would implement off-cycle price increases that would allow Vestis to "take price" in the second half of the year. Specifically, Scott explained that Vestis had "been surgically analyzing opportunities to take price more strategically," and confirmed that that "we will be taking price around certain specific kind of product lines" with certain

63

customers, in addition to "tak[ing] some more general pricing" in the near future. Dillon similarly confirmed there were "opportunities for surgical pricing," and that the Company was "really just capitalizing on [them]."

**Answer:** Defendants deny the allegations in Paragraph 86 of the Complaint. To the extent Paragraph 86 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

87.    In addition, Scott specifically reassured investors that these pricing actions were not necessary to reach Vestis' guidance. Rather, they were purportedly just "additional comfort to give [investors] confidence" that the Company would achieve its growth guidance—"the same confidence we have that we're going to ramp up the growth rates in the back half of the year, and deliver against the 4% to 4.5%" due to the Company's main growth initiatives.

**Answer:** Defendants deny the allegations in Paragraph 87 of the Complaint. To the extent Paragraph 87 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

64

88.     Significantly, Defendants again emphasized that Vestis had already implemented and was utilizing all of the necessary systems and processes to ensure accurate, on-time deliveries and excellent customer service. In particular, Defendants again highlighted the fact that the Company had successfully implemented, and was using, Telematics to ensure correct, on-time deliveries. Indeed, in the Company's 2023 Form 10-K (filed on December 21, 2023), Defendants touted Vestis' use of "our new telematics technology" just as they had in the Information Statement, stating: "We seek to increase route efficiency with technology and processes that reduce travel time, distance and fuel consumption. For example, our new telematics technology allows us to proactively reduce fuel usage by limiting idling through real-time, in-cab driver alerts."

**Answer:** Defendants deny the allegations in Paragraph 88 of the Complaint. To the extent Paragraph 88 purports to quote from and/or characterize Vestis's Form 10-K filed on December 21, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

89.     Now during the February 7, 2024 call, Defendants amplified and further detailed their extensive use of Telematics. Indeed, Defendant Scott proclaimed that, "[y]ear-to-date," Vestis had "successfully deployed new [T]elematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling technology

65

and processes across North America," which was "all a part of our strategy to establish the capability to continuously optimize our network and our routes." Defendant Scott further emphasized that the Company's use of Telematics would "ensure that we're running routes in compliance with how we'd like to do that." Furthermore, Defendants touted that Vestis had successfully flexed its "logistics muscle," as it had "already completed" multiple "network optimization events," delivering a "step change improvement in the way we operate." And in terms of sales, Scott reported that Vestis was "seeing really good progress with our frontline account executives, driving revenue per head."

**Answer:** Defendants deny the allegations in Paragraph 89 of the Complaint. To the extent Paragraph 89 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

90.     Defendants further took pains during the February 7 call to make crystal clear that the Company's customer retention rate remained strong by highlighting again that it had consistently been and continued to be "greater than 90%." For example, when an analyst directly asked Defendant Scott if she could "please comment on retention, the trends and the drivers, whether it's service quality, the predictive analytics, the digital tools"—and "what reasons for attrition would be"—

Scott responded by strongly averring that the Company's retention rate remained consistently high. Indeed, despite having just disclosed the loss of one national account, Scott strongly assured investors that Vestis' had maintained a retention rate "greater than 90%," just as had been "filed in the Form 10." Thus, the Company had not suffered any massive customer churn and there were "no real surprises as it relates to retention and where we expected to be."

**Answer:** Defendants deny the allegations in Paragraph 90 of the Complaint. To the extent Paragraph 90 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

91.    Despite Defendants' rosy picture, Vestis' stock price fell approximately 13% following these disclosures, from the Class Period high of $22.30 per share on February 6, 2024, to close at $19.42 on February 7, 2024. Analysts at Baird reported "[s]hares were off materially with today's earnings on concerns over revenue guidance achievement and implications from its newly hired COO abruptly leaving" and explained that the revenue "shortfall" was "one of the primary reasons for the selloff." A J.P. Morgan report commented that "moving pieces in the F2024 revenue guide" and "the COO departure" explained "why the VSTS stock fell" and Wells Fargo similarly found that "[g]iven his experience (Cintas, etc.), we view the [COO]

loss as a negative." Barclays pointed to "the new commentary around a lost clean room national account that wasn't a strategic exit" to explain the drop.

**Answer:** Defendants deny the allegations in Paragraph 91 of the Complaint, except admit that Vestis's stock decreased between February 6, 2024 and February 7, 2024. To the extent Paragraph 91 purports to quote from and/or characterize statements from third party analysts' reports or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

92.    Defendants' reassurances, however, prevented an even more significant decline in the stock price. Indeed, Jefferies "contend[ed] there was nothing out of today's print that calls into question our thesis that VSTS should achieve its revenue growth target," and "expect[ed] revenue growth to accelerate in the 2H24 given surgical price actions and company specific initiatives." Jefferies also believed that "Real Change Is Happening" and "the right investment and actions have been put into place and the success can be witnessed this year." J.P. Morgan commented that "the Vestis client base is healthy overall," and Wolfe Research reiterated its outperform rating given that Vestis had "limited contract renewal disruption." Wells Fargo similarly highlighted that Vestis' "[r]etention [was] stable" at 90%, and was

impressed with the Company's "deploying [T]elematics across 89% of its fleet and fully deploying new route/scheduling tech as it continues logistics optimization."

**Answer:** Defendants deny the allegations in Paragraph 92 of the Complaint. To the extent Paragraph 92 purports to quote from and/or characterize third party analysts' reports or any other publicly available document, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

F.    **The Truth Is Fully Revealed: Defendants Make A Host Of Shocking Admissions, Including Massive Customer Losses Even Before The Spinoff Due To Vestis' Inadequate Service And Systems**

93.    On the morning of May 2, 2024, Vestis shocked the market by disclosing terrible financial results for the second quarter of 2024 that were far below analysts' quarterly revenue consensus of $718 million, including revenue of $705 million—a mere 0.9% year-over-year increase—and an Adjusted EBITDA margin of just 12.4%. Given these poor results, Defendants announced that instead of anticipating 4% to 4.5% revenue growth for the year as they had consistently touted to investors, the Company would come nowhere near that amount and now expected its business to shrink, with "growth" in the range of negative 1% to 0%.

**Answer:** Defendants deny the allegations in Paragraph 93 of the Complaint. To the extent Paragraph 93 purports to quote from and/or characterize Vestis's press release on May 2, 2024 or any other publicly available documents, Defendants refer

69

the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

94.    On the ensuing earnings call, Defendants made a series of extraordinary admissions that directly contradicted their prior statements, including that: (i) despite Defendants' claims that they had implemented numerous systems to ensure Vestis provided on-time and accurate delivery of its products, Vestis did not even "<u>have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer</u>"; (ii) Defendants had not "successfully deployed" Telematics across Vestis' fleet at all, as they were only "expecting" to be able to "<u>begin</u>" using the technology at some undetermined point in the <u>future</u>; (iii) as a result, Vestis was plagued by severe "service gaps" that rendered it unable to adequately provide the most basic services expected of a uniforms services company—*i.e.*, correct and on-time deliveries— which directly led to a "large amount" of lost customers; (iv) the majority of these customer losses had occurred <u>before the Spinoff</u>, and included two major national account customers representing a significant portion of Vestis' revenue; (v) given this customer exodus, prior to the Spinoff, Vestis' customer retention rate had fallen materially <u>below</u> the 90% mark that Defendants had repeatedly boasted it was "in excess of"; (vi) given these service issues, Vestis was unable to increase pricing and had instead resorted to significant <u>discounting</u> to retain customers; and (vii)

70

Defendants had known about these service and retention issues long before the Spinoff, but concealed this highly material information throughout the Class Period.

**Answer:** Defendants deny the allegations in Paragraph 94 of the Complaint. To the extent Paragraph 94 purports to quote from and/or characterize the transcript of Vestis's May 2, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

95.     First, contrary to Defendants' statements touting that they had "fully deploy[ed] new routing and scheduling technology and processes across North America" to ensure on-time, accurate deliveries, Defendants now acknowledged on the May 2, 2024 earnings call that the exact opposite was true. Indeed, emblematic of Vestis' abject failure in this regard, Defendant Scott explicitly admitted that Vestis did not even "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Scott went on to further disclose that "we [were] not tight on our processes as it relates to disciplined loading of trucks, delivering on time, delivering full loads" and thus Vestis needed to "do a better job on being on time, being complete, being fully loaded and putting metrics around that, so that we can ensure that we're delivering consistently the expectations that our customers have for us."

71

**Answer:** Defendants deny the allegations in Paragraph 95 of the Complaint. To the extent Paragraph 95 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call, the transcript of Vestis's May 2, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

96.    Second, and directly contradicting Defendants' claim from just three months prior that Vestis had "successfully deployed new [T]elematics technology across 89% of our fleet," Defendant Scott now admitted that no such thing had ever occurred. Specifically, Scott conceded that despite Telematics being the most basic, "very normal thing that you would have in a B2B [business-to-business] route-based business" to ensure correct, on-time delivery, at the time that Scott "c[a]me into this business" two years earlier, Defendants "did not have [T]elematics in our fleet" and "we were not using [T]elematics to make sure that we are delivering to customers on time and also that we are following routing efficiencies." Remarkably, Scott made crystal clear that, despite her prior statements to the contrary and the fact that over two years had passed since she joined Vestis, Telematics was still not operational at the Company and Defendants were not in fact utilizing the technology to ensure accurate, on-time deliveries. Indeed, Scott admitted that Defendants were only "expect[ing]"—at some point in the future—to be able to "begin to use those insights

72

and that data from [T]elematics to shore this up and to make sure that we're delivering on time and that we're where we should be, when we should be":

> And so as I come into the business and evaluate how we're measuring service efficacy, I found it very odd that we did not have [T]elematics in our fleet. That's a very normal thing that you would have in a B2B route-based business. But we were not using [T]elematics to make sure that we are delivering to customers on time and also that we are following routing efficiencies. So we've put that [T]elematics in our trucks, and we expect very quickly that we'll begin to use those insights and that data from [T]elematics to shore this up and to make sure that we're delivering on time and that we're where we should be, when we should be.

**Answer:** Defendants deny the allegations in Paragraph 96 of the Complaint. To the extent Paragraph 96 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call, the transcript of Vestis's May 2, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

97.    Third, while Defendants had claimed the prior quarter that they had gone "deep and granular" to determine that Vestis' revenue shortfall and customer losses were not attributable to any service issues at the Company, Defendants now admitted the opposite: Vestis' severe "service gaps" had caused customers to leave the Company in droves. Indeed, according to Defendant Scott, the "root causes" of why "customers [are] choosing to leave Vestis" were due to "service experiences

73

related to our procedures" that were specifically "related to how we are delivering the load on time and incomplete loads." Thus, Scott was forced to concede that Vestis' poor results were not due to an external "uptick in business closures" that was beyond Defendants' control. To the contrary, Scott confirmed: "we know that more than 70% of cancellations [were] due to causes that are within our control."

**Answer:** Defendants deny the allegations in Paragraph 97 of the Complaint. To the extent Paragraph 97 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call, the transcript of Vestis's May 2, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

98.     Fourth, Defendants shocked investors by admitting that the critical customer losses that materially affected Vestis' business occurred before the Spinoff was complete. Indeed, Defendants admitted during the call that the principal reason for Vestis' poor results was a "large amount of rollover losses from FY 2023," including the loss of two large national account customers, all of which materially impacted Vestis in the current fiscal year. Significantly, Defendant Dillon expressly acknowledged that "[c]ustomer losses reduced second quarter revenues by 9% year-over-year, more than offsetting our new business growth," and that no less than two-thirds of that lost revenue, or $40.8 million, was attributable to customer losses that

74

<u>Defendants knew about, but failed to disclose to investors, at the time of the Spinoff</u>. In fact, Dillon explicitly acknowledged that 6% of the 9% in lost revenue came from what he called "<u>known customer losses as we exited fiscal 2023</u>"—*i.e.*, pre-Spinoff—"and 3% from customer losses during this fiscal year"—*i.e.*, during the Class Period. Moreover, Dillon further admitted that Vestis was still "<u>currently absorbing [the] losses incurred in FY 23</u>."

**Answer:** Defendants deny the allegations in Paragraph 98 of the Complaint. To the extent Paragraph 98 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

99.    Fifth, during the fourth quarter of 2023—*i.e.*, the last quarter before the Spinoff—Vestis' abysmal service issues had led to an enormous exodus of customers, and the Company experienced a sharp drop-off in its vaunted customer retention rate. Specifically, while Defendants had repeatedly boasted that Vestis had consistently maintained a customer retention rate "in excess of 90%," Defendants were now forced to admit that the Company's customer retention rate in Q4 2023—*i.e.*, the last quarter before the Spinoff—had fallen to only 85%, a highly material decline far below the 90% threshold and the Company's top competitors' typical retention rate of over 95%:



**Answer:** Defendants deny the allegations in Paragraph 99 of the Complaint. To the extent Paragraph 99 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

100. Sixth, while Defendants had previously assured the market that they would "take price" in the second quarter—and stated that this effort was simply to give investors extra "comfort" and was not at all important to Vestis achieving its guidance—in truth, the Company's service was so deficient that Defendants could not increase pricing at all, but had to resort to dramatic discounting in order to stem even greater customer losses. As Defendants admitted, Vestis had "deliberately moderated" pricing because "service efficacy and price sensitivity go hand-in-hand"—such that Vestis' severe "service gaps ha[d] driven price sensitivity, as fully

satisfied customers typically don't leave because they've received a price increase."
Thus, as Scott admitted, Vestis had been forced to significantly reduce pricing just to keep current customers on board, as "the need to enhance our service . . . resulted in pricing and volume erosion during the renewal process."

**Answer:** Defendants deny the allegations in Paragraph 100 of the Complaint. To the extent Paragraph 100 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

101.    Seventh, Defendants starkly admitted that throughout the Class Period, they had been fully aware of these significant issues in Vestis' business, which had been prevalent "for quite some time." Specifically, during the call, analysts were incredulous that Defendants had not disclosed these severe service and customer retention issues earlier given that Defendants Scott and Dillon had overseen the legacy AUS business at Aramark for years prior to the Spinoff. Significantly, in response, Scott admitted: "these challenges have been in our business for quite some time" and were "not related to the spin [] I'll be clear about that." Scott further made clear that these deficiencies were very well known and "ha[d] persisted in this business for some time," and that the Company was losing customers due to "very specific delivery matters related to on time delivery" and "shortages on loads."

77

Similarly, Defendant Dillon confirmed that, throughout the Class Period, Defendants were aware that these issues significantly impacted the Company's ability to retain its customers, stating that they "knew the impact coming in of the lower retention rate."

**Answer:** Defendants deny the allegations in Paragraph 101 of the Complaint. To the extent Paragraph 101 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

**G.    The Market Excoriates Defendants For Their Material Misrepresentations And "Troubling" Lack Of Credibility**

102.    In direct response to Defendants' stark admissions, Vestis' share price plummeted in half, from a closing price of $18.47 per share on May 1, 2024, to a closing price of just $9.41 per share on May 3, 2024—representing an over $1 billion decline in market capitalization on extraordinarily high trading volume.

**Answer:** Defendants deny the allegations in Paragraph 102 of the Complaint, except admit that Vestis's stock price decreased between May 1, 2024, and May 3, 2024.

103.    Analysts were utterly stunned at Defendants' revelations, excoriating management for not revealing these severe service and customer retention issues

earlier, with numerous analysts concluding that management's credibility had been crushed given their failure to disclose highly material information to the market.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 of the Complaint, which purport to characterize the reactions of third party analysts.

104. For example, Jefferies made clear that Defendants had misrepresented the true state of Vestis' business during the Class Period, specifically noting that the Company's senior management had failed to disclose highly material information to investors, as "this [was] the first time customer retention and service issues were made apparent publicly"—and that as a result, there was now "**a significant mgmt. credibility issue**" (emphasis in original):

> **More troubling, mgmt. never fully disclosed the fall off in retention on recurring revenue it started experiencing 2H23 or the true magnitude of customer losses to be expected and overcome in FY24 (we had modeled ~MSD % customer losses, not 9%+). For a newly public company, there is now a significant mgmt. credibility issue and the tone yesterday lacked a mea culpa, In our opinion.**

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104 of the Complaint. To the extent Paragraph 104 purports to quote from and/or characterize third party analysts' reports or any other publicly available documents, Defendants refer the Court to the

79

source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

105.    Jefferies further highlighted Vestis executives' "change in tone [] in the last 90 days. . . including in the short period of time an erosion in national account business and now a reversal in pricing capabilities."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105 of the Complaint. To the extent Paragraph 105 purports to quote from and/or characterize analysts' statements from analyst reports or publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

106.    Other analysts corroborated Jefferies, similarly noting that Defendants had failed to disclose the severe service and customer retention issues that were plaguing the Company. For example, Wolfe Research emphasized that they were "surprised by the sudden [guidance] cut," while particularly highlighting the fact that Vestis' "service shortfalls were not discussed during the Company's previous analyst day," and the Company had just "provided its original FY24 guidance last quarter." Baird also declared that the Company's "baseline earnings reset" involved "structural issues which take time to fix"; that Vestis' management's "credibility

80

[was] low" given the "depths of the challenges inside VSTS [that] were born out on the call"; and that Vestis had to "clear the decks and earn back credibility."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 of the Complaint. To the extent Paragraph 106 purports to quote from and/or characterize third party analysts' reports or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

107.  Analysts were also incredulous as to how Defendants could possibly have been unaware of these longstanding and severe service issues considering the fact that Defendant Scott had been hired a full two years before the Spinoff for the purpose of preparing Vestis to be successful as an independent entity. For example, Barclays noted: "[Y]ou were at the company for almost 2 years, while under Aramark. You guys presumably did all this work going through IR Day and your confidence the last 2 quarters was pretty solid as well." Thus, Barclays wondered in disbelief how there could be "this big of a revision," "in the last 90 days or 60 days or whatever," since Defendants last spoke to the market. As Wolfe Research bluntly put it: "why haven't you guys caught this before the separation?"

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107 of the Complaint. To the

81

extent Paragraph 107 purports to quote from and/or characterize analysts' statements from analyst reports or publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

108.    Moreover, multiple analysts specifically called out the fact that Defendants' admissions completely contradicted Defendants' earlier representations, including as recently as the prior quarter. For example, Goldman Sachs emphasized how "the revenue guide that you issued just a quarter ago was brought down quite a significant amount." J.P. Morgan pointed out that "[a]s you articulated, your plan had been just a couple of months ago for a targeted in-year price increase and then you pivoted to a price decrease."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 of the Complaint. To the extent Paragraph 108 purports to quote from and/or characterize analysts' statements from analyst reports or publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

**H.    Scores Of Former Employees Confirm Vestis' Longstanding Service Issues And Poor Customer Retention That Continued Throughout the Class Period**

109.    Lead Plaintiffs' investigation included interviews with 17 former employees[1] of Aramark, Vestis, or both entities. The former employees spanned every level of the Company—including former Vice Presidents, General Managers, and Account Executives—and came from multiple locations throughout the United States. The investigation also included former employees from the Company's main competitor, Cintas. These former employees uniformly confirmed that both Aramark and Vestis had longstanding, well-known problems with servicing and retaining customers due to a myriad of issues, which Defendants hid from investors.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 of the Complaint.

110.    Significantly, these high-level former employees confirmed that, both before and during the Class Period, Vestis had: (i) suffered immense customer losses prior to and throughout the Class Period; (ii) had a reputation for providing poor services, such as late and incorrect deliveries; (iii) routinely delivered poor quality products to its customers; (iv) had old, outdated cleaning facilities and plants that were unable to process the amount of items needed to be cleaned; and (v) did not respond to customer complaints about any of these issues.

---

[1] Former employees are referred to herein as "FE#" and are all referenced using masculine pronouns to maintain their confidentiality.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110 of the Complaint.

> **1.    Former Employees Confirmed That Vestis Lost Significant Customers Before the Spinoff due to Poor Service And Unsupportable Price Increases**

111.    Numerous former employees confirmed that, both prior to and after the Spinoff, customers left Vestis in droves because of the Company's abysmally sub-par service.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 of the Complaint.

112.    For example, FE 1[2], a former Vice President of Operations at AUS until 2022 who then served as a consultant for the President of AUS from 2022 until May 2023, stated that before the Spinoff in 2023, he saw internal reports on a global scale that showed Aramark was experiencing serious retention issues within the uniform business, commenting that "[customer] losses there during my time consulting certainly outweighed the gains." With access to certain retention reports for the entire country, FE 1 could clearly "see the bleeding of the customers and the type of customers and businesses that were being lost versus the businesses that the sales teams were signing up." Indeed, FE 1 recalled how a "giant" and long-term

---

[2] FE 1 was first interviewed by AlphaSense Expert Insights on December 8, 2023, and his interview was published on the AlphaSense platform on December 14, 2023. AlphaSense is a prominent, subscription-based professional market intelligence platform used principally by hedge funds, market research firms and financial institutions that provides, among other things, exclusive access to a proprietary database of one-on-one interviews with experts and former employees of publicly traded companies across various industries.

customer, Pape Material Handling, left Aramark for a competitor, Cintas, just before the Spinoff due to "repetitive failures," noting that Vestis "losing large industrial customers has continued."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112 of the Complaint.

113.  Significantly, FE 1 emphasized that these customer departures were hugely significant to Vestis' business, as customer retention levels were absolutely critical for a uniforms services company like Vestis that was dependent on a recurring revenue model. Specifically, FE 1 stated that if retention rates fell below 90%, it was considered to be a dire "DEFCON One" situation for the Company.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113 of the Complaint.

114.  Indeed, according to internal Vestis reports Lead Plaintiffs obtained during the course of their investigation, Vestis lost recurring revenue of over $147 million between August 21, 2023 and April 19, 2024, with approximately $55 million of that amount lost during the five weeks prior to the Spinoff, or nearly 8% of the Company's reported first quarter revenue of $718 million.

**Answer:** Defendants deny the allegations in Paragraph 114 of the Complaint, except to the extent that Plaintiffs purport to cite internal Vestis reports that Plaintiffs allegedly obtained during the course of their investigation, in which case Defendants

lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 of the Complaint.

115. Specifically, the Company generated internal "Weekly Install and Loss" reports that depicted how much new business was added in a particular week and the amount of business lost that same week due to customers leaving Vestis. The latest report available to Plaintiffs includes data through the week ending April 19, 2024, and shows a running tally of losses dating back to the week ending August 25, 2023—five weeks before the Spinoff. The report makes clear that the Company lost millions of dollars in recurring business every week between late August 2023 and April 2024, with an average weekly loss of $4.2 million during that time period.

**Answer:** Defendants deny the allegations in Paragraph 115 of the Complaint. To the extent Paragraph 115 purports to cite certain internal Company reports that Plaintiffs allegedly obtained, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations.

116. Moreover, the pre-Spinoff losses from late August and September 2023—*i.e.,* in Q4 2023, right before the Spinoff—were even more significant, as the Company lost recurring revenue of over $9 million per week, on average. Importantly, due to how critical customer retention was to the Company, these internal reports were circulated on a weekly basis to numerous high-level Vestis executives, including Andy Panos, the Senior Vice President of Sales at Vestis who

reported directly to Defendant Scott, and Matt Cornelius, the Company's Vice President of Sales.

**Answer:** Defendants deny the allegations in Paragraph 116 of the Complaint. To the extent Paragraph 116 purports to cite certain internal Company reports that Plaintiffs allegedly obtained, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations.

117.   FE 2, a former Account Executive at Aramark and then Vestis in Pine Bluff, Arkansas from September 2017 until April 2024, similarly recalled losing several significant customers during his tenure with Vestis, including large national accounts like Tyson's Chicken, in addition to "medium-sized" customers, like Twin River Foods, who had left Vestis in January 2024. FE 2 attributed these customer losses to the poor quality of services that Vestis was providing them, as he recalled conversations with route drivers who said they were routinely delivering rugs with holes in them and uniforms that were not cleaned.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117 of the Complaint.

118.   FE 3, who was a National Sales Trainer and Compliance Manager for Aramark and Vestis in Baton Rouge, Louisiana from October 2004 until April 2024—a unique role within the Company's corporate office—confirmed that at least two large national accounts left Vestis due to its poor service, with one being Tyson's

87

Chicken and the other being Whole Foods. Specifically, FE 3 stated that "I know that we lost a big part of Tyson because that was a big conversation every week," and AUS thus "had a lot of knowledge that there were a lot of service issues that were not being corrected [for Tyson's Chicken] at least since 2022"—adding that Regional Vice President Jim McLaughlin was let go because of Tyson's Chicken. In fact, FE 3 reported that Defendant Scott had met directly with Tyson Chicken's leadership to attempt to dissuade the large customer from leaving. When asked why large national accounts like Tyson's Chicken and Whole Foods would leave the Company, FE 3 emphasized that "[a]nytime you lose a customer in the uniform business it usually boils down to one of two things: you either lose it because someone else undercut your price or you have so many service issues that cannot be overcome."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118 of the Complaint.

119.   FE 4[3], who worked as an Account Executive for Aramark in Wixom, Michigan from February 2023 until October 2023, and as an Account Executive for Vestis in Toledo, Ohio from October 2023 until March 2024, reported that several of his customers signed up with Vestis for three-to-five-year contracts, but left after a short time, explaining that "[s]ervice was so bad that these clients left within the

---

[3] FE 4 reported to Thomas Mueller, a Sales Manager for the Company.

first 30 to 90 days. I promised these customers all of this stuff and they immediately left." FE 4 explained that several of the customers he signed up for long-term contracts left after a short time because of subpar and "trash" products. FE 4 stated that the product quality issues continued to get worse after the Spinoff because Vestis kept delivering dirty, worn, and ripped floor mats to FE 4's high-end customers, and "[i]t was very clear to us and the clients that Vestis stopped investing in new products." FE 4 stated that, as a result, Vestis had a very high customer turnover or "churn" rate, noting that "[t]he more we signed up the more we were leaving on the backend. It was tough to compete with other uniform companies that were doing a much better job."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119 of the Complaint.

120.   Additionally, despite the Company's assertion that the reason why "customers leave" is because "[w]e are seeing small to medium enterprise customers with an uptick in business closures," FE 5—a former Regional Account Executive for Aramark and then Vestis in Nashville, Tennessee and Baton Rouge, Louisiana from November 2020 until April 2024—said that was not true at all. FE 5 stated that in the 4 years he was at Aramark and Vestis, he never once had a medium enterprise customer leave because they went out of business, and instead confirmed that customers left for competitors specifically because of the poor service they received

from Vestis. In fact, FE 5 explained that his customers' uniforms were constantly misplaced, and they just received whatever was on the truck, because within his territory of Louisiana and Mississippi, the Company did not have the proper infrastructure in either state to handle the demands of both states.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120 of the Complaint.

121.   FE 6, a Facility Sales Representative for Aramark and Vestis in Toledo, Ohio from February 2023 until February 2024, similarly stated that the quality of Vestis' products resulted in the loss of significant customers. FE 6 described, for example, how Vestis delivered floor mats to customers that no longer had rubber edges to them, had holes in them, or turned black from being stained. Because of these quality issues, FE 6 highlighted that he lost a $3,000 per week customer to Cintas because Vestis kept delivering linens that had stains and holes in them.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 of the Complaint.

122.   Tellingly, FE 1 explained how CEO Scott was "absolutely" aware of the quality issues at Vestis that were causing customers to leave, stating that the "reports were very clear" and there were "not a lot of ways to hide quality and service problems" in the Company. FE 7, a former Regional Account Executive at Aramark and then Vestis from November 2019 until May 2024 in San Diego, California,

similarly confirmed that "Kim Scott and the C-Suite executives all had to see the cancellations of contracts."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122 of the Complaint.

123.   Indeed, as a result of the high customer losses, and in line with Defendants' admissions at the end of the Class Period, former employees reported that Defendants were ultimately forced to dramatically lower Vestis' prices to retain whatever customers were left. For example, FE 8, a Sales Account Executive for Aramark and then Vestis in Nashville, Tennessee from December 2019 until April 2024, and FE 2 both recalled a February 2024 town hall meeting hosted by CEO Scott, during which Scott acknowledged the poor results, stating that Vestis would now have to cut prices dramatically, as the same towels that were previously increased to $0.07-$0.08 per towel were now being sold for $0.02 per towel.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 of the Complaint.

### 2.   Former Employees Confirmed that The Service and Quality Issues Were Caused By Defendants' Lack of Investment to Upgrade Old and Outdated Cleaning Facilities

124.   Numerous former employees described how, despite Defendants' repeated public averments regarding their significant investments in Vestis' business, in reality Vestis' severe service and quality issues were due in large part

91

to the Company's utter lack of investment in and failure to upgrade old and outdated cleaning facilities that resulted in woefully sub-par products and services.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 of the Complaint.

125. Aramark had built its uniform services company through a series of acquisitions, which included acquiring huge plants to clean uniforms. Because the acquired plants were old, with some even dating back to the 1980s, FE 1 explained that Aramark had "a lot of big plants that were running a lot of product through them and were badly in need of upgrade or replacement." FE 1 added that "[i]f you have old plants and you are not willing to invest in them then you have a disaster on your hands."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125 of the Complaint.

126. FE 9,[4] a former President at Aramark Refreshment Services from January 2015 until January 2022, similarly stated that for decades, Aramark, and now Vestis, did not spend enough money on capital improvements, and now "their plants are older," and "outdated." As FE 9 put it, the Company's facilities "are just a hodgepodge of acquired plants," so "[t]here's just no efficiency." As FE 1 summed

---

[4] FE 9 was a President at Aramark Refreshment Services, responsible for overseeing full profits and losses for the refreshment line of Aramark's business. FE 9 previously held the positions of Regional Vice President and Vice President at Aramark. FE 9 reported directly to Aramark's C-suite. FE 9 was interviewed by AlphaSense Expert Insights on May 20, 2024, and his interview was published on the AlphaSense platform on May 28, 2024.

up, "there was a failure to invest in their facilities which are now a detriment to providing quality service."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126 of the Complaint.

127.   FE 10[5], a former Regional Sales VP at AUS from August 2018 until July 2022, noted that because "Aramark has not invested into their processing facilities," they "lag substantially behind on processing capabilities and new state-of-the-art equipment" compared to competitors. With older machines, FE 10 explained that "[y]ou know the quality is not going to be good. It's going to take longer to clean. The machine is going to break down often"—all of which led to service problems for the Company.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127 of the Complaint.

128.   Indeed, FE 10 confirmed that Aramark's and Vestis' outdated cleaning facilities caused uniforms to "look terrible," as they were delivered to customers "wrinkled," shrunk to the wrong sizes, and otherwise "fade out really quickly." FE 5 likewise confirmed Aramark did nothing to improve operations or invest in their

---

[5] FE 10 previously held the positions of Regional Sales Director and Sales Manager. FE 10 reported to a Regional President. As Regional Sales VP, FE 10 was responsible for sales strategy, go-to-market strategy and overseeing over 200 sales representatives and managers throughout his region. FE 10 was interviewed by AlphaSense Expert Insights on three different occasions: on September 21, 2023, with his interview published on the AlphaSense platform on October 5, 2023; on April 5, 2024, with his interview published on the AlphaSense platform on April 19, 2024; and on May 18, 2024, with his interview published on the AlphaSense platform on May 28, 2024.

infrastructure, noting that, after the Spinoff, Vestis continued to have quality control issues such as delivering towels to customers that were stained, had holes in them, and smelled of moldy food. FE 11[6], a former Direct Sales Executive for Aramark and then Vestis from December 2021 until May 2024 in New England, recalled how uniforms and floor mats were sent to Vestis' outdated facilities to be cleaned but they were returned to customers still smelling even after being washed. Tellingly, FE 2 specifically noted that "Senior Management was aware of the plant and uniform problems."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128 of the Complaint.

129.   Some of the facilities were so bad that in markets like Portland, Oregon and Memphis, Tennessee—two locations that "really desperately needed new plants"—FE 1 said it felt like "any day, the city or some government entity would come in and just put a red tag on the building and say, 'You can't operate that here anymore.'" Similarly, Vestis' cleaning facility in Tyler, Texas was the oldest facility in Texas that needed to undergo a complete overhaul, and FE 12[7], a former Regional Account Executive for Aramark and then Vestis from November 2020 until January

---

[6] FE 11 was responsible for selling Vestis products directly to businesses, such as hospitals, in the New England region. FE 11 reported to Sheri Pelish, a Regional Vice President for the Company.

[7] FE 12 also previously held the position of Facility Sales Specialist at Aramark. FE 12 reported to Samantha Hardway, a Sales Manger for the Company. FE 12 was responsible for selling uniforms, first aid items, restaurant products, and facility supplies, such as floormats, to small and mid-size companies.

2024 in the Dallas/Fort Worth region of Texas, highlighted that all his problematic products sent to customers were washed at that Tyler plant.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129 of the Complaint.

130.   Other former employees dealt with the same issues at the Company's plants throughout North America. For example, FE 4, who worked at the Company's Toledo, Ohio plant, said that his facility was at least 20 years outdated, adding that Vestis "rode that equipment until the very last bit of it worked." FE 4 stated that the Company's lack of investment in upgrading the Toledo plant led to many of the quality issues customers complained about before opting to leave Vestis. Indeed, because products coming out of the Toledo plant were stained, discolored, and damaged, FE 6 explained how he lost a $1,000 per week customer because the new bar towels they ordered were delivered by Vestis shredded and "with holes so large that you could put your fist through the hole."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130 of the Complaint.

131.   Despite these longstanding issues with their plants, Aramark, and later, Vestis, did nothing to improve upon the situation. Indeed, FE 12 stated that the main issue plaguing Vestis was these aging cleaning facilities. Yet, as FE 12 confirmed, after escalating complaints from customers about the quality of the napkins, rags,

95

and towels, Vestis never adequality fixed the plant facility issues causing these problems.

**Answer:** Defendants deny the allegations in Paragraph 131 of the Complaint. To the extent Plaintiffs purport to cite or summarize statements allegedly made by anonymous FEs, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131.

132.   In fact, according to multiple former employees, the true reason COO Synek left the Company was not because of personal reasons, but was rather due to the outdated facilities and Defendants' refusal to make the necessary investments to fix them.

**Answer:** Defendants deny the allegations in Paragraph 132 of the Complaint. To the extent Plaintiffs purport to cite statements allegedly made by anonymous FEs, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132.

133.   As FE 1 explained, COO Synek abruptly left the Company due to the amount of work that needed to be done to improve Vestis' cleaning facilities. Indeed, FE 1 believed that COO Synek felt like he was "misled" as to "commitments to quality, commitments to resources, commitments to capital," because he recalled hearing that COO Synek made comments about "housekeeping" and "facility maintenance" after he visited some of Vestis' plants.

96

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133 of the Complaint.

134.    Similarly, FE 3 noted that there was a fundamental disagreement between COO Synek and CEO Scott, commenting that Synek "was trying to make changes, and they were not being received." FE 3 stated that, both prior to and following the Spinoff, "[t]here were [] not enough investments in keeping the plants up to par, cleanliness, lighting, and even safety. There was always an issue with trying to find the money to improve the plants." FE 3, who worked with the VP of Plant Operations, James Baltzegar, on recommendations for plant investments to avoid compliance issues and fines, stated that these improvements never happened, noting that he and Baltzegar got fired because "we were pushing the whole agenda of improvement."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134 of the Complaint.

135.    Like FE 10 summed up, "Vestis' struggle is that the service is subpar. The quality of product is subpar. They haven't invested in facilities in 10+ years."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135 of the Complaint.

**3.** **Numerous Former Employees from Different Locations and Roles Within the Company all Painted the Same Picture: Both Before and During the Class Period, Vestis' Service Functions Were So Bad Its Service Was "Nonexistent"**

136. As numerous former Aramark and Vestis employees confirmed, both prior to and after the Spinoff, rather than "providing excellent service," Defendants instead had longstanding issues with providing even the most basic aspects of a uniforms services company: namely, providing on-time and correct deliveries.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136 of the Complaint.

137. For example, FE 10 stated that the "[n]umber one" issue Vestis needed to focus on to prevent losing customers was to "improv[e] the level of service," because "their service is what kills them." FE 10 explained that frustration grew among customers not wanting to receive "garments [that] look like crap," as FE 10 was eventually told by customers that—instead of receiving uniforms that were "wrinkled," "still dirty," and not "cleaned right"—they could just clean uniforms "better just doing it myself." FE 10 explained that Aramark struggled with its services, "whether it be product shortages or product quality or not having a good customer management program." FE 10 stated that customers not getting the correct items back was "one of the biggest pain points" for customers when they would

98

choose to leave Vestis, pointing out that no matter how cheap your prices are compared to competitors, customers will "leave you when you[r] service is bad."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137 of the Complaint.

138.    Similarly, FE 13[8], a former Account Executive at AUS from April 2022 until May 2023, stated that Aramark's service was sub-par because it had an insufficient number of "installers," or employees who would initially set up a customer's account and order the uniforms, causing unwarranted delays in service and resulting in AUS losing business. As FE 13 stated: "[t]he number [of installers] that we had wasn't enough to cover the amount of business that we were bringing in," and as a result there were "delays on getting people's product in"—"then you're telling a customer or an account that it's going to be done by this day, but we're not able to get it done in an adequate time frame, then they just move on to the next provider." FE 13 stated that, as a result of these service issues, Vestis had a "bad reputation" in the industry as having poor services and things not running "smoothly."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138 of the Complaint.

---

[8] As an Account Executive, FE 13 responsible for managing accounts, cold calling, presentations, contract negotiations, and acquisitions. FE 13 was interviewed by AlphaSense Expert Insights on February 23, 2024, and his interview was published on the AlphaSense platform on February 28, 2024.

139.   FE , who 14 worked as a Facility Sales Specialist for Aramark and then as an Account Executive for Vestis from December 2021 until July 2024 in Springfield, Illinois, described how the Company's severe service issues led to customer departures. FE 14 explained that Vestis experienced service issues with soiled products and not having enough inventory, stating that "[w]e couldn't get product, and we were constantly shorting our customers." For example, FE 14 stated that it was like "pulling teeth" to get an extra bag of microfiber towels to be used as samples. FE 14 confirmed that the Company lost customers as a result: "[O]nce [a customer] relationship was tarnished, those customers were gone and that spreads like wildfire with your customers."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139 of the Complaint.

140.   FE 12 also stated that his customers' products were routinely getting lost after they were picked up for servicing. For example, FE 12's customers would have ten pants and ten shirts ready to be picked up and cleaned, but when returned by Vestis, the customers would get a mismatched amount of seven pants and nine shirts.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140 of the Complaint.

141. FE 12 explained that while Vestis used barcodes for tracking their products, the barcodes were unreadable due to the very low quality of the uniforms. FE 10 similarly stated that, while barcodes were put on items, there "was no scanning going on." As a result, FE 10's customers would get frustrated with Vestis' lack of "inventory management," when every week they "turn[ed] in five shirts and five pants" and received "back three shirts, two pants, four shirts, [and] one pant." This was corroborated by FE 1, a former Vice President of Operations for AUS who worked at AUS from December 2006 until 2022, and then served as a consultant for Aramark's President of AUS, Art Wake, from 2022 to May 2023. FE 1 stated that the Company did not enforce that any of its employees actually scanned the barcodes on items in the plants, noting that "in many parts of the country, they just view scanning as an optional sort of event that they can choose not to do."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141 of the Complaint.

142. Aside from the poor services, customers were also unhappy with the Company's low-quality offerings that quickly deteriorated and became unusable. FE 15[9], a former Service Account Manager at Cintas from August 2016 until January 2022, explained that Aramark's uniforms were lower quality compared to Cintas, as

---

[9] FE 15 reported to a Manager at Cintas. As a Service Account Manager, FE 15 was responsible for contract negotiations, customer satisfaction, revenue management, and employee operations. FE 15 was interviewed by AlphaSense Expert Insights on October 11, 2023, and his interview was published on the AlphaSense platform on October 16, 2023.

customers commonly complained that they were itchy or used materials that were not fit to wear in a hot industrial factory. FE 15 heard from customers that the uniforms Aramark manufactured were "uncomfortable," "weren't fitted," "oversize[d]," and "didn't offer a women's line." FE 11 similarly recalled that the Company "didn't spend any money to upgrade anything," and as a result, "[t]he uniforms were ragged." As FE 11 recalled, Cintas was very good at stealing Vestis' business because "[w]e had a very antiquated system, and we sold inferior products."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142 of the Complaint.

143.   Numerous other former employees also specifically confirmed that the same service and quality issues that were prevalent at Aramark continued through the Spinoff at Vestis. For example, FE 8 noted that following the Spinoff, "only the rugs at the front door and the name on the building changed," but the quality of the service at Vestis "still sucked." FE 8 recalled that clients came to him complaining about the quality of the uniforms and other items delivered from Vestis, most commonly that "linen was disgusting and dirty, uniform names were falling off, there were stains in the pants, and the towels smelled like fish." Importantly, FE 8 stated if Vestis were to not deliver what the customer expected on the first delivery, the customer was able to break its contract with the Company and move on to a competitor.

**Answer:** Defendants deny the allegations in the first sentence of Paragraph 143 of the Complaint and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 143 of the Complaint.

144.   FE 2 similarly explained how there was little change between Aramark and Vestis following the Spinoff, noting that the quality of service was already deteriorating under Aramark around December 2022, and rather than improve, it in fact got significantly worse for Vestis after the Spinoff.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144 of the Complaint.

145.   FE 4 stated that the main complaint he received from his customers was that Vestis was not switching out older floor mats with new ones, *i.e.*, what the customers expected and had paid for, and instead customers received mats that were dirty and worn out. While these issues existed under Aramark, FE 4 confirmed that they continued at Vestis and in fact got worse because Vestis stopped investing in new materials.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145 of the Complaint.

146.   FE 1 stated that Aramark had a grading system that was used to monitor product quality, noting that towels with holes in them should be thrown out and not sent to the customer. After the Spinoff, however, FE 1 stated that the quality issues

103

actually worsened at Vestis rather than improving, concluding that the Company either changed its product grading standards or was trying to extend the useful life of its products to improve short term profits. FE 2 similarly described how the quality of the Vestis' uniform product was poor, old, and that even as of April 2024, "85% of the rugs we were delivering still had the Aramark logo on it."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 of the Complaint.

147.   FE 12 also stated that while Aramark had quality issues with certain products, such as napkins, rags, and towels, these issues continued at Vestis after the Spinoff, as customers continued to complain about the same issues they dealt with at Aramark. FE 12 recalled losing several customers to Cintas because of these quality issues, including a new account that FE 12 had just signed up with Vestis who complained that their first shipment of rags was delivered with holes in them. Calling it a "bad situation," FE 12 explained that he "could see that it was not going to get any better," noting that he left the Company because "it was very embarrassing to deliver such poor-quality products." Tellingly, even after he left Vestis, FE 12 still received text messages from several customers complaining about quality issues that had still not been fixed.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147 of the Complaint.

148.    Similarly, FE 16,[10] an Account Executive for Aramark and then Vestis in Mississippi from September 2022 until July 2024, stated that he lost many of his customers before and after the Spinoff due to significant issues with the linens and uniforms they received. For example, FE 16 explained how the Company constantly misplaced aprons and towels or returned items to the customer with holes in them and dirty. Uniforms were also routinely misplaced, as FE 16's customers would not receive the right number of uniforms back.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 148 of the Complaint.

149.    As for new customers who ordered uniforms, FE 16 said that instead of the 4-to-6-week timeline given for initial delivery, customers typically had an "outrageous" wait time of more than 5 months. By the time he left Vestis in July 2024, one of FE 16's national accounts, Fairbanks Scales, had been waiting for over four months for their uniforms and still did not receive them. Not surprisingly, Fairbanks Scales was frustrated with Vestis, and questioned FE 16 about the delay. Likewise, many of FE 16's customers who wanted their floor mats changed every week complained that they had to wait up to four weeks to receive a new floor mat. As an Account Executive dealing with customers directly, FE 16 was

---

[10] FE 16 reported to Jay Naron, a Regional Account Executive for the Company who reported directly to Regional Manager, Brian Morgan. FE 16 was responsible for selling and servicing accounts within his territory in Mississippi.

"embarrass[ed]" because he "sold to these accounts and the Company could not service them right."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 149 of the Complaint.

150.   Along the same lines, FE 17,[11] who worked as an Account Executive at Aramark and then Vestis from March 2023 until April 2024 in Maryland, stated that Vestis' service was so bad that it was "selling a nonexistent service," adding that the Company's Account Executives "were expected to sell 'air' because we knew for a fact that it was not going to happen, and it was a complete misrepresentation of the facts." FE 17 explained that "it was a game of getting customers locked into a five-year contract where the account is barely set up and once set up, they receive[d] zero service."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 150 of the Complaint.

### 4.     Despite Increasing Customer Complaints, Former Employees Confirmed that Vestis Instructed Sales Representatives to Ignore Customers

151.   As numerous former employees described, Vestis not only provided poor service, it maintained bad customer relationships. Indeed, when customers started to complain about quality of products and services they received from

---

[11] FE 17 reported to James Crowder, a Sales Manager for the Company. FE 17 was responsible for calling businesses within Maryland to offer them uniform services.

Aramark, and later Vestis, both FE 4 and FE 6 stated that they were told not to take the customer's calls. FE 4 was specifically told by "management" to "gloss" over customer complaints and was even instructed to block their customers from calling, explaining that his "job was to go out there, sign them up, promise them everything and then don't talk to them anymore." And FE 6 noted that while he was told the Territory Managers and Delivery Managers were supposedly handling these customer complaints, they were never addressed, resulting in a high customer turnover rate for the Company.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 151 of the Complaint.

152. Furthermore, FE 14 stated that Vestis had issues with billing new customers, noting that if the customers did not pay within the first 30 days of initial service, that account would be dropped. FE 14 confirmed that the Company "had brand new customers being dropped because of our billing issues."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 152 of the Complaint.

153. FE 5, FE 8, and FE 12 all recalled receiving many customer complaints that their bills received were wrong or even higher than the agreed upon service fees. FE 8 clearly saw "fees that had been tacked on to the client's bill" when examining differences between the contracts negotiated and the bills received by his customers.

However, when FE 8 told his supervisor, Alex Karpin, that "adding these unexpected fees" would adversely affect future sales, FE 8 was directed to tell his customers call a 1-800 number, which FE 8 said was just a "run around" for the clients. FE 7 similarly described a "run around" for customer service issues, explaining how the customers would call the route drivers, the service representatives, the district managers and finally the customer service helpline—all without receiving a response. Notably, FE 7 emphasized that the Company "wore people down and ignored their calls. It wasn't until they threatened to cancel their contracts or stopped paying that we would answer them and try to address their service issue."

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153 of the Complaint.

154. Consequently, FE 12 said that customers always complained about their invoices being wrong or that they were being overcharged. FE 5 added that account executives were also trained to "not explain the contract with the customers" unless they asked.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154 of the Complaint.

155. Furthermore, because most of the Company's customers were signed to five-year contracts, there was a culture at Vestis that the Company could get away with ignoring the increasing number of customer complaints. For example, FE 5

108

recalled a conversation with a head customer service representative at Vestis who was laughing about the number of complaints they received from Cracker Barrel, a national account for Vestis, adding that because Cracker Barrel had 2 years left on their contract, because the Company "know[s] Cracker Barrel, and other national accounts are stuck with them." As FE 11 explained, it was thought to be essentially impossible for a customer to get out of their contracts even if Vestis did not meet their standards, leaving customers feeling like they "were locked in a bad deal and that left a bad taste in their mouth." FE 5 stated that Vestis went so far as to misrepresent its retention rate to other customers in an effort to hook new business and cover up the Company's poor customer service, noting that he was instructed to tell potential customers the retention rate at Vestis was 95%, while in his territory of Louisiana and Mississippi, the retention rate was much, much lower, only between 10% to 15%.

**Answer:** Defendants deny the allegations in Paragraph 155 of the Complaint. To the extent Plaintiffs purport to cite statements made by anonymous FEs, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

156. During the Class Period, Defendants made materially false and misleading statements and omitted material facts, in violation of Sections 10(b) and

20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning Vestis' financial and operational condition, which included, among other misrepresentations, statements concerning the Company's customer service and product quality, implementation of new initiatives and investments, technological, operational and logistical processes, and customer retention.

**Answer:** Paragraph 156 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 156.

157. As discussed above and further below, Defendants' representations were materially false and misleading when made, and omitted material facts either required to be disclosed or necessary to make the statements not misleading. These material misstatements and omissions had the effect of creating an unrealistically positive assessment of Vestis' business and operational status. In truth, Defendants had falsely presented to investors a materially misleading portrayal of the Company.

**Answer:** Paragraph 157 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 157.

110

### A.     August 15, 2023 Registration Statement and September 11, 2023 Information Statement

158.   To complete the Spinoff, on August 15, 2023, Defendants participated in the preparation and filing of the Form 10 with the SEC, which registered Vestis' shares.[12] On or about September 8, 2023, the Registration Statement was declared effective by the SEC. The Registration Statement included a preliminary information statement and provided information regarding Vestis' business and management. On or about September 11, 2023, Defendants caused the Company to file the final information statement (the "Information Statement") with the SEC on Form 8-K, which was signed by Defendants Zillmer and Scott endorsing its contents.

**Answer:** Defendants deny the allegations in Paragraph 158 of the Complaint, except admit that: (i) Vestis filed its Form 10 with the SEC on August 15, 2023, which was declared effective on or about September 8, 2023; and (ii) Vestis filed its final Information Statement with the SEC on or about September 11, 2023. Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

159.   In the Information Statement, Defendants made a series of specific, positive statements touting Vestis' ability to provide customers with products and services on a timely basis—an ability which was so profound that it gave Vestis a

---

[12] Defendants filed with the SEC a registration statement on Form 10 on August 15, 2023, and Amendment No. 1 on September 6, 2023. Defendants' "Registration Statement" refers to the registration statement on Form 10 on August 15, 2023, as amended.

"competitive advantage" in the marketplace and ensured remarkably high customer retention rates. Indeed, Defendants specifically touted that Vestis enjoyed a "significant competitive advantage[]" because of its "long-tenured customer relationships." Further, the Information Statement emphasized that Vestis "maintain[ed] long-term relationships with our customers due to the quality of our services and products" and the Company's "ability to deliver on-time."

**Answer:** Defendants deny the allegations in Paragraph 159 of the Complaint. To the extent Paragraph 159 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

160. The statements in paragraph 159 were materially false and misleading and omitted material facts when made. Contrary to Defendants' statements touting the quality of Vestis' services and products and the Company's "ability to deliver on-time," the exact opposite was true. As Defendants were ultimately forced to admit, throughout the Class Period, Vestis was plagued by severe "service gaps" in which the Company was widely unable to achieve "on-time delivery" and routinely delivered inaccurate and "incomplete loads" to its customers. Indeed, these issues were so profound and intractable that, in Defendant Scott's own words, the Company

112

had no "process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Underscoring this failure, Defendants admitted that, during the Class Period, Vestis did not utilize even the most basic tools a B2B uniforms service business would use—including Telematics, which Scott described as a "very normal thing that you would have in a B2B route-based business." Even though Telematics was absolutely essential to ensuring that the Company could deliver its products and services on-time and accurately, Scott admitted at the end of the Class Period that Vestis was not utilizing Telematics during the Class Period to ensure accurate, on-time deliveries, and that it was only at some undetermined point in the future that the Company would "begin to use those insights and that data from Telematics to shore this up and to make sure that we're delivering on time and that we're where we should be, when we should be."

**Answer:** Defendants deny the allegations in Paragraph 160 of the Complaint.

161.   The Information Statement also represented that, as a result of Vestis' consistent on-time delivery and high-quality services and products, the Company maintained a remarkably high "customer retention rate [] in excess of 90%." Defendants also touted the Company's customer retention under the Information Statement's heading "High-Quality Revenue Growth," where they stated that Vestis "serv[ed] an attractive, large and long-tenured customer base" and that the Company

113

remained "<u>focused on retaining these customers . . . by ensuring we are delivering . . . new or updated services and products</u>."

**Answer:** Defendants deny the allegations in Paragraph 161 of the Complaint. To the extent Paragraph 161 purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

162. The statements in paragraph 161 were materially false and misleading and omitted material facts when made. Contrary to Defendants' statements touting the Company's "long-tenured customer relationships" and its customer retention rate "in excess of 90%," in reality, and unbeknownst to investors, the Company was losing customers in droves even prior to the Spinoff. Indeed, as Defendants admitted at the end of the Class Period, and as the FEs confirmed, in the months leading up to the Spinoff, Vestis was "bleeding" customers, including "<u>two large national accounts</u>," which directly caused the Company's customer retention rate to drop well below the "in excess of 90%" rate that Defendants publicly touted—all the way to <u>85%</u>. As the FEs confirmed, this represented a highly material decline of which Defendants were well aware, as a retention rate below 90% in the uniforms services business—which was heavily reliant on high customer retention, with top

competitors consistently boasting a retention rate of over 95%—represented a "DEFCON One" situation for the Company.

**Answer:** Defendants deny the allegations in Paragraph 162 of the Complaint. To the extent Paragraph 162 purports to quote from and/or characterize  Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them. To the extent Plaintiffs purport to cite statements made by anonymous FEs, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162. To the extent Paragraph 162 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 162 of the Complaint.

163.    The Information Statement also touted the Company's "new [T]elematics technology" that "increase[ed] route efficiency": "We seek to increase route efficiency with technology and processes that reduce travel time, distance and fuel consumption. For example, our new [T]elematics technology allows us to proactively reduce fuel usage by limiting idling through real-time, in-cab driver alerts."

**Answer:** Defendants deny the allegations in Paragraph 163 of the Complaint. To the extent Paragraph 163 purports to quote from and/or characterize Vestis's final

Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

164. The statements in paragraph 163 were materially false and misleading and omitted material facts when made. As Defendant Scott admitted at the end of the Class Period, rather than having implemented "new Telematics technology" that "increased route efficiency," in reality, Defendants "were not using Telematics to make sure that we are delivering to customers on time and also that we are following routing efficiencies." Scott admitted that Vestis was not using Telematics technology during the Class Period despite the fact that Telematics was "a very normal thing that you would have in a B2B route-based business" and was absolutely critical to providing on-time, accurate uniforms services. Indeed, even at the end of the Class Period, Scott admitted that the Company had only "rolled out Telematics across our fleet now," and that Telematics had only "now been installed in the trucks," such that no benefits from Telematics could even be realized until 2025. Thus, as Scott was forced to concede, Defendants were only "expecting" to be able to "begin" using Telematics at some undisclosed point in the future: "we expect very quickly that we'll begin to use those insights and that data from Telematics to shore

116

this up and to make sure that we're delivering on time and that we're where we should be, when we should be."

**Answer:** Defendants deny the allegations in Paragraph 164 of the Complaint.

165. Further, the Information Statement included purported "**RISK FACTORS**" under "**Operational Risks**" that discussed hypothetical future risks regarding the Company's customer retention:

> Vestis' failure to retain its current customers, renew its existing customer contracts on comparable terms and obtain new customer contracts could adversely affect Vestis' business, financial condition or results of operations.
>
> . . .
>
> The failure to renew a significant number of Vestis' existing contracts, including on the same or more favorable terms, would have a material adverse effect on Vestis' business, financial condition or results of operations, and the failure to obtain new business could have an adverse impact on Vestis' growth and financial results.

**Answer:** To the extent Paragraph 165 of the Complaint purports to quote from and/or characterize Vestis's final Information Statement filed on September 11, 2023 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

166. The above purported "risk factor" was materially false and misleading and omitted material facts when made. As Defendants admitted at the end of the

117

Class Period, the risk to Vestis' business concerning the Company's failure to retain current customers, renew existing customer contracts on comparable terms, and to obtain new customers had already materialized. Indeed, Defendants admitted that because of Vestis' longstanding operational deficiencies and the Company's inability to accurately and timely deliver its products and services, Vestis had lost a "large amount" of customer revenue in fiscal year 2023—*i.e.*, prior to the Spinoff—including "two large national accounts" that represented a significant portion of the Company's revenue. Moreover, Defendants admitted that they knew full well about these "large" customer losses during the Class Period—they expressly admitted that these were "known customer losses as we exited fiscal 2023." Furthermore, as Defendants revealed at the end of the Class Period, because of these customer losses, the Company's customer retention rate dropped sharply in the quarter before the Spinoff all the way to 85%—a highly material decline that stood in stark contrast to the Company's competitors, who regularly boasted customer retention rates as high as 95%.

**Answer:** Defendants deny the allegations in Paragraph 166 of the Complaint.

**B.      September 13, 2023 Statements Regarding Analyst/Investor Day**

167.   On September 13, 2023, two days after the Information Statement was filed, Defendants held an "Analyst/Investor Day" where Vestis was formally 'unveiled' to the public. Defendants Scott and Dillon presented a slide presentation

and held a conference call. On the slide presentation, Defendants stated that the Company's "single highest value growth lever is retention, which we achieve through service excellence," and touted the Company's "[s]ticky [c]ustomer [b]ase" with "[h]igh tenure[d]" customers, including a "national account tenure of ~26 years." During the accompanying conference call, Scott yet again emphasized the Company's excellent customer retention, and especially pointed to the Company's large national accounts as proof of this, stating: "our national account customers are with us for 26 years.     So these are very loyal customers, we have very strong relationships, and we are seen as great partners." Scott further stated that "our team is very focused on doing exactly what we say we're going to do, deliver on the promise, show up on time every week, deliver the products and services that you promise to your customers and do that with consistency and excellence."

**Answer:** Defendants deny the allegations in Paragraph 167 of the Complaint, except admit that Vestis held an Analyst Day on September 13, 2023. To the extent Paragraph 167 purports to quote from and/or characterize materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

168.   The statements in paragraph 167 were materially false and misleading and omitted material facts when made. First, Defendants' statements touting the

119

Company's "service excellence" and its ability to deliver its products and services "on time every week," with "consistency and excellence," were materially false because Vestis was unable to timely and accurately deliver its products and services to customers during the Class Period. Indeed, as Defendant Scott admitted at the end of the Class Period, Vestis had no "process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Demonstrating the Company's abject failure in this regard is the fact that, during the Class Period, Vestis did not utilize even the most basic tools a B2B uniforms service business would use—including Telematics, which Scott described as a "very normal thing that you would have in a B2B route-based business." Even though Telematics was critical to ensuring that Vestis could deliver its products and services on-time and accurately, Scott admitted at the end of the Class Period that Vestis was not utilizing Telematics during the Class Period to ensure accurate, on-time deliveries, and that it was only at some undetermined point in the future that the Company would "begin to use those insights and that data from Telematics to shore this up and to make sure that we're delivering on time and that we're where we should be, when we should be."

**Answer:** Defendants deny the allegations in Paragraph 168 of the Complaint.

169. Second, Defendants' statements touting the Company's customer retention, and its purportedly "very loyal" and "sticky customer base," including its

120

long-tenured national account customers, were also materially false and misleading. Indeed, as Defendants admitted at the end of the Class Period, and as the FEs independently confirmed, by this point, the Company was "bleeding" customers because of these severe "service gaps." In fact, Defendants admitted that Vestis had lost a "large amount" of customer revenue in fiscal year 2023—*i.e.*, prior to the Spinoff—including from "two large national account customers" that represented a significant portion of the Company's revenue. Moreover, Defendants admitted that they knew full well about these "large" customer losses during the Class Period— they expressly admitted that these were "known customer losses as we exited fiscal 2023."

**Answer:** Defendants deny the allegations in Paragraph 169 of the Complaint. To the extent Paragraph 169 purports to quote from and/or characterize Defendants' statements from publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them. To the extent Plaintiffs purport to cite statements allegedly made by anonymous FEs, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 169.

170. Furthermore, internal Vestis reports confirmed, at the same time that Defendants were making these representations, the Company was in the midst of a

mass exodus of customers, with a staggering $55 million in recurring weekly revenue lost in the five weeks prior to the Spinoff. As a result, Vestis' much-touted customer retention rate was not "in excess of 90%," as Defendants had repeatedly boasted, but had dropped to 85%. As the FEs confirmed, this represented a highly material decline of which Defendants were well aware, as a retention rate below 90% in the uniforms services business—which was heavily reliant on high customer retention, with top competitors consistently boasting a retention rate of over 95%—represented a "DEFCON One" situation for Vestis.

**Answer:** Defendants deny the allegations in Paragraph 170 of the Complaint. To the extent Plaintiffs purport to cite statements allegedly made by anonymous FEs, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 170.

171. Significantly, also on Analyst Day, Defendants emphatically touted the Company's operating systems and technological advancements, which supposedly ensured that the Company could provide on-time, accurate deliveries to its customers. Indeed, Defendants emphasized the "implementation of ABS," Vestis' new operating system that it "launched across [Vestis'] entire network," and stated that this system "allowed us to [] put a handheld in the hand of every route service representative who's in a customer location . . . so we've given them digital tools in their hands so that they can interact more seamlessly and more efficiently with the

customer." Defendant Scott further stated that the Company had "digitize[ed] the experience" for its RSRs (drivers), sales team, and customers, and that customers had purportedly given "incredibly positive feedback" about these technological improvements, as the resulting "data analytics" allowed employees to "really trend customer behaviors and understand what's happening with that customer so that we can provide excellent service to them."

**Answer:** Defendants deny the allegations in Paragraph 171 of the Complaint. To the extent Paragraph 171 purports to quote from and/or characterize materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

172.    The statements in paragraph 171 were materially false and misleading and omitted material facts when made. Contrary to Defendants' statements touting the Company's purported technological advancements and "excellent service," its ability to "interact more seamlessly and more efficiently with the customer," and the "incredibly positive feedback" Defendants had supposedly received from customers, the exact opposite was true. As Defendants admitted at the end of the Class Period, Vestis was unable to timely and accurately deliver its products and services to customers. In Defendant Scott's own words, Vestis had no "process to verify that

123

the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." In fact, Vestis did not utilize even the most basic tools a B2B uniforms service business would use—including Telematics—which Scott described as a "very normal thing that you would have in a B2B route-based business" and was critical to ensuring that Vestis could deliver its products and services on-time and accurately. As Scott admitted at the end of the Class Period, Vestis was not utilizing Telematics during the Class Period to ensure accurate, on-time deliveries, and that it was only at some undetermined point in the future that the Company would "begin to use those insights and that data from Telematics to shore this up and to make sure that we're delivering on time and that we're where we should be, when we should be."

**Answer:** Defendants deny the allegations in Paragraph 172 of the Complaint.

173.    Later on the Company's Analyst Day conference call, an analyst asked about "what you talked about a little bit in terms of purposeful growth and sometimes stepping back a little bit because if you go through the [Form 10-K] financials you see like the workplace supplies had very good growth, but the uniforms were kind of—were basically flat revenue year-over-year. Can you talk about the dynamics that were behind that and why we didn't see Uniforms growth?" In response, Scott claimed that while the Company had lost some customers, these losses were "very intentional" and strategic, and therefore "non-regrettable." As Scott stated: "And

124

then you have, quite frankly, non-regrettable losses around some accounts that just didn't make sense for our portfolio. So you've got a couple of accounts that have left the portfolio as well that are depressing that uniforms number . . . So while you may see that as a depressed number or a flat number, it's very intentional."

**Answer:** Defendants deny the allegations in Paragraph 173 of the Complaint. To the extent Paragraph 173 purports to quote from and/or characterize materials from Vestis's September 13, 2023 Analyst Day or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

174. The statements in paragraph 173 were materially false and misleading and omitted material facts when made. As Defendants admitted at the end of the Class Period, Vestis' severe "service gaps" resulted in the Company having lost "a large amount" of customers even prior to the Spinoff in 2023, including the loss of "two large national account customers" in the months leading up to the Spinoff. Moreover, Defendants made clear that they knew full well about these customer losses—they expressly referred to them as "known customer losses as we exited fiscal 2023"—and that they resulted in a "large amount of rollover losses from FY '23" that the Company was still absorbing. Rather than these customer losses being in any way "intentional," as Defendants later admitted, "more than 70% of

125

cancellations [were] due to causes that [were] within our control"—namely, Vestis' failure to provide on-time delivery and complete, accurate uniform loads.

**Answer:** Defendants deny the allegations in Paragraph 174 of the Complaint.

**C.     November 29, 2023 Statements Regarding 2024 First Quarter Results**

175.   On November 29, 2023, Defendants caused the Company to issue a press release announcing financial results for the first quarter and full year ended September 30, 2023. That same day, Vestis held a conference call with analysts and investors to discuss the Company's results. During the call, an analyst noted the Company's continued muted growth performance in its uniforms business and queried: "As you execute your strategy that you outlined at the Analyst Day [ ] should we expect to see the uniforms business maybe accelerate a bit versus what we saw in fiscal 2023? Clearly, we're making really nice progress on the workplace supplies, but in uniforms [growth is] lighter." In response, Defendant Scott again claimed that Vestis' Uniforms business growth was not due to any underlying problems in the Company's business, but rather was "very purposeful": "We are just purposely at times exiting some business[es] . . . So I would expect you should see a muted uniforms growth rate again in FY '24, but that is a very purposeful decision to grow very strategically . . . and exiting some underperforming businesses."

**Answer:** Defendants deny the allegations in Paragraph 175 of the Complaint, except admit that: (i) Vestis issued a press release on November 29, 2023,

126

announcing financial results as of September 29, 2023; and (ii) Vestis held an earnings call on November 29, 2023 with analysts and investors to discuss the Company's results. To the extent Paragraph 175 purports to quote from and/or characterize the transcript of Vestis's November 29, 2023 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

176.   This exchange prompted another analyst to ask about the Company's customer retention. In response, Defendant Scott again touted, as Defendants had done in their Information Statement and at Analyst Day, the Company's "amazing customer experience," "above 90%" "retention rates," and the "service excellence culture across the [C]ompany." As Scott stated: "We are seeing really, really great feedback from our customers around these initiatives. And so we feel very, very good about the establishment of a service excellence culture across the company. We also continue to deliver retention rates that are above 90% as we stated in our Form 10." Scott also again highlighted the long tenure of Vestis' national accounts in particular, stating that "those [national accounts], as you know, stay more than 20 years with us. So they're very valuable customers and the lifetime value is great."

**Answer:** Defendants deny the allegations in Paragraph 176 of the Complaint. To the extent Paragraph 176 purports to quote from and/or characterize the transcript

127

of Vestis's November 29, 2023 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

177.  The statements in paragraphs 175 and 176 were materially false and misleading and omitted material facts when made. First, Defendants' statements touting the Company's purported "service excellence" and its ability to deliver an "amazing customer experience" were materially false and misleading because Vestis was unable to timely and accurately deliver its products and services to customers during the Class Period. Indeed, as Defendant Scott admitted at the end of the Class Period, Vestis had no "process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Emblematic of the Company's service failures was the fact that, during the Class Period, Vestis did not utilize even the most basic tools a B2B uniforms service business would use—including Telematics—which Scott admitted was a "very normal thing that you would have in a B2B route-based business." Even though Telematics was critical to ensuring that Vestis could deliver its products and services on-time and accurately, Scott admitted at the end of the Class Period that Vestis was not utilizing Telematics during the Class Period to ensure accurate, on-time deliveries, and that it was only at some undetermined point in the future that

128

the Company would "begin to use those insights and that data from Telematics to shore this up and to make sure that we're delivering on time and that we're where we should be, when we should be."

**Answer:** Defendants deny the allegations in Paragraph 177 of the Complaint.

178.   Second, Defendants' statements touting the Company's purportedly "strategic" and "very purposeful" exiting of underperforming businesses; Vestis' "retention rates that are above 90% as we stated in our Form 10"; and the strength of the Company's national accounts, were also materially false and misleading. As Defendants admitted at the end of the Class Period, Vestis' customer losses were not "strategic" or "purposeful" at all, but were instead the result of severe "service gaps" that caused the Company to lose customers in droves in 2023, including the loss of "two large national accounts" in the months leading up to the Spinoff. Furthermore, Defendants later admitted that "more than 70% of cancellations [were] due to causes that [were] within our control"—namely, Vestis' utter failure to provide on-time delivery and complete, accurate uniform loads.

**Answer:** Defendants deny the allegations in Paragraph 178 of the Complaint.

179.   Moreover, as internal Vestis reports confirmed, at the same time that Defendants were making positive representations concerning the Company's customer retention, Vestis was in the midst of a mass exodus of customers, with a staggering $55 million in recurring weekly revenue lost in the five weeks prior to

129

the Spinoff. Moreover, Defendants made clear that they knew full well about these customer losses—they expressly referred to them as "known customer losses as we exited fiscal 2023"—and as a result, Vestis experienced a "large amount of rollover losses from FY '23," which it was still absorbing. Thus, Vestis' customer retention rate was not "in excess of 90%," as Defendants had boasted, but had dropped to 85% even before the Spinoff was completed.

**Answer:** Defendants deny the allegations in Paragraph 179 of the Complaint. To the extent Paragraph 179 purports to cite certain internal Company reports that Plaintiffs allegedly obtained, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations. To the extent Paragraph 179 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

### D.    Statements in Form 10-K Filed on December 21, 2023

180.   On December 21, 2023, Vestis filed its annual report on Form 10-K ("2023 10-K"), which was signed by Scott and Dillon, endorsing its contents. The 2023 10-K repeated statements from the Information Statement regarding the Company's customer retention set forth in ¶159, which were materially false and misleading for the same reasons alleged in ¶160.

**Answer:** Defendants deny the allegations in Paragraph 180 of the Complaint, except admit that Vestis filed a Form 10-K with the SEC, on December 21, 2023.

181. The 2023 10-K also repeated statements from the Information Statement regarding Vestis' "new [T]elematics technology" set forth in ¶163, which were materially false and misleading for the same reasons alleged in ¶164.

**Answer:** Defendants deny the allegations in Paragraph 181 of the Complaint.

182. Additionally, the 2023 10-K repeated the same "Risk Factors" as the Information Statement as to customer retention set forth in ¶165, listed as "Operational Risk[]," which where materially false and misleading for the same reasons alleged in ¶166.

**Answer:** Defendants deny the allegations in Paragraph 182 of the Complaint.

**E.    February 7, 2024 Statements Regarding Second Quarter 2024 Results**

183. On February 7, 2024, Defendants caused the Company to issue a press release announcing financial results for the second quarter ended December 21, 2023, along with full-year 2024 guidance. The press release included a statement by Scott that "our high-quality growth strategy is effective" and "I remain confident in our ability to deliver on our full year financial outlook."

**Answer:** Defendants deny the allegations in Paragraph 183 of the Complaint, except admit that Vestis issued a press release, on February 7, 2024, announcing financial results as of December 29, 2023. To the extent Paragraph 183 purports to

quote from and/or characterize Vestis's press release on February 7, 2024 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

184.    Also on February 7, 2024, Vestis held a conference call with analysts and investors to discuss the Company's financial results for the second quarter ended December 21, 2023, along with full-year 2024 guidance. On the conference call, Defendants stated "[a]s we move through the balance of the year, we expect acceleration in our growth rates." Scott further stated that "[w]e are also seeing opportunity for additional pricing actions in the back half of the year. As a result, I remain confident in our ability to deliver our full year guidance of 4% to 4.5% revenue growth and adjusted EBITDA margin of 14.3%."

**Answer:** Defendants deny the allegations in Paragraph 184 of the Complaint, except admit that Vestis held a conference call with analysts on February 7, 2024. To the extent Paragraph 184 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

185.    Later on during the earnings call, Scott confirmed that the Company would "take price," stating: "So we do see the opportunity to take some incremental

132

pricing in the back half of the year. We've been very thoughtful and I would say, somewhat moderated about pricing." Scott further stated, "we will be taking price" with the Company's customers and that Defendants would be doing so "in a very surgical way with a lot of analysis around which customers will be impacted and what the current relationship and state and condition of the relationship is with that customer." Scott also stated that "we're also seeing really good progress with our frontline account executives, driving revenue per head."

**Answer:** Defendants deny the allegations in Paragraph 185 of the Complaint. To the extent Paragraph 185 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call, or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

186.    Then, an analyst asked Scott whether the Company's ability to take price should give investors "comfort" that the Company would achieve its 2024 guidance: "Now it sounds like you do have some opportunistic areas to take price, which I think you explained, is very clear and exciting. So does this more so give us – when we think about it as driving incremental comfort in achieving the guidance for the year?" In response, Scott stated: "Yes. I would think about [pricing] as additional comfort to give you confidence, the same confidence we have that we're

going to ramp up the growth rates in the back half of the year, and deliver against the 4% to 4.5% . . . yes, you should think about pricing as a -- providing a level of comfort." Dillon added, "[t]he surgical pricing was in our guidance . . . we talked at Analyst Day [about] the disciplined pricing . . . that there were opportunities for surgical pricing. And so we're really just capitalizing on that."

**Answer:** Defendants deny the allegations in Paragraph 186 of the Complaint. To the extent Paragraph 186 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

187.   The statements in paragraphs 183 through 186 were materially false and misleading and omitted material facts when made. In reality, Defendants were not able to "take price" or implement "surgical" price increases. To the contrary, and as Defendants admitted at the end of the Class Period, Defendants were forced to do the exact opposite: dramatically lower prices, to the tune of "250 basis points," in order to stem a mass customer exodus resulting from Vestis' abysmally bad and uncured "service gaps." As Scott admitted only three months later, Defendants were forced to "deliberately moderate[] planned price increases . . . in order to reduce customer churn" because customers were unwilling to accept any price increases—and in fact demanded substantial discounts—as a result of Vestis being unable to

134

render even the most basic services that were expected of a uniforms program. As Defendant Scott admitted: "<u>We believe service gaps have driven price sensitivity as fully satisfied customers typically don't leave because they've received a price increase</u>." Defendant Dillon similarly admitted that "<u>our service efficacy and price sensitivity go hand-in-hand</u>," and due to customers' "reason[s] for quits" pertaining to Vestis' poor services—"and the magnitude of the carryover losses" from the customers who had already departed—the Company was forced to "<u>moderate the pricing</u>" in order to keep more customers from leaving.

**Answer:** Defendants deny the allegations in Paragraph 187 of the Complaint.

188. Additionally, during the February 7, 2024 earnings call, Scott stated that "[y]ear-to-date, we've successfully deployed new [T]elematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling technology and processes across North America, all a part of our strategy to establish the capability to continuously optimize our network and our routes." Scott further emphasized that the Company's use of Telematics would "ensure that we're running routes in compliance with how we'd like to do that."

**Answer:** Defendants deny the allegations in Paragraph 188 of the Complaint. To the extent Paragraph 188 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents,

135

Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

189. The statements in paragraph 188 were materially false and misleading and omitted material facts when made. As Defendant Scott admitted at the end of the Class Period, Defendants had in no way "successfully deployed new Telematics technology across 89% of our fleet" or "fully delploy[ed] new routing and scheduling technology and processes across North America." Scott's admission was striking given that she also admitted that Telematics was "a very normal thing that you would have in a B2B route-based business" and was absolutely critical to providing on-time, accurate uniforms services. In fact, Scott admitted that even at the end of the Class Period, Vestis had only "rolled out Telematics across our fleet now," and that Telematics had only "now been installed in the trucks," such that no benefits from Telematics could even be realized until 2025. As Scott conceded, Defendants were only "expecting" to be able to "begin" using Telematics at some undisclosed point in the future: "we expect very quickly that we'll begin to use those insights and that data from Telematics to shore this up and make sure that we're delivering on time and that we're where we should be, when we should be."

**Answer:** Defendants deny the allegations in Paragraph 189 of the Complaint.

190. Additionally on the February 7, 2024 conference call, one analyst asked: "I was hoping that you could please comment on retention, the trends and the

136

drivers, whether it's service quality, the predictive analytics, the digital tools. And conversely, <u>what reasons for attrition would be outside of the delivery exits</u>, say specifically within Uniform direct sales?" In response, Scott continued to tout the Company's customer retention of "<u>greater than 90%, which is what we filed in the Form 10 and we continue to maintain retention above that</u>," adding that "<u>we have no real surprises as it relates to retention and where we expected to be for the most part</u>."

**Answer:** Defendants deny the allegations in Paragraph 190 of the Complaint. To the extent Paragraph 190 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

191.   The statements in paragraph 190 were materially false and misleading and omitted material facts when made. As Defendants admitted just three months later at the end of the Class Period, by this point, Vestis' severe "service gaps" had caused the Company to lose a "large amount" of customers in 2023, including "<u>two large national accounts</u>" just prior to the Spinoff. Moreover, as internal Vestis reports confirmed, at the same time that Defendants were making positive representations concerning the Company's customer retention, Vestis was in the midst of a mass exodus of customers. Indeed, these reports showed that Vestis lost a massive <u>$147 million</u> in recurring weekly revenue due to customer losses between August 21, 2023

137

and April 19, 2024, <u>with a staggering $55 million in recurring weekly revenue lost in the five weeks prior to the Spinoff</u>. As Defendants made clear at the end of the Class Period, they knew full well about these customer losses—they called them "known customer losses as we exited fiscal 2023"—and that as a result, Vestis experienced a "<u>large amount of rollover losses from FY '23</u>," which it was still absorbing. Thus, Defendants had no basis to boast about a customer retention rate "in excess of 90%," without disclosing this highly material adverse information to investors.

**Answer:** Defendants deny the allegations in Paragraph 191 of the Complaint.

192.    In response to the same analyst question, and specifically the portion relating to the reasons the Company had seen for customer "attrition," Defendant Scott also claimed that the Company had "gone pretty deep and granular" to investigate the issue and had observed some smaller customers leaving due to issues that were completely outside of Vestis' control. Specifically, Scott claimed that those customer losses were due to a purported "uptick in business closures" that had nothing to do with any deficiencies in Vestis' business:

> [G]enerally speaking, when you look at the rest of retention and you look at recent codes to answer your question around why would you see customers leave. <u>We are seeing small to medium enterprise customers with an uptick in business closures, we are monitoring that very closely</u>. And so just important to note as we look at recent codes. And it's also <u>when you try to drill it down a little bit further. You can see a trend</u> **. . .** So when you look at

what is happening around business closures, particularly with small to medium enterprise, <u>we're going pretty deep and granular to understand what are those patterns and trends around why customers leave. We're seeing a slight uptick in customers going out of business in those all those medium and enterprise verticals</u> . . .

**Answer:** Defendants deny the allegations in Paragraph 192 of the Complaint. To the extent Paragraph 192 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call, or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

193. After another analyst asked Defendant Scott to "discuss some of the factors you're seeing that may be causing Uniforms business growth to come a bit below some of what your competitors are seeing where growth is tracking somewhere north of 5%," Scott again claimed that there was "an uptick in business closures" that had nothing to do with shortfalls in Vestis' business. Specifically, Scott stated: "<u>I did mention that we do see an uptick in business closures as it relates to our SMEs. So that also has an effect on the number as it relates to the impact of retention on the Uniforms number, and we're very transparent about that, we're very aware of it, we're managing that very closely.</u>"

**Answer:** Defendants deny the allegations in Paragraph 193 of the Complaint. To the extent Paragraph 193 purports to quote from and/or characterize the transcript

139

of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

194. The statements in paragraphs 192 and 193 were materially false and misleading and omitted material facts when made. As Defendants disclosed at the end of the Class Period, rather than customer losses being due to an "uptick in business closers" that had nothing to do with deficiencies in Vestis' service performance, the exact opposite was true. In reality, the vast majority of the Company's customer losses had nothing to do with "business closures" and were instead attributable to Vestis' inability to provide its products and services to customers accurately and on-time. Indeed, as Defendant Scott was forced to admit just three months later, "we know that more than 70% of the cancellations are due to causes that are within our control."

**Answer:** Defendants deny the allegations in Paragraph 194 of the Complaint.

195. Also on the Company's February 7, 2024 earnings call, Scott belatedly acknowledged that the Company had suffered a "a national account loss" which was "[not] a strategic loss" but rather "a regrettable loss" that "wasn't part of our strategy." As Scott revealed: "[W]e also have a national account loss, but we haven't talked about it a lot because it wasn't a strategic loss. It was an unfortunate loss from

our Clean Room business last year, and it was a loss that continues to flow through in the first 2 quarters of this year, which also affects that Uniforms number."

**Answer:** Defendants deny the allegations in Paragraph 195 of the Complaint. To the extent Paragraph 195 purports to quote from and/or characterize the transcript of Vestis's February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

196.   The statements in paragraph 195 were materially false and misleading and omitted material facts when made. While Scott belatedly admitted that the Company's lack of uniforms business growth was not "purposeful" or "strategic" but instead due in part to the "regrettable" loss of a major national account customer, Scott materially omitted the fact that the Company had lost not one but "two large national accounts" prior to the Spinoff, in addition to additional significant losses from numerous other customer departures during the Class Period. In addition, Defendants knew full well about these customer losses, as they specifically referred to them as "known customer losses as we exited fiscal 2023"—and that Vestis "was still absorbing" those losses. Moreover, Scott also omitted that these customer losses were directly attributable to Vestis' pervasive "service gaps" pertaining to "on-time delivery" and "shortages on loads"—*i.e.*, fundamental failures in the core offerings of the Company's uniforms business.

**Answer:** Defendants deny the allegations in Paragraph 196 of the Complaint.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

197. Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew they were making the above-detailed materially false and misleading statements and omissions of material fact, or, at minimum, acted recklessly in making those statements and omissions. Certain allegations reflecting Defendants' scienter are summarized below.

**Answer:** Paragraph 197 states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 197.

198.   Defendants made a series of striking admissions at the end of the Class Period that directly contradicted their prior public representations. While Defendants repeatedly emphasized that Vestis' "service excellence," the "quality of our services and products," and "our ability to deliver on-time" resulted in the Company's high customer retention rate "in excess of 90%," at the end of the Class Period, Defendants admitted that the exact opposite was true. Indeed, Vestis could not adequately perform even the most basic task required of a uniform services company: namely, "delivering on time, delivering full loads."

**Answer:** Defendants deny the allegations in Paragraph 198 of the Complaint. To the extent Paragraph 198 purports to quote from and/or characterize publicly

142

available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

199. Furthermore, Defendants confirmed that Vestis had lost a substantial number of customers both before the Spinoff and during the Class Period, including "two large national accounts" that accounted for a significant portion of the Company's revenue, because of these severe "service gaps." Indeed, Defendants expressly conceded that they were aware of these customer losses even prior to the start of the Class Period, as they specifically noted that they were "known customer losses as we exited fiscal 2023," and that they resulted in "a large amount of rollover losses from FY '23 that [were] impacting our volume in FY '24." Furthermore, Defendants made clear that these customer losses were due to Vestis' abysmal service, stating that "customers [were] choosing to leave Vestis" specifically because of "service experiences related to our procedures," and those customer losses were "related to how we are delivering the load on time and incomplete loads."

**Answer:** Defendants deny the allegations in Paragraph 199 of the Complaint. To the extent Paragraph 199 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their

143

true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

200.   Similarly, while Defendants regularly boasted to investors that Vestis had "fully deploy[ed]" advanced technological systems such as ABS, and had "successfully deployed across 89% of our fleet" the critically-important fleet management technology called Telematics, at the end of the Class Period, Defendants again admitted that this was not true. Indeed, Defendant Scott specifically admitted that the Company did not "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." And even though Scott conceded that Telematics was a "very normal thing that you would have in a B2B route-based business," and that she had been aware since the time she "c[a]me into this business" that "we did not have Telematics in our fleet," Scott admitted that even at the end of the Class Period, Vestis' Telematics system was still not operational, such that Defendants were only "expecting" to be able to "begin" using Telematics at some undisclosed point in the future: "we expect very quickly that we'll begin to use those insights and that data from Telematics to shore this up and make sure that we're delivering on time and that we're where we should be, when we should be."

**Answer:** Defendants deny the allegations in Paragraph 200 of the Complaint. To the extent Paragraph 200 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

201. Finally, Defendants also expressly admitted that they were well aware of these issues throughout the Class Period. Indeed, Defendant Scott acknowledged that the Company's severe service problems were not a new development and were not "related to the" Spinoff, but were longstanding issues that had been "in our business for quite some time." Likewise, Defendant Dillon confirmed that, throughout the Class Period, Defendants were aware that these issues significantly impacted the Company's ability to retain its customers, stating that they "knew the impact coming in of the lower retention rate." Indeed, Defendants confirmed that the "root cause[]" for "more than 70% of cancellations [was] due to causes that [were] within our control": Vestis' utter failure to provide the basic uniforms services customers were paying for, including "very specific delivery matters related to [on] time delivery, shortages on loads." Defendants' stark admissions flatly contradicting their prior Class Period statements demonstrate their scienter.

**Answer:** Defendants deny the allegations in Paragraph 201 of the Complaint. To the extent Paragraph 201 purports to quote from and/or characterize publicly

145

available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

202. *The detailed accounts from numerous former high-ranking Vestis and Aramark employees from across North America, as well as internal Company reports, confirm that Defendants were aware of the Company's long-standing service and customer retention issues throughout the Class Period.* ¶¶109-155. For example, FE 3 explained that major account Tyson Chicken left due to Vestis' significant and persistent service problems, and the Company "had a lot of knowledge that there were a lot of service issues that were not being corrected at least since 2022"—and further described how Defendant Scott had personally met with Tyson Chicken in an effort to attempt to stop it from leaving the Company. FE 1, a former Vice President of Operations at AUS until 2022 who then served as a consultant for the President of AUS from 2022 until May 2023, similarly stated that before the Spinoff in 2023, he saw internal reports on a global scale that showed AUS was "bleeding customers," such that AUS' customer losses "certainly outweighed the gains."

**Answer:** Defendants deny the allegations in Paragraph 202 of the Complaint. To the extent Plaintiffs purport to cite statements made by anonymous FEs,

146

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202.

203.   In addition to these FE accounts, contemporaneous internal Vestis documents Lead Plaintiffs obtained as part of their investigation confirm that, as result of Vestis' severe service issues, Defendants knew that the "in excess of 90%" retention rate that they repeatedly touted both prior to and after the Spinoff was materially false and misleading. These internal reports showed that Vestis lost a massive $147 million in recurring weekly revenue due to customer losses between August 21, 2023 and April 19, 2024, with a staggering $55 million of that amount lost in the five weeks prior to the Spinoff. Furthermore, the FEs confirmed that these reports were provided to high-level executives, including direct reports of Defendant Scott. The FEs also corroborated that the Individual Defendants were well aware of these issues, as a retention rate below 90% in the uniforms services business—which was heavily reliant on high customer retention, with top competitors consistently boasting a retention rate of over 95%—represented a "DEFCON One" situation for the Company.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203 of the Complaint. To the extent Paragraph 203 states legal conclusions, no response is required. To the extent

a response is required, Defendants deny the allegations in Paragraph 203 of the Complaint.

204.   *The visceral reaction of sophisticated analysts to Defendants' disclosures at the end of the Class Period wholly support Defendants' scienter.* When the full truth was revealed at the end of the Class Period, analysts reacted with astonishment, excoriating Defendants' credibility in an extraordinary rebuke for the management of a publicly-traded company. These sophisticated market participants highlighted the stark contrast from Defendants' prior representations, including as recently as the prior quarter. For example, Jefferies emphasized that Vestis suffered from a "significant mgmt. credibility issue," as it was "troubling" that "mgmt. never fully disclosed the fall off in retention on recurring revenue it started experiencing 2H23 or the true magnitude of customer losses to be expected...in FY24." Baird emphasized that Vestis' management' "credibility is low." Barclays wondered how there could be "this big of a revision" "in the last 90 days or 60 days or whatever," particularly given that Defendants "were at the company for almost 2 years, while under Aramark," had "presumably did all this work" in advance of the Spinoff and had continued to project "confidence the last 2 quarters" to the market. Wolfe Research similarly wondered: "why [didn't] [management] [catch] this before the [Spinoff]?" Defendants' severe loss of credibility with the market as a result of their misrepresentations is further indicative of their scienter.

**Answer:** Defendants deny the allegations in Paragraph 204 of the Complaint. To the extent Paragraph 204 purports to quote from and/or characterize analysts' statements from analyst reports or publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them. To the extent Paragraph 204 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 204 of the Complaint.

205. *The Individual Defendants themselves admitted that they were fully knowledgeable about these facts*. As Defendants Scott and Dillon continuously proclaimed, they were at the Company for over two years prior to the Spinoff, and their entire focus during that time was on implementing new "logistics" initiatives and improving operations in connection with the Spinoff. For example, at Aramark Analyst Day on December 9, 2021—nearly two years before the Spinoff was completed—Scott emphasized that she "had the opportunity to go pretty deep" and had "immersed [herself] in this business over the last 60 days." Scott further emphasized that she was "very, very, focused on logistics," and prioritized Vestis "doing more sophisticated things around routing and scheduling and logistics."

**Answer:** Defendants deny the allegations in Paragraph 205 of the Complaint. To the extent Paragraph 205 purports to quote from and/or characterize materials

from Aramark's Analyst Day on December 9, 2021 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

206. Scott continued to emphasize how deeply she was involved in the Company during the Class Period. For example, when COO Synek departed, Scott strongly reassured investors that there would be no disruption to Vestis' business because Scott's "plan ha[d] been in motion for a very long time, for the 2.5 or 2 plus years that I've been here." Scott further emphasized that she "c[a]me from a route-based business previously so [she was] familiar with the [logistics] tools" and further stated that she personally had "spent time in the field riding along with [employees] and meeting our customers" to ensure the Company's systems were working.

**Answer:** Defendants deny the allegations in Paragraph 206 of the Complaint. To the extent Paragraph 206 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

207. *The Individual Defendants' specific, regular public remarks to investors—including in response to direct analyst inquiries—about customer retention and the associated growth in the Company's business are similarly*

150

*demonstrative of their intimate knowledge about those subjects.* On numerous occasions, Defendant Scott was directly asked by analysts why the uniforms business' growth was more muted despite the Company's growth initiatives, and in each instance Scott either falsely proclaimed that this was due to strategic and "non-regrettable" terminations of customer relationships that were purportedly "very intentional" and "very purposeful" because they "didn't make sense for our portfolio," or to "business closures" that were outside the Company's control.

**Answer:** Defendants deny the allegations in Paragraph 207 of the Complaint. To the extent Paragraph 207 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

208.   However, at the end of the Class Period, Scott starkly admitted that the exact opposite was true: the Company had in fact suffered very regrettable losses of major accounts that caused it to have a significant an insurmountable revenue growth deficit even before it spun off, and these customers had been lost due to issues that were completely within the Company's control, namely its abysmally bad service. Scott's specific, repeated responses to analyst questions in this regard are highly probative of her scienter.

**Answer:** Defendants deny the allegations in Paragraph 208 of the Complaint. To the extent Paragraph 208 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

209.  *The single most important task of a uniform services provider was providing uniform products and services on-time and accurately*. As a B2B route-based uniforms and workplace supplies provider, it was absolutely critical for Vestis to deliver high quality products to customers accurately and on-time. Indeed, delivering products and services on a consistent, timely basis was the core of what the Company provided. As one former Aramark Regional VP explained, "inventory management" was the "biggest" issue for a uniforms provider—if the right number of uniforms were not timely delivered, customers were left with deficient uniforms and were often significantly impacted. Defendant Scott herself emphasized the critical importance of logistics to Vestis' success on multiple occasions, averring that her management team was "very, very focused on logistics" and were "really, really expert at logistics because we're running a route-based business." Given the stated importance of on-time deliveries and logistics—Vestis' core business—Defendants knew or were severely reckless in not knowing about the fundamental service issues that had plagued the Company "for quite some time."

**Answer:** Defendants deny the allegations in Paragraph 209 of the Complaint. To the extent Paragraph 209 purports to quote from and/or characterize publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them. To the extent Plaintiffs purport to cite statements allegedly made by a former Aramark Regional VP, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations.

210.   *The abrupt and suspicious departure of COO Chris Synek supports a strong inference of scienter*. Synek, a former Cintas executive for fifteen years, left Vestis after being with the Company for <u>less than five months</u>. Defendants announced Synek's departure in a February 6, 2024 Form 8-K filed with the SEC, one day prior to disclosing disappointing results for Q1 2024—Vestis' first full quarter as a standalone entity. Investors and analysts were concerned about the unexpected departure, questioning whether it was "related to an underlying issue with the business." While Vestis claimed he left for "personal reasons," Synek quickly pivoted to work for a different logistics company as CEO in August 2024. Significantly, Plaintiffs' FEs confirmed Synek left due to the Company's poor operations and Defendants' refusal to make any improvements. Synek's sudden departure at a critical time for Vestis as a new standalone company is highly probative of Defendants' scienter.

153

**Answer:** Defendants deny the allegations in Paragraph 210 of the Complaint, except admit that Vestis's COO Chris Synek departed the Company on or about February 5, 2024. To the extent Paragraph 210 states legal conclusions, no response is required. To the extent Plaintiffs purport to cite statements allegedly made by anonymous FEs, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 210.

211. *The Individual Defendants had opportunity and motive*. Despite the fact that Defendants unequivocally knew that Vestis could not perform the most basic tasks required of a uniform services company, Defendants deliberately concealed these highly material facts from investors in order to complete the Spinoff and pocket the massive $1.5 billion payment for Aramark, which it badly needed to pay down its corporate debt. The Individual Defendants were each current or former executives of Aramark. Had Defendants revealed the truth about the Company's issues, the Spinoff would not have occurred, and Aramark would not have been able to meet its deleveraging plan and lower its astronomically high debt.

**Answer:** Defendants deny the allegations in Paragraph 211 of the Complaint, except admit that Defendants Scott and Dillon were former AUS executives. To the extent Paragraph 211 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 211.

212.   The foregoing facts, particularly when considered holistically and in the light most favorable to the Plaintiffs (as they must be), support a strong inference of Defendants' scienter.

**Answer:** Paragraph 212 states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 212.

## VII.   LOSS CAUSATION

213.   As further described above, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Vestis shares at an artificially high level, and operated as a fraud or deceit on Class Period purchasers of Vestis common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

**Answer:** Paragraph 213 states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 213.

214.   As detailed below, the truth was revealed through two corrective disclosures, causing Lead Plaintiffs and the Class to suffer significant damages as a result.

**Answer:** Paragraph 214 states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 214.

215.   Lead Plaintiffs and members of the Class purchased Vestis common stock at artificially inflated prices during the Class Period. But for Defendants' fraudulent scheme and material misrepresentations and omissions, Lead Plaintiffs and members of the Class would not have purchased Vestis common stock at artificially inflated prices.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiffs' alleged losses in Paragraph 215. To the extent Paragraph 215 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 215.

216.   As Defendants' fraudulent scheme and material misrepresentations and omissions were gradually revealed to the market through two corrective disclosures, the price of Vestis common stock declined significantly. The corrective impact of the initial partial disclosure alleged herein was tempered, however, by Defendants' continued material misrepresentations and omissions, as detailed above.

**Answer:** Paragraph 216 states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 216.

217.   Lead Plaintiffs and the Class suffered economic losses as the price of Vestis common stock fell in response to the corrective disclosures, as demonstrated below. The disclosures described below, however, do not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun. Lead Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiffs' alleged losses in Paragraph 217 of the Complaint. To the extent Paragraph 217 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 217 of the Complaint.

### A.    February 7, 2024 Corrective Disclosure

218.   On February 7, 2024, prior to the markets opening, Vestis issued a press release disclosing disappointing results for the first quarter of 2024—Vestis' first quarter as a standalone entity—including revenue for the quarter of $717.9 million,

or revenue growth of just 2.5%, a clear shortfall compared to analyst consensus estimates of over $725 million. Later on the accompanying conference call with analysts, CEO Scott revealed that Vestis had suffered a "regrettable loss" of a "national account" prior to the Spinoff that "wasn't part of our strategy." In addition, the Company had also announced that COO Synek resigned effective immediately after just being hired in September 2023. *See also infra,* ¶¶79-92.

**Answer:** Defendants deny the allegations in Paragraph 218 of the Complaint, except admit that Vestis issued a press release on February 7, 2024. To the extent Paragraph 218 purports to quote from and/or characterize the transcript of Vestis's press release or February 7, 2024 earnings call or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

219.   In response to these disclosures, Vestis stock price fell approximately 13% from a closing price of $22.30 per share on February 6, 2024, to a closing price of $19.42 on February 7, 2024.

**Answer:** Defendants deny the allegations in Paragraph 219 of the Complaint, except admit that Vestis's stock price declined between February 6, 2024, and February 7, 2024.

220.   Notwithstanding the price decline following Defendants' February 7, 2024 disclosure, Vestis' stock price remained artificially inflated because Defendants continued to materially mislead the market regarding the true state of Vestis' business, including by concealing the full extent of the Company's revenue shortfall, the loss of national accounts, and the reasons why it happened.

**Answer:** Defendants deny the allegations in Paragraph 220. To the extent Paragraph 220 states legal conclusions, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 220 of the Complaint.

## B.   May 2, 2024 Corrective Disclosure

221.   On May 2, 2024, prior to the markets opening, Vestis issued a press release disclosing disappointing results for the second quarter of 2024 and slashed its 2024 guidance. Specifically, the Company reported revenue of $705 million, a mere 0.9% year-over-year increase. In addition, Vestis announced that instead of achieving revenue growth of 4% to 4.5% for the year, it now expected revenue growth in the range of <u>negative 1%</u> to 0%, and an Adjusted EBITDA margin of 12.0% to 12.4%, versus 14.3% previously. Later on the accompanying earnings conference call, CEO Scott admitted that instead of providing "service excellence," Vestis was plagued by significant "service gaps" that had resulted in the Company suffering from serious customer retention problems. *See also infra,* ¶¶93-108.

**Answer:** Defendants deny the allegations in Paragraph 221 of the Complaint, except admit that Vestis issued a press release on May 2, 2024. To the extent Paragraph 221 purports to quote from and/or characterize Vestis's press release on May 2, 2024 or any other publicly available documents, Defendants refer the Court to the source documents for their true and complete contents and deny that Plaintiffs have accurately summarized or characterized them.

222. In response to Defendants' stark admissions, Vestis' share price plummeted 49% from a closing price of $18.47 per share on May 1, 2024, to a closing price of $9.41 per share on May 3, 2024.

**Answer:** Defendants deny the allegations in Paragraph 222 of the Complaint, except admit that Vestis's share price declined between May 1, 2024, and May 3, 2024.

## VIII.  PRESUMPTION OF RELIANCE

223. At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

    a)    Vestis' common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)    As a regulated issuer, Vestis filed periodic reports with the SEC and the NYSE;

c)    Vestis regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)    Vestis was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

**Answer:** Paragraph 223 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 223.

224.  As a result of the foregoing, the market for Vestis' common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock. All investors who purchased the Company's common

stock during the Class Period suffered similar injury through their purchase of Vestis' common stock at artificially inflated prices, and a presumption of reliance applies.

**Answer:** Paragraph 224 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 224.

225.   A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Vestis' business and operations— information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

**Answer:** Paragraph 225 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 225.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

226.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**Answer:** Paragraph 226 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 226.

227.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or

163

approved by an executive officer and/or director of Vestis who knew that such statement was false when made.

**Answer:** Paragraph 227 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 227.

## X.    CLASS ACTION ALLEGATIONS

228.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased Vestis common stock between October 2, 2023 and May 1, 2024, and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Vestis at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

**Answer:** Paragraph 228 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 228.

229.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vestis' shares were actively traded

164

on the NYSE. As of July 26, 2024, the Company had more than 131 million shares outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

**Answer:** Paragraph 229 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 229.

230. Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**Answer:** Paragraph 230 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 230.

231. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class

and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

**Answer:** Paragraph 231 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 231.

232. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Vestis;

d)    whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Vestis;

166

e)      whether the market price of Vestis shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

**Answer:** Paragraph 232 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 232.

233.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

**Answer:** Paragraph 233 of the Complaint states legal conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 233.

## XI.    CLAIMS FOR RELIEF

### COUNT I

167

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

234.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**Answer:** Defendants repeat and incorporate by reference each of their prior responses to Paragraphs 1 through 233, as though set forth herein in their entirety.

235.   This cause of action is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**Answer:** Paragraph 235 of the Complaint characterizes the nature of the present action and no response is required. To the extent a response is required, Defendants admit that the complaint purports to bring this action pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

236.   Lead Plaintiff asserts Section 10(b) and Rule 10b-5(a), (b) and (c) claims against all Defendants.

**Answer:** Paragraph 236 of the Complaint characterizes the nature of the present action and no response is required. To the extent a response is required, Defendants admit that the complaint purports to assert claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants otherwise deny the allegations in Paragraph 236.

237.   During the Class Period, Defendants carried out a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of Vestis shares. Such scheme was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vestis shares; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Vestis shares at artificially inflated prices. In furtherance of

169

this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

**Answer:** Defendants deny the allegations in Paragraph 237 of the Complaint.

238.   Defendants participated directly or indirectly in the preparation and/or issuance of the Information Statement, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Vestis shares. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Vestis' finances and business prospects.

**Answer:** Defendants deny the allegations in Paragraph 238 of the Complaint.

239.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Vestis' business, operations, and prospects, as specified herein.

**Answer:** Defendants deny the allegations in Paragraph 239 of the Complaint.

240.   Defendants Aramark and Zillmer are liable under Section 10(b) and SEC Rule 10b-5(b) for all conduct and materially false and misleading statements and omissions made prior to and in connection with the Spinoff, as alleged herein. These materially false and misleading statements and omissions are actionable under

170

Section 10(b) because they were incorporated into Vestis' beginning stock price as of October 2, 2023. These misstatements were specifically directed towards investors in Vestis stock, and were in fact intended to, and did, inflate the stock price once the stock began trading. Such statements were made in the days and weeks leading up to the Spinoff, relied on by the market in determining the price of Vestis stock, and were not rendered stale or superseded by any later events or disclosures. Accordingly, investors who purchased Vestis stock during the Class Period relied on these misrepresentations at the time of purchase.

**Answer:** Defendants deny the allegations in Paragraph 240 of the Complaint.

241. Defendants Scott and Dillon as executives of Aramark and then Vestis are liable under Section 10(b) and SEC Rule 10b-5(b) for all conduct and the materially false and misleading statements and omissions made before and after the Spinoff, as alleged herein.

**Answer:** Defendants deny the allegations in Paragraph 241 of the Complaint.

242. Defendants made or were responsible for the materially false and misleading statements and omissions alleged herein, which they knew or severely recklessly disregarded to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

171

**Answer:** Defendants deny the allegations in Paragraph 242 of the Complaint.

243. Defendants had actual knowledge of the materially false and misleading statements and omissions alleged herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Vestis' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

**Answer:** Defendants deny the allegations in Paragraph 243 of the Complaint.

244. Defendants are also liable under SEC Rules 10b-5(a) and 10b-5(c) for engaging in deceptive and manipulative acts in a scheme to defraud investors. As part of their scheme to defraud investors in violation of SEC Rules 10b-5(a) and (c), Defendants (i) disseminated materially misleading statements regarding Vestis' business prior to the Spinoff, including in the Information Statement for the Spinoff, the contents of which Aramark's CEO, Defendant Zillmer, and Vestis' CEO, Defendant Scott, specifically endorsed and (ii) continued to conceal the truth about Vestis even after the Spinoff occurred. Defendants' did so in order to artificially inflate the perceived value of AUS and Vestis to ratings agencies, third party advisors, and lenders, effectuate the Spinoff, and cause nearly $1.5 billion in cash to be paid from Vestis to Aramark as part of the Spinoff.

**Answer:** Defendants deny the allegations in Paragraph 244 of the Complaint.

172

245.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vestis' common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Vestis' common stock had been artificially inflated by Defendants' fraudulent course of conduct.

**Answer:** Defendants deny the allegations in Paragraph 245 of the Complaint.

246.    By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**Answer:** Defendants deny the allegations in Paragraph 246 of the Complaint.

247.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**Answer:** Defendants deny the allegations in Paragraph 247 of the Complaint.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against Aramark and the Individual Defendants**

248.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**Answer:** Defendants repeat and incorporate by reference each of their prior responses to Paragraphs 1 through 247, as though set forth herein in their entirety.

173

249.   This Count is asserted on behalf of all members of the Class against Aramark and the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

**Answer:** Paragraph 249 of the Complaint characterizes the nature of the present action and no response is required. To the extent a response is required, Defendants admit that the Complaint purports to bring a putative class action against Defendants for alleged violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, but otherwise deny the allegations in Paragraph 249.

### A.   Individual Defendants

250.   The Individual Defendants participated in the operation and management of Aramark and Vestis, and conducted and participated, directly and indirectly, in the conduct of Aramark's and Vestis' business affairs. Because of their senior positions, they knew the adverse non-public information about the AUS segment's and Vestis' business, operations, and financial results as specified herein.

**Answer:** Defendants deny the allegations in Paragraph 250 of the Complaint.

251.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aramark and Vestis disseminated in the marketplace concerning the AUS segment's and Vestis' business operations and

174

results. The Individual Defendants exercised their power and authority to cause Aramark and Vestis to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Aramark and Vestis within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Vestis shares.

**Answer:** Defendants deny the allegations in Paragraph 251 of the Complaint.

252.   Each of the Individual Defendants, therefore, acted as a controlling person of Aramark and Vestis. By reason of their control, senior management positions and/or being directors of Aramark and Vestis, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Aramark and Vestis to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Aramark and Vestis and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

**Answer:** Defendants deny the allegations in Paragraph 252 of the Complaint.

253.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aramark and Vestis.

175

**Answer:** Defendants deny the allegations in Paragraph 253 of the Complaint.

**B.    Aramark**

254.   Aramark participated in the operation and management of Vestis prior to the Spinoff, and conducted and participated, directly and indirectly, in the conduct of Vestis' business affairs. Because of its control over Vestis, Aramark knew the adverse non-public information about the AUS segment's and Vestis' business, operations, and financial results as specified herein.

**Answer:** Defendants deny the allegations in Paragraph 254 of the Complaint.

255.   Because of its position of control and authority, Aramark was able to, and did, control the contents of the various reports, press releases and public filings which Vestis disseminated in the marketplace concerning the AUS segment's and Vestis' business operations and results prior to and in connection with the Spinoff. Aramark exercised its power and authority to cause Vestis to engage in the wrongful acts complained of herein. Aramark, therefore, was a "controlling person" of Vestis within the meaning of Section 20(a) of the Exchange Act. In this capacity, Aramark participated in the unlawful conduct alleged which artificially inflated the market price of Vestis shares.

**Answer:** Defendants deny the allegations in Paragraph 255 of the Complaint.

256.   By reason of its control, including overlapping senior management positions, including Defendants Scott and Dillon, and/or being the parent of Vestis,

176

Aramark had the power to direct the actions of, and exercised the same to cause, Vestis to engage in the unlawful acts and conduct complained of herein. Aramark exercised control over the general operations of Vestis prior to and in connection with the Spinoff, and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

**Answer:** Defendants deny the allegations in Paragraph 256 of the Complaint.

257.   By reason of the above conduct, Aramark is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Vestis.

**Answer:** Defendants deny the allegations in Paragraph 257 of the Complaint.

## XII.   PRAYER FOR RELIEF

258.   WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a)   Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)   Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

177

c)     Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)     Awarding such other and further relief as this Court deems appropriate.

**Answer:** Answering Plaintiffs' prayer for relief as alleged in Paragraph 258 of the Complaint, Defendants deny that Plaintiffs are entitled to relief against Defendants.

## XIII.  JURY DEMAND

259.   Lead Plaintiffs demand a trial by jury.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 259 of the Complaint. To the extent a response is required, Defendants deny Plaintiff's demand for a jury trial.

### DEFENDANTS' AFIRMATIVE DEFENSES

Without assuming the burden of proof or persuasion where such burden properly rests with Plaintiffs and the members of the putative class, and without waiving and hereby expressly reserving the right to assert any and all such defenses at such time and to such extent as discovery and factual developments establish a basis therefore, Defendants hereby assert the following defenses to the claims asserted in the Complaint:

178

**FIRST DEFENSE**

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because the Complaint fails to state a claim upon which relief may be granted.

**SECOND DEFENSE**

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Plaintiffs lack statutory and constitutional standing to assert claims under the Securities Exchange Act against any Defendant.

**THIRD DEFENSE**

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Defendants had no duty to disclose to Plaintiffs the information allegedly omitted from the challenged statements.

**FOURTH DEFENSE**

Plaintiffs' and any putative class members' claims are barred, in whole or in part, and the putative class is not entitled to any recovery from Defendants under the Securities Exchange Act, because Defendants did not make any untrue statement of material fact, nor did they omit to state any material fact required to be stated or necessary to make the statements made not misleading.

**FIFTH DEFENSE**

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Plaintiffs cannot plead or prove fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities

179

Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1), and otherwise have failed to properly identify the alleged false or misleading statements of which Plaintiffs complain or to explain why those statements were false.

## SIXTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, by applicable statutes of limitation or repose.

## SEVENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Plaintiffs do not meet the requirements of Rule 23.

## EIGHTH DEFENSE

Plaintiffs' and any putative class members' claims cannot properly be maintained in a class action because Plaintiffs are not proper class representatives and would not fairly and adequately protect the interests of the members of the putative class.

## NINTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because the putative class period for Plaintiffs' claims is overbroad and, therefore, many of the putative class members are not entitled to any recovery.

## TENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Defendants' alleged misstatements are non-actionable statements

containing expressions of opinion, repetition of publicly available information, and/or forward-looking statements, and/or contained sufficient cautionary language and risk disclosures.

## ELEVENTH DEFENSE

To the extent that Plaintiffs' and any putative class members' claims are based on any predictions or forward-looking statements, such claims are not actionable under the statutory safe harbor in the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-5(c)(1)(A), (B), and/or the bespeaks caution doctrine.

## TWELFTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, for lack of actual and/or justifiable reliance on Defendants' alleged misstatements or on any disclosures allegedly rendered materially false or misleading as a result of any alleged omission by Defendants.

## THIRTEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Plaintiffs relied exclusively upon their own reasonable independent investigations, their own decisions, and the advice of their professional advisors.

## FOURTEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Defendants acted at all times in good faith and without knowledge or

intent to commit securities fraud and did not directly or indirectly participate in, or induce, any unlawful acts.

## FIFTEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Defendants did not know, and in the exercise of reasonable care could not have known, that any of the challenged statements contained an untrue statement of material fact or an omission of a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

## SIXTEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because any increase or decrease in the market value of Vestis stock held by Plaintiffs was the result of market or other economic factors separate from the alleged wrongful conduct by Defendants.

## SEVENTEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because the risks of investing in Vestis securities were publicly disclosed to Plaintiffs and the market at all relevant times. Plaintiffs knew or should have known of the risks associated with Vestis's business, and in failing to consider these risks, each putative class member assumed the risk that such person or entity might be damaged by purchasing or acquiring Vestis securities.

182

## EIGHTEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Plaintiffs have failed to mitigate damages and have failed to exercise due diligence in an effort to mitigate their damages (to which, in any event, they are not entitled).

## NINETEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because the damages suffered by Plaintiffs, if any, were caused by independent, intervening, and/or superseding events beyond Defendants' control and unrelated to Defendants' conduct, and/or by the policies, practices, acts, or omissions of independent persons or entities other than Defendants over which Defendants have no control.

## TWENTIETH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

## TWENTY-FIRST DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because Plaintiffs have suffered no cognizable damages.

## TWENTY-SECOND DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because the damages sought are too speculative and remote.

183

## TWENTY-THIRD DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because of Plaintiffs' inequitable conduct and unclean hands.

## TWENTY-FOURTH DEFENSE

The facts which Plaintiffs allege to have been misrepresented or omitted were in fact known to and entered the securities market through credible sources. Plaintiffs and any putative class members are not entitled to any recovery from Defendants because the substance of the allegedly material information that Plaintiffs allege to have been omitted or misrepresented was in fact disclosed in the public disclosures of third parties, in Vestis's own public filings and announcements, and from other sources that were otherwise publicly available and/or widely known to the market and to the investing community.

## TWENTY-FIFTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, to the extent that: (i) the market price of Vestis securities was not inflated as a result of any alleged misrepresentation or omission made by Defendants; (ii) there was no stock price impact from any alleged misrepresentation or omission; (iii) any allegedly false or misleading statements asserted in the Complaint were not immediately assimilated into the market; (iv) no efficient market existed for the trading of Vestis securities; and (v) a "fraud on the market" presumption is not legally or factually proper.

## TWENTY-SIXTH DEFENSE

Defendants are entitled to recover contribution from others for any liability they incur as a result of any of the alleged misrepresentations, omissions, and conduct attributable to such third parties.

## TWENTY-SEVENTH DEFENSE

Defendants are entitled to offset the damages of Plaintiffs and any putative class members, if any, by benefits received by Plaintiffs and any putative class members through their investments in Vestis securities, in accordance with the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule, or regulation.

## TWENTY-EIGHTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, to the extent that the damages sought exceed those permitted under the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule, or regulation.

## TWENTY-NINTH DEFENSE

Plaintiffs and any putative class members are not entitled to recover the costs and expenses of this litigation, including attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements.

## THIRTIETH DEFENSE

185

Plaintiffs' and any putative class members' claims are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

## THIRTY-FIRST DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because of the lack of transaction causation and/or loss causation.

## THIRTY-SECOND DEFENSE

Defendants Scott and Dillon are not liable under Section 20(a) of the Securities Exchange Act of 1934 for Vestis's alleged violation of Section 10(b) because they acted in good faith and did not directly or indirectly induce the acts constituting the alleged violation.

## THIRTY-THIRD DEFENSE

Defendants are not liable for statements they did not make under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).

## THIRTY-FOURTH DEFENSE

Plaintiffs' claims and all claims on behalf of the alleged putative class are barred, in whole or in part, because Plaintiffs will be unable to establish that the purported misstatements and omissions alleged in the Amended Complaint were the cause of Plaintiffs' decisions to purchase shares in Vestis.

## THIRTY-FIFTH DEFENSE

Any damage, loss or liability sustained by Plaintiffs must be reduced or eliminated in proportion to the wrongful or negligent conduct of entities or

186

individuals other than Defendants under the principles of equitable allocation, recoupment, set-off, proportionate responsibility, and comparative fault, including under the proportionate liability provisions of the federal securities laws.

## THIRTY-SIXTH DEFENSE

Plaintiffs' claims and all claims on behalf of the alleged putative class are barred, in whole or in part, because Plaintiffs would have acquired shares in Vestis even if, when acquired, Plaintiffs had known of the allegedly untrue statements of material fact, omissions of material fact, misleading statements, or other wrongful conduct upon which Aramark Defendants' purported liability rests.

## THRITY-SEVENTH DEFENSE

Plaintiffs' claims and all claims on behalf of the alleged putative class are barred, in whole or in part, because some or all of the purported misstatements or omissions alleged in the Amended Complaint reflect or pertain to non-actionable statements of corporate optimism or puffery.

## ADDITIONAL DEFENSES, COUNTERCLAIMS, CROSS-CLAIMS, AND THIRD-PARTY CLAIMS

Defendants reserve the right to raise any additional defenses, counterclaims, cross-claims, and third-party claims not asserted that may become apparent through discovery or other investigation.

WHEREFORE, Defendants respectfully request that this Court dismiss the Complaint and Plaintiffs' claims, enter judgment in favor of Defendants and against

187

Plaintiffs, award Defendants the reasonable attorneys' fees, costs, and expenses they have incurred in the defense of this action, and grant Defendants any additional relief that is fair and appropriate.

Respectfully submitted, this 30th day of October, 2025.

By: */s/ Nathan R. Miles*
Simon R. Malko
Georgia Bar No. 467190
Nathan R. Miles
Georgia Bar No. 829924
MORRIS, MANNING & MARTIN
3343 Peachtree Road, NE
1600 Atlanta Financial Center
Atlanta, GA 30326
Telephone: (404) 504-5492
Facsimile: (404) 365-9532
smalko@mmmlaw.com
nmiles@mmmlaw.com


By: */s/ Michelle Annunziata*
Joseph De Simone (*PHV admitted*)
Michelle Annunziata (*PHV admitted*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
jdesimone@mayerbrown.com
mannunziata@mayerbrown.com
Max Hirsch (*PHV admitted*)
MAYER BROWN LLP
333 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071
Telephone: (213) 229-9500
mhirsch@mayerbrown.com

***Counsel for Defendants Vestis***

*Corporation, Kimberly Scott and Rick Dillon*

# CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served via ECF System this 30th day of October, 2025 on all counsel of record.


DATED this 30th day of October, 2025.

/s/ Nathan R. Miles
Nathan R. Miles

**Error! No document variable supplied.**